# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER,THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP, | Case No.   25-cv-00079 |
| *Plaintiffs*, | |
| *v.* | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION, EXPEDITED HEARING, AND/OR A TEMPORARY RESTRAINING ORDER** |
| NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts, | |
| *Defendants*. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

LEGAL STANDARD .......................................................................................................... 13

ARGUMENT ...................................................................................................................... 14

    I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS ......................... 14

        A.  The "Gender Ideology" Prohibition Violates the APA .................................... 14

             1.  The "Gender Ideology" Prohibition Exceeds the NEA's Statutory Authority. ........................................................................... 16

             2.  The "Gender Ideology" Prohibition Is Arbitrary and Capricious. .......................................................................................... 18

        B.  The "Gender Ideology" Prohibition Violates the First Amendment. .............. 22

             1.  The First Amendment Prohibits Viewpoint-Based Discrimination ......................................................................................... 22

             2.  Viewpoint-Based Discrimination Is Unconstitutional in Grants. ....... 23

        C.  The "Gender Ideology" Prohibition Is Unconstitutionally Vague .................. 28

    II.  ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM. ........................................................................................ 31

    III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION .......................................................................................................... 33

    IV. THIS COURT SHOULD WAIVE THE BOND REQUIREMENT ........................... 33

CONCLUSION .................................................................................................................... 34

CERTIFICATE OF SERVICE ............................................................................................. 36

## TABLE OF AUTHORITIES

**Cases**

*Arkansas Writers' Project, Inc. v. Ragland,*
  481 U.S. 221 (1987) ................................................................................................ 25

*Bella Lewitzky Dance Foundation v. Frohnmayer,*
  754 F. Supp. 774 (C.D. Cal. 1991) ....................................................... 21, 24, 29

*Bennett v. Spear,*
  520 U.S. 154 (1997) ......................................................................................... 14, 16

*Brooklyn Institute of Arts & Sciences v. City of New York,*
  64 F. Supp. 2d 184 (E.D.N.Y. 1999) .............................................................. 26, 27

*Bullfrog Films, Inc. v. Wick,*
  847 F.2d 502 (9th Cir. 1988) ............................................................................... 23

*Burlington Truck Lines v. United States,*
  371 U.S. 156 (1962) ............................................................................................... 19

*Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez,*
  561 U.S. 661 (2010) ............................................................................................... 25

*City of Chicago v. Morales,*
  527 U.S. 41 (1999) ................................................................................................. 28

*City of Los Angeles v. Barr,*
  2020 WL 11272648 (C.D. Cal. June 17, 2020) ................................................. 17

*Crowley v. Local No. 82, Furniture & Piano Moving,*
  679 F.2d 978 (1st Cir. 1982) ......................................................................... 33, 34

*Cuban Museum of Arts and Culture v. City of Miami,*
  766 F. Supp. 1121 (S.D. Fla. 1991) ................................................................... 27

*Dickson v. Secretary of Defense,*
  68 F.3d 1396 (D.C. Cir. 1995) ............................................................................. 19

*Dillmon v. National Transportation Safety Board,*
  588 F.3d 1085 (D.C. Cir. 2009) .......................................................................... 19

*Esperanza Peace and Justice Center v. City of San Antonio,*
  316 F. Supp. 2d 433 (W.D. Tex. 2001) ............................................................. 27

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ............................................................................................... 19

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ........................................................................................ 28

*Good News Club v. Milford Central School*,
    533 U.S. 98 (2001) .......................................................................................... 26

*Hannegan v. Esquire, Inc.*,
    327 U.S. 146 (1946) ........................................................................................ 22

*Hunt v. City of Los Angeles*,
    638 F.3d 703 (9th Cir. 2011) .......................................................................... 30

*Iancu v. Brunetti*,
    588 U.S. 388 (2019) ........................................................................................ 26

*Leathers v. Medlock*,
    499 U.S. 439 (1991) ........................................................................................ 25

*Legal Services Corp. v. Velazquez*,
    531 U.S. 533 (2001) ............................................................................. 22, 23, 26

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024) ........................................................................................ 16

*Louisiana v. Biden*,
    543 F. Supp. 3d 388 (W.D. La. 2021) ............................................................. 19

*Matal v. Tam*,
    582 U.S. 218 (2017) ................................................................................... 23, 26

*McGuire v. Reilly*,
    386 F.3d 45 (1st Cir. 2004) ............................................................................. 23

*Miller v. California*,
    413 U.S. 15 (1973) .......................................................................................... 18

*Minnesota State Board for Community Colleges v. Knight*,
    465 U.S. 271 (1984) ........................................................................................ 26

*Motor Vehicles Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Company*,
    463 U.S. 29 (1983) ............................................................................... 19, 20, 21

*National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ........................................ passim

*National Association of Diversity Officers in Higher Education v. Trump*,
    No. 1:25-CV-00333-ABA, 2025 WL 573764, (D. Md. Feb. 21, 2025) ............................. 8, 29

*New York v. Trump*,
No. 25-CV-39-JJM-PAS, 2025 WL 357368 (D.R.I. Jan. 31, 2025)......................................... 14

*Nken v. Holder*,
556 U.S. 418 (2009)............................................................................................................. 14

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983)....................................................................................................... 25, 28

*Reno v. ACLU*,
521 U.S. 844 (1997)............................................................................................................. 28

*Ridley v. Massachusetts Bay Transportation Authority*,
390 F.3d 65 (1st Cir. 2004)........................................................................................ 22, 23, 26

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)............................................................................................................... 32

*Rosenberger v. Rector and Visitors of the University of Virginia*,
515 U.S. 819 (1995)....................................................................................................... 22, 26, 30

*Santa Cruz Lesbian & Gay Community Center v. Trump*,
508 F. Supp. 3d 521 (N.D. Cal. 2020) ........................................................................... 21, 30

*Seafreeze Shoreside, Inc. v. U.S. Department of Interior*,
2023 WL 3660689 (D. Mass. May 25, 2023) ................................................................... 13

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*,
502 U. S. 105 (1991)............................................................................................................ 25

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
699 F.3d 1 (1st Cir. 2012).......................................................................................... 14, 31, 33

*Speiser v. Randall*,
357 U.S. 513 (1958)............................................................................................................. 29

*Texas v. Johnson*,
491 U.S. 397 (1989)............................................................................................................. 27

*Texas v. United States*,
524 F. Supp. 3d 598 (S.D. Tex. 2021) ............................................................................... 19

*Trafalgar Capital Associates, Inc. v. Cuomo*,
159 F.3d 21 (1st Cir. 1998)................................................................................................ 15

*United States v. Miselis*,
972 F.3d 518 (4th Cir. 2020) ............................................................................................ 30

*United States v. Rundo,*
   990 F.3d 709 (9th Cir. 2021) ................................................................. 30

**Statutes**

18 U.S.C. § 1001 ..................................................................................... 16

20 U.S.C. § 951 .......................................................................... 2, 18, 21

20 U.S.C. § 953 .......................................................................... 2, 3, 21

20 U.S.C. § 954 .......................................................................... passim

20 U.S.C. § 955 .......................................................................... 3, 4

20 U.S.C. § 959 .......................................................................... 4

31 U.S.C. § 3730 ..................................................................................... 16

5 U.S.C. § 704 ..................................................................................... 14

5 U.S.C. § 705 ..................................................................................... 13

5 U.S.C. § 706 .......................................................................... 16, 18, 22

**Other Authorities**

135 Congressional Record 16284 (1989) ....................................................... 3

78 Stat. 905 ..................................................................................... 3

79 Stat. 846 ..................................................................................... 2

79 Stat. 849 ..................................................................................... 3

Executive Order 14168, 90 Federal Register 8615 (Jan. 30, 2025) ..................... passim

House of Representatives Report No. 618 (1965) ....................................... 2, 3

Senate Report No. 300, 89th Congress, 1st Session (1965) ............................ 3, 4

## INTRODUCTION

Congress created the National Endowment for the Arts ("NEA") to fund excellent art by individuals and organizations, without regard to viewpoint. The statutory criteria for grants are artistic merit and artistic excellence: Congress did not authorize the agency to exclude applicants from consideration because it disagrees with the viewpoint they seek to express. Yet, in response to Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," the NEA now requires applicants to certify that they will not use federal funds to "promote" what the government deems to be "gender ideology." Applicants whose projects appear to "promote" such messages and ideas are ineligible for NEA grants, no matter their artistic merit, solely because the government disapproves of the viewpoint they express.

Plaintiffs Rhode Island Latino Arts, National Queer Theater, and The Theater Offensive have each received NEA funding in the past and seek NEA funding in the current funding cycle and beyond, but they object to the ban on "promoting" what the government deems to be "gender ideology," are uncertain about what it means, and reasonably fear that it would bar the specific projects they would like to pitch to the NEA in applications due on March 24, 2025. The same is true for many of the more than 600 theater members of Plaintiff Theatre Communications Group, including many who reasonably fear submitting an application at all in light of the ideological certification requirement and funding prohibition (together, "gender ideology prohibition").

Plaintiffs seek a preliminary injunction to stay and enjoin this prohibition, which was never authorized by Congress and is invalid because it: (1) violates the Administrative Procedure Act ("APA") by exceeding the NEA's statutory authority, being arbitrary and capricious, and violating constitutional rights; (2) violates the First Amendment by imposing a viewpoint-based prohibition on funding; and (3) is void for vagueness under the Fifth Amendment.

1

Plaintiffs seek expedited consideration in order to permit a ruling before March 24, 2025, the due date for NEA applications, so that they can submit applications without being subject to the "gender ideology" prohibition.

## STATEMENT OF FACTS

### A.    National Endowment for the Arts

Congress established the NEA in 1965 as part of "a broadly conceived national policy of support for . . . the arts in the United States." 20 U.S.C. § 953(b). Congress pledged federal funding "to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." *Id*. § 951(7).

The NEA's enabling statute, the National Foundation on the Arts and the Humanities Act of 1965 (the "Act"), "authorize[s]" the NEA's Chair to offer grants to groups "of exceptional talent engaged in or concerned with the arts." *Id*. § 954(c). The Act broadly defines funding priorities, including, *inter alia*, projects and productions "which have substantial national or international artistic and cultural significance"; "that reach, or reflect the culture of, a minority, inner city, rural, or tribal community"; and "that will encourage public knowledge, education, understanding, and appreciation of the arts." *See id*. §§ 954(c)(1), (4), (5).

In response to concerns that government support for the arts might lead to "attempts at political control of culture," Congress took several steps to insulate the agency from political pressures, and to insulate private grantees' speech from government content control. H.R. Rep. No. 89-618, at 21 (1965), *reprinted in* 1965 U.S.C.C.A.N. 3186, 3205 ("H.R. Rep. No. 618"). First, Congress required that funding criteria be based on artistic merit. *See* 79 Stat. 846–47, § 5(c)(1). As reflected in the current language of the Act, "artistic excellence and artistic merit are the criteria

by which applications are judged." 20 U.S.C. § 954(d)(1).[1] Second, in what the House Report described as an "assurance against federal interference in the arts," H.R. Rep. No. 618, 1965 U.S.C.C.A.N. at 3200, Congress forbade the NEA from "exercis[ing] any direction, supervision, or control over the policy determination, personnel, or curriculum, or the administration or operation of any . . . institution, organization, or association," 20 U.S.C. § 953(c). Third, Congress made the NEA an agency of arts professionals guided by artistic merit rather than of politicians who might be driven by political concerns. It required that the NEA's decisionmakers—the Chair and the National Council on the Arts—be experts in the arts. *See* 78 Stat. 905, § 5(a) (requiring National Council on the Arts members to be selected "for their broad knowledge of or experience in, or for their profound interest in the arts," to include those "professionally engaged in the arts," and to be from "the major art fields"); 79 Stat. at 849, § 6(a) (transferring the National Council on the Arts to the NEA); 20 U.S.C. § 955(b) (continuing to impose similar requirements on NEA Chair and Council); *see also* 135 Cong. Rec. 16284 (1989) (statement of Senator Pell) ("When we structured the Endowment, we were careful to put the artistic decisionmaking in the hands of outside experts and away from the influence of government . . . ."). Fourth, the Senate Report devoted an entire section to "Freedom of Expression," stating that those administering the Act should give "the fullest attention to freedom of artistic and humanistic expression." S. Rep. No. 300, 89th Cong., 1st Sess. at 3–4 (1965). The Act was designed to encourage "free inquiry and

---

[1] As described in more detail below, *see infra* Argument I.B.1, in 1990, Congress added a requirement that the process for choosing grant recipients "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public" and barred the NEA from funding obscenity. 20 U.S.C. § 954(d). Artists challenged the "decency and respect" clause as imposing a viewpoint-based restriction on grants but the Supreme Court held that the language was purely hortatory and did not require any particular weight to be given to "decency and respect," much less impose a viewpoint-based prohibition on funding. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580–81 (1998).

expression," not "conformity for its own sake"; in particular, it was not meant to give "undue preference . . . to any particular style or school of thought or expression." *Id.*

Since its founding, the NEA has awarded more than $5.5 billion in funding. The NEA typically announces awards semiannually. On January 14, 2025, the NEA announced its latest tranche of funding, consisting of "1,474 awards totaling $36,790,500 to support the arts in communities" around the country. Ex. 3 to Eidelman Decl.

### B.    The NEA's Grantmaking Process

The Act sets forth the process by which grantees are chosen: the Chair must "utilize advisory panels to review applications," 20 U.S.C. § 959(c), which must be "composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view," *id.* § 959(c)(1). They must also include "lay individuals who are knowledgeable about the arts." *Id.* § 959(c)(2). The panels "make recommendations to the National Council on the Arts," *id.* § 959(c), which then counsels the Chair on whether to approve or deny funding, *id.* § 955(f). The Chair has "final authority," though any grant amount must be limited to the "amount . . . recommended by the Council" and the Chair may not approve an application that the Council recommended denying. *Id.* § 955(f)(2).

### C.    Grants for Arts Projects

The NEA's Grants for Arts Projects ("GAP") is the agency's principal grant category. It offers funding for "arts projects with specific, definable activities" across disciplines, from arts education to dance to theater. Ex. 1 to Eidelman Decl. at 6. "Projects may be small, medium, or large" and funding can cover "any or all phases." *Id.* Applicants may request between $10,000 to

4

$100,000. *Id.* at 20. The NEA anticipates awarding $62,245,000 for fiscal year 2026. *Id.* It anticipates that it will receive 4,500 applications and make 2,075 awards. *Id.* at 4.

The GAP application process has two parts. *Id.* at 22. In Part 1, applicants must complete the Application for Federal Domestic Assistance/Short Organization Form, "a brief form that collects basic information" about the applicant organization, and submit it on Grants.gov. *Id.* at 21. In Part 2, an applicant must complete the Grant Application Form, which constitutes "the majority of [the] application material, including information about [the] organization's history and budget, and project details including a project description, timeline, budget information, and work samples," and submit it on the NEA's applicant portal. *Id.*

Applications are reviewed for "artistic excellence and artistic merit." 20 U.S.C. § 954(d)(1); *see also* Ex. 1 to Eidelman Decl. at 25. Excellence refers to the quality of the artists, work, and organizations involved. Ex. 1 to Eidelman Decl. at 25. Merit includes the "value and appropriateness of the project" to the organization's mission, field, and community; the feasibility of the project; how clearly defined the goals, outcomes, and plan are; evidence of direct compensation to artists; and, where applicable, "[e]ngagement with individuals whose opportunities to experience and participate in the arts are limited by geography, ethnicity, economic status, or disability." *Id.* The only content-based bar is on obscenity. *Id.* at 9.

**D.    Executive Order 14168: "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"**

On January 20, 2025, President Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO" or "EO"). *See* 90 Fed. Reg. 8615 (Jan. 30, 2025). The Gender Ideology EO explains its purpose is to resist "ideologues who deny the biological reality of sex." *Id.* § 1. "Gender ideology," the EO states, "replac[es] the immutable biological reality of

sex with an internal, fluid, and subjective sense of self unmoored from biological facts," and it is, in the White House's view, an "attack against the ordinary and longstanding use and understanding of biological and scientific terms." *Id.* The EO asserts that "[t]his is wrong" and that "[t]he erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system." *Id.* The EO declares that it is therefore "the policy of the United States to recognize two sexes, male and female." *Id*. § 2. It directs that "[f]ederal funds shall not be used to promote" what the government deems to be "gender ideology" and that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id*. § 3(g).

The Gender Ideology EO defines "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." *Id*. § 2(f). The EO condemns "gender ideology" as "internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.*

### E.    NEA's Assurance of Compliance and Funding Prohibition

Applicants must agree to the following in both Part 1 and Part 2 of their application:

> By signing this application, I certify (1) to the statements contained in the list of certifications* and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances* and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001).

> * The list of certifications and assurances, or an internet site where you may obtain this list, is contained in the announcement or agency specific instructions.

Ex. A to Odsess-Rubin Decl. In seeking to register to apply for an NEA grant, there is no option not to agree or to modify the text of the certification. Applications must be submitted online, and the website only accepts a submission if the applicant checks a box that reads, "I agree." *See, e.g.,* Odsess-Rubin Decl. ¶ 12.

On February 6, 2025, the NEA announced that it was revising the GAP guidelines for the current submission cycle. Ex. 4 to Eidelman Decl. Following the revisions, the Assurance of Compliance applicants must agree to now includes the following language:

> By signing and submitting its application form on Grants.gov, the applicant certifies that it is in compliance with the [antidiscrimination] statutes outlined below and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance.

Ex. 2 to Eidelman Decl. at 1. In particular, "the applicant agrees that, if the applicant is selected and becomes a NEA grant recipient . . . federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168[.]" *Id.* Accordingly any application that appears to "promote" what the government deems to be "gender ideology" will not receive funding, and any funded project cannot "promote" such ideas or messages.

The Assurance of Compliance warns applicants that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply . . . , it may suspend or terminate the award, and/or recover the funds." *Id.* It also states that "[t]he applicant's assurance of compliance is subject to judicial enforcement," and requires that applicants "maintain records of [their] compliance and submission for three (3) years . . . and permit access to records as required by applicable regulations, guidelines or other directives." *Id.* It concludes "[t]he United States has the right to seek judicial or administrative enforcement of this assurance." *Id.*

Prior to the revisions, the deadline for the current GAP submission cycle had been February 13, 2025. When announcing the forthcoming revisions, the NEA shifted the deadline to March 2025, and directed organizations "that have already submitted an application . . . to submit a new application[.]" Ex. 4 to Eidelman Decl. Part 1 of the application for the March 2025 cycle must now be submitted by March 11 and Part 2 is due on March 24. Ex. 1 to Eidelman Decl. at 23. The NEA will consider extensions due to "registration or renewal issues," or technical malfunctions that are the result of failures on the government's submission or registration sites. *Id.* The NEA Chair may also "adjust application deadlines for affected applicants" "[i]n the event of a major emergency," such as a "systems technological failure" in the submission or registration systems. *Id.*

Prior to February 21, 2025, the NEA had also required that grant applicants certify that they "will not operate any programs promoting 'diversity, equity, and inclusion' (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173." On February 21, 2025, a district court enjoined DEI certification requirements stemming from that Executive Order. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *19 (D. Md. Feb. 21, 2025). The NEA subsequently updated its Assurance of Compliance to state that it "is not currently requiring any grantee or contractor to make any 'certification' or other representation pursuant to Executive Order No. 14173." Ex. 2 to Eidelman Decl. It assures applicants that "[t]his term will not apply to your award as long as this preliminary injunction remains in effect." *Id.*

## F.    The Plaintiffs

Rhode Island Latino Arts ("RILA") is a Latino arts nonprofit organization in Rhode Island. Martínez Decl. ¶ 2. Founded in 1988, its mission is to promote, encourage, and preserve the art,

history, heritage, and cultures of Latinos in Rhode Island. *Id.* RILA offers programming of every genre of art, including visual art, dance, and music. *Id.* ¶ 3. It puts on theatrical and musical performances, Latin percussion sessions, dancing events, script readings, and storytelling events. *Id.* RILA also conducts literacy programs and has a gallery. *Id.* The NEA awarded grants to RILA in 2019, 2020, and 2022. *Id.* ¶¶ 5–7.

National Queer Theater ("NQT") is a theater collective dedicated to celebrating LGBTQ+ artists and providing a home for otherwise unheard storytellers. Odsess-Rubin Decl. ¶ 2. NQT strives to support the most marginalized people in the queer community, including transgender people, immigrants, and people of color. *Id.*[2] Since 2019, NQT has hosted the annual Criminal Queerness Festival ("CQF"), which features works by emerging artists from countries that criminalize homosexuality, such as Syria, Venezuela, Uganda, China, and Poland. *Id.* ¶ 5. The plays are accompanied by talkback discussions facilitated by the playwrights, human rights advocates, and other subject matter experts. *Id.* The NEA awarded NQT grants for the festival in 2023 and 2024. *Id.* ¶ 3. In addition, NQT was offered an NEA grant in 2025 for CQF, and that award is pending processing. *Id.* In January 2025, the festival received a prestigious Obie Award that honors theater grant recipients. *Id.* ¶ 4. Supporting transgender writers and transgender themes has always been a part of the festival, including when it received NEA funding. *Id.* ¶ 7.

The Theater Offensive ("TTO") is a theatrical organization whose mission is to present liberating art by, for, and about queer and trans people of color, that transcends artistic boundaries, celebrates cultural abundance, and dismantles oppression. Byrd Decl. ¶ 2. TTO is open to all

---

[2] Most people are "cisgender," meaning that they have a gender identity that aligns with their sex assigned at birth. Transgender people have a gender identity different from their sex assigned at birth. "Nonbinary" people have a gender identity that is neither exclusively male nor exclusively female. The term "intersex" describes a wide range of natural bodily variations, and intersex people are born with sex characteristics that do not fit binary notions of bodies designated "male" or "female."

without regard to race, sex, or other identifying characteristics, and it seeks in particular to support the voices of transgender, nonbinary, and queer people, including people of color. *Id.* The NEA awarded grants to TTO in 2016, 2017, 2021, 2022, and 2024. *Id.* ¶¶ 4–9.

The Theatre Communications Group ("TCG") is a national theater organization with over 600 member theaters and affiliates and over 3,500 individual members. Cachapero Decl. ¶ 2. Its mission is to support a just and thriving theater ecology, meaning one that has the investments, commitments, and participants it needs to create, produce, and present diverse stories; encourage, engage, and financially sustain theater makers and practitioners; abundantly serve multifaceted communities; advance values and practices of equity and justice; and sustain theater as a viable industry. *Id.* ¶ 3. At the core of TCG's work is ensuring equitable participation in all areas of practice and that all populations in its community have access to TCG's services, including those of LGBTQ+ and transgender/gender-nonconforming identities. *Id.* Many of TCG's members, who include TTO, have received NEA funding in the past, and TCG itself has received 42 NEA grants since 1998. *Id.* ¶¶ 4–5. TCG sues on its own behalf and on behalf of its members, many of whom are deterred from applying for NEA grants because of the new provision prohibiting "promot[ion]" of what the government deems to be "gender ideology." *Id.* ¶¶ 9. It has also had to divert resources in response to the new prohibition, which has caused much confusion and concern in the theatre community. *Id.* ¶¶ 12–13.

## G.    The Harm of the NEA's Changes to Plaintiffs

The "gender ideology" prohibition bars RILA from being eligible to apply for funding to support two priority projects: (1) a production of "Faust," in which the lead character is gay and queer, and an actor RILA was considering for the role is nonbinary and uses they/them pronouns, Martínez Decl. ¶ 12; and (2) a storytelling program that has included stories about coming out as

queer, and is intended to be open to all stories and themes, including those that might contravene the "gender ideology" prohibition, *id.* ¶ 13. Because of the prohibition, RILA shifted gears and, absent judicial relief, will instead apply for an NEA grant to support performance tours and an oral history performance highlighting the contributions of Latinos to American history and Rhode Island history. *Id.* ¶ 15. If not for the "gender ideology" prohibition, RILA would seek support for a project that would explicitly include supporting and celebrating the transgender, nonbinary, and queer members of RILA's community, both as artists and thematically. *Id.*

RILA is also unsure of the precise contours of the "gender ideology" prohibition, including whether it can cast transgender and/or nonbinary actors in the performance tours, whether the performance can feature transgender and nonbinary characters, and what it means for the unrestricted freedom RILA typically gives its actors to create, interpret, and perform characters as they choose, including dressing as a man one night and a woman the next for the same role. *Id.* ¶¶ 12, 16–17. Because the new NEA guidelines do not make it clear what is prohibited, RILA must steer clear of any potential violations. For example, RILA would like to explicitly state that it will support transgender, nonbinary, and queer artists and themes, but RILA fears compliance penalties and being ineligible for funding if it does so. *Id.* ¶ 16. It seeks judicial relief that would permit it to submit an application that supports these artists and themes without surrendering an opportunity for NEA support. *Id.* ¶ 18.

NQT and TTO have similar concerns about whether "promoting" what the government deems to be "gender ideology" includes working with actors, playwrights, and other artists who identify as transgender, nonbinary, or intersex, and whether it prohibits the mere presence of a trans, nonbinary, or intersex character. Odsess-Rubin Decl. ¶ 14; Byrd Decl. ¶ 18. They fear that

11

their very missions as organizations dedicated to queer and transgender people might run afoul of the "gender ideology" prohibition, making them ineligible for funding for any project. *Id.*

In the absence of this funding restriction, NQT would again seek NEA funding to support the Criminal Queerness Festival, specifically the production scheduled to take place in the summer of 2026. Odsess-Rubin Decl. ¶¶ 8–9. The festival celebrates freedom of expression and opposes censorship in other countries, and it is expressly intended to support artists who explore LGBTQ+ stories, including work that affirms the equal dignity and genuine experience of transgender artists, that explores and celebrates stories of and about transgender people, and that rejects the notion that people's identities are determined by their biological anatomy at birth. *Id.* ¶¶ 6, 16. NQT fears that, absent injunctive relief against the "gender ideology" prohibition, the viewpoints expressed by the festival will render it ineligible for NEA funding. *Id.* ¶ 18.

Were it not for the "gender ideology" prohibition, TTO would apply for an NEA grant in the upcoming March 2025 cycle to support a new play titled "Smoke," written by a transgender playwright. Byrd Decl. ¶ 10. The play is set to feature two transgender actors in leading roles; it explores love, found family, motherhood, and healing, and reveals the complexities of trans life at a time when transgender people were at a turning point in the fight for their human rights. *Id.* The NEA funds would be used to support the artists in the play. *Id.* Rehearsals for the play begin in May 2026. *Id.* TTO seeks injunctive relief to ensure that the viewpoints expressed in "Smoke" do not bar it from competing for NEA funding. *Id.* ¶ 20.

TCG sues on its own behalf and on behalf of its members, who include theaters and theater makers, among them TTO, who object to the "gender ideology" prohibition and would like to seek funding in the March 2025 cycle and in future funding cycles for projects that involve transgender characters, cast transgender or nonbinary actors, and otherwise celebrate and affirm transgender

and nonbinary people. Cachapero Decl. ¶¶ 6, 9, 11. Some TCG members intend to check the box in the NEA application agreeing to the certification while simultaneously making clear that they do not agree to abide by the "gender ideology" prohibition. *Id.* ¶ 11. Other TCG members fear submitting an application at all in the March 2025 cycle because they believe it requires agreeing to the Assurance of Compliance, and they fear penalties that might flow to them if they are deemed to have falsely certified. *Id.* ¶ 9. If the "gender ideology" prohibition were lifted, these members would apply for NEA funding in the March 2025 cycle, but they are currently not able to apply. *Id.* TCG also relies on NEA funding in its own right and plans to apply for an NEA grant during the July 2025 cycle to support its fieldwide convenings, national conference, and research, but only if there is no longer a "gender ideology" prohibition, because their convenings and conferences are committed to affirming the equal dignity of all artists, including transgender, queer, and nonbinary artists. *Id.* ¶ 19.

Each plaintiff relies on NEA funding, and intends to seek funding in future years as well, and seeks relief that will protect its right to receive funding based on artistic merit and excellence, while preserving its freedom to express viewpoints that the government has defined (and condemned) as "promoting" what it deems to be "gender ideology." *Id.* ¶ 17; Martínez Decl. ¶ 22; Odsess-Rubin Decl. ¶ 19; Byrd Decl. ¶ 20.

## LEGAL STANDARD

The APA authorizes courts to "postpone the effective date of an agency action or to preserve status or rights pending conclusion" of APA proceedings, "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. There is "substantial overlap" between the factors considered in analyzing a stay under the APA and a preliminary injunction. *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 2023 WL 3660689, at *3 (D. Mass. May 25, 2023) (citation omitted). The plaintiffs must show that weighing the following factors favors preliminary relief: "(1) the

plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence

of an injunction; (3) whether issuing the injunction will burden the defendants less than denying

an injunction would burden the plaintiffs and (4) the effect, if any, on the public interest." *Sindicato*

*Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (cleaned up). "The

legal standard for a Temporary Restraining Order ('TRO') mirrors that of a preliminary

injunction." *New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 357368, at *1 (D.R.I. Jan.

31, 2025). "In the First Amendment context, the likelihood of success on the merits is the linchpin

of the preliminary injunction analysis." *Fortuño*, 699 F.3d at 10. And when the government is the

party opposing the injunction, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435–36

(2009).

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS.

### A.    The "Gender Ideology" Prohibition Violates the APA.

Congress directed that NEA funding decisions shall be based on "artistic merit and artistic

excellence." 20 U.S.C. § 954(d). Nothing in the statute authorizes the NEA to impose a viewpoint-

suppressing screen on funding decisions, yet the NEA has imposed just that. Even if the statute

authorized the NEA to impose a "gender ideology" prohibition, the agency can offer no reasoned

explanation for this decision. Accordingly, Plaintiffs are likely to succeed in establishing that the

prohibition violates the APA.

The "gender ideology" prohibition constitutes final agency action. The APA authorizes

courts to review "final agency action," 5 U.S.C. § 704—i.e., action that "mark[s] the

consummation of the agency's decisionmaking process" and determines "rights or obligations . . .

from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned

up). "The core question [for finality] is whether the agency has completed its decisionmaking

process, and whether the result of that process is one that will directly affect the parties." *Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) (cleaned up).

Defendant's "gender ideology" prohibition marks the consummation of the NEA's decisionmaking process with respect to implementing the Gender Ideology EO. *See* EO § 3(g). The prohibition explicitly cites the EO, stating that "[t]he applicant understands that federal funds shall not be used to promote gender ideology, pursuant to [the] Executive Order. . . ." Ex. 3 to Eidelman Decl. at 12. And it marks the consummation of the NEA's decisionmaking process with respect to its grant guidelines for fiscal year 2026. *See* Ex. 4 to Eidelman Decl. It is a "definitive statement of the agency's position" that an applicant must accept and comply with the prohibition in order to apply for and/or accept an NEA grant. *Trafalgar*, 159 F.3d at 35 (cleaned up).

The prohibition also has "direct and immediate consequences" for Plaintiffs and their members. *Id.* Each applicant must certify that they will abide by the prohibition, and any application that seeks to "promote" what the government deems to be "gender ideology" will be rendered ineligible for funding. The provision has compelled RILA to change the scope of the project for which it will apply and forced it to alter the language it uses to describe itself as an organization. Martínez Decl. ¶¶ 15–16. For TTO and NQT, the prohibition requires them to sign an illegal certification while simultaneously objecting to it, and, unless lifted by this Court, will render them ineligible for funding without regard to the artistic merit of their proposals. Byrd Decl. ¶ 17; Odsess-Rubin Decl. ¶ 17. Many of TCG's members reasonably feel unable to even submit Part 1 of the application as long as the "gender ideology" prohibition stands. Cachapero Decl. ¶¶ 9, 11.

The Assurance of Compliance "warns" every applicant that if it accepts a grant without conforming to the gender ideology condition, "it does so at the risk of incurring . . . penalties,"

specifically suspension, termination, or recovery of the grant funds. Moreover, a false certification could expose an applicant to criminal penalties, *see* 18 U.S.C. § 1001(a) (allowing for criminal penalties up to five years), and potentially even *qui tam* actions brought by private citizens, *see* 31 U.S.C. § 3730(b) (allowing for *qui tam* action under the False Claims Act). The condition therefore imposes "direct and appreciable legal consequences" on Plaintiffs. *Bennett*, 520 U.S. at 178.

This final agency action exceeds the NEA's statutory authority, is arbitrary and capricious, and is contrary to constitutional right.

### 1.    The "Gender Ideology" Prohibition Exceeds the NEA's Statutory Authority.

The "gender ideology" prohibition has no basis in the Act, and indeed directly contravenes the statute's core purpose, which is to fund meritorious art without regard to its viewpoint. Just as the Act would not authorize the executive branch to prohibit art that "promotes liberal ideology" or "is critical of the administration's policies," so it does not authorize a ban on art that "promotes" what the government deems to be "gender ideology."

The APA directs courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), courts afford no deference to the agency, but instead independently interpret the relevant statute to assess whether agency action is contrary to law.

Here, the Act provides that "the Chairperson shall ensure that

(1)    artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public; and

(2)    applications are consistent with the purposes of this section. Such regulations and procedures shall clearly indicate that obscenity is without

16

artistic merit, is not protected speech, and shall not be funded. . . .

20 U.S.C. § 954(d).

Thus, "artistic excellence and artistic merit are *the* criteria by which applications are judged." *Id*. (emphasis added). "It is clear . . . that the text of § 954(d)(1) imposes no categorical requirement" on eligibility for NEA funding. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 581 (1988); *see also id*. at 580-81 (rejecting the plaintiffs' argument that the "decency and respect" clause "constrains the agency's ability to fund certain categories of artistic expression," and instead interpreting it as satisfied by diverse peer review panels). The statute "does not . . . place conditions on grants, or even specify that [specific] factors must be given any particular weight in reviewing an application." *Id*.

By prohibiting any art that "promotes" what the government deems to be "gender ideology," the NEA has imposed a new, extra-statutory eligibility criterion. The "gender ideology" prohibition fundamentally subverts the Act's regime of assigning grants according to artistic excellence and merit by precluding applicants "otherwise eligible under the Act from receiving grants for which they are eligible." *City of Los Angeles v. Barr*, 2020 WL 11272648, at *6 (C.D. Cal. June 17, 2020) (holding that DOJ conditions on grants exceeded the agency's authority under the Juvenile Justice Act). By imposing it, the NEA is acting in clear contravention of the Act.

As the Supreme Court noted, the statute's focus on "artistic merit and excellence," without regard to particular viewpoints, is underscored by § 954(d)(2). *Finley*, 524 U.S. at 581. In § 954(d)(2), Congress instructed that "obscenity is without artistic merit, is not protected speech, and shall not be funded," thereby "prohibit[ing] the funding of [a] certain class[ ] of speech" under the Act. *Id.* The *only* content that Congress explicitly forbade the NEA from funding was the wholly unprotected category of obscenity. *See Miller v. California*, 413 U.S. 15 (1973). That

choice underscores that the agency is to be guided by artistic merit and excellence, and may not exclude meritorious art because it disapproves of the viewpoint it expresses.

Congress's purpose in establishing the NEA was to fund a broad range of private artistic expression, *without* exercising any control over the content or viewpoints expressed. *See* Statement of Facts, *supra* at 1–4. Indeed, by disfavoring expression that "promotes" what the government deems to be "gender ideology"—and not expression that opposes it—the condition flouts the Act's express purpose of cultivating "mutual respect for the diverse beliefs and values of all persons and groups," 20 U.S.C. § 951(6), and "freedom of thought, imagination, and inquiry," *Finley*, 524 U.S. at 573 (quoting 20 U.S.C. § 951(7)).

The Act's statutory and legislative history, *see* Statement of Facts, *supra* at 1–4, underscores the plain meaning of the text, and makes clear that it does not authorize the NEA to superimpose a viewpoint-based restriction on arts funding. When Congress added the "decency and respect" clause, it did so in response to a congressionally appointed commission that "cautioned Congress against the adoption of distinct viewpoint-based standards for funding." *Finley,* U.S. at 581–82. "In keeping with that recommendation, the criteria in § 954(d)(1) inform the assessment of artistic merit, but Congress declined to disallow any particular viewpoints." *Id*. at 582. In imposing a viewpoint-based prohibition, the NEA has now done precisely what Congress rejected.

### 2. The "Gender Ideology" Prohibition Is Arbitrary and Capricious.

The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice

18

made.'" *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Agency

action is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*. It is also "arbitrary and capricious if it departs from agency precedent without explanation."

*Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1090 (D.C. Cir. 2009) (citation omitted); *see

also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . .

depart from a prior policy *sub silentio*" and "must show that there are good reasons for the new

policy.").

The "gender ideology" prohibition is arbitrary and capricious because the NEA provides

*no* explanation for its inclusion in the Assurance of Compliance, while departing from

longstanding agency precedent. The only possible explanation is contained in the EO, which the

condition implements. But the EO says nothing about arts funding at all, and the NEA's reliance

on the EO is insufficient to demonstrate a "satisfactory explanation for its action." *State Farm*, 463

U.S. at 30; *see also Louisiana v. Biden*, 543 F. Supp. 3d 388, 414 (W.D. La. 2021), *vacated and

remanded for lack of specificity in the injunction*, 45 F.4th 841 (5th Cir. 2022) ("A decision

supported by no reasoning whatsoever in the record cannot be saved merely because it involves an

Executive Order."); *Texas v. United States*, 524 F. Supp. 3d 598, 653–54 (S.D. Tex. 2021) (holding

that a two-page Executive Order and a five-page Memorandum does not "demonstrate[] reasoned

decisionmaking"); *cf. Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) ("When an

agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision.").

Nor does the EO on which the NEA relies provide a "satisfactory explanation." *State Farm*, 463 U.S. at 43. To begin, by directing that "grant funds" not "promote" what the government deems to be "gender ideology," the EO requires the NEA to consider a factor "which Congress has not intended it to consider." *Id*. As discussed above, the plain text of the Act instructs that the NEA judge grant applications by two criteria only—artistic excellence and artistic merit—and therefore prohibits the agency from precluding applicants based on a viewpoint-based screen.

Moreover, even if the Act did not prohibit the NEA from imposing a viewpoint-based prohibition on grant funding, the EO on its face provides no "satisfactory explanation" for such agency action. It makes allegations—for example, regarding "ideologues . . . us[ing] legal and other socially coercive means to permit men to self-identify as women" and an "attack against the ordinary and longstanding use and understanding of biological and scientific terms," EO § 1—but offers no support, much less "facts found," for them. Therefore, the EO cannot possibly articulate any "rational connection between" those (non-existent) facts "and the choice made." *State Farm*, 463 U.S. at 43 (citation omitted).

In addition, "the choice made"—prohibiting the NEA from funding any art that "promotes gender ideology"—does not even conceivably further the EO's stated aim of "defend[ing] women's rights and protect[ing] freedom of conscience." EO § 1. Art that "promotes gender ideology" does not deny women any rights. Moreover, requiring applicants to certify that they will not "promote gender ideology" is a quintessential *restriction* on the applicants' freedom of conscience and rights. *See, e.g.*, Martínez Decl. ¶ 20, Odsess-Rubin Decl. ¶ 15, Byrd Decl. ¶ 17

(noting expressive rights as artists, and desire to affirm all gender identities, including transgender, nonbinary, and queer identities).

Defendants have also "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. As discussed below, the "gender ideology" prohibition is unconstitutionally vague and captures vast swaths of artistic expression. *See infra* Argument I.B, I.C. Yet the NEA made no effort whatsoever to clarify what is and is not prohibited. This lack of clarity will place NEA funding out of reach for many organizations—which may, in turn, place many works of art out of reach of the public—actively undermining the NEA's purpose of "develop[ing] and promot[ing] a broadly conceived national policy of support for the humanities and the arts" and "creat[ing] and sustain[ing] not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." 20 U.S.C. §§ 951(7), 953(b).[3] As authorized by Congress, the NEA exists to "giv[e] emphasis to American creativity and cultural diversity," 20 U.S.C. § 954(c)(1), and it has procedures to take into account "respect for the diverse beliefs and values of the American public," *id.* § 954(d)(1). By forbidding the expression of one viewpoint held by members of the American public—that gender is real and is not determined by "biological sex"—the prohibitions "distort

---

[3] Because the prohibition will be imposed on grant applications that have nothing to do with gender identity, or would have been granted without any consideration as to whether they concern gender or sex, it is perhaps even further removed from "the purposes of the grant." *Cf. Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020) ("Requiring federal grantees to certify that they will not use grant funds to promote concepts the Government considers 'divisive,' even where the grant program is wholly unrelated to such concepts, is a violation of the grantee's free speech rights."); *Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F. Supp. 774, 785 (C.D. Cal. 1991) ("[O]nce [applicants a]re chosen for grants, on the basis of artistic merit, the government may not place restrictions on disbursement of those grants that require grantees to certify to . . . provisions that are vague . . . and which correspondingly cause a chilling effect.").

[the] usual functioning" of NEA funding. *Cf. Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543 (2001).[4]

### B.    The "Gender Ideology" Prohibition Violates the First Amendment.

The "gender ideology" prohibition violates the First Amendment, because it imposes an impermissible viewpoint-based restriction on a government program designed to support private speech. The government need not support the arts at all. But if it chooses to create a forum to support private artistic expression, as it has done here, it may not "aim at the suppression of dangerous ideas" by excluding disfavored viewpoints. *See Finley*, 524 U.S. at 587 (cleaned up).

### 1.    The First Amendment Prohibits Viewpoint-Based Discrimination.

When it comes to "what is good art," "[o]ur system of government" intentionally "accommodat[es] . . . the widest varieties of tastes and ideas," for it is a judgment that "varies with individuals as it does from one generation to another." *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 157 (1946). In the arts, as in other contexts, the First Amendment rests on "[t]he bedrock principle of viewpoint neutrality," which "demands that the state not suppress speech" due to "disagreement with the underlying ideology or perspective that the speech expresses." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004).

Viewpoint-based restrictions are not "proper when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Velazquez*, 531 U.S. 533 at 542 (alteration in original) (quoting *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 834 (1995)). Even where the government program's purpose "is not to encourage a diversity of views," but simply to "facilitate

---

[4] The APA also requires courts to "hold unlawful and set aside" agency action "found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). As explained below, the gender ideology condition violates the First Amendment and is unconstitutionally vague under the Fifth Amendment.

private speech, not to promote a governmental message," the rule against viewpoint-based discrimination stands. *Id.* at 542 (cleaned up); *see also Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 509 (9th Cir. 1988) (rejecting argument that content-based waiver of import duties did not implicate the First Amendment "because [it does] not punish or directly obstruct plaintiffs' ability to produce or disseminate their films").

"The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another," *McGuire v. Reilly,* 386 F.3d 45, 62 (1st Cir. 2004), and not merely "incidentally," but "intent[ionally]," "in a way that prefers one particular viewpoint in speech over other perspectives on the same topic," *Ridley*, 390 F.3d at 82. The "gender ideology" prohibition is a textbook example: it restricts only speech that "*promotes*" what the government deems to be "gender ideology," not speech that condemns, questions, or criticizes it. *See Matal v. Tam*, 582 U.S. 218, 243 (2017) (opinion of Alito, J.) ("[T]he disparagement clause discriminates on the bas[i]s of 'viewpoint.' . . . Giving offense is a viewpoint."). It prohibits a play celebrating and affirming the idea that "biological sex" is not immutable, *see* Odsess-Rubin Decl. ¶¶ 6–7, 15–16, Byrd Decl. ¶¶ 10, 17, but not the opposite. In imposing this requirement, the government has made plain its aim is to silence those "who deny the biological reality of sex." EO § 1.

### 2.    Viewpoint-Based Discrimination Is Unconstitutional in Grants.

Even in the context of a public grant program, where the government necessarily chooses winners among private speakers, the intentional suppression of disfavored ideas is constitutionally impermissible. "The NEA's mandate is to make esthetic judgments" about "excellence," *Finley*, 524 U.S. at 586, not values-based or political decisions about viewpoints. "In simple terms, the government may well be able to put restrictions on who it subsidizes, and how it subsidizes, but once the government moves to subsidize, it cannot do so in a manner that . . . violates the First and

Fifth Amendments." *Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F. Supp. 774, 784–85 (C.D. Cal. 1991).

The Supreme Court's decision in *NEA v. Finley* is particularly instructive. In that case, the Supreme Court considered the constitutionality of 20 U.S.C. § 954(d), added to the Act by Congress in 1990, after controversy erupted over two NEA-funded projects in 1989—a Robert Mapplethorpe retrospective that included homoerotic photographs, and an Andres Serrano piece entitled Piss Christ, which featured a photograph of a crucifix covered in urine. Congress enacted Section 954(d) in response, directing "the Chairperson, in establishing procedures to judge the artistic merit of grant applications, to 'tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public.'" *Finley*, 524 U.S. at 576 (alteration in original) (quoting 20 U.S.C. § 954(d)). Four performance artists who had been denied NEA funding in the past, and sought to apply for future funding, along with the National Association of Arts Organizations, sued to challenge the validity of this provision. They alleged, *inter alia*, that the "decency and respect" provision imposed a viewpoint-based prohibition on NEA funding.

The Supreme Court held that § 954(d) does not violate the First Amendment, but only after concluding that it did not impose a viewpoint-based restriction. Instead, the Court interpreted the provision as "merely hortatory." *Id.* at 580. The NEA had implemented the requirement "merely by ensuring that the members of the advisory panels that conduct the initial review of grant applications represent geographic, ethnic, and esthetic diversity." *Id.* at 577. The Court held that "[i]t is clear . . . that the text of § 954(d)(1) imposes no categorical requirement." *Id.* at 581. Section 954(d)(1) "does not preclude awards to projects that might be deemed 'indecent' or 'disrespectful,' nor place conditions on grants, or even specify that those factors must be given any particular

weight in reviewing an application." *Id.* at 580–81. The Court emphasized that the provision does not "set forth a clear penalty, proscribe[] views on particular 'disfavored subjects,'" or "suppress[] 'distinctive idea[s], conveyed by a distinctive message.'" *Id.* at 582 (last alteration in original) (citations omitted).

At the same time, the Court noted that it "would confront a different case" if the NEA were to deny grants to projects or productions expressing disfavored viewpoints. *Id.* at 587. That is because, "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas,'" *id*. at 587 (alteration in original) (quoting *Regan v. Tax'n With Representation of Wash*., 461 U.S. 540, 550 (1983)), especially if doing so "result[s] in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace,'" *id*. (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd*., 502 U. S. 105, 116 (1991)). It may not "threaten[ ] to suppress the expression of particular ideas or viewpoints.'" *Id.* (quoting *Leathers v. Medlock*, 499 U.S. 439, 447 (1991)). Even a subsidy cannot be "'manipulated' to have a 'coercive effect'" on private speech. *Id.* (citing *Ark. Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 237 (1987)).

The Supreme Court's decisions regarding other government benefits echo this rule. When considering the constitutionality of a restriction on which student groups a public law school would recognize—opening the door to benefits like access to school funds, facilities, and channels of communication—the Supreme Court deemed it "effectively a state subsidy," *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 682 (2010), and held that any restrictions on recognition had to be viewpoint-neutral, *id*. at 679. Equally, when reviewing Congress' limitation on the use of Legal Services Corporation funds, the Supreme Court explained that suits "involv[ing] a subsidy for specified ends" rely on rules that mirror those

25

present in "limited forum cases," including their prohibition on viewpoint-based restrictions. *Velazquez*, 531 U.S. at 543–44 (2001); *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 114 (2001) (framing access to a limited public forum as "exten[sion of a] benefit") (quoting *Rosenberger*, 515 U.S. at 839 (1995)). And though the justices have not agreed on whether viewpoint-based prohibitions on trademark registration constitute "a condition on a government benefit or a simple restriction on speech," *Iancu v. Brunetti*, 588 U.S. 388, 392 (2019), they unanimously agreed that "if a trademark registration bar is viewpoint-based, it is unconstitutional." *id.* at 393; *see also Matal*, 582 U.S. at 243–44 (opinion of Alito, J.); *id.* at 248–49 (Kennedy, J., concurring).

The prohibition on viewpoint discrimination also applies where the government provides support to speech through any kind of forum, even, as here, a nonpublic forum. Nonpublic forum doctrine "concern[s] government's authority to provide assistance to certain persons in communicating with other persons who would not, as listeners, be acting for the government"— in other words, government support for speech by private actors. *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 282 (1984). What typically distinguishes nonpublic forums from limited public forums are the kinds of "selectivity" and "discretionary access" involved here. *Ridley*, 390 F. 3d at 95 (citing *Finley*, 534 U.S. at 589–90). And in a nonpublic forum, any regulations must be viewpoint-neutral and reasonable "in light of the purposes served by the forum." *Id.* at 82 (citation omitted). Yet the "gender ideology" prohibition is viewpoint-based and directly contrary to the purposes served by the NEA.

Since *Finley*, lower courts considering public funding for the arts have drawn and applied the same lines. In *Brooklyn Inst. of Arts & Scis. v. City of New York*, 64 F. Supp. 2d 184 (E.D.N.Y. 1999), the court held that New York's decision to stop funding a museum because of a

controversial exhibit—which included, for example, a painting titled "The Holy Virgin Mary" with "small photographs of buttocks and female genitalia scattered on the background," *id.* at 190–92—constituted impermissible viewpoint-based discrimination. "[T]he issue is not whether the City could have been required to provide funding for the Sensation Exhibit," the court wrote, "but whether the Museum, having been allocated a general operating subsidy, can now be penalized with the loss of that subsidy . . . because of the perceived viewpoint of the works in the Exhibit." *Id*. at 202. The court held that the city's censorious funding withdrawal violated the First Amendment because the government may not "prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Id*. at 198 (citing *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).

Similarly, in *Esperanza Peace & Justice Center v. City of San Antonio*, the court held that San Antonio impermissibly discriminated on the basis of viewpoint when it rescinded a grant previously extended to a nonprofit, because the groups assertedly "advocat[ed] a gay and lesbian lifestyle." 316 F. Supp. 2d 433, 454 (W.D. Tex. 2001). While acknowledging that the city had discretion to choose programs for any number of reasons—for example, their ability to draw more tourists or produce better quality works—the court held that what it could "*not* [do was to] choose to withhold funds from a group merely because the council—or its constituents—disagree with the message the group espouses." *Id*. at 454–56**.** While "the government is not required to fund arts programs . . . if it chooses to do so, it must award the grants in a scrupulously viewpoint-neutral manner." *Id*. at 447. *See also Cuban Museum of Arts and Culture v. City of Miami*, 766 F. Supp. 1121, 1125 (S.D. Fla. 1991) (holding that Miami violated the First Amendment when, motivated by its ideological objections to an exhibit, it refused to renew the lease of a museum even though the museum was not contractually entitled to the lease).

27

The "gender ideology" prohibition is unconstitutional for the same reason. Unlike the "merely hortatory" provision upheld in *Finley* because it was *not* viewpoint-based, this prohibition expressly makes works ineligible for funding, no matter how artistically meritorious, merely because they express a viewpoint disfavored by the government. The prohibition's very purpose is to "aim at the suppression of dangerous ideas," *see* EO § 2(f) (describing the viewpoint that "males can identify as and thus become women and vice versa" as a "false claim"), and is therefore impermissible, *Regan*, 461 U. S. at 550.

### C.    The "Gender Ideology" Prohibition Is Unconstitutionally Vague.

The "gender ideology" prohibition is also unconstitutionally vague. A law is impermissibly vague if it either "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012). And where a law carries potential criminal penalties, the test for vagueness is even more demanding. *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997).

Under these principles, the "gender ideology" prohibition must satisfy the most exacting vagueness standard, and it fails. It is hard to understand what, exactly, constitutes "promot[ing] gender ideology," and yet NEA applicants, like RILA, who certify that they will not use federal funds to "promote gender ideology" may face criminal, civil, or administrative sanctions if they cross the line. *See* Part I.A *infra* (describing potential consequences).

Here, too, a previous case considering Congress' 1990 amendments to the Act is instructive. That case, *Bella Lewitzky*, arose in response to Congress's requirement that all NEA

grant recipients certify in writing that they would not use federal funding "to promote, disseminate, or produce materials which in the judgment of the [NEA] . . . may be considered obscene." 754 F. Supp. at 776. Two grantees sued—one who had "completed the certification, but crossed out and initialed [the obscenity condition], indicating [its] refusal to be bound" by it and another who had "refused to make the required certification." *Id.* at 777.

The reviewing court held that the certification was unconstitutionally vague "because it leaves the determination of obscenity in the hands of the NEA," *id.* at 782, and forces grantees to "speculate about how the NEA will assess obscenity," *id.* at 781. Though the NEA pointed to the *Miller* obscenity test and argued that it would adhere to those constitutional limits, the court held that the NEA could not possibly fulfill that promise because obscenity law requires consideration of community standards and processes that a national agency could not realistically enact. *Id.* And, because the vagueness was part of an oath, the court held that it also violated the First Amendment, for it would "cause the oath takers to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden area were clearly marked." *Id.* at 782–83 (quoting *Speiser v. Randall,* 357 U.S. 513, 526 (1958)).

The problem here is even worse, for no doctrine defines "gender ideology" or what it means to "promote" it. The term "gender ideology" itself is broad. *Cf. Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *19 (D. Md. Feb. 21, 2025) (holding that "equity"-related certification and prohibition was vague in part because "equity" is "broad"). The Gender Ideology EO states the government's preference for views recognizing "the immutable biological reality of sex," rather than "an internal, fluid, and subjective sense of self unmoored from biological facts." EO § 1. It disallows "replac[ing] the biological category of sex" with "self-assessed gender identity" or communicating "the idea that there is a

vast spectrum of genders that are disconnected from one's sex." EO § 2(f). It is far from clear what this definition means for women playing male roles in a play, the mere presence of a transgender actor or character, *see* Byrd Decl. ¶ 18, Odess-Rubin Decl. ¶ 14, Martínez Decl. ¶ 16, or a theater that simply subverts sex-based stereotypes. And that vagueness will inevitably silence protected speech as artists seek to steer clear of violating it. *See* Martínez Decl. ¶ 17.

The vagueness is further exacerbated by the fact that neither the NEA nor the EO defines what it means to "promote" in this context. The ordinary meaning of "promote" is "[t]o further the growth, development, progress, or establishment of," "to advance or actively support," or "to encourage."[5] These terms are expansive and highly subjective, and multiple courts have recognized that terms like "promote" are susceptible to a "wide range of meanings depending on context." *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020) (prohibition on "encourag[ing]" or "promot[ing]" a riot was overbroad);[6] *see also United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021) (same, explaining that "encourage" and "promote" could mean "to recommend, advise"), *cert. denied*, 142 S. Ct. 865 (2022); *Rosenberger*, 515 U.S. at 836 (emphasizing "vast potential reach" of term "promote[]"). In *Santa Cruz Lesbian and Gay Community Center v. Trump*, the court held that an executive order that contemplated conditioning federal grants on a recipient's certification that they would not use federal funds to "promote" certain race- and sex-related concepts was unconstitutionally vague because it "lack[ed] clarity" and "pose[d] a danger of arbitrary and discriminatory application." 508 F. Supp. 3d at 543–44 (quoting *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011)).

---

[5] *Promote*, Oxford English Dictionary (online ed., last modified July 2023); *see also Promote*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/promote (online ed., last modified Aug. 4, 2023) ("to contribute to the growth or prosperity of: further").

[6] Because the court found those statutory terms overbroad, it had no occasion to resolve whether they were also unconstitutionally vague. *Miselis*, 972 F.3d at 546.

The prohibition at issue here could potentially encompass any work involving a transgender or queer character or subject, including "La Cage aux Folles," "Dog Day Afternoon," "Rent," "Boys Don't Cry," "Hedwig and the Angry Inch," and "My Name Is Pauli Murray." And it could potentially encompass any work involving a male actor playing a female role or a female actor playing a male role, *see* EO, § 2(f) (stating that "gender ideology" permits "the false claim that males can identify as and thus become women and vice versa"). Male and female impersonation is a time-honored tradition in artistic works, going back to Shakespeare's "Twelfth Night" and "Merchant of Venice," "Yentl," "Tootsie," "Victor Victoria," and many more. In RILA's case, this could include a lead actor choosing to dress in women's clothes one night and men's another, while performing the same role. Martínez Decl. ¶ 12.

The prohibition might also prohibit NEA funding to support a wide variety of artistic expression, even if the subject matter of the art itself does not touch upon what the government deems to be "gender ideology." For example, it could potentially capture an organization's support for a transgender or nonbinary artist, regardless of whether that artist's work has anything to do with what the government deems to be "gender ideology." It might even bar any organization from applying for—or accepting—NEA funding so long as the organization's mission includes an objective of supporting transgender and nonbinary artists and art. *See* Byrd Decl. ¶ 18, Odsess-Rubin Decl. ¶ 14, Martínez Decl. ¶ 17.

## II. ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM.

Where "plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim," "[t]here is no need for an extensive analysis of this element of the preliminary injunction inquiry." *Fortuño*, 699 F.3d at 15. Instead, "it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well," *id.*, for "[t]he loss of

First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (citation omitted).

Many of TCG's more than 600 theater members, who are located across the country, will be irreparably harmed absent a preliminary injunction against the gender ideology prohibition before March 24 because that certification requirement is barring them from submitting an application at all. They need relief from this Court in order to seek the funding they would like to ask for in the March 2025 cycle.

Absent relief, Plaintiffs RILA, NGT, and TTO will also be ineligible to receive funding for the projects they hope to have funded in this grant cycle. RILA will have no choice but to submit a project that differs from what it hoped to offer. Martínez Decl. ¶ 18. Meanwhile, NQT and TTO will be barred from receiving funding for projects they have planned specifically for summer 2026 because their projects will be deemed to "promote gender ideology." Odsess-Rubin Decl. ¶¶ 17–18; Byrd Decl. ¶¶ 15, 17. Submitting in March is important to TTO because putting on a production requires securing everything from a venue to actors to creative and production team members. Byrd Decl. ¶ 11. Having a year to adequately plan is best practice for TTO. *Id.* Submitting in March is also important to NQT because that is the only way to ensure getting a grant notification in December, which is also when NQT passes its organizational budget. Odsess-Rubin Decl. ¶ 9. In addition, if NQT had to wait until the next funding cycle, it would only get notification regarding NEA funding in April 2026, two months prior to the 2026 Criminal Queerness Festival, which would not offer enough time to plan. *Id.* Moreover, absent an injunction against enforcement of the "gender ideology" provision, the certifications submitted by TTO and NQT will be invalid and bar them from any consideration at all.

Plaintiffs seek a preliminary injunction before March 24, the deadline for grant applications for the current funding cycle, to give themselves enough time to ensure they can meet the deadline. They also seek relief that would permit organizations to submit the March 11 certification after the Court rules, as that certification has deterred TCG members from applying at all. Alternatively, the Court could choose to extend the deadlines for both Parts of the application process for the March 2025 cycle.

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION.

Both the balance of equities and the public interest weigh strongly in favor of preliminary injunctive relief. Where suppression of speech is at issue, the government action "harms not only the speaker, but also the public to whom the speech would be directed." *Fortuño*, 699 F.3d at 15. "[T]he public" has an interest "in having a robust debate on the issues of concern to plaintiffs." *Id.* at 16. Equally, the NEA's own interest in supporting the diversity of American culture and views will be furthered if the challenged prohibition is enjoined. Moreover, the NEA has already stricken the DEI-related assurance from its requirements in response to another court order. *See* Statement of Facts E *supra.* And should the Court choose to delay the application deadline to allow those organization that do not submit a Part 1 application by March 11 because they object to or fear signing the certification, it is unlikely to seriously harm the NEA, which has already extended the deadline for the March funding cycle because of the new "gender ideology" prohibition— especially given that the NEA explicitly states that system-wide issues with the registration or submission systems can justify further extensions. Ex. 1 to Eidelman Decl. at 23.

## IV.    THIS COURT SHOULD WAIVE THE BOND REQUIREMENT.

This Court has the discretion to waive the posting of any bond required by Fed. R. Civ. P. 65(b), or to set a token bond. *Crowley v. Loc. No. 82, Furniture & Piano Moving*, 679 F.2d 978,

1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984). In *Crowley*, the First Circuit identified several important factors for a district court to consider: (1) "at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant"; (2) "in order not to restrict a federal right unduly, the impact that a bond requirement would have on enforcement of the right should also be considered." *Id*. The court noted: "[a] bond requirement would have a greater adverse effect where the applicant is an individual and the enjoined party an institution that otherwise has some control over the applicant than where both parties are individuals or institutions." *Id.* These factors weigh in favor of waiving bond.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs hereby respectfully request that this Court issue a preliminary injunction and/or temporary restraining order staying and setting aside the NEA's ideological certification requirement and funding prohibition, and enjoining the Defendants, their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with them, from 1) requiring applicants for NEA funding to certify that they will not "promote gender ideology" in order to be eligible to apply, and 2) forbidding grant recipients from "promot[ing] gender ideology" with federal funds. Plaintiffs further request that the Court order that the NEA accept applications from applicants who missed the Part 1 deadline on March 11 because they were unwilling or unable to agree to the "gender ideology" prohibition, and allow them to submit Parts 1 and 2 of the application by March 24, 2025, or within a reasonable period to be set by the Court after hearing from the parties.

Dated: March 6, 2025                          Respectfully submitted,

                                              /s/   Lynette Labinger
                                              Lynette Labinger, Esq. (Bar No. 1645)
                                              128 Dorrance Street, Box 710
                                              Providence, RI 02903
                                              401.465.9565
                                              LL@labingerlaw.com
                                              Cooperating counsel
                                              AMERICAN CIVIL LIBERTIES UNION
                                                 FOUNDATION OF RHODE ISLAND

                                              Vera Eidelman*
                                              Scarlet Kim*
                                              Lauren Yu*
                                              Brian Hauss*
                                              AMERICAN CIVIL LIBERTIES UNION
                                                 FOUNDATION
                                              125 Broad Street, 18th Floor
                                              New York, NY 10004
                                              veidelman@aclu.org
                                              scarletk@aclu.org
                                              lyu@aclu.org
                                              bhauss@aclu.org

                                              David D. Cole*
                                              600 New Jersey Ave. NW
                                              Washington, DC 20001
                                              (202) 622-9078
                                              cole@georgetown.edu

                                              *Pro hac vice applications forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that I filed the within document via the ECF system on this day of March 6, 2025 and that it is available for viewing and downloading to all counsel of record.


Dated: March 6, 2025                    By:        /s/  Lynette Labinger
                                                    Lynette Labinger