UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS,
NATIONAL QUEER THEATER,
THE THEATER OFFENSIVE, and
THEATRE COMMUNICATIONS GROUP,

    *Plaintiffs*,

v.

NATIONAL ENDOWMENT FOR THE
ARTS, and MARY ANNE CARTER, in
her official capacity as Acting Chair of the
National Endowment for the Arts,

    *Defendants*.

Case No.

## **DECLARATION OF GISELLE BYRD**

I, Giselle Byrd, declare as follows:

1. My name is Giselle Byrd. I am the Executive Director of The Theater Offensive ("TTO"). The facts set forth in this declaration are based on my personal knowledge.

2. TTO is a theatrical organization, founded in 1989, that presents liberating art by, for, and about queer and trans people of color, that transcends artistic boundaries, celebrates cultural abundance, and dismantles oppression. Although TTO is open to all without regard to race, sex, or other identifying characteristics, it seeks in particular to support the voices of trans, nonbinary, and queer people, including people of color, who are often the most underserved in the theatrical community both on and offstage. I joined TTO as its Executive Director in December 2023.

3. TTO has previously received six grants from the NEA.

1

4. In 2016, TTO received an NEA grant to support its youth theater program, True Colors, which is the longest running LGBTQIA2S+ youth theater program in the country. That year, TTO was also awarded the National Arts and Humanities Youth Programs Award.

5. In 2017, TTO received an NEA grant to support the development and production of an original production titled "They, Them, Theirs: Showcasing Trans Lives."

6. In 2022, TTO received an NEA grant to support the production of "Amm(i)gone," an original piece that explored the intersections of Islamophobia, sexism, ageism, racism, immigration, and queerness.

7. In 2022, TTO received an NEA grant to support operational costs in response to the COVID-19 pandemic.

8. In 2023, TTO received an NEA grant to support the development of "Fly," an original work that featured a transmasculine narrative and trans actors.

9. In 2025, TTO received an NEA grant to support artist and personnel costs for its Queer Republic Festival. The festival is focused on supporting and producing multidisciplinary works by queer and trans artists that promote wellbeing and resilience and affirm the equal dignity and lived experiences of trans, queer, and nonbinary people.

10. TTO intends to apply for funding from the NEA's Grants for Arts Projects in the March 2025 cycle to support the production of a new play titled "Smoke," written by a trans playwright. A play which is set against the backdrop of 1960's D.C., "Smoke" explores love, found family, motherhood, and healing and reveals the complexities of trans life in a time where trans people were at the turning point in the fight for their human rights. The production will feature two trans actors in the leading roles. The NEA funds would be used to support the artists in the play, which would begin rehearsals in May 2026.

11. We intend to apply for the March 2025 cycle and not the July 2025 cycle in order to have enough planning time for "Smoke." Every production requires significant lead time in order to ensure that proper funding is in place as we begin the production process. This process includes securing a venue, actors, creative and production team members, security, and more. This is instrumental in order to successfully execute productions that continue to grow our audience and donor bases simultaneously. Having a year to adequately plan and secure the necessary funding is best practice for organizations such as ours, where we often face the ever-present threat of limited capacity. This is due to the ongoing discrimination towards the livelihood of queer and trans people, requiring them to find multiple methods of employment that, in turn, do not allow them the abilities to create artistic work.

12. The importance of applying in the March cycle for "Smoke" is also due to the NEA's timeline, pursuant to which applicants do not know if their application was recommended or rejected for funding until December 2025 for the March cycle, making the earliest start date for any funded project January 2026. If we were to apply in the second cycle of funding, it would not allow the project to start until June 1, 2026, which would be too late for our production timeline.

13. The NEA's Grants for Arts Projects application has two parts. Part 1 is submitted through Grants.gov and collects basic information about an organization. For the upcoming application cycle, Part 1 is due March 11, 2025. Part 2 of the application is submitted through the NEA's applicant portal, and requires information about the organization, its history and budget, and information about the project. Part 2 is due March 24, 2025.

14. In order to submit Parts 1 and 2 of the application, we must submit a certification that we agree to an Assurance of Compliance. An applicant agrees to the certification by checking

a box labeled "I agree." There is no other option for the certification. Parts 1 and 2 of the application cannot be submitted without this box checked.

15.  For the March 2025 cycle, NEA amended the Assurance of Compliance to include a new requirement, which states that "[t]he applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

16.  The new Assurance of Compliance also states that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement."

17.  The certification requirement poses an obstacle for us, because we want to apply for funding, but believe we have a right to be considered without regard to whether the views our project expresses "promote" what the government deems to be "gender ideology." Accordingly, we intend to check the box agreeing to the certification in the application only because doing so is necessary to submit an application, but we will simultaneously include a statement in the application making clear that we are not agreeing to abide by the "gender ideology" provision because we believe it is unconstitutional and otherwise invalid, and will seek judicial relief invalidating that provision to ensure that our application can be considered fairly without regard to the invalid "gender ideology" provision.

18.  The certification requirement is unclear as to what constitutes "promoting" what the government deems to be "gender ideology" and thereby forces us to guess as to what we can and cannot do with an NEA grant. For example, it does not make clear whether "promoting" what

the government deems to be "gender ideology" includes working with actors, playwrights, and other artists who identify as trans and/or nonbinary, without more, or whether they prohibit only certain messages, themes, or views. The requirement is also unclear as to whether the existence of a trans and/or nonbinary character in a piece constitutes "promoting" what the government deems to be "gender ideology." Nor is it clear what views are proscribed. Is any discussion of trans and/or nonbinary identity prohibited, or only expression that might be seen to "promote" those identities? What messages fall within the prohibited "ideology"? We fear that TTO's very mission as an organization dedicated to queer and trans people might run afoul of the "gender ideology" requirement. Our work aims to provide this country's trans and nonbinary community with narratives that reflect their lives, when their very existence is facing erasure due to the principles of the "gender ideology" executive order.

19. The "gender ideology" prohibition does not only affect stories with trans and/or nonbinary discussion, but censors the artistic freedoms that our donor base expects and requires from TTO, which has the potential to lead to a loss of financial support. This is further compounded by the prestige of receiving an NEA grant, which can provide opportunities for new funding possibilities. With this lack of support, many theater companies will cease their productivity as they will no longer have access to these opportunities.

20. TTO seeks injunctive relief invalidating the "gender ideology" restriction so that TTO is not rendered ineligible from competing for NEA funding because of the viewpoints our NEA-funded work will express.

21. We also intend to apply for NEA grants in future grant cycles to support works of artistic merit that meet all the NEA's statutory requirements, and that affirm transgender and/or

nonbinary identities through their artistic expression. But as long as the NEA requires that no funds can be used to support "gender ideology," we are barred from seeking such support.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March  5 , 2025.

*Giselle Byrd*
_____
Giselle Byrd