UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP,<br><br>*Plaintiffs*,<br><br>v.<br><br>NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts,<br><br>*Defendants*. | Case No. |

## DECLARATION OF EMILYA CACHAPERO

I, Emilya Cachapero, declare as follows:

1. My name is Emilya Cachapero. I am the Co-Executive Director: National and Global Programming of Theatre Communications Group ("TCG"). I reviewed this with LaTeshia Ellerson, who is the Co-Executive Director: National Engagement of TCG, and Alisha Tonsic, who is the Co-Executive Director: National Operations and Business Development of TCG. The facts set forth in this declaration are based on our personal knowledge and reflect our collective views.

2. TCG is a national theatre organization with over 600 member theatres and affiliates and over 3,500 individual members. TCG offers networking and knowledge-building opportunities for theatre professionals through annual convenings, industry reports, workshops, webinars, and the publication of *American Theatre* magazine and TCG Books, while also awarding $43 million

1

in funding and professional development support to more than 900 organizations and 1,300 individuals over its history of grantmaking. TCG also engages in federal and regional advocacy. In addition, TCG conducts research about the fiscal health of the field by surveying its members, both organizational and individual; this data includes demographic information such as gender identities of individual artists.

3. TCG's mission is to lead for a just and thriving theatre ecology. It is committed to modeling and advocating for the structural, cultural, and equitable environments that a just and thriving theatre ecology requires. TCG believes that a better world for the theatre requires greater equity, visibility, and funding. We envision a thriving theatre ecology that has the investments, commitments, and participants it needs to create, produce, and present diverse stories; encourage, engage, and financially sustain theatre makers and practitioners; abundantly serve multifaceted communities; advance values and practices of equity and justice; and sustain theatre as a viable industry. At the core of our work is ensuring equitable participation in all areas of practice and that all populations in our community have access to our services, including those of Black, Indigenous and all People of Color (BIPOC), LGBTQ+, transgender/gender-nonconforming (TGNC), and disability identities.

4. Though the NEA is a defendant in this lawsuit, the NEA is not TCG's adversary. We stand in full support of the NEA's mission to create art that sustains, strengthens, and nurtures the diverse fabric of our country. However, we fundamentally object to the Trump administration's imposition of an ideological viewpoint-based screen on NEA funding, by barring grants that in any way "promote" what the administration deems to be "gender ideology." We believe the "gender ideology" restriction unlawfully suppresses the speech of all artists, including transgender, nonbinary, and queer artists.

5. TCG has received 42 NEA grants since 1998 to support fieldwide convenings, research, and other programming.

6. Many of our members apply for and receive funding from the NEA to support their artistic endeavors. Many of them want to apply for funding from the NEA's Grants for Arts Projects in the March 2025 cycle.

7. For the March 2025 cycle, the NEA amended the Assurance of Compliance that applicants must agree to in order to seek NEA funding to include a new requirement, which states that "[t]he applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

8. The new Assurance of Compliance also states that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement."

9. Because of the new certification requirement, many of our members have been deterred from applying for funding in the March 2025 cycle, though they had otherwise planned to and would like to. These members object to having to make such a certification, and fear the penalties that could flow to them if they are deemed to have falsely certified. If the certification requirement and funding restriction were lifted, these members would apply for NEA funding in the March 2025 cycle. And many of our members fear that the ban on "promot[ing]" what the government deems to be "gender ideology" would bar them even from being considered for

funding because they work with, or are, transgender, nonbinary, or queer artists, and are committed to treating all their artists with equal dignity.

10. For example, one member theatre, which has received several NEA grants and whose mission includes presenting "diverse" stories of the American identity, had planned to apply in March, but cannot and will not sign the Assurance of Compliance because the theatre fundamentally disagrees with the "gender ideology" requirement. Transgender people are part of this member theatre's workforce, audience, and arts education programs, and the theatre recognizes all gender identities. It believes that not acknowledging those under the transgender umbrella is discriminatory. As a result, the theatre is unable to apply for an NEA grant that would otherwise cover 25 percent of their production cost.

11. The "gender ideology" requirement also bars many of our members from being considered without regard to whether their projects express views that "promote" what the government deems to be "gender ideology." The Theater Offensive ("TTO") is one such member of TCG. TTO intends to apply for funding from the NEA's Grants for Arts Projects in the March 2025 cycle to support a new play written by a trans playwright. The certification requirement on the NEA application poses an obstacle for TTO because of the "gender ideology" requirement. TTO intends to check the box agreeing to the certification while simultaneously including a statement in the application making clear that it is not agreeing to abide by the "gender ideology" requirement because it believes the requirement is unconstitutional and otherwise invalid.

12. Many of our members, including TTO, find the certification requirement unclear as to what constitutes "promoting gender ideology" and thereby forces them to guess as to what is and is not permitted with an NEA grant. For example, it does not make clear whether "promoting gender ideology" includes merely working with actors, playwrights, and other artists who identify

4

as trans, nonbinary, or queer, or whether it prohibits only certain messages, themes, or views. The requirement is also unclear as to whether the existence of a trans, nonbinary, or queer character in a piece constitutes "promoting gender ideology." Nor is it clear what views are proscribed. Is any discussion of trans, nonbinary, or queer identity prohibited, or only expression that might be seen to "promote" those identities? What messages fall within the prohibited "ideology"?

13.    We have heard from members that they are uncertain about how to proceed, unsure of whether to apply knowing they will be barred from eligibility because their project may express views that "promote" what the government deems to be "gender ideology," apply with a different project, or forego applying for NEA funding altogether. These members feel that they require legal advice to understand how to handle the uncertainty that has been imposed on them, and many are unable to access it in time. In addition, many members, especially smaller theatres do not have existing relationships with lawyers or the money to support access to legal counsel, particularly on such a quick timeline.

14.    We seek judicial relief so that our members can apply and compete for NEA funding without regard to whether their programs in some ways "promote" what the government deems to be "gender ideology."  Because many members would like to apply in the March cycle of funding, we seek preliminary injunctive relief that would allow them to do so.

15.    Many members have expressed dismay at being forced to compromise on their commitment to free artistic expression and their ideals in order to seek NEA funding. These organizations seek to affirm all gender identities, including transgender, nonbinary, and queer identities. Some members have also told us about the financial impact of losing NEA funding. For example, for one small theatre, an NEA grant would cover their entire design team's wages, pension, and health. These members would like to apply for NEA funding but for the ban on

"promoting" what the government deems to be "gender ideology," and would do so in the March 2025 cycle if this Court provides relief invalidating that restriction while this case is pending.

16. The ban on "promoting" what the government deems to be "gender ideology" requirement has also caused us to divert a great deal of our time and resources. For example, we have diverted some of our research into polling members about how the requirement has affected their plans to apply, or not apply, for NEA funding. In addition, our programming team has had to quickly pivot to provide our members and the larger field with informational webinars, federal action updates, and resource materials to help them assess their level of risk and guide their choices.

17. We seek judicial relief invalidating the "gender ideology" prohibition so that our members can apply and be considered for NEA funding fairly without regard to whether their work or organization or projects "promote" what the government deems to be "gender ideology." This is core to our mission to lead for a just and thriving theatre ecology that celebrates free artistic expression. A just and thriving theatre ecology is one that financially sustains all theatre makers and practitioners and serves multifaceted communities, including trans, nonbinary, and queer theatre communities, and that produces works of artistic merit and excellence, without being disadvantaged because a work is deemed to promote a viewpoint the administration opposes.

18. Many of our members, including TTO, intend to apply for NEA grants in future grant cycles as well to support works of artistic merit that meet all the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through their artistic expression. But as long as the NEA requires that no funds can be used to support "gender ideology," they are barred from seeking such support. This is true for TCG as well.

19. If the Court invalidates the "gender ideology" prohibition, TCG intends to apply for an NEA grant during the July 2025 cycle to support fieldwide convenings and research. Last year, TCG's national conference, supported in part by the NEA, included a panel on gender identity and a presentation by a trans woman. TCG is in preliminary planning stages for the next conference in 2026, and TCG is committed to including in the conference discussion about gender identity, affirming trans, nonbinary, and queer members of the community.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 5, 2025.

_____
Emilya Cachapero

8