## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS,
NATIONAL QUEER THEATER, THE
THEATER OFFENSIVE, and THEATRE
COMMUNICATIONS GROUP,

        Plaintiffs,

   *v.*

NATIONAL ENDOWMENT FOR THE
ARTS; MARY ANNE CARTER, in her of-
ficial capacity as Acting Chair of the Na-
tional Endowment for the Arts,

        Defendants.

Civil Action
No. 25-cv-79-WES-PAS

## DEFENDANTS' RESPONSE TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

BACKGROUND ........................................................................................................................2

    The NEA's selective, partial grantmaking process ...........................................................2

    Executive Order 14168 .....................................................................................................5

    Plaintiffs' preliminary-injunction declarations ..................................................................5

STANDARD OF REVIEW ..........................................................................................................6

ARGUMENT ...............................................................................................................................7

I.     Because the Plaintiffs' claims are not justiciable, the Court should deny the
      preliminary-injunction motion. ...........................................................................................7

      A.    Because there is no agency action to challenge, the Plaintiffs lack
          standing to pursue preliminary relief. ......................................................................7

      B.    Because the agency is conducting a new administrative process to
          determine whether, and how, the EO might apply, the Plaintiffs'
          claims are not ripe. .................................................................................................12

II.    Without any agency action, the Plaintiffs are not entitled to any preliminary
      relief. .................................................................................................................................14

      A.    The likely success of the Plaintiffs' claims turns on agency action that
          the agency has rescinded, compelling denial of their motion. ...............................14

      B.    The Plaintiffs suffer no irreparable harm. ..............................................................15

      C.    The balance of the equities and public interest—which merge where
          the government is the defendant—weigh against preliminary relief. ....................16

III.   The Court should limit any injunctive relief to the Plaintiffs and the NEA
      only. ..................................................................................................................................17

IV.   Any injunctive relief should be stayed pending appeal and accompany a bond. ..............17

CONCLUSION...........................................................................................................................18

TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ................................................................................ 12, 13

*Akebia Therapeutics, Inc. v. Azar*,
976 F.3d 86 (1st Cir. 2020) ....................................................................... 7, 15

*Am. Library Ass'n v. Barr*,
956 F.2d 1178 (D.C. Cir. 1992) ...................................................................... 10

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................ 13, 14

*Broderick v. di Grazia*,
504 F.2d 643 (1st Cir.1974) ........................................................................... 13

*Cammarano v. United States*,
358 U.S. 498 (1959) ........................................................................................ 9

*Carney v. Adams*,
592 U.S. 53 (2020) .......................................................................................... 7

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) .......................................................................... 15

*City of Fall River v. Fed. Energy Regulatory Comm'n*,
507 F.3d 1 (1st Cir. 2007) ....................................................................... 12, 13

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) ................................................................................. *passim*

*Cont'l Air Lines, Inc. v. Civil Aeronautics Bd.*,
522 F.2d 107 (D.C. Cir.1975) ........................................................................ 13

*Dep't of Homeland Sec. v. New York*,
140 S. Ct. 599 (2020) ..................................................................................... 17

*Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*,
643 F.3d 16 (1st Cir.), *cert. denied*, 565 U.S. 977 (2011) ................................ 12

*Florida v. Dep't of Health & Hum. Servs.*,
19 F.4th 1271 (11th Cir. 2021) ...................................................................... 17

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................................... 7, 11

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024) ......................................................................... 14

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*,
    844 F.3d 318 (1st Cir. 2016) ............................................................ 12

*Lewis v. Casey*,
    518 U.S. 343 (1996) ........................................................................ 17

*Louisiana v. Biden*,
    64 F.4th 674 (5th Cir. 2023) .......................................................... 12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................................... 6, 7

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
    367 F.3d 68 (1st Cir. 2004) ............................................................ 10

*Murthy v. Missouri*,
    603 U.S. 42 (2024) ...................................................................... 6, 8

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ............................................................... *passim*

*New England Health Care Employees Union, Dist. 1199, SEIU v. Women & Infants Hosp.*,
    C.A. No. 15–66 S., 2015 WL 1424402 (D.R.I. Mar. 27, 2015) ...................... 16

*New Jersey v. Trump*,
    No. 25-1170, slip op. (1st Cir. Mar. 11, 2025) .................................... 6

*New York v. Trump*,
    No. 25-CV-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ................ 14

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................ 6

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ...................................................................... 13

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
    414 F.3d 23 (D.C. Cir. 2005) ..................................................... 9, 10

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460 (2009) ........................................................................ 9

*Portela-Gonzalez v. Sec'y of the Navy*,
    109 F.3d 74 (1st Cir. 1997) ............................................................ 13

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................ 7

*Raven v. Sajet*,
    334 F. Supp. 3d 22 (D.D.C. 2018, *aff'd sub nom. Raven v. United States*, No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17, 2019), *cert. denied*, 140 S.Ct. 866 (2020) ................................................................................. 9

*Regan v. Taxation with Representation of Wash.*,
  461 U.S. 540 (1983) ............................................................................................ 8, 9

*Renne v. Geary*,
  501 U.S. 312 (1992) ............................................................................................ 6

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ............................................................................................ 8

*Savage v. U.S. Small Bus. Admin.*,
  552 F. Supp. 3d 241 (D.R.I. 2021) ..................................................................... 8

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ............................................................................................ 7

*Texas v. United States*,
  523 U.S. 296 (1998) ............................................................................................ 12

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................................ 8

*Trump v. New York*,
  592 U.S. 125 (2020) ............................................................................................ 8

*United Presbyterian Church in the U.S.A. v. Reagan*,
  738 F.2d 1375 (D.C. Cir. 1984) .......................................................................... 10

*United States v. Am. Library Ass'n*,
  539 U.S. 194 (2003) ............................................................................................ 10

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ............................................................................................ 17

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) ............................................................................................ 9

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ............................................................................................ 8

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................ 6

**Statutes**

20 U.S.C. § 954(b)(1) ............................................................................................... 2

20 U.S.C. § 954(c) .................................................................................................... 2, 3

20 U.S.C. § 954(d) .................................................................................................... 4

20 U.S.C. § 954(d)(1) ............................................................................................... 4

20 U.S.C. § 954(e) .................................................................................................... 3, 16

20 U.S.C. § 954(h) ........................................................................................................... 4

20 U.S.C. § 955(b) ........................................................................................................... 4

20 U.S.C. § 955(f) ........................................................................................................... 4

20 U.S.C. § 955(f)(1) ...................................................................................................... 4

20 U.S.C. § 959(c) ........................................................................................................... 3

5 U.S.C. § 704 ............................................................................................................... 14

**Other Authorities**

Executive Order 14168 ("Defending Women From Gender Ideology Extremism and
    Restoring Biological Truth to the Federal Government"), 90 Fed. Reg. 8615
    (Jan. 20, 2025) ....................................................................................................... 5, 6

**Rules**

Fed. R. Civ. P. 65 .......................................................................................................... 2, 17

**Constitutional Provisions**

U.S. Const., art. III, § 2 .................................................................................................. 7

The Plaintiffs (or their members) are theater artists concerned that the National Endowment for the Arts ("NEA"[1]) might implement a recent Executive Order ("EO") in a way that could violate the Administrative Procedure Act ("APA") and the First and Fifth Amendments. The Plaintiffs anticipate applying to the NEA's Grants for Arts Program ("GAP"), the only NEA program at issue in this case. But the specific relief that the Plaintiffs seek in their motion for preliminary injunction (ECF 2-1 at 34) is no longer necessary. As of March 11, 2025, the NEA is: (1) no longer requiring GAP applicants to certify that they will comply with the EO and (2) is no longer applying the EO in its grantmaking decisions. Instead, the NEA has initiated a new administrative proceeding to assess whether, and if so how, to implement the EO. The NEA's GAP program is operating today just as it had before the contested EO issued in January 2025.

Because the Plaintiffs' preliminary-injunction motion seeks relief from circumstances that no longer exist, the Court should deny the motion on any one or more of the following four grounds. First, because there is no case or controversy for this Court to adjudicate, the Plaintiffs lack standing. Without any agency action to challenge, the Plaintiffs cannot show any injury in fact. Their concern about any impact of the NEA's potential adoption of any part of the EO is speculative. Their alleged harms are the same as they would face in selecting any project that might qualify for an NEA grant.

Second, even if the Plaintiffs had standing, their claims are not ripe for adjudication. Whether and how the NEA might implement the EO is unknown. Separation-of-powers principles counsel against judicial intervention in ongoing administrative proceedings that might yield a result that could obviate any judicial intervention. There is no irreparable harm in waiting for the NEA to complete its ongoing administrative review, as the Plaintiffs could renew their request for preliminary relief if, and when, their alleged harm should become more concrete and immediate.

---

[1]    For convenience, the government refers to both Defendants—the NEA and its Senior Advisor, Mary Anne Carter—as the NEA.

Third, without any agency action to review, none of the Plaintiffs' alleged causes of action can satisfy the Plaintiffs' burden to qualify for preliminary relief under Federal Rule of Civil Procedure 65. The absence of agency action prevents all claims under the APA and the U.S. Constitution, as they all turn on the agency action that the NEA rescinded on March 11, 2025.

Finally, even if the preceding hurdles did not preclude preliminary relief, the Plaintiffs' motion still fails because they have failed to articulate any irreparable harm. Whatever the NEA does or does not do with the EO, no GAP applicant is entitled to funding. Most applicants will be rejected under criteria independent of the EO (whether or however the EO might apply after the NEA's ongoing evaluation). And for an applicant that is selected, the NEA funds only a single project that an applicant proposes, and at most only 50 percent of that single project's expenses. With or without the EO, every GAP applicant confronts the same dilemma. They must conceive of a single project that they think optimizes their chances for partial funding. They must juggle all the logistical planning and scheduling around that contingency (and incur any corresponding expenses). They still must confront the more-likely-than-not possibility that the NEA ultimately may not fund their projects. And, even if the NEA funds their projects, they still must fill a funding gap from other sources. That is not irreparable harm, nor is it significant enough to short-circuit an ongoing administrative proceeding that might, or might not, obviate the sole ground for the Plaintiffs' case. The Court should deny the motion.

## BACKGROUND

### The NEA's selective, partial grantmaking process

Congress created the NEA in 1965. The President appoints the NEA's Chair with the advice and consent of the Senate, and the Chair principally administers selective grantmaking for arts projects. 20 U.S.C. §§ 954(b)(1), (c). The statute sets forth a range of objectives for such funding—namely, projects of artistic and cultural significance and excellence. *E.g.*, 20 U.S.C. § 954(c)(1)-(4). In February 2025, NEA published on its website the details of its GAP program for fiscal year 2026. ECF 2-2, Ex. 1. This notice describes the NEA's selective, grantmaking procedures and terms for the program.

The NEA anticipates rejecting more than half of the GAP applications. *Id.* at 4. GAP funding for any winning project is limited. GAP funds only arts "projects"—a word used more than 240 times in the NEA's notice—"with specific, definable activities." *Id.* at 9 & *generally*; 20 U.S.C. § 954(c). GAP does not fund an applicant's general operations or full season of programming. ECF 2-2, Ex. 1 at 6. Typically, GAP awards may not exceed 50 percent of a project's costs. 20 U.S.C. § 954(e). And the funding of a winning project is typically between $10,000 to $100,000,[2] contingent on available funds. ECF 2-2, Ex. 1 at 4.

There are two GAP application cycles (GAP 1 and GAP 2), and each has two deadlines: Part 1 for the Grants.gov submission and Part 2 for the NEA applicant Portal submission. *Id.* at 21. GAP 1's Part 1 deadline was March 11, 2025. *Id.* at 5, 23. The NEA extended GAP 1's Part 2 deadline from March 24, 2025, to April 7, 2025. ECF 10 ¶ 9. GAP 2's Part 1 deadline is July 10, 2025. ECF 2-2, Ex. 1 at 5, 23. In Part 1 of either cycle, applicants must check a box next to "I agree" on an electronic Assurance of Compliance form by which the applicant certifies compliance with various legal requirements. *E.g.*, Ex. 1 (Bolan Decl., Ex. A (NEA, Legal Requirements and Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance)); ECF 2-4, Ex. A (depicting electronic form).

NEA staff first check applications for "completeness and eligibility." ECF 2-2, Ex. 1 at 25. Program eligibility requirements include limits on (among other things) artistic disciplines, *id.* at 6-8; specific project activities and costs, *id.* at 10-11; 20 U.S.C. § 954(e); applicant type (*e.g.*, no individuals), *e.g.*, ECF 2-2, Ex. 1 at 13; and number of applications (typically one per calendar year), *id.* at 15.

Different NEA personnel then take three separate, sequential steps. First, advisory panelists, convened by artistic discipline and including "arts experts," evaluate eligible applications. Those advisory panels submit their recommendation on all projects for subsequent review by the National Council on the Arts (the "Council"). 20 U.S.C. § 959(c); ECF 2-2, Ex. 1 at 25-26.

---

[2]    The range is higher for "Local Arts Agencies," ECF 2-2, Ex. 1 at 4, but no Plaintiff describes itself as such.

Second, the Council's voting members re-evaluate all applications and submit their recommendations to the Chair. The Council includes the Chair; six members of Congress (who lack any vote); and another 18 members, all appointed by the President by and with Senate advice and consent who are private citizens and arts professionals with experience and achievement in the arts. 20 U.S.C. § 955(b).

Third, the Chair selects winning applications. The Chair may not select applications that the Council has recommended denying, and typically may not adjust the amount of funding that the Council has recommended for a project. 20 U.S.C. § 955(f); ECF 2-2, Ex. 1 at 23, 26.

Throughout these steps, the mandatory, affirmative review criteria are "artistic excellence" and "artistic merit," which are weighted equally. *E.g.*, 20 U.S.C. §§ 954(d)(1), 955(f)(1), 959(c). No project "determined to be obscene" may receive funding. 20 U.S.C. § 954(d). The permissive criteria are "general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). As the Supreme Court recognized in *National Endowment for the Arts v. Finley*, these criteria necessarily implicate "content-based considerations" that inevitably result in "denying money to a larger amount of constitutionally protected expression." 524 U.S. 569, 585 (1998) (cleaned up).

The NEA will notify applicants of the approval or denial of their proposed projects in December 2025 (for GAP 1) or in April 2026 (for GAP 2). GAP 1 recipients may start their projects as early as January 1, 2026. GAP 2 recipients may start theirs as early as only five months later: June 1, 2026. ECF 2-2, Ex. 1 at 5, 23. For projects that receive NEA funding, the grantee must acknowledge the NEA's partial funding in relation to the grantee's winning project. Ex. 1 (Bolan Decl., Ex. B at 6-7 (NEA, General Terms and Conditions for Federal Financial Assistance Awards to Organizations (Apr. 22, 2024), https://www.arts.gov/sites/default/files/FY25-GTC-ORGs-11.5.2024.pdf). Through the Assurance of Compliance, the NEA reserves its rights to ensure that grant recipients comply with the terms of the NEA's awards. Ex. 1 (Bolan Decl., Ex. A at 10); 20 U.S.C. § 954(h).

**Executive Order 14168**

On January 20, 2025, the President issued Executive Order 14168 ("Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"), 90 Fed. Reg. 8615 (Jan. 20, 2025) (again, the "EO"). This EO, in part, sets forth a policy "to recognize two sexes, male and female" relative to a person's biological classification at conception, and defines "gender ideology," in part, as contrary to that policy. EO §§ 2 & 2(a), (d)-(f). The EO instructs federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," EO § 3(g), subject to the legal authority granted to agency decisionmakers and "consistent with applicable law," EO §§ 8(a)(i) & (b). The EO does not regulate what private persons choose to say or not to say. Instead, by its plain terms, the EO "govern[s] all Executive interpretation of and application of Federal law and administration policy." EO § 2.

On February 6, 2025, the NEA updated its Assurance of Compliance to ask GAP applicants to certify their compliance with the EO. ECF 10 ¶ 6. On March 6, 2025, the Plaintiffs sued the NEA in this Court to challenge the certification requirement and the use of the EO in evaluating GAP applications. ECF 1. On March 11, 2025, the NEA rescinded the certification requirement as to the EO. ECF 10 ¶ 8; Ex. 1 (Bolan Decl., Ex. A at 12).

In a memorandum dated March 17, 2025, the NEA took two further steps. First, it "rescinded all implementation of the EO." Ex. 1 (Bolan Decl., Ex. C (Mem. from Mary Anne Carter, NEA Senior Advisor, to NEA Grantmaking Staff (Mar. 17, 2025)). Second, it initiated a "new evaluation of the EO" in light of ongoing judicial decisions construing it and "consistent with applicable law." *Id.*; *see also* EO §§ 8(a)(i) & (b). The March 17 Memorandum set two deadlines—one for this new administrative process to complete (April 16, 2025), a second to implement the outcome of that process (April 30, 2025). Ex. 1 (Bolan Decl., Ex. C).

**Plaintiffs' preliminary-injunction declarations**

Each Plaintiff submitted a declaration concerning their intentions to apply for the NEA's fiscal-year 2026 GAP cycles. Each previously received NEA funding, some for projects created

by transgender, queer, or nonbinary artists with transgender themes. ECF 2-3 ¶¶ 2, 7 (Martínez Decl. (Mar. 5, 2025)); ECF 2-4 ¶ 7 (Odess-Rubin Decl. (Mar. 5, 2025)); ECF 2-5 ¶¶ 4-8 (Byrd Decl. (Mar. 5, 2025)); ECF 2-6 ¶¶ 2, 5 (Cachapero Decl. (Mar. 5, 2025)). Each suspects that projects for which it will apply or could have applied would not qualify for GAP funding for fiscal year 2026—if the NEA were to implement the EO—as the projects feature some combination of transgender, nonbinary, and queer themes, artists, and participants. All contend that the EO, if implemented, would frustrate their missions; that they are uncertain about what promoting gender ideology means; and that they (or their members) intend to apply in future years for NEA grants for projects that include transgender themes, artists, and participants. ECF 2-3 ¶¶ 16-17, 21-22; ECF 2-4 ¶¶ 14, 19; ECF 2-5 ¶¶ 18, 21; ECF 2-6 ¶¶ 12, 18-19. None contends, however, that anything that the NEA does or does not do would imperil its continuing existence or prevent it from presenting projects that will feature transgender themes, artists, and participants without NEA funding.

## STANDARD OF REVIEW

A plaintiff must first demonstrate that this Court possesses subject-matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Courts "presume they lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1992) (cleaned up). A plaintiff must "make a clear showing that it is likely to establish each element of standing." *New Jersey v. Trump*, No. 25-1170, slip op. at 7 (1st Cir. Mar. 11, 2025) (quoting *Murthy v. Missouri*, 603 U.S. 42, 58 (2024)) (cleaned up).

"A preliminary injunction is an 'extraordinary remedy.' " *Id.* at 6 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). A plaintiff must establish that: (i) it likely will succeed on the merits; (ii) absent preliminary relief, it likely will suffer irreparable harm; (iii) the balance of the equities tips in its favor; and (iv) an injunction is in the public interest. *Id*. at 6-7 (citing *Winter*, 555 U.S. at 20). The third and fourth factors "merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "If the movant fails to demonstrate a

likelihood of success on the merits, the remaining elements are of little consequence." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020).

## ARGUMENT

I.  **Because the Plaintiffs' claims are not justiciable, the Court should deny the preliminary-injunction motion.**

   A.  **Because there is no agency action to challenge, the Plaintiffs lack standing to pursue preliminary relief.**

Article III of the Constitution limits the federal courts' jurisdiction to "cases" and "controversies." U.S. Const., art. III, § 2. *See also, e.g.*, *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013) (finding claimants lacked standing). "We have long understood that constitutional phrase to require that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 592 U.S. 53, 58 (2020); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 397 (2024) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.").

To prevent the issuance of advisory opinions, a claimant must establish standing. *See, e.g.*, *Clapper*, 568 U.S. at 408. Separation-of-powers principles underlie this requirement "to prevent the judicial process from being used to usurp the powers of the political branches." *Id*. Courts are "especially rigorous" in assessing standing when they must "decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id*. (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)).

To establish standing, a claimant must show (1) an injury in fact (2) fairly traceable to the contested conduct that (3) a favorable court decision would likely redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Injury in fact is the "first and foremost" of standing's three elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). The Plaintiffs alleged three types of harm before the NEA rescinded its implementation of the EO:

- first, suspicion that the EO would disqualify their applications, cause them to lose federal funding, or expose them to compliance penalties based on the possible implementation of

the EO, which they contend would be a viewpoint-based prohibition infringing their First Amendment free-speech rights;

- second, uncertainty about how the EO, if applied, would apply; and

- third, frustration of their organizations' missions and project planning.

*E.g.*, ECF 2-1 at 10-13. None satisfies any of the three traditional standing elements. *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) ("[P]laintiffs must demonstrate standing for each claim that they press . . . and for each form of relief that they seek.") (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

None of the Plaintiffs' declarations establish injury in fact.

First, and most importantly, there is simply no agency action that affects the Plaintiffs' ability to compete for a selective GAP award. Absent agency action, the Plaintiffs suffer "no concrete harm" as that absence "does not require them to do anything or to refrain from doing anything." *Trump v. New York*, 592 U.S. 125, 134 (2020). The mere possibility that a future agency action might be the same as the NEA's now-rescinded implementation of the EO is also insufficient injury as a matter of law. *Id.* at 131 ("Any prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time.") (cleaned up). Moreover, "threatened injury must be certainly impending to constitute injury in fact." *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also, e.g.*, *Savage v. U.S. Small Bus. Admin.*, 552 F. Supp. 3d 241, 247, 249-50 (D.R.I. 2021) (McElroy, J.) (dismissing declaratory-judgment claim about plaintiff's eligibility for government funding because agency action, in part, was merely "threatened").

Second, whether the NEA implements the EO or not, the Plaintiffs' First Amendment contentions do not establish injury in fact. Regardless of how the Court might characterize the speech at issue in this case, and even if the NEA were to implement the EO, that would not be enough to establish irreparable harm. A "decision not to subsidize the exercise of a fundamental right does not infringe the right." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549 (1983)); *see also Clapper*, 568 U.S. at 418 ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific

present objective harm or a threat of specific future harm.") (cleaned up); *cf. Regan*, 461 U.S. at 546 (rejecting First Amendment challenge to statute precluding tax subsidy for lobbying activity) ("We again reject the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.' ") (quoting *Cammarano v. United States*, 358 U.S. 498, 515 (1959) (Douglas, J., concurring)).

Given the posture of this case, and the uncertainty about the outcome of the NEA's ongoing administrative proceeding, it is premature for the Court to assess the Plaintiffs' asserted First Amendment harms further. In any event, Plaintiffs' First Amendment theory of harm is unlikely to succeed. The NEA's selective, grantmaking decisions do not create any fora for any private citizens' exercise of free speech. Instead, the NEA's decisions about which art projects it selects for awards—and which it does not—constitute a form of government speech, and are therefore not subject to the First Amendment. *See, e.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) ("[A]s a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position. In doing so, it represents its citizens and it carries out its duties on their behalf.").

When the government acts as a patron of the arts, the government is speaking, and the First Amendment does not apply. *See, e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998) ("[T]he Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake."); *id.* at 598 (Scalia, J., concurring) ("It is the very business of government to favor and disfavor points of view."); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 29, 30-31 (D.C. Cir. 2005) (reversing judgment finding that exclusion of claimant's submission to publicly funded art display violated First Amendment); *Raven v. Sajet*, 334 F. Supp. 3d 22 (D.D.C. 2018) (dismissing First Amendment claim based on allegations that political animus underlain National Portrait Gallery decision not to hang plaintiff's portrait of President Trump), *aff'd sub nom.*

*Raven v. United States*, No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17, 2019), *cert. denied*, 140 S.Ct. 866 (2020); *id*. at 32 ("[T]he First Amendment simply does not apply to government art selections, no matter how arbitrary.") (citing *Gittens*, 414 F.3d at 30); *cf. United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality opinion) (rejecting public libraries' First Amendment challenge to statute conditioning funding for Internet access on adding filtering software) ("To the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance").

Arguments about whether and how the First Amendment might apply to the NEA's hypothetical decision to implement the EO in some way will require careful consideration of how the law applies to the agency's concrete actions. Therefore, the appropriate time to develop these and other arguments, if at all, will depend on whether—and if so how—the NEA adopts and implements the EO.

Third, the Plaintiffs' allegations of regulatory uncertainty—an inevitability of many new policy announcements—also do not establish injury in fact, whether the First Amendment applies to the Plaintiffs' claims or not. *See Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992) (" '[P]resent deterrence from First Amendment conduct because of the difficulty of determining the application of a regulatory provision to that conduct [will not] by itself support standing.") (quoting *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (Scalia, J.)); *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) (affirming denial of preliminary-injunction motion) ("A threat that is either unlikely to materialize or purely theoretical will not do."); *id*. ("Preliminary injunctions are strong medicine, and they should not issue merely to calm the imaginings of the movant."). And, to the extent that this regulatory uncertainty allegedly arises from the potentially vague implementation of the EO (again, if implemented at all), that is not an injury when the speech at issue is the government's selection of works of art. *See, e.g.*, *Finley*, 524 U.S. at 588 ("[W]hen the Government is acting as a patron rather than as sovereign, the consequences of imprecision are not constitutionally severe.").

Fourth, every Plaintiff alleges that the EO, if implemented by the NEA, would frustrate its mission. *E.g.*, ECF 2-3 ¶ 21; ECF 2-4 ¶¶ 14, 16; ECF 2-5 ¶ 19; ECF 2-6 ¶¶ 3, 17. The Supreme Court rejected this type of injury as supporting standing last term:

> [A]n organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization. A plaintiff must show far more than simply a setback to the organization's abstract social interests.

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (cleaned up).

Moreover, the Plaintiffs cannot establish an injury in fact by incurring costs in anticipation of some future harm. ECF 2-4 ¶ 9 (risk of shortened planning time); ECF 2-5 ¶¶ 11-13 (same); ECF 2-6 ¶ 16 (diversion of resource to evaluate of EO). *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 394 ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way."); *Clapper*, 568 U.S. at 416 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing . . . .").

The Plaintiffs cannot satisfy either of the two other standing requirements. With or without the EO (and regardless of the April 7 GAP 1 deadline relative to the administrative proceeding the NEA anticipates completing by April 16), all GAP applicants must make difficult choices about what to pitch to the NEA with the hope of securing uncertain, partial funding. *Cf. Clapper*, 568 U.S. at 417 ("Another reason that respondents' present injuries are not fairly traceable to [the contested law] is that even before [it] was enacted, they had a similar incentive to engage in many of the countermeasures that they are now taking."). As to RILA and TCG's members, they have the same incentives to choose a project proposal that they hope the NEA might grant under its "subjective selection" process, *Finley*, 524 U.S. at 590, where the NEA has already encouraged applications on specific topics, ECF 2-2, Ex. 1 at 6-7; *Finley*, 524 U.S. at 588 ("[A]s a

practical matter . . . artists may conform their speech to what they believe to be the decisionmaking criteria in order to acquire funding.").

Regardless, the NEA has rescinded its implementation of the EO and extended GAP 1's Part 2 deadline. There is nothing for the Court to redress. The Plaintiffs thus cannot satisfy standing's third element. *See, e.g.*, *Louisiana v. Biden*, 64 F.4th 674, 678 (5th Cir. 2023) (dismissing appeal; vacating preliminary injunction given plaintiff States' lack of standing) ("Plaintiffs' allegations of 'injury in fact' rely on a chain of hypotheticals . . . . Such injuries . . . flow . . . from potential future regulations, i.e., final rules that are subject to their own legislated avenues of scrutiny, dialogue, and judicial review on an appropriately developed record.").

### B.    Because the agency is conducting a new administrative process to determine whether, and how, the EO might apply, the Plaintiffs' claims are not ripe.

Even if this Court were to conclude that the Plaintiffs have standing, the Court should still deny the motion under the ripeness doctrine. *See, e.g.*, *Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*, 643 F.3d 16, 17 (1st Cir.), *cert. denied*, 565 U.S. 977 (2011). "Ripeness is a justiciability doctrine" whose purpose is to prevent "courts from 'entangling themselves in abstract disagreements over administrative policies' and from improperly interfering in the administrative decision-making process." *City of Fall River v. Fed. Energy Regulatory Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). "The burden to prove ripeness is on the party seeking jurisdiction." *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (affirming dismissal of pre-enforcement judicial review on ripeness grounds).

Courts apply a two-part test to determine whether a case is ripe for review, and both favor denial of the Plaintiffs' motion. First, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also City of Fall River*, 507 F.3d at 6 (declining to review agency's conditional project approval for lack of ripeness). Agency action is not ripe for judicial review until an agency has made a final decision. *Abbott Labs.*, 387 U.S. at 149. And, for

an agency review to be final, it must be both (a) "the consummation of the agency's deci-sionmaking process," and (b) a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177 (1997); *Abbott Labs.*, 387 U.S. at 148-49. The NEA rescinded any action to implement the EO; there is now no final agency action.

Without any agency action to review, it is unclear what the Court would be assessing, how, and on what grounds, as well as what relief it could grant. *See, e.g.*, *Broderick v. di Grazia*, 504 F.2d 643, 645 (1st Cir.1974) (action for declaratory judgment, that statement Police Com-missioner threatened police officers with due process violation in future administrative proceed-ings, was not ripe because "[a] court could only guess at how [the statement] might be translated into practice"); *City of Fall River*, 507 F.3d at 6 ("[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."); *Cont'l Air Lines, Inc. v. Civil Aeronautics Bd.*, 522 F.2d 107, 125 (D.C. Cir.1975) ("If the [agency's] position is likely to be abandoned or modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempt-ing to reach a final decision."); *cf. Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 79 (1st Cir. 1997) ("Disregarding available administrative processes thrusts parties prematurely into overcrowded courts and weakens an agency's effectiveness by encouraging end-runs around it.").

Second, a court must consider the hardship to both parties, but there is no hardship to the Plaintiffs. Should the outcome that the Plaintiffs expect actually occur, they may still challenge the agency's decisionmaking before this Court. *See City of Fall River*, 507 F.3d at 7; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998) ("The [plaintiff] thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain.").

**II.    Without any agency action, the Plaintiffs are not entitled to any preliminary relief.**

Again, regardless of the Rule 65 elements that guide a court's analysis of requests for preliminary relief, the NEA is doing precisely what the Plaintiffs have asked the Court to order the NEA to do, ECF 21 at 34: (a) not require applicants to certify that they will comply with the EO, and (b) not implement the EO. ECF 10 ¶ 8; Ex. 1 (Bolan Decl., Ex. C). It is not clear what relief the Plaintiffs could now lawfully seek and that the Court could now lawfully issue.

Regardless of the question of relief, it is beyond dispute that the Plaintiffs are not entitled to it. The NEA has rescinded the agency action that is the sole basis of the Plaintiffs' pleading and motion, and so the Plaintiffs cannot prevail on the Rule 65 elements necessary to merit preliminary relief.

**A.    The likely success of the Plaintiffs' claims turns on agency action that the agency has rescinded, compelling denial of their motion.**

As this Court recently held,

> The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An agency action is "final" if: (1) it marks the " 'consummation' of the agency's decisionmaking process," and (2) the action determines rights or obligations or creates legal consequences. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (citing *Bennett v. Spear*, 520 U.S. 154, 177, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)).

*New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *8 (D.R.I. Mar. 6, 2025) (McConnell, C.J.). The only "final" agency action relevant to the EO is the NEA's decision to rescind it. Otherwise, it has embarked on a new administrative proceeding, whose outcome, grounds, and implementation are uncertain. Because there is no agency decisionmaking for this Court to evaluate, it is difficult to conceive how the Plaintiffs could prevail in challenging agency action under the APA that has not yet occurred.[3]

---

[3]    In *New York v. Trump*, Judge McConnell found that the government's rescission of a challenged agency action did not obviate the need for a preliminary injunction based on his view that there was direct evidence that the "rescission was in name only and that the substantive effect of the directive carries on." 2025 WL 715621, at *4 (cleaned up). There is no such evidence here.

The same result follows for the Plaintiffs' First and Fifth Amendment claims. The only criteria guiding any NEA decisionmaking on any GAP applications are those that predate the EO and that the Supreme Court approved of in *Finley*. That decision addressed both First and Fifth Amendment interests—both in the NEA's favor. *E.g.*, 524 U.S. at 588. Without any more information about whether and how the NEA might implement the EO, Plaintiffs lack any agency action to challenge under the First or Fifth Amendment beyond NEA's grantmaking decisions upheld in *Finley*.

### B.    The Plaintiffs suffer no irreparable harm.

The Plaintiffs cannot establish the merit of claims that depend on agency action that has been rescinded. As a result, the remaining Rule 65 "elements are of little consequence." *See, e.g.*, *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020).

Regardless, the Plaintiffs cannot show any harm from the merely possible implementation of the EO. "A tenuous or overly speculative forecast of anticipated harm does not possess the substance required to show irreparable injury." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (cleaned up). The primary harm that the Plaintiffs point to, now that the NEA has rescinded any action that implements the EO, is their contention that, because the GAP 1 Part 2 deadline on April 7 precedes the April 16 deadline for the agency's new administrative process, they must apply for projects that are not their first choices. The Plaintiffs argue their First Amendment rights will be chilled as a result.

That alleged harm is not irreparable for three reasons. First, Plaintiffs' alleged harm is not irreparable, for the same reasons that the Plaintiffs' have not shown injury in fact to support standing. Even without the EO, the NEA administers a "subjective selection" process, consistent with the authority to "selectively fund" certain activities to the exclusion of others. *Finley*, 524 U.S. at 588; *id*. at 593 (Scalia, J., concurring). And applications, therefore, will inevitably "conform their speech to what they believe to be the decisionmaking criteria in order to acquire funding." *Id*. at 589 (majority opinion). Thus, the choices that every GAP applicant confronts (even by April 7, 2025) necessarily have uncertain consequences.

Second, what is most practically at stake—the loss of an NEA grant—would not irreparably harm the Plaintiffs. By the NEA's own calculations, it will reject more than 50 percent of GAP applicants. ECF 2-2, Ex. 1 at 4. Even if an applicant were to receive a grant, the NEA legally cannot be the sole source—of a project's funding. *See* 20 U.S.C. § 954(e) (stating that a grant "shall not exceed 50 per centum of the total cost of such project or production" subject to otherwise inapplicable exceptions). And even then, many project costs are unallowable (directly or because of activities related to the project). ECF 2-2, Ex. 1 at 13-14.

As a result, with or without the EO, *every* applicant, and not just the Plaintiffs, must plan for the likely denial of their applications, no matter what projects those applications proposed. The anticipated partial loss of a project's funding from the NEA is not irreparable harm because Plaintiffs are not *entitled* to NEA funding. The same problem applies to the Plaintiffs' speculations about possible lost time to plan a project or frustrated budget expectations or difficulties securing personnel for projects or waiting five months for possible GAP 2 funding.

Third, as noted above, the First Amendment does not apply to government art selections like the one at issue here. The Plaintiffs' First Amendment rights are not implicated by their decision of which work of art to submit for government selection, so there are no rights to be chilled.

Other movants have presented far more precarious consequences absent preliminary relief and still failed to persuade this Court that their harm was irreparable. *See, e.g.*, *New England Health Care Employees Union, Dist. 1199, SEIU v. Women & Infants Hosp.*, C.A. No. 15–66 S., 2015 WL 1424402, at *3-*4 (D.R.I. Mar. 27, 2015) (Smith, J.) (denying motion for temporary restraining order after finding anticipated patient diversion and corresponding economic losses, in the absence of order compelling union personnel to work, did not show irreparable harm).

**C.    The balance of the equities and public interest—which merge where the government is the defendant—weigh against preliminary relief.**

The Plaintiffs' showing on this factor repeats its merits arguments, which necessarily fail given the NEA's rescission of the sole ground for the Plaintiffs' motion. Because the NEA's

grantmaking process, which does not incorporate the EO, is itself constitutional, the public inter-est weighs against an injunction. *Finley*, 524 U.S. 587-88. Allowing the NEA, moreover, to com-plete its ongoing administrative review and decide whether and how to implement the EO also are in the public interest and consistent with separation-of-powers principles.

## III. The Court should limit any injunctive relief to the Plaintiffs and the NEA only.

Injunctive relief should not provide "a remedy beyond what [is] necessary to provide re-lief" to injured parties. *Lewis v. Casey*, 518 U.S. 343, 360 (1996). Accordingly, to the extent the Court intends to grant the Plaintiffs' request for a preliminary injunction, such relief should be narrowly tailored to apply only to the Plaintiffs and the NEA. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Universal injunctions have little basis in traditional equitable practice."); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a na-tionwide injunction "are rare").

## IV. Any injunctive relief should be stayed pending appeal and accompany a bond.

To the extent the Court issues any injunctive relief, the NEA also respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an ap-peal is authorized.

The NEA also respectfully requests that any injunctive relief accompany a bond under Federal Rule of Civil Procedure 65(c), which provides that "[t]he court may issue a pre-liminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary

relief would potentially mandate that the Executive spend money that may not be recouped once distributed.

## CONCLUSION

For the preceding reasons, the NEA respectfully asks the Court to deny the Plaintiffs' preliminary injunction motion.

Dated: March 21, 2025               Respectfully submitted,

NATIONAL ENDOWMENT FOR THE ARTS; MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts,

By their Attorneys

SARA MIRON BLOOM
Acting United States Attorney

*/s/ Kevin Bolan*
KEVIN BOLAN
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
kevin.bolan@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on March 21, 2025, I filed this document and its attachments through the Court's ECF system, thereby electronically serving all parties of record in this action.

*/s/ Kevin Bolan*
KEVIN BOLAN
Assistant United States Attorney