# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER,THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts, <br><br> *Defendants*. | Case No. 25-cv-79-WES-PAS <br><br> **REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ........................................................................................... 1

SUPPLEMENTAL STATEMENT OF FACTS .............................................. 3

ARGUMENT ................................................................................................... 5

    I.   PLAINTIFFS' CLAIMS ARE JUSTICIABLE ....................................... 5

        A.  Plaintiffs Have Standing to Bring This Action ................................... 5

        B.  Plaintiff TCG Has Standing to Bring This Action ............................ 9

            1.  TCG Has Associational Standing on Behalf of Its Members .............. 9

            2.  TCG Has Standing in Its Own Right ................................................. 11

        C.  The NEA's Rescission of the "Gender Ideology" Prohibition Is Voluntary Cessation under the Mootness Doctrine ......................... 12

        D.  This Case is Ripe ............................................................................. 15

    II.  ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM ..................................................... 17

    III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS ........................ 20

        A.  Imposing a Viewpoint-Based Restriction on NEA Applications Violates the APA ............................................................................. 20

        B.  Imposing a Viewpoint-Based Restriction on NEA Applications Violates the First Amendment ......................................................... 20

        C.  The "Gender Ideology" Prohibition Is Unconstitutionally Vague ........ 26

    IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION ................................................................................. 27

    V.  THIS COURT SHOULD NOT LIMIT ANY INJUNCTIVE RELIEF TO PLAINTIFFS ............................................................................ 27

    VI. THE COURT SHOULD NOT STAY ANY INJUNCTION PENDING APPEAL ............................................................................................. 28

    VII. THIS COURT SHOULD WAIVE THE BOND REQUIREMENT. ......... 28

CONCLUSION.................................................................................................................30

CERTIFICATE OF SERVICE ......................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) .................................................................................................... 22, 23

*Already LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ............................................................................................................ 1

*Am. Truck Associations v. Alviti*,
  630 F. Supp. 3d 357 (D.R.I. 2022) ............................................................................. 10, 11

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006) ......................................................................................................... 8

*Becker v. Fed. Election Comm'n*,
  230 F.3d 381 (1st Cir. 2000) ............................................................................................ 6

*Broderick v. di Grazia*,
  504 F.2d 643 (1st Cir. 1974) .......................................................................................... 16

*Brown v. Colegio de Abogados de Puerto Rico*,
  613 F.3d 44 (1st Cir. 2010) ........................................................................................... 14

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ....................................................................................................... 27

*California v. Dep't of Educ.*,
  No. 25-1244, 2025 WL 878431 (1st Cir. Mar. 21, 2025) ........................................... 28, 29

*Carson as next friend of O.C. v. Makin*,
  979 F.3d 21 (1st Cir. 2020) ........................................................................................... 22

*City of Fall River v. Fed. Energy Regul. Comm'n*,
  507 F.3d 1 (1st Cir. 2007) ............................................................................................. 16

*Clapper v. Amnesty International*,
  568 U.S. 398 (2013) ..................................................................................................... 5, 6

*Cmty. Hous. of Me v. Martinez*,
  146 F. Supp. 2d 36 (D. Me. 2001) ................................................................................. 15

*Comcast of Maine/New Hampshire, Inc. v. Mills*,
  988 F.3d 607 (1st Cir. 2021) ......................................................................................... 27

*Conservation L. Found. v. Academy Express, LLC*,
  129 F.4th 78 (1st Cir. 2025) ........................................................................................ 9, 12

*Cont'l Air Lines, Inc. v. Civil Aeronautics Bd.*,
  522 F.2d 107 (D.C. Cir. 1975) ................................................... 16

*Coons v. Indus. Knife Co., Inc.*,
  620 F.3d 38 (1st Cir. 2010) ....................................................... 20

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
  473 U.S. 788 (1985) ................................................................. 25

*Crowley v. Local No. 82, Furniture & Piano Moving*,
  679 F.2d 978 (1st Cir.1982) ...................................................... 29

*Deal v. Mercer Cnty. Bd. of Educ.*,
  911 F.3d 183 (4th Cir. 2018) ..................................................... 15

*Eldridge v. Gordon Bros. Grp., LLC*,
  316 F.R.D. 12 (D. Mass. 2016) .................................................. 20

*FBI v. Fikre*,
  601 U.S. 234 (2024) ........................................................... 1, 2, 13

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................. 12

*Finley v. NEA*,
  100 F.3d 671 (9th Cir. 1996) ....................................................... 8

*Finley v. NEA*,
  795 F. Supp. 1457 (C.D. Cal. 1992) ............................................. 8

*Friends of the Earth v. Laidlaw Env't Servs (TOC), Inc.*,
  528 U.S. 167 (2000) ................................................................. 13

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*,
  114 F. 4th 660 (8th Cir. 2024) ................................................... 24

*Harvey v. Veneman*,
  396 F.3d 28 (1st Cir. 2005) ....................................................... 21

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................. 11

*Hochendoner v. Genzyme Corp.*,
  823 F.3d 724 (1st Cir. 2016) ....................................................... 7

*Housatonic River Initiative v. United States Env't Prot. Agency*,
  75 F.4th 248 (1st Cir. 2023) ...................................................... 10

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ................................................................................ 9

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
  110 F.4th 295 (1st Cir. 2024) .................................................................. 9

*Iverson v. City of Boston*,
  452 F.3d 94 (1st Cir. 2006) ...................................................................... 20

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) .................................................................................. 27

*Laufer v. Acheson Hotels*,
  50 4th 259 (1st Cir. 2022) ........................................................................ 7

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) .................................................................................. 21

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ......................................................................... 6, 9, 10

*Matal v. Tam*,
  582 U.S. 218 (2017) .................................................................................. 23

*Mcinnis-Misenor v. Me Med. Center*,
  319 F.3d 63 (1st Cir. 2003) ...................................................................... 16

*McGuire v. Reilly*,
  386 F.3d 45 (1st Cir. 2004) ...................................................................... 21

*Nat'l Council of Nonprofits v. OMB*,
  2025 WL 368852 (D.D.C. Feb. 3, 2025) ................................................ 15

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) .................................................................................. 16

*NEA v. Finley*,
  524 U.S. 569 (1998) .................................................................... 7, 8, 22, 26

*New Jersey v. Trump*,
  No. 25-1170, 2025 WL 759612 (1st Cir. Mar. 11, 2025) ...................... 28

*New York v. Trump*,
  No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025)..................... 14, 15

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................. 28

v

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ............................................................................... 16

*People for the Ethical Treatment of Animals v. Gittens,*
    414 F.3d 23 (D.C. Cir. 2005) ........................................................... 8, 24

*Pharm. Soc'y of State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs.,*
    50 F.3d 1168 (2d Cir.1995) ................................................................. 29

*Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico,*
    906 F.2d 25 (1st Cir. 1990) ................................................................. 11

*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460 (2009) ........................................................................ 8, 24

*Portela-Gonzalez v. Sec'y of the Navy,*
    109 F.3d 74 (1st Cir. 1997) ................................................................. 16

*R.I. Ass'n of Realtors v. Whitehouse,*
    199 F.3d 26 (1st Cir. 1999) ........................................................... 15, 16

*Raven v. Sajet,*
    334 F. Supp. 3d 22 (D.D.C. 2018) ................................................... 8, 25

*Raven v. United States,*
    No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17, 2019) .............. 8, 25

*Regan v. Taxation with Representation of Wash.,*
    461 U.S. 540 (1983) ........................................................................ 8, 22

*Ridley v. Massachusetts Bay Transp. Auth.,*
    390 F.3d 65 (1st Cir. 2004) ..................................................... 23, 26, 27

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020) .............................................................................. 17

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ........................................................................ 8, 21

*S.S. by S.Y. v. City of Springfield,*
    332 F. Supp. 3d 367 (D. Mass. 2018) ................................................. 10

*Shurtleff v. City of Boston,*
    596 U.S. 243 (2022) ............................................................................ 24

*Sindicato Puertorriqueno de Trabajadores v. Fortuño,*
    699 F.3d 1 (1st Cir. 2012) ....................................................... 12, 17, 27

*Sullivan v. City of Augusta*,
  406 F. Supp. 2d 92 (D. Me. 2005) ......................................................... 15

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .............................................................. 28

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017)........................................................................ 22

*United States* v. *Am. Library Ass'n, Inc.*,
  539 U.S. 194 (2003)............................................................... 8, 25, 26

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
  587 F.3d 464 (1st Cir. 2009)............................................................. 17

*W.R. Grace & Company v. EPA*,
  959 F.2d 360 (1st Cir. 1992)............................................................. 16

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015)..................................................................... 8, 24

*West Virginia v. EPA*,
  597 U.S. 697 (2022)......................................................................... 13

*Westfield High Sch. L.I.F.E. Club v. City of Westfield*,
  249 F. Supp. 2d 98 (D. Mass. 2003) ................................................ 29

*Worthley v. School Committee of Gloucester*,
  652 F. Supp. 3d 204 (D. Mass. 2023) ........................................ 15, 29

**Statutes**

18 U.S.C. § 1001.................................................................................... 26

20 U.S.C. § 951...................................................................................... 24

20 U.S.C. § 954........................................................................................ 8

20 U.S.C. § 955...................................................................................... 18

20 U.S.C. § 959...................................................................................... 18

**Other Authorities**

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025)..................... 1, 2

**INTRODUCTION**

"The Constitution deals with substance, not strategies." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (citation omitted). The NEA may not evade judicial review by the "simple expedient of suspending its challenged conduct after it is sued." *Id*. (citing *Already LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). "A live case or controversy cannot be so easily disguised, and a federal court's constitutional authority cannot be so readily manipulated." *Id*. Yet that is precisely what the NEA has done, and it forms the sum total of its opposition to Plaintiffs' preliminary injunction motion.

The NEA's action does not moot this case, or this motion. In the immediate term it leaves Plaintiffs facing the Hobson's choice of either not submitting the application they assert they have the right to submit, or submitting their preferred application and risking the very real prospect of being deemed ineligible for NEA funding because of their viewpoints. The NEA could have alleviated that dilemma by agreeing not to apply the prohibition on promoting "gender ideology" to this funding cycle, or by delaying the application date a few weeks. But it declined to do either, leaving Plaintiffs compelled to seek this Court's preliminary relief.

On March 6, 2025, Plaintiffs filed their complaint and preliminary relief motion, challenging the NEA's implementation of the "Gender Ideology" EO, which required applicants to certify that they will not use federal funds to "promote gender ideology", Exec. Order No. 14168 § 3(g), 90 Fed. Reg. 8615 (Jan. 30, 2025), and rendering any project that appears to "promote gender ideology" ineligible for NEA funding (together, "gender ideology prohibition"). Five days later, the NEA rescinded the certification requirement. Six days after that, the NEA rescinded "all implementation of the EO" until it finishes a "new evaluation of the EO" by April 16, and implements it on April 30. It continues to require applicants to apply by April 7, thus leaving

Plaintiffs in the same position they were in when they filed suit: compelled, absent relief from this Court, to alter their applications to avoid being ineligible for the viewpoint their art would express.

On the basis of its temporary rescission, the NEA asserts that Plaintiffs seek relief "from circumstances that no longer exist" and so "the Court should deny the motion." Defs.' Resp. to Pls.' Mot. for Prelim. Inj. 1 ("Defs.' Resp."). But the new circumstance is entirely a response to this litigation. Accordingly, under the voluntary cessation exception to the mootness doctrine, the NEA bears the "formidable burden" of demonstrating that "no reasonable expectation remains that it will return to its old ways." *Fikre*, 601 U.S. at 241 (cleaned up). The NEA cannot meet that burden, which would require disclaiming the possibility of reinstating the "gender ideology" prohibition. Indeed, because the Executive Order directs all agencies to "ensure grant funds do not promote gender ideology," Exec. Order No. 14168 § 3(g), 90 Fed. Reg. 8615 (Jan. 30, 2025), there is not merely a "reasonable expectation," but a strong likelihood, that the prohibition will be applied. The need for this Court's preliminary intervention thus remains.

Because the NEA's temporary rescission falls squarely into the voluntary cessation exception to the mootness doctrine, Plaintiffs' challenge to the "gender ideology" prohibition remains a live case or controversy. The NEA's related attempts to manufacture standing and ripeness problems erroneously muddle distinct justiciability inquiries. Plaintiffs have standing because standing is established based on the facts existing when they filed the Complaint, and those facts indisputably alleged concrete, particularized, actual or imminent harms traceable to the "gender ideology" prohibition and redressable by an order enjoining the NEA from imposing the prohibition. Similarly, the NEA cannot render a ripe case unripe through voluntary cessation, and the case is ripe because final agency action imposed hardship on Plaintiffs when they filed. The case also remains ripe both because the NEA has not shown that its voluntary cessation means

there is no reasonable likelihood that the "gender ideology" prohibition will be reinstated, and because its actions fail entirely to alleviate the Hobson's choice Plaintiffs face.

Because Plaintiffs have standing, and the case is ripe and not moot, the question of whether they are entitled to preliminary relief turns most critically on Plaintiffs' likelihood of success on the merits and the potential for irreparable harm. The NEA does not dispute the merits of Plaintiffs' APA claims and therefore waives opposition to them for the purposes of this motion. The NEA's opposition to the merits of Plaintiffs' First and Fifth Amendment claims rests on arguments that NEA-funded artists are somehow speaking for the government, and that the First and Fifth Amendments have no application to conditions on government funding. Both arguments are refuted by Supreme Court precedent. And Plaintiffs continue to suffer irreparable harm because the very real likelihood that the NEA will do what the Executive Order directs and bar funding of work promoting "gender ideology" requires them to alter their applications.

Plaintiffs seek a preliminary injunction to stay and enjoin the "gender ideology" prohibition or, in the alternative, to enjoin any retroactive application of the "gender ideology" prohibition to the current cycle of applications due on April 7, 2025. Plaintiffs continue to seek expedited consideration in order to permit a ruling before April 7, so that they can submit applications without fear of being rendered ineligible for promoting "gender ideology."

## SUPPLEMENTAL STATEMENT OF FACTS

Plaintiffs filed this action on March 6, 2024, Compl., ECF No. 1, after providing advance notice to the NEA that they would be seeking preliminary injunctive relief on an expedited basis. The next day, on March 7, the NEA's counsel stated at a status conference that the NEA would be rescinding the certification requirement for the duration of this action. On March 10, the NEA filed a declaration stating that the NEA would remove the certification requirement by March 11, 2025,

Eilers Decl. ¶ 8, and the NEA in fact rescinded the requirement on March 11, 2025, specifically tying that change to this action. *See* Bolan Decl. Ex. A, at 12, Defs.' Resp., ECF No. 11-1.

On March 17, 2025, the NEA issued a memo, which stated that the NEA has temporarily "rescinded all implementation of the [Gender Ideology] EO," pending "a new evaluation of the EO in accordance with the Administrative Procedure Act," including consideration of "applicable law" like the NEA's enabling statute. Bolan Decl. Ex. C, at 1. The memo further stated: "The NEA will not implement the EO at any grant evaluation stage . . . *unless and until such a time that the agency's process of deliberating and considering this EO has completed.*" *Id.* at 2 (emphasis added). It also laid out the timeline: The NEA's new evaluation will conclude by April 16, 2025, and it will implement and make public its decision by April 30, 2025. *Id.*

The memo did not disclaim the possibility of reinstating the "gender ideology" prohibition, and the EO—including its directive to *all* agencies not to fund "gender ideology"—remains in place. The NEA also declined to agree to not apply that prohibition on current applications, meaning that applicants, including Plaintiffs, must file their applications knowing that the EO bars funding anything that promotes "gender ideology," that the NEA initially adopted that prohibition and only rescinded it temporarily after this suit was filed, and that the NEA declined to commit, even in this funding cycle, not to apply that viewpoint-based bar.

The NEA's abrupt, and expressly temporary, change of course in response to this lawsuit forces Plaintiffs to self-censor in their applications because of the very real possibility that the NEA may retroactively impose an eligibility bar based on the Gender Ideology EO to any applications submitted by April 7. In particular, Plaintiff Rhode Island Latino Arts ("RILA") will change the scope of its project based on whether there may be such an eligibility bar. Martínez Suppl. Decl. ¶ 6; Martínez Decl. ¶ 15. Some of Plaintiff Theatre Communications Group's

("TCG") members face a similar predicament, where they will either change the scope of their project or not submit Part 2 by April 7 because of a potential "gender ideology" prohibition. Cachapero Suppl. Decl. ¶ 4. The NEA's temporary rescission does not fix the issue for TCG members, *id.* ¶ 5, or remove RILA's need to alter its application, Martínez Suppl. Decl. ¶¶ 8–9. Because the NEA continues to reserve the possibility of reimposing the "gender ideology" prohibition on April 30, RILA and other TCG members must account for that possibility when submitting their applications by April 7. *Id.* ¶¶ 10–11; Cachapero Suppl. Decl. ¶¶ 7–8. Absent relief, RILA will submit a more limited project that steers far clear of any "gender ideology" prohibition, avoiding any support for expression by and about transgender, queer, and nonbinary artists, characters, and themes. Martínez Suppl. Decl. ¶ 6. RILA seeks judicial relief so that it does not have to self-censor and may submit an application that seeks funding for the full scope of its planned project. *Id.* The same is true for TCG members. Cachapero Suppl. Decl. ¶¶ 4,5, 7.

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS ARE JUSTICIABLE

### A.    Plaintiffs Have Standing to Bring This Action

At the outset, the NEA appears to challenge Plaintiffs' standing to bring this action at all. Despite a section heading that reads "[b]ecause there is no agency action to challenge, the Plaintiffs lack standing to pursue *preliminary relief*," Defs.' Resp. 7 (emphasis added), the NEA asserts in that section that "whether the NEA implements the EO or not, the Plaintiffs' First Amendment contentions do not establish injury in fact." *Id*. at 8. This assertion appears to rest on three arguments: (1) that Plaintiffs have alleged only "subjective 'chill,'" *id*. at 8–9 (quoting *Clapper v. Amnesty International*, 568 U.S. 398, 418 (2013)); (2) that Plaintiffs do not suffer injury because "a 'decision not to subsidize the exercise of a fundamental right does not infringe the right,'" *id*. at 8 (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)); and (3) that Plaintiffs do not suffer injury

because the NEA's "grantmaking decisions . . . constitute a form of government speech, and are therefore not subject to the First Amendment," *id*. at 9. Each argument fails.

First, Plaintiffs have not merely alleged "subjective chill"; they have alleged "concrete, particularized, and actual or imminent" harm. *Clapper*, 568 U.S. at 409. For standing purposes, Plaintiffs need only make that showing "under the facts existing *when the complaint [was] filed*." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992) (emphasis added); *Becker v. Fed. Election Comm'n*, 230 F.3d 381, 386 n.3 (1st Cir. 2000) ("[W]hile it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter."). In their initial declarations, filed at the same time as the complaint, Plaintiffs attested to concrete, particularized First Amendment harms. Plaintiff RILA stated it would self-censor its grant application because of the prohibition. Martínez Decl. ¶¶ 12–15, 18. Plaintiffs National Queer Theatre ("NQT") and The Theatre Offensive ("TTO") stated their applications would be barred from eligibility because of the prohibition, Odsess-Rubin Decl. ¶¶ 16–17; Byrd Decl. ¶¶ 10, 17, and Plaintiff TCG stated that its members' applications would be similarly barred, *see* Cachapero Decl. ¶¶ 9–11. These harms were imminent because Plaintiffs are applying for funding in the March 2025 cycle, Martínez Decl. ¶ 8; Odsess-Rubin Decl. ¶ 8; Byrd Decl. ¶ 10; Cachapero Decl. ¶ 11, and the NEA stated its intention to impose the prohibition on applications in this cycle, Eidelman Decl. Ex. 2, at 12.

Although Plaintiffs need only demonstrate injury at the time the complaint was filed, Plaintiffs also continue to experience concrete, particularized, and actual or imminent harm: RILA will have to decide by April 7 whether to apply for the project it actually wants the NEA to fund or one it believes steers far clear of the "gender ideology" prohibition, Martínez Suppl. Decl. ¶¶ 6,

6

10; TCG members are in the same boat, Cachapero Suppl. Decl. ¶ 4; and NQT and TTO are barred from receiving funds under the "gender ideology" prohibition that the NEA has rescinded only in reaction to this litigation and may reinstate as early as April 30. *See infra* Argument I.C (discussing voluntary cessation), , Argument II (discussing irreparable harm).

The NEA also appears to assert that Plaintiffs' allegations of vagueness injury do not establish injury in fact. *See* Defs.' Resp. 10. Again, the NEA conflates the standing and merits inquiries. Plaintiffs have adequately alleged *injury* arising from the vagueness of the "gender ideology" prohibition—which requires them to steer clear of the prohibited zone of "promoting gender ideology" on the grant application, Martínez Decl. ¶¶ 15, 18, and self-censor when implementing any grant that is awarded, Martínez Suppl. Decl. ¶ 6. It will further subject them to arbitrary or discriminatory treatment in the NEA's assessment of their grant applications, *see* Martínez Decl. ¶ 15; Odsess-Rubin Decl. ¶¶ 14–15; Byrd Decl. ¶ 18, and arbitrary or discriminatory monitoring of any project that results, *see* Martínez Decl. ¶¶ 11, 14, 17, 20; Odsess-Rubin Decl. ¶ 13; Byrd Decl. ¶ 16; Cachapero Decl. ¶¶ 8, 15.

The NEA's second and third arguments attacking Plaintiffs' assertions of injury conflate standing and the merits. Whether the NEA's viewpoint-based discrimination in fact violates the First Amendment is a merits question, and "standing in no way depends on the merits of the plaintiff's contention." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 734 (1st Cir. 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Instead, the "only question is . . . whether [the plaintiff] plausibly alleges she was injured under her theory of the underlying legal claim." *Laufer v. Acheson Hotels*, 50 4th 259, 267 (1st Cir. 2022), *vacated on other grounds*, *Acheson Hotels v. Laufer*, 600 U.S. 1 (2023). As explained above, Plaintiffs have plausibly alleged First Amendment harms. Indeed, the Supreme Court decided *NEA v. Finley*, 524 U.S. 569 (1998) ("*Finley III*"), a

pre-enforcement challenge to a "decency" standard, on nearly identical facts with no concern as to standing. In *Finley III*, four artists who sought to apply for NEA funding in the future, and a national membership organization whose members sought to do the same, challenged Congress' new requirement that the NEA consider "general standards of decency and respect" when judging applications. 20 U.S.C. § 954(d)(1). The standard had never been enforced, but plaintiffs alleged that it would impermissibly violate their First and Fifth Amendment rights. The district court rejected the NEA's contention that the plaintiffs lacked standing, recognizing as a cognizable harm the plaintiffs' "restrict[ion of] their expressive conduct, which is otherwise protected by the First Amendment" in order "to ensure that they are considered for future grants." *Finley v. NEA*, 795 F. Supp. 1457, 1469 (C.D. Cal. 1992) ("*Finley I*"). The NEA did not contest standing before the Ninth Circuit or the Supreme Court, and neither court—which had "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)—considered standing to be a colorable issue, *see Finley III*, 524 U.S. 569; *Finley v. NEA*, 100 F.3d 671 (9th Cir. 1996) ("*Finley II*") (both reaching the merits).[1]

Finally, the NEA attacks Plaintiffs' standing to bring this action on traceability grounds. It asserts that "[w]ith or without the EO . . . all GAP applicants must make difficult choices about what to pitch to the NEA with the hope of securing uncertain, partial funding." Defs.' Resp. 11. Traceability requires "a causal connection between the injury" but not "a tort-like showing of

---

[1] All of the other cases the NEA cites for the proposition that "whether the NEA implements the EO or not, the Plaintiffs' First Amendment contentions do not establish injury in fact" similarly do not address standing. NEA Resp. 8–10 (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009); *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194 (2003); *Rust v. Sullivan*, 500 U.S. 173 (1991); *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540 (1983); *Raven v. Sajet*, 334 F. Supp. 3d 22 (D.D.C. 2018), *aff'd sub nom. Raven v. United States*, No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17, 2019); *People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005). Plaintiffs address the merits considered in these cases below. *See infra* Argument II.B.

8

proximate causation." *Conservation L. Found. v. Academy Express, LLC*, 129 F.4th 78, 90 (1st Cir. 2025). Here, each of the Plaintiffs has alleged that the "gender ideology" prohibition is the direct underlying cause of their injuries—which are *not* having to make a pitch that may not get funded, but having to *self-censor* their applications and project plans or *be rendered ineligible* for NEA funding because of a specific, viewpoint-based eligibility bar. *See* Martínez Decl. ¶¶ 15, 18; Odsess-Rubin Decl. ¶¶ 15–16; Byrd Decl. ¶ 17. Absent the prohibition, they would not have to censor their applications or projects, and they would be eligible to receive funding. *See* Martínez Decl. ¶¶ 15, 18; Odsess-Rubin Decl. ¶¶ 15–16; Byrd Decl. ¶ 17.[2]

## B.    Plaintiff TCG Has Standing to Bring This Action

Notwithstanding the NEA's arguments to the contrary, TCG has standing in two ways: It has associational standing through its members, and it has standing in its own right. One is enough; TCG has established both.

### 1.    TCG Has Associational Standing on Behalf of Its Members

An organization has associational standing to "sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 308 (1st Cir. 2024) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). And it need only make that showing "under the facts existing when the complaint [was] filed." *Lujan*, 504 U.S. at 569 n.4.

---

[2] The NEA's argument that Plaintiffs fail to meet the redressability requirement is limited to asserting that because it has rescinded the "gender ideology" prohibition, "[t]here is nothing for the Court to redress." Defs.' Resp. 12. The NEA therefore does not dispute that Plaintiffs established redressability through their allegations in the Complaint at the time of filing. The NEA's subsequent, and expressly temporary, voluntary cessation does not alter redressability unless it renders the dispute moot.  As shown in Argument I.C, *infra*, it does not.

First, as long as one member has individual standing, the organization has associational standing to sue on its members' behalf. *See id.* at 563; *Am. Truck Associations v. Alviti*, 630 F. Supp. 3d 357, 374 (D.R.I. 2022), *aff'd in part, rev'd in part, and remanded sub nom. Am. Trucking Ass'ns   v. R.I. Tpk. & Bridge Auth.*, 123 F.4th 27 (1st Cir. 2024). Here, TCG has members, including TTO, who are barred from eligibility because of the "gender ideology" prohibition. Cachapero Decl. ¶¶ 9–11, 15, 18. [3] As explained above, TTO has met the requirements for individual standing. *See supra* Argument I.A.

Second, the interests that TCG seeks to protect—the interests of its members to express their views through their art and to support art for, by, and about transgender, nonbinary, and queer artists, Cachapero Decl. ¶¶ 10, 11, 15, 18—are germane to TCG's purpose of ensuring that theaters have the resources they "need[ ] to create, produce, and present diverse stories"; "serve multifaceted communities"; "sustain theatre as a viable industry"; and ensure participation by, and access for, transgender/gender-nonconforming artists. Cachapero Decl. ¶¶ 3, 17. *Cf. Am. Trucking Ass'ns*, 630 F. Supp. 3d at 374 (challenge to truck-only tolling system germane to purpose of trucking industry association); *S.S. by S.Y. v. City of Springfield*, 332 F. Supp. 3d 367, 375 (D. Mass. 2018) (case concerning rights of students with disabilities germane to purpose of organizations advocating for children's mental health services and providing legal services to people with disabilities).

Third, this action does not require the participation of TCG's individual members because Plaintiffs' claims and requested relief revolve around questions of law with no fact-intensive inquiry individual to any specific arts organization required. *See Housatonic River Initiative v. United States Env't Prot. Agency*, 75 F.4th 248, 265–66 (1st Cir. 2023) (asking for relief from EPA

---

[3] The NEA has disputed TTO's standing, but it does not contest that TCG can establish standing through its members.

action); *see also Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 35 (1st Cir. 1990); *Am. Trucking Ass'ns*, 630 F. Supp. 3d at 374.

### 2.    TCG Has Standing in Its Own Right

Like the other plaintiffs, TCG also satisfies the requirements for standing in this action in its own right because it demonstrated standing when the Complaint was filed. TCG regularly applies for and receives grants from the NEA, Cachapero Decl. ¶ 5 (stating that TCG has received forty-two NEA grants), and would like to apply for a grant during the July 2025 cycle for its national conference, during which there will be discussion about gender identity, affirming trans, nonbinary, and queer members of the community, *id.* ¶ 19. But its application would be barred by the "gender ideology" prohibition. *Id.* Accordingly, like the individual Plaintiffs, TCG asserted a concrete, particularized, and actual harm traceable to the "gender ideology" prohibition and redressable by enjoining the prohibition. *See supra* Argument I.A.

TCG has suffered additional harms to the organization.[4] TCG had to divert resources to address members' needs because of the prohibition. Cachapero Decl. ¶ 16. It had to poll members to understand how the prohibition impacted their decisions to apply for NEA funding, and it had to quickly provide members with "webinars, federal action updates, and resource materials to help them assess their level of risk and guide their choices." *Id.* These activities are more than just "evaluat[ing]" the Gender Ideology EO, *contra* Defs.' Resp. 11, and this "drain on the organization's resources" constitutes "far more than simply a setback to the organization's abstract social interests," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). It is a concrete and

---

[4] The NEA appears to argue that RILA, NQT, and TTO cannot show an injury-in-fact because they did not suffer an organizational injury. Defs.' Resp. 11. That does not defeat their standing, as RILA, NQT, and TTO have established standing based on the eligibility bar that they face with their applications. *See supra* Argument I.A.

particularized injury, *id.,* traceable to the "gender ideology" prohibition, *see Conservation L. Found.*, 129 F. 4th at 90 (requiring "causal connection"), and redressable through an injunction.[5]

The NEA's cited cases are distinguishable. The Supreme Court's ruling in *FDA v. All. for Hippocratic Med.* that an organization cannot manufacture standing by spending resources to draft citizen petitions and engage in public advocacy, 602 U.S. 367, 394 (2024), has no bearing on this case where TCG has been forced to spend resources to help its members understand and figure out how to *comply* with, not oppose, the "gender ideology" prohibition. Similarly, *Clapper*'s holding that "fears of hypothetical future harm" are not enough, 568 U.S. at 416, is inapplicable. When TCG filed suit, the fear that the NEA would bar eligibility based on the "gender ideology" prohibition was not speculative; the NEA *had* imposed that bar.[6]

## C.    The NEA's Rescission of the "Gender Ideology" Prohibition Is Voluntary Cessation under the Mootness Doctrine

The NEA's principal argument is that Plaintiffs lack standing for preliminary relief "[b]ecause there is no agency action to challenge." Defs.' Resp. 7. But as explained above, standing is determined based on the facts existing at the commencement of the lawsuit and Plaintiffs have unquestionably established it. Whether the NEA's own voluntary and explicitly temporary cessation of the challenged prohibition means there is no case or controversy is a question of mootness. "[M]ootness, not standing, . . . addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit." *West Virginia v. EPA*, 597

---

[5] TCG also continues to experience harm as it seeks to guide its members through the NEA's ongoing changes. Cachapero Suppl. Decl. ¶ 10.

[6] To the extent the NEA argues that Plaintiffs have failed to establish entitlement to preliminary relief or irreparable harm, those are separate inquiries, subject to the standard for granting preliminary relief. *See Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012). For the reasons explained in Plaintiffs' opening brief and below, they have established both. *See* Pls.' Br. 31 – 33, *infra* Argument III.

U.S. 697, 719 (2022) (cleaned up).[7] This "distinction matters because the Government . . . bears the burden to establish that a once-live case has become moot." *Id*. This burden is "formidable"; "a defendant's 'voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice *cannot 'reasonably be expected to recur*.'" *Fikre*, 601 U.S. at 241 (quoting *Friends of the Earth v. Laidlaw Env't Servs (TOC), Inc.*, 528 U.S. 167, 189 (2000)) (emphasis added). "Were the rule more forgiving, a defendant might suspend its challenged conduct after being sued . . . and later pick up where it left off." *Id*.

The NEA's rescission of the "gender ideology" prohibition is a classic example of voluntary cessation. One day after Plaintiffs filed suit, the NEA informed the Court that it would rescind the certification requirement; on March 11, it paused that requirement, expressly tying any reimposition to this case. And six days after that, it issued a memo temporarily "rescind[ing] all implementation of the [Gender Ideology]" but only until it completes "a new evaluation of the EO" by April 16, and implements and announces it on April 30. Bolan Decl. Ex. C, at 1, 2.

These actions do not meet the government's "formidable" burden. Critically, the NEA has not disclaimed implementing the same exact "gender ideology" prohibition at the conclusion of its review process, and the EO requires all agencies to do so. Indeed, given that the Gender Ideology EO directs all agencies to "ensure grant funds do not promote gender ideology," it is not only reasonable but likely that the NEA will re-impose the prohibition.

---

[7] None of the cases the NEA cites to support its argument that there is no agency action and therefore no injury involve an intervening circumstance. *See* Defs.' Resp. 8 (citing *Trump v. New York*, 592 U.S. 125 (2020); *Clapper*, 568 U.S. 398; *Savage v. U.S. Small Bus. Admin.*, 552 F. Supp. 3d 241 (D.R.I. 2021)). Later, the NEA offers another variant of this argument, stating that "the Plaintiffs' allegations of regulatory uncertainty. . . also do not establish injury in fact." Defs.' Resp. 10. Although the two cases cited by the NEA do involve intervening circumstances, neither involve voluntary cessation and are therefore inapposite. *See Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992) (action mooted by passage of legislation); *Matos ex rel. Matox v. Clinton Sch. Dist.*, 367 F.3d 68, 72–73 (1st Cir. 2004) (action mooted by "passage of time").

13

Moreover, far from mooting Plaintiffs' request, the timeline for its "new evaluation of the EO" particularly warrants the court's review at this juncture. The NEA plans to conclude its evaluation—at which point it very well may reinstate the "gender ideology" prohibition—in as little as three weeks. The agency's refusal to disclaim reinstatement of the prohibition not only means that it cannot meet its "formidable" burden of demonstrating mootness, but also that Plaintiffs have to submit their applications by April 7 facing that very real prospect. Where, as here, an agency has imposed a rule pursuant to an Executive Order; rescinded it only temporarily, and only in response to the lawsuit; the Executive Order still stands; and Plaintiffs must take action in the meantime that could render them ineligible for funding because of their art's viewpoint, the dispute is not moot, and the need for preliminary relief remains acute.

Courts have applied the doctrine of voluntary cessation in the context of determining whether to award preliminary relief. A recent decision in this district is particularly instructive. In *New York v. Trump*, No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025), twenty-two states and the District of Columbia sued, *inter alia*, the Office of Management and Budget ("OMB"), challenging a directive implementing various Executive Orders freezing federal funds. One day after the plaintiffs filed suit, OMB rescinded its directive and argued "that the Court lacks jurisdiction to enter preliminary relief in this case because the . . . rescission renders the States's . . . request for preliminary relief . . . moot." *Id*. at *5. The court rejected this argument, holding that OMB failed to meet its "heavy burden of illustrating that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id*. at *6 (quoting *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 49 (1st Cir. 2010)).[8] It then proceeded to award

---

[8] As this portion of the cited opinion demonstrates, the court in *New York v. Trump* did not, as the NEA appears to assert, rest its determination that OMB's voluntary action "did not obviate the need for a preliminary injunction" solely on the "view that there was direct evidence that the 'rescission was in name only and that the substantive effect of the

preliminary relief, notwithstanding the rescission. *See also Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *7 (D.D.C. Feb. 3, 2025) (holding OMB rescission of same directive mid-TRO briefing did not render case moot and issuing TRO); *id.* ("Even taking the rescission at face value . . . Defendants have not convincingly shown that they will refrain from 'resum[ing] the challenged activity' in the future.") (citation omitted); *Worthley v. School Committee of Gloucester*, 652 F. Supp. 3d 204, 211 (D. Mass. 2023) (granting preliminary injunction in First Amendment case despite defendant's rescission of order because voluntary cessation exception applied).

### D.    This Case is Ripe

For the same reasons that the NEA's voluntary cessation does not defeat standing or make this challenge moot, it also does not render it unripe. *See* Defs.' Resp. 12. The issue of "whether intervening events can render unripe a previously ripe challenge" is also "one of mootness[.]" *Sullivan v. City of Augusta*, 406 F. Supp. 2d 92, 105 (D. Me. 2005), *aff'd in part*, 511 F.3d 16, 31–32 (1st Cir. 2007); *see also Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018) ("[Defendant] cannot . . . reframe this case as an unripe challenge . . . in order to avoid the demanding requirements of demonstrating mootness."); *Cmty. Hous. of Me v. Martinez*, 146 F. Supp. 2d 36, 44 (D. Me. 2001) (similar argument by agency "conflates ripeness and mootness" (citing *R.I. Ass'n of Realtors v. Whitehouse*, 199 F.3d 26, 34 (1st Cir. 1999))). And as with standing, the difference between mootness and ripeness matters because under the voluntary cessation doctrine, the case is moot only if the government can show there is no reasonable expectation that the challenged conduct will recur.

---

directive carries on.'" Defs.' Resp. 14 n.3 (quoting *New York*, 2025 WL 715621, at *4 (cleaned up)). The court is clear that OMB failed to meet the heavy burden necessary to exempt itself from the voluntary cessation exception to the mootness doctrine by showing that the action could not be reasonably expected to recur.

The NEA does not dispute that Plaintiffs' claims were ripe when they filed the complaint: the issues were fit for judicial decision and withholding court consideration would cause Plaintiffs' hardship. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Because "the issue presented is . . . legal, as opposed to factual, and the . . . challenged agency action is final," it was fit for judicial review. *See W.R. Grace & Company v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992); *see also R.I. Ass'n of Realtors*, 199 F.3d at 34 (whether prohibiton "unconstitutionally restrain[s] free expression" is purely legal); Pls.' Mem. 14–16 (discussing final agency action). And withholding the Court's consideration would cause hardship with "direct and immediate consequences" for Plaintiffs and their members, Pls.' Mem. 15, which demonstrates "hardship" to them "of withholding court consideration," *see Mcinnis-Misenor v. Me Med. Center*, 319 F.3d 63, 70 (1st Cir. 2003) (hardship inquiry "typically turns upon whether the challenged action creates a 'direct and immediate' dilemma for the parties" (citation omitted)).

The NEA's conflation of ripeness and mootness is brought into relief by the long list of cases it cites. Defs.' Resp. 13 (citing *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998); *City of Fall River v. Fed. Energy Regul. Comm'n*, 507 F.3d 1 (1st Cir. 2007); *Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74 (1st Cir. 1997); *Broderick v. di Grazia*, 504 F.2d 643 (1st Cir. 1974); *Cont'l Air Lines, Inc. v. Civil Aeronautics Bd.*, 522 F.2d 107 (D.C. Cir. 1975)). Not a single one of these cases involves voluntary cessation. Rather, each involves a challenge to a "decision whose effects may never be 'felt in a concrete way by the challenging parties.'" *City of Fall River*, 507 F.3d at 6–7 (citation omitted) (challenge to conditional approval for natural gas pipeline that "may well never go forward" not ripe). By contrast, when Plaintiffs filed this case, they were challenging not "contingent future events," but an actual prohibition that imposed hardship on them. *Id*. (citation omitted). They continue to challenge that same prohibition, and that challenge

is not moot because the NEA has not forsworn it, which in any event the Gender Ideology EO directs it to impose. This case is therefore ripe for review.

## II.    ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM

The NEA's argument that "Plaintiffs lack standing to pursue preliminary relief" is really an argument that its rescission of the "gender ideology" prohibition means Plaintiffs cannot currently demonstrate irreparable harm for purposes of preliminary relief. This argument fails.

First, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (citation omitted), and Plaintiffs continue to suffer *present* First Amendment injury.. Absent this Court's relief, they are not free to submit applications on April 7 that reflect the full range of views that they would like to express, but must instead censor those applications out of the very reasonable fear that if they are deemed to "promote gender ideology," they will be ineligible for funding. That injury to their First Amendment rights is by definition irreparable; only this Court's intervention can ensure that they can submit applications without being compelled to censor themselves.[9]

In particular, absent relief before the April 7 deadline, RILA will be forced to censor itself and submit a project that is not the project it wants to submit, but a more restricted one that avoids violating any "gender ideology" prohibition. Martínez Suppl. Decl. ¶¶ 6, 10. It will have no opportunity to amend this application after the NEA announces a new policy on April 30, which

---

[9] *New England Health Care Emps. Union, District 1199, SEIU v. Women & Infants Hosp.*, which the NEA cites, is distinguishable. Defs.' Br. 16. *New England Health Care* concerned alleged economic losses that did not clearly show a net financial loss, whereas here, Plaintiffs have shown actual, not speculative, First Amendment harms. *See supra* Argument I.A–B; *see also Fortuño*, 699 F.3d at 15; *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009) (noting that "infringements of free speech, association, privacy or other rights" have a status "as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief").

may reinstate the original prohibition. *Id.* ¶ 11. In addition, RILA must apply during the March 2025 cycle; it has already started the application, and the NEA permits only one application per calendar year. *Id.* ¶ 3. Moreover, RILA is applying for funding for programming in the first half of 2026, which only an award in the March 2025 cycle can support. *Id.* ¶¶ 4, 6.

Some of TCG's members are also in a similar situation. Some members will self-censor their applications either by adjusting their project descriptions or withdrawing and not submitting Part 2 of their applications absent a guarantee that the "gender ideology" prohibition will not serve as an eligibility bar in the consideration of their applications. Cachapero Supp. Decl. ¶ 4. TCG itself also continues to experience harm as it seeks to guide its members through the NEA's ongoing changes. *Id.* ¶ 10.

The NEA suggests that should it reimpose the prohibition, Plaintiffs can seek relief then. But at that point it will be too late. Applications are due April 7, and the NEA will begin implementing a new policy shortly thereafter, on April 30. That policy will be relevant in at least four stages, including the very first stage of the application review process, which will likely commence shortly after the applications are due and requires NEA staff to check applications for eligibility. Eidelman Decl. Ex. 1, at 25. It will also impact the second stage, when advisory panels review the applications based on the NEA's criteria, with individual panelists typically given four weeks to consider applications before meeting as a panel, 20 U.S.C. § 959(c); Eidelman Decl. Ex. 1, at 14; the third, when the National Council on the Arts counsels the NEA Chair on whether to approve or deny each application, 20 U.S.C. § 955(f); and the fourth, when the Chair makes the final call. *Id.* § 955(f)(2). Given this timeline, it is unclear how Plaintiffs could plausibly seek relief—which would require a renewed TRO or preliminary injunction motion, briefing of that

18

motion, argument, and a court decision—against any reimposed "gender ideology" prohibition before it is implemented against Plaintiffs.[10]

The NEA's other arguments to the contrary are unavailing. First, the NEA asserts that Plaintiffs' First Amendment harms are not irreparable because every GAP applicant inevitably has to make decisions about what to include in the project and because NEA funding is not guaranteed. Defs.' Resp. 15–16.[11] This argument fundamentally misconstrues the nature of Plaintiffs' injury and claim. Plaintiffs are not claiming injury because of the loss of *entitlement* to an NEA grant; they are claiming injury because the NEA is imposing a *viewpoint-based bar* on *eligibility* for a grant. The viewpoint-based bar imposes clear First Amendment harms on Plaintiffs. *See supra* Argument I.A, I.B. Second, the NEA asserts that Plaintiffs' harms are not irreparable because this action concerns government speech. Defs.' Br. 16. As explained above, this argument conflates standing and the merits. *See supra* Argument I.A, II.B. And it is wrong on the merits. *See infra* Argument III.B.

Plaintiffs seek a preliminary injunction to provide clarity and relief by April 7, the deadline for Part 2 of grant applications for the current funding cycle. Alternatively, the Court could enjoin the NEA from retroactively applying any reimposed "gender ideology" prohibition to applications submitted and grants awarded as part of the March 2025 cycle. Both would address the otherwise irreparable harm.

---

[10] A violation of First Amendment rights is not the only irreparable harm; absent relief, Plaintiffs also face an irreparable harm arising from their vagueness claim, including self-censorship on their applications. Moreover, waiting until a permanent injunction can be issued gives Plaintiffs no opportunity to adjust or tailor applications submitted in the March 2025 cycle. *See Rio Grande Cmty. Health Center, Inc. v. Rullan.*, 397 F.3d 56, 76 (2005).

[11] The NEA makes much of its selectivity, but estimates that it will award grants to just under 50% of applicants in fiscal year 2026. *See* Eidelman Decl. Ex. 1, at 4 (anticipating funding 2,075 of 4,500 applications).

### III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS

#### A.    Imposing a Viewpoint-Based Restriction on NEA Applications Violates the APA

The NEA makes no attempt whatsoever to rebut Plaintiffs' claims that the "gender ideology" prohibition exceeds the NEA's statutory authority under the Act and is arbitrary and capricious. *See* Pls.' Mem. 14–22. Thus, the NEA waives its defense against the merits of these claims for purposes of the preliminary injunction motion. "The First Circuit requires a litigant to raise all arguments in its opposition to a dispositive motion or waive the right to raise them thereafter." *Eldridge v. Gordon Bros. Grp., LLC*, 316 F.R.D. 12, 27 (D. Mass. 2016) (citing *Iverson v. City of Boston*, 452 F.3d 94, 103 (1st Cir. 2006) ("Courts are entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion."), *aff'd in relevant part*, 863 F.3d 66, 83–84 (1st Cir. 2017); *see also Coons v. Indus. Knife Co., Inc.*, 620 F.3d 38, 44 (1st Cir. 2010) ("[T]he district court was 'free to disregard' the . . . argument that was not developed in [the opposition] brief . . . ." (citation omitted)).

The NEA's sole argument addressing the likely success of Plaintiffs' APA claims is that "there is no agency decisionmaking for this Court to evaluate." Defs.' Resp. 14. But as Plaintiffs have explained, the NEA has failed to overcome the high bar of showing that the "gender ideology" prohibition cannot reasonably be expected to recur. *See supra* Argument I.C. Because Plaintiffs' original challenge is not moot, the final agency action is the "gender ideology" prohibition that the NEA imposed. And the need to apply by April 7 continues to make preliminary relief necessary.

#### B.    Imposing a Viewpoint-Based Restriction on NEA Applications Violates the First Amendment

The NEA put virtually all its eggs in the justiciability basket, and therefore barely responds to the merits of Plaintiff's constitutional claims. To the extent it does, it appears to argue that there is no First Amendment issue at all because Plaintiffs have no affirmative right to NEA funding,

20

*see, e.g.,* Defs.' Resp. 8, 9, and NEA grantmaking constitutes government speech.[12] The first argument misconstrues the right at issue—Plaintiffs do not assert a right to *receive* a grant, but to fairly *compete* for one, without being subject to a viewpoint-based eligibility bar or litmus test. And the second misunderstands the "government speech" doctrine.

As Plaintiffs explained in their opening brief, government grantmaking is not immune from First Amendment scrutiny. Where grants are offered to "facilitate private speech, not to promote a governmental message," viewpoint-based discrimination is unconstitutional. *See* Pls.' Mem. 28 (citing *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001)); *see also Harvey v. Veneman*, 396 F.3d 28, 42–43 (1st Cir. 2005) (recognizing that programs designed to facilitate private speech, as in *Velazquez*, are distinct from programs in which the government uses "private speakers to transmit information pertaining to its own program," as in *Rust*, 500 U.S. 173); *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004) (similar). If the rule were otherwise, the President could bar any NEA funding for projects that do not "promote the Republican party platform," or that "promote views of which the President disapproves."

Rather than respond to those arguments, the NEA instead miscasts *Finley III* as a case about government speech. Defs.' Resp. 9. Far from it. Were the NEA correct, *Finley* would hold that the plaintiffs' claims merited no First Amendment scrutiny at all, because government speech is not limited by the First Amendment. But NEA-funded artists are not government officials or press secretaries; they speak for themselves, not for the government. For good reason, the term "government speech" appears nowhere in the opinion. To the contrary, the Court considered the plaintiffs' First Amendment challenge, and stated that "the First Amendment certainly has

---

[12] Defendants also write that "it is premature for the Court to assess the Plaintiffs' asserted First Amendment harms further," Defs.' Resp. at 9, arguably conceding that the NEA's decisionmaking *is* subject to First Amendment scrutiny.

application in the subsidy context." *Finley III*, 524 U.S. at 587. The Court upheld the "decency" provision only because it had been construed *not* to impose any viewpoint filter, but merely to require the appointment of diverse peer review panels. The Court stressed that the law did not "constrain[ ] the agency's ability to fund certain categories of artistic expression," *id.* at 580. And the Court warned that, "even in the provision of subsidies, the Government 'may not aim at the suppression of dangerous ideas.'" *Id.* at 587 (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983)).

*Finley* is no outlier. *See* Pls.' Mem. 25–26 (discussing other Supreme Court cases applying First Amendment scrutiny to government distributions of funds, none of which the NEA addresses). "[T]he Government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit.'" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (cleaned up) (holding unconstitutional law that prohibited organizations that did not expressly oppose prostitution and sex trafficking from receiving federal funds). The Supreme Court has repeatedly made clear that, even in the provision of grants—indeed, even "competitive" ones—policies that "expressly discriminate[ ] against otherwise eligible recipient[s] by disqualifying them . . . solely because of their [First-Amendment protected] character . . . imposes a penalty" on the exercise of First Amendment rights. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 455, 462 (2017) (holding unconstitutional grant program that excluded religious organizations); *see also Carson as next friend of O.C. v. Makin*, 979 F.3d 21, 34 n.1 (1st Cir. 2020), *rev'd and remanded on other grounds*, 596 U.S. 767 (2022) (recognizing that *Trinity Lutheran* "resonates with unconstitutional conditions doctrine in the First Amendment area more generally").

The NEA asserts that its grantmaking decisions "do not create any fora for any private citizens' exercise of free speech." Defs.' Resp. 9. But as Plaintiffs' opening brief explained, that is precisely what the NEA does—it supports private artistic expression. *See* Pls.' Mem. 23–28. As the First Circuit explained in *Ridley v. Massachusetts Bay Transp. Auth.*, "selectivity and discretionary access"—two of the factors of NEA grantmaking that the NEA seeks to immunize itself behind—"are defining characteristics of non-public fora." 390 F.3d 65, 95 (1st Cir. 2004). Indeed, *Ridley* pointed to *Finley* in explaining the standards that govern nonpublic fora. *Id.*

And, contrary to the NEA's arguments, the First Amendment applies even when the conditions are not "actually coercive, in the sense of an offer that cannot be refused." *Agency for Int'l Dev.*, 570 U.S. at 214 (citation omitted).[13] Equally, it governs even where the conditions are "relevant to the objectives of the program." *Id.* The government cannot avoid First Amendment limitations by attempting to frame them as *part* of the underlying program itself. Nor can it cry "government speech" without justification, for that doctrine is "susceptible to dangerous misuse," particularly to "silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017).

The NEA's grantmaking is not government speech, nor do NEA-funded artists speak for the government. In determining whether "a government entity is speaking on its own behalf or providing a forum for private speech," courts look to (1) the history of government use of the program to communicate its message, (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains control over the expression. *Pleasant*

---

[13] Relatedly, the amount of money at issue does not alter the First Amendment analysis. The First Amendment's prohibition on viewpoint discrimination protects speakers from  all manner of economic burdens, including the imposition of a tax, *Minneapolis Star & Trib. Co.*, 460 U.S. at 582–83, the "denial of a tax exemption," *Speiser v. Randall*, 357 U.S. 513, 518 (1958), and a bar on access to publishing proceeds, *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991).

*Grove City, Utah v. Summum*, 555 U.S. 460, 470–72 (2009); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–10 (2015). The government must show "that the challenged activity constitutes government speech in the literal sense—purposeful communication of a governmentally determined message by a person acting within the scope of a power to speak for the government." *Shurtleff v. City of Boston*, 596 U.S. 243, 269–71 (2022) (Alito, J., concurring).

The NEA's grantmaking fails each prong: historically, the government has used NEA grants to fund a wide diversity of views, not its own message, *see* 20 U.S.C. § 951(6) (NEA's purpose is to foster "mutual respect for the diverse beliefs and values of all persons and groups"); the public does not perceive a production funded in part by the NEA as the government's speech; and the "gender ideology" prohibition constitute the government's first attempt to control any particular message expressed (or not allow it to be expressed) with the funds, *see* Pls.' Mem. 22–26. Each factor weighs heavily against a finding of government speech. *Cf. GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F. 4th 660, 666–69 (8th Cir. 2024) ("the placement and removal of books in public school libraries" is not government speech).

This case stands in sharp contrast to the two out-of-circuit art cases the NEA cites. First, in *People for the Ethical Treatment of Animals, Inc. v. Gittens*, the D.C. Circuit concluded that D.C.'s "Party Animals" exhibit—which consisted of a government-sponsored display of "sculptures of 100 donkeys and 100 elephants" that the government itself had preformed and over which the government "retained ownership"—was government speech. 414 F.3d 23, 25 (D.C. Cir. 2005). The government enlisted private parties to paint them, just as it might enlist a private party to paint a judicial portrait or an official mural, but "reserve[d] the right of design approval" and "to reject designs that in the [government's] view 'conveyed controversial messages.'" *Id.* at 26. The DC

Circuit properly characterized that as government speech, as it was essentially a government project contracted to private parties to express the government's views. There was clear history of the government controlling the message over sculptures it owned and displayed largely on public property; the public associated the sculptures with the government; and the government exercised significant control over how the sculptures were painted.

The same is true for *Raven v. Sajet*, in which the court concluded that the National Portrait Gallery's choice of portraits is government speech because the Gallery "has historically been used to communicate messages from the government . . . on government property"; "the public would reasonably interpret the government to be the speaker"; and "the Smithsonian's Board . . . maintain[s] editorial control over the speech." 334 F. Supp. 3d 22, 31–32 (D.D.C. 2018), *aff'd sub nom. Raven v. United States*, No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17, 2019).

By contrast, no one thinks an NEA artist speaks for the government, and the government has never exercised control over the views NEA-funded artists express. Indeed, the program was expressly created to support a diversity of private artistic expression, and Congress was particularly concerned that it not become a government propaganda program. Pls.' Mem. 2–4.

Finally, while the NEA suggests that *American Library Association* is a government speech case, *see* Defs.' Resp. 16, the plurality opinion explained why it was not. The Court stated that a library "decid[es] what private speech to make available to the public," and cited *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802–803 (1985), a nonpublic forum case, with approval in upholding the law. *United States* v. *Am. Library Ass'n, Inc.*, 539 U.S. 194, 204, 206 (2003) (plurality opinion). The plurality emphasized how the restrictions at issue were consistent with the nature, history, and purpose of libraries' collection decisions (an inquiry relevant to nonpublic forum analysis) and—echoed by Justice Kennedy in his concurrence—highlighted the

ease with which a patron could unblock any improperly blocked site, something that would not matter if there were no First Amendment right at issue. *Id*. at 208–09 (plurality opinion); *see also id*. at 214 (Kennedy, J., concurring). *Am. Library Ass'n, Inc.* was not a government speech case, and neither is this.

### C.    The "Gender Ideology" Prohibition Is Unconstitutionally Vague

The NEA does not dispute that the "gender ideology" prohibition is vague. Instead, it argues that, because all that is at issue is eligibility for a government grant, that imprecision does not matter. To make this argument, the NEA yet again misreads *Finley III*. There, the Court explained that "[i]n the context of selective subsidies, it is not always feasible for Congress to legislate with clarity"—but it also noted that if the terms of the challenged provision "appeared in a regulatory scheme, they could raise substantial vagueness concerns." 524 U.S. at 588–89. Here, Plaintiffs do not challenge "subjective criteria such as 'excellence,'" *id*. at 589, but the direct proscription of "views on particular 'disfavored subjects.'" *Id*. at 582. Moreover, there *are* "consequences for submitting a non-conforming [application or running a non-conforming project]" other than "having it rejected." *Ridley*, 390 F.3d at 94 (discussing *Finley III*).

As the NEA has previously made clear, "any false, fictitious, or fraudulent statements or claims [applicants make] may subject [them] to criminal, civil, or administrative penalties." Odsess-Rubin Decl. Ex. A, (citing 18 U.S.C. § 1001). This includes running afoul of the NEA's "gender ideology" prohibition within the scope of their NEA-funded project. Plaintiffs thus have a right to know what does and does not constitute "promoting gender ideology," and to have the NEA's discretion in making that determination sufficiently cabined.

Moreover, even if denial of a grant application were the only potential consequence here, Plaintiffs' "excessive delegation" due process claim succeeds. In *Ridley*, while the First Circuit concluded that applicants for ad placement on public transportation had no void-for-vagueness

claim because the only consequence for them was having an ad rejected, it held that "the discretion

given to . . . administrators under the scheme [still could not be] unconstitutionally excessive." 390

F.3d at 94. Here, the NEA's discretion is not sufficiently cabined, *see* Pls.' Mem. 29–30, and

Defendants have waived any argument to the contrary.

## IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION

The balance of the equities and public interest also weigh in favor of a preliminary

injunction because the NEA's implementation of the Gender Ideology EO to bar NEA funding for

art that "promotes" what the government deems to be "gender ideology" is unlawful and

unconstitutional. Allowing the NEA to impose a viewpoint-based eligibility bar is against the

public interest, which favors robust public conversation and a diverse expression of views. *See*

*Fortuño,* 699 F.3d at 16. The NEA has also failed to explain how enjoining the "gender ideology"

prohibition would cause it hardship.

## V.    THIS COURT SHOULD NOT LIMIT ANY INJUNCTIVE RELIEF TO PLAINTIFFS

There is no reason to limit any injunction to Plaintiffs, for a preliminary injunction may

"reach beyond the particular circumstances of [the] plaintiffs" if they satisfy the standard for a

facial challenge, as Plaintiffs have done here. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).

"[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the

geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Indeed,

the First Circuit regularly affirms injunctions against unconstitutional policies on their face, not

limited only to the plaintiffs. *See, e.g.*, *Fortuño,* 699 F.3d at 16 (directing district court to

preliminarily enjoin unconstitutional provisions of Puerto Rico statute, not limited to plaintiffs);

*Comcast of Maine/New Hampshire, Inc. v. Mills*, 988 F.3d 607, 617 (1st Cir. 2021) (affirming

preliminary injunction delaying enforcement of entire chapter of state law on its face on First

Amendment grounds, not limited to plaintiffs). It is also within the Court's power under the APA to issue universal relief, including at this stage. *See Texas v. United States*, 809 F.3d 134, 188,188 n.211 (5th Cir. 2015) (citing cases), *aff'd*, 579 U.S. 547, 547 (2016).

Even if this Court decides to limit the injunction to the parties, any relief must cover TCG, which has members all around the country. Cachapero Suppl. Decl. ¶ 2; *see also New Jersey v. Trump*, No. 25-1170, 2025 WL 759612, at *9 (1st Cir. Mar. 11, 2025) (declining to stay nationwide injunction where it was needed to provide complete relief to the plaintiffs).

## VI.    THE COURT SHOULD NOT STAY ANY INJUNCTION PENDING APPEAL

The NEA asks that, should this Court issue injunctive relief, it simultaneously stay that relief. Defs.' Resp. 17. "A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right." *New Jersey v. Trump*, No. 25-1170, at *3(quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). To the contrary, a court's assessment of a stay mirrors its assessment of a request for preliminary injunction. *See California v. Dep't of Educ.*, No. 25-1244, 2025 WL 878431, at *2 (1st Cir. Mar. 21, 2025) (reciting stay factors). Yet the NEA offers no argument or citation to support its request or explain why this Court, having determined that the factors warrant issuance of a preliminary injunction, would simultaneously conclude that its own decision should be stayed. Moreover, such a stay would enact precisely the irreparable harms justifying preliminary relief in this case: if the injunction were stayed to allow for appeal, Plaintiffs would not obtain relief prior to the April 7 deadline.

## VII.    THIS COURT SHOULD WAIVE THE BOND REQUIREMENT

The NEA's request for a bond is equally unjustified. "The First Circuit has recognized an exception to the security bond requirement in Fed. R. Civ. P. 65(c) in 'suits to enforce important federal rights or public interests,'" including when plaintiffs "seek to preserve their rights to free expression." *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 129 (D.

Mass. 2003) (quoting *Crowley v. Local No. 82, Furniture & Piano Moving,* 679 F.2d 978, 1000 (1st Cir.1982), *rev'd on other grounds,* 467 U.S. 526 (1984)). "In addition, requiring a security bond in this case might deter others from exercising their constitutional rights." *Westfield High Sch. L.I.F.E. Club,* 249 F. Supp. 2d at 129. For this reason, when they even consider a bond request in First Amendment challenges, courts in this circuit regularly decline to impose one on plaintiffs seeking preliminary relief. *See, e.g., id.* (refusing to impose bond on students seeking to vindicate First Amendment rights against school); *Worthley,* 652 F. Supp. 3d at 216 n.1 (waiving bond requirement when preliminarily enjoining school from enforcing policy defendants argued no longer applied).

Moreover, though the NEA includes vague boilerplate language asserting that "any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed," it offers no explanation at all regarding what that actually means, including what specifically the Executive anticipates spending money on, how much, or why it cannot be recouped. "Determining the necessity of posting security and the amount thereof is within the sound discretion of the Court," *Westfield High Sch. L.I.F.E. Club,* 249 F. Supp. 2d at 128 (citing *Pharm. Soc'y of State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs.,* 50 F.3d 1168, 1174–75 (2d Cir.1995)), and courts may choose not to require a bond where the defendants fail to identify "any harm, financial or otherwise, that may result in case the preliminary injunction is later vacated." *Id.*; *cf. California v. Dep't of Ed,* No. 25-1244, at *5 (rejecting government's request for stay of TRO against rescission of grants where government relied on "speculation and hyperbole" to argue that "the TRO allows grant recipients to request up to the entirety of their award monies . . . with limited ability for the Department to recoup the funds should it prevail on the merits" and where "the funds will go to programs Congress intended to fund . . . consistent

29

with priorities previously published by the [defendant] in accordance with applicable regulations").

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court stay and enjoin the "gender ideology" prohibition or, in the alternative, enjoin any retroactive application of the "gender ideology" prohibition to the current cycle of applications due on April 7, 2025.

Dated: March 25, 2025                Respectfully submitted,

                                     /s/  Lynette Labinger
                                     Lynette Labinger, Esq. (Bar No. 1645)
                                     128 Dorrance Street, Box 710
                                     Providence, RI 02903
                                     401.465.9565
                                     LL@labingerlaw.com
                                     Cooperating counsel
                                     AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION OF RHODE ISLAND

                                     Vera Eidelman
                                     Scarlet Kim
                                     Lauren Yu
                                     Brian Hauss
                                     AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION
                                     125 Broad Street, 18th Floor
                                     New York, NY 10004
                                     veidelman@aclu.org
                                     scarletk@aclu.org
                                     lyu@aclu.org
                                     bhauss@aclu.org

                                     David D. Cole
                                     600 New Jersey Ave. NW
                                     Washington, DC 20001
                                     (202) 622-9078
                                     cole@georgetown.edu

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the within document via the ECF system on this day of March 25, 2025 and that it is available for viewing and downloading to all counsel of record.

Dated: March 25, 2025                              By:      */s/* Lynette Labinger
                                                            Lynette Labinger