UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP,<br><br>*Plaintiffs*,<br><br>v.<br><br>NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Secretary of the National Endowment for the Arts,<br><br>*Defendants*. | Case No. 1:25-cv-00079-WES-PAS |

**SUPPLEMENTAL DECLARATION OF MARTA V. MARTÍNEZ**

I, Marta V. Martínez, declare as follows:

1. My name is Marta V. Martínez. I am the Executive Director and Founder of Rhode Island Latino Arts ("RILA"). The facts set forth in this declaration are based on my personal knowledge.

2. RILA is planning to submit an application to the NEA's Grants for Arts Projects ("GAP") during the March 2025 cycle. RILA is a small organization and the money we have received in the past from the NEA has made a significant difference to our programming. The money we could receive from the NEA this cycle would similarly make a significant difference to our programming. It would make it possible to fund a project we could not otherwise put on. Because of that possibility, we made the decision to submit to GAP in the March cycle whether or not the NEA's prohibition on "promoting gender ideology" is in place. However, the scope of the

1

project that we apply for depends entirely on whether or not that prohibition is part of the NEA's grantmaking process.

3. The NEA permits us to submit only one application per calendar year. Because we have submitted Part 1 of our application for this grant cycle, we must submit Part 2 by April 7 or forego any NEA grant applications this year.

4. We chose to apply during the March 2025 cycle because we need the funding for programming in the first half of 2026. It would not have been feasible for us to apply during the July 2025 cycle because funds awarded during that cycle are not available until June 2026. If we had waited until July to apply for a grant, that would have left a gap in our programming for 2026.

5. RILA would like to seek funding for a project that reflects our intention to support artistic expression by and about trans, queer, and nonbinary artists, characters, and themes within the scope of the NEA-funded programming. In particular, this project would include a storytelling component. When we run storytelling programs, we allow performing artists to tell their stories without restrictions, and they feel comfortable working with us because we give them the artistic freedom to say what they want. In the past, a storyteller told a story about their son coming out as queer. We intend to continue to keep this program open to all performers and allow others to speak about or interpret their art based on their personal lives on stage, including nonbinary and transgender performers. These performers are members of the RILA community, and we want them to feel free to affirm their identities in their performances as part of their expressive work. We will not tell our artists to stay away from topics that could be interpreted as "promoting" what the government deems as "gender ideology."

6. Unless it is clear that the NEA will not refuse to fund any projects that appear to "promote" what the government deems to be "gender ideology" in the March 2025 grant cycle,

however, RILA will instead submit a more limited project that focuses on performance tours and an oral history highlighting the contributions of Latinos to American history and Rhode Island history, which would steer clear of any support for artistic expression by and about trans, queer, and nonbinary artists, characters, and themes, including through a storytelling component. This is not the full scope of the project we want to submit, but a more restricted project because we believe we need to censor ourselves and change the scope of our planned project to avoid violating any "gender ideology" prohibition. Absent relief, we will steer far clear of any project that could be deemed to "promote gender ideology" because the possibility of NEA funding is so significant for RILA.

7. If it were clear that no "gender ideology" prohibition would factor into the consideration of our grant application, we would expand the scope of our project in Part 2 of our grant application due April 7. As we have done in the past, we would like to support artists who are transgender, queer, or nonbinary, and art that features trans, queer and nonbinary artists, characters and themes, including through a storytelling component.

8. The declaration from Ann Eilers dated March 7, 2025, did not provide us with the relief we need to proceed with our desired project in this application cycle. Although the declaration stated that we would no longer need to certify compliance with EO 14168 while the outcome of this litigation is pending, it did not remove the prohibition on any project that appears to "promote gender ideology" from receiving funding. Even without the certification, we fear that an application for RILA's desired project would still be barred from eligibility due to the "gender ideology" prohibition. Absent the relief we seek, we would still be forced to submit Part 2 of our application with our more restricted, self-censored project rather than our desired project.

9. Similarly, the memo from Mary Anne Carter dated March 17, 2025, does not provide us with the relief we need to proceed with our intended project in this application cycle. The memo states that the NEA will not implement EO 14168 "unless and until such a time that the agency's process of deliberating and considering this EO has completed," and that the "new consideration and evaluation process will complete by April 16, 2025 and the agency will implement and make public the final decision resulting from that process by April 30, 2025." It is therefore clear that any implementation of EO 14168 will be imposed on the March 2025 round of applications, even though the governing rules will not be made clear to applicants like RILA before the application is due.

10. Because the EO that the NEA is deliberating over states that "[f]ederal funds shall not be used to promote gender ideology" and that "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," RILA continues to fear that the NEA will reimpose the same "gender ideology" prohibition that the NEA had put in place when RILA filed suit. Because of that, RILA is forced to censor itself with regard to the project that we submit in Part 2, due on April 7. While the prohibition may not technically be in place when RILA submits, the NEA has reserved the ability—and in no way disclaimed its intention to—reimpose the "gender ideology" prohibition on April 30, thereby making any proposal submitted by April 7 that could be deemed to cross the "gender ideology" line ineligible for funding in the current cycle. Absent the relief we seek, therefore, we cannot seek funding for the project we actually want to submit, given the likelihood that it will be ineligible starting on April 30, once it is too late for us to change our submission.

11. Moreover, because the NEA has said that it will impose any new rules and prohibitions it comes up with on April 30 on applications that are submitted on April 7, it is very

unclear to RILA what standards, prohibitions, and preferences will govern our April 7 application. This lack of clarity makes it difficult for us to determine what to include, and not include, in our application. And we will have no opportunity after any new rules, policies, or standards are announced on April 30 to adapt our application.

12. Putting together an application for an NEA grant takes a great deal of effort, especially for a small organization like RILA that does not have a dedicated development office for writing grant applications. The process of writing this grant requires extensive planning, coordination, and research. It involves gathering detailed information, developing a compelling narrative, preparing budgets, timelines, and work plans, and often coordinating with multiple partners. For a small team juggling multiple programs and responsibilities, completing a federal grant application can take several weeks of focused work and staff time that might otherwise be used for direct programming. I started working on Part 2 of our application as soon as the NEA applicant portal opened on March 14, 2025, because of how much time I would need to work on the application, and intend to submit Part 2 as soon as practicable after this Court issues a ruling on the pending motion for preliminary relief. Despite these challenges, RILA remains committed to applying for federal support because of the transformative impact such funding can have on our community-based arts and cultural initiatives.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March  21 , 2025.

_____
Marta V. Martínez