UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                       )
RHODE ISLAND LATINO ARTS, et al.,      )
                                       )
          Plaintiffs,                  )
                                       )
     v.                                )     C.A. No. 25-79 WES
                                       )
NATIONAL ENDOWMENT FOR THE ARTS,       )
et al.,                                )
                                       )
          Defendants.                  )
_____)

### MEMORANDUM AND ORDER

WILLIAM E. SMITH, Senior District Judge.

     Before the Court is Plaintiffs' Motion for a Preliminary
Injunction, Expedited Hearing, and/or a Temporary Restraining
Order ("PI Motion"), ECF No. 2.  Plaintiffs are hopeful recipients
of federal arts funding whose intended projects would feature
transgender and nonbinary performers, characters, stories, and
themes.  They seek to preliminarily enjoin the National Endowment
for the Arts ("NEA") and its leadership from prohibiting recipients
of NEA grants from using the grants to promote "gender ideology,"
as defined in recent Executive Order 14168 (the "EO").  According
to the Complaint, such a prohibition would violate the
Administrative Procedure Act ("APA"), the First Amendment, and the
Fifth Amendment.  The Court finds that Plaintiffs have demonstrated
a likelihood of success on the merits of their APA and First

Amendment claims and that they would suffer irreparable harm if the prohibition were imposed. Critical to the outcome here, however, is that after Plaintiffs filed their Complaint and PI Motion, the NEA rescinded its implementation of the EO pending further administrative review, which will conclude in a matter of weeks. Notwithstanding the NEA's pivot, under the voluntary cessation doctrine, Plaintiffs' claims are not moot. But due to the posture of the case, the Court finds that the balance of equities tips in Defendants' favor and that an injunction is not in the public interest at this time. Therefore, the PI Motion is denied.[1]

I.    **BACKGROUND**

   A. **The NEA's Authorizing Statute**

The National Foundation on the Arts and the Humanities Act of 1965 ("NFAHA") declares, as amended, that "[t]he arts . . . belong to all the people of the United States." 20 U.S.C. § 951(1). The NFAHA further provides that "it is necessary . . . for the Federal Government to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." Id. § 951(7). In accordance with these principles, the

---

[1] The Court will schedule a conference within the next several weeks to set a schedule for the case.

NFAHA established the NEA, which provides financial assistance to groups and certain individuals "of exceptional talent engaged in or concerned with the arts." Id. § 954(c). Among the priorities identified in the funding program at issue in this case are "projects and productions which have substantial . . . artistic and cultural significance, giving emphasis to American creativity and cultural diversity," and those with similar significance "that reach, or reflect the culture of, a minority, inner city, rural, or tribal community." Id. § 954(c)(1), (4).

Because the drafters and subsequent amenders of the NFAHA were concerned about the NEA being leveraged as an instrument of "political control of culture," they took several steps to ensure that grants are awarded based on talent alone, irrespective of the artists' identities, backgrounds, viewpoints, or perspectives. See Compl. ¶ 17, ECF No. 1 (quoting H.R. Rep. No. 89-618, at 21 (1965)); see also id. ¶ 21 ("Congress's intent was to have 'Government assistance, but not intervention[;] . . . support but not control[;] . . . stimulation but not participation.'" (omissions in original) (quoting 111 Cong. Rec. 23963 (1965) (statement of Rep. John S. Monagan))).

One safeguard against political interference is a prohibition against federal supervision or control over the policies, personnel, or operations of grant recipients. 20 U.S.C. § 953(c).

Another safeguard is the nested, multilayer review process that underlies each individual grant decision. Working outward from the innermost layer, this process begins with an advisory panel's review of a grant application; the panel is required to "recommend applications . . . solely on the basis of artistic excellence and artistic merit." Id. § 959(c). Notably, the NEA must "ensure that all panels are composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view." Id. § 959(c)(1).

From there, the NEA's National Council on the Arts (the "Council") is required to make recommendations concerning whether to approve applications determined by the advisory panels to have artistic excellence and artistic merit. Id. § 955(f)(1). Just as the composition of the advisory panels ensures a diversity of viewpoints and backgrounds, so too does that of the Council. In selecting the Council's eighteen voting members, the President must "give due regard to equitable representation of women, minorities, and individuals with disabilities who are involved in the arts and shall make such appointments so as to represent equitably all geographical areas in the United States." Id. § 955(b)(1), (1)(C).

At the outermost layer of review is the Chairperson, who may

4

not approve or disapprove any application until it is recommended for approval by the Council, and who may not approve an application for which the Council has made a negative recommendation. <u>Id.</u> § 955(f)(2); <u>see also</u> <u>id.</u> § 955(b)(1) (requiring the President to consider equitable representation in selection of the Chairperson). Moreover, the Chairperson must ensure that "artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." <u>Id.</u> § 954(d)(1). Finally, the NFAHA provides that "[i]n selecting individuals and groups of exceptional talent as recipients of financial assistance to be provided under [the program at issue here], the Chairperson shall give particular regard to artists and artistic groups that have traditionally been underrepresented." <u>Id.</u> § 954(c).

In short, this complex statutory framework demonstrates Congress's intent to insulate the NEA from political control and to encourage the freedom of expression. As a Senate committee report on the original version of the NFAHA explained:

> It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of artistic and humanistic expression. One of the artist's and humanist's great values to society is the mirror of self-examination which they raise so that society can become aware of its shortcomings as well as its strengths . . . . Countless times in history artists and humanists who were vilified

by their contemporaries because of their innovations in
style or mode of expression have become prophets to a
later age.  Therefore, the committee affirms that the
intent of this act should be the encouragement of free
inquiry and expression. . . . [C]onformity for its own
sake is not to be encouraged, and . . . no undue
preference should be given to any particular style or
school of thought or expression.

Compl. ¶ 21 (omissions in original) (quoting S. Rep. No. 89-300,
at 3-4 (1965)).

### B. Executive Order 14168

On January 20, 2025, President Trump signed Executive Order
14168, "Defending Women from Gender Ideology Extremism and
Restoring Biological Truth to the Federal Government." Id. ¶ 47.
According to Section 2(f) of the EO:

"Gender ideology" replaces the biological category of
sex with an ever-shifting concept of self-assessed
gender identity, permitting the false claim that males
can identify as and thus become women and vice versa,
and requiring all institutions of society to regard this
false claim as true.  Gender ideology includes the idea
that there is a vast spectrum of genders that are
disconnected from one's sex.  Gender ideology is
internally inconsistent, in that it diminishes sex as an
identifiable or useful category but nevertheless
maintains that it is possible for a person to be born in
the wrong sexed body.

Exec. Order No. 14168, § 2(f), 90 Fed. Reg. 8615, 8615-16 (Jan.
30, 2025).  The EO has multiple substantive provisions, but
relevant to the present case is Section 3(g), which declares that
"[f]ederal funds shall not be used to promote gender ideology.
Each agency shall assess grant conditions and grantee preferences

6

and ensure grant funds do not promote gender ideology." Id. § 3(g), 90 Fed. Reg. at 8616.

The President signed the EO about three weeks ahead of the initial application deadline for the semiannual Grants for Arts Project ("GAP"), the NEA's premier grant program. Compl. ¶¶ 34-37. The submission deadline for the current funding cycle was initially set for February 13, 2025. Id. ¶ 37. On February 6, however, the NEA updated its application procedure and pushed the final deadline to March 24, with an intermediate deadline set for March 11. Id. ¶¶ 37, 40-41, 51. The NEA's updated procedure required each applicant to certify, at both stages of the application and subject to potential criminal, civil, or administrative penalties for making false statements, that if selected as a grant recipient, the applicant (1) "will comply with all applicable Executive Orders while the award is being administered" and (2) "understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168." Id. ¶ 51; see id. ¶¶ 40-43. In response to this litigation, the final deadline was again pushed back to April 7 and other changes were made, discussed below.

### C. The Plaintiffs

Plaintiffs are three prospective applicants for the current funding cycle and a membership organization that represents a host

of prospective applicants. Id. ¶¶ 2, 10-13. All four are concerned about the NEA's implementation of the EO. Id. ¶ 6. Rhode Island Latino Arts ("RILA") would prefer to submit a project "that would affirmatively include celebrating transgender, queer, and nonbinary identity and featur[e] artists and characters with those identities." Id. ¶ 63. Since February 6, however, when the NEA implemented the EO, RILA has considered whether to censor itself and submit a different project for the current funding cycle. Id. ¶¶ 63-67.

National Queer Theater ("NQT") intends to seek funding for its Criminal Queerness Festival, which has received GAP awards in previous years and

> is devoted to freedom of expression and to fighting censorship and criminalization of sexuality and gender identity in other countries. It is meant to be a beacon for the queer community here and abroad, by affirming the equal dignity of people to be who they are, without being compelled to adhere to traditional heterosexual stereotypes.

Id. ¶ 70; see id. ¶¶ 68-69, 71-72. NQT will seek GAP funding this cycle regardless of the NEA's implementation of the EO, "[b]ut it will simultaneously make clear in writing on the application that it is not agreeing to the 'gender ideology' prohibition because it believes it is legally invalid." Id. ¶ 74.

The Theater Offensive ("TTO") intends to apply for a grant in the current funding cycle to support the production of a new play,

8

written by a transgender playwright, that features two transgender actors in the leading roles and explores "the complexities of transgender life." Id. ¶ 77. "TTO fears that its very mission as an organization dedicated to queer and trans people might run afoul of the 'gender ideology' prohibition." Id. ¶ 80. Despite those concerns, TTO intends to seek funding and, like NQT, express its disagreement with the prohibition in writing on the application. Id. ¶ 79.

Finally, the Theatre Communications Group ("TCG"), which is a national membership organization, has many members who find themselves in the same situation as the Plaintiffs above — indeed, TTO is a member of TCG. Id. ¶¶ 13, 94. TCG also intends to apply for a grant during the next funding cycle, in July 2025, to support a conference that would include a panel discussion "about gender identity, affirming trans, nonbinary, and queer members of the community." Id. ¶ 95.

**D. The Instant Litigation**

Due to these concerns, Plaintiffs filed a Complaint on March 6 seeking declaratory and injunctive relief against the NEA and Mary Anne Carter, in her official capacity as the NEA's Acting Chairperson. Id. at 1. The Complaint alleges that Defendants, by requiring applicants to certify their compliance with the EO and prohibiting applications that promote "gender ideology," as

9

defined in the EO, have violated the APA, the First Amendment, and the Fifth Amendment.  Id. ¶¶ 5-7.  Because the application deadlines were fast approaching, Plaintiffs filed their PI Motion, also on March 6, seeking to preliminarily enjoin Defendants from imposing the certification requirement and from prohibiting applications that promote gender ideology.  Pls.' Mem. L. Supp. PI Mot. ("PI Mem.") 1, ECF No. 2-1.

The Court scheduled a hearing on the PI Motion for March 18. Notice Hr'g PI Mot. (Mar. 7, 2025).  But then, on March 10, the NEA submitted a declaration providing that: no later than the following day, the NEA would remove "the new language requiring compliance with E.O. 14168 . . . until the conclusion of this litigation.  The NEA intends to no longer require applicants to certify their compliance with E.O. 14168 while the outcome of this litigation is pending."  Decl. Ann Eilers, Deputy Chair Mgmt. & Budget, NEA ("Eilers Decl.") ¶ 8, ECF No. 10.  The Eilers Declaration further provided that the March 24 deadline would be changed to April 7.  Id. ¶ 9.  The Court thereafter rescheduled the hearing on the PI Motion for March 27.  Notice Hr'g PI Mot. (Mar. 11, 2025).

In yet another pivot, the NEA then issued a memorandum from Mary Anne Carter, on March 17, that abandoned the NEA's prior statement concerning the certification requirement.  Memorandum

from Mary Anne Carter, Sr. Advisor, NEA, to NEA Grantmaking Staff ("Carter Memo") 1 (Mar. 17, 2025).  The Carter Memo provides that "the NEA has rescinded all implementation of the EO, as it applies to the NEA's grantmaking activities." Id.  Furthermore, it states:

> The NEA will not implement the EO at any grant evaluation stage during the current pending grant cycles, and any grants cycles in the future, unless and until such a time that the agency's process of deliberating and considering this EO has completed.
>
> The NEA will not require any applicant for any agency funds to certify their compliance with the EO during this time.
>
> . . .
>
> This new consideration and evaluation process will complete by April 16, 2025 and the agency will implement and make public the final decision resulting from that process by April 30, 2025.

Id. at 2.  The Carter Memo did not change the April 7 deadline. See generally id.  In its Response to the PI Motion, filed on March 21, Defendants argue that because the NEA has rescinded the implementation of the EO pending further administrative review, Plaintiffs' claims are nonjusticiable on standing and ripeness grounds (they do not argue mootness).  Defs.' Resp. PI Mot. ("Defs.' Resp.") 1, ECF No. 11.  Despite their argument that Plaintiffs' claims are nonjusticiable, Defendants have not moved to dismiss the action, but they discourage the Court from "short-circuit[ing] an ongoing administrative proceeding that might, or might not, obviate the sole ground for the Plaintiffs' case."  Id.

11

at 2.

In their Reply, Plaintiffs assert that their claims are still justiciable and accuse Defendants of "manufactur[ing] standing and ripeness problems [by trying to] erroneously muddle distinct justiciability inquiries."  Pls.' Reply Mem. L. Supp. PI Mot. ("Pls.' Reply") 2, ECF No. 12.  According to Plaintiffs, it is mootness — not standing or ripeness — that is at issue here; and despite the NEA rescinding its implementation of the EO, Plaintiffs contend that because the voluntary cessation doctrine applies, their claims are not moot.  Id.

The Court heard argument on Thursday, March 27, and promised a decision on the PI Motion before April 7, the application deadline for the current funding cycle.  Minute Entry (Mar. 27, 2025).

## II.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  Id. (quoting Amoco Prod. Co. v. Village of Gamble, 480 U.S. 531, 542 (1987)).  To secure a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is

12

likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20. "[W]hen the Government is the opposing party," as in this case, the third and fourth factors merge. Nken v. Holder, 556 U.S. 418, 426 (2009).

## III. DISCUSSION

The Court begins with the parties' conflicting justiciability arguments and finds that mootness, not standing or ripeness, is the relevant inquiry. From there, the Court considers whether the voluntary cessation exception to mootness applies and finds that, while it does not apply to the certification requirement, it does apply to the NEA's categorical prohibition of applications that promote gender ideology. Finally, the Court considers whether this categorical prohibition, which the Court refers to in this case as an "eligibility bar," should be preliminarily enjoined. In the end, the Court finds that Plaintiffs clearly satisfy the first two elements of the preliminary-injunction test: likelihood of success on the merits and irreparable harm absent an injunction. But at this juncture, the balance of the equities and public interest counsel against preliminary relief. This is an unusual but not unheard-of outcome in a preliminary injunction motion. Typically, likelihood of success and irreparable harm rule the day on these motions. But there are four factors for a reason, and

this is the rare case where the balance of the harms and equities plus the public interest caution against the extraordinary relief requested.

## A. Justiciability

According to Defendants, because the NEA has rescinded its implementation of the EO, Plaintiffs no longer have standing; and because the NEA will not re-implement the EO until after the application deadline, Plaintiffs' claims are not ripe. Defs.' Resp. 7-13. Defendants' Response does not argue mootness. At bottom, however, they assert that there "is no case or controversy for this Court to adjudicate." Id. at 1.

Whether Plaintiffs' claims are justiciable despite the NEA's rescission of the EO is clearly a question of mootness, not standing or ripeness, regardless of the labels Defendants use. Standing is a fixed question, "to be assessed under the facts existing when the complaint is filed." Lujan v. Defs. of Wildlife, 504 U.S. 555, 569 n.4 (1992); see also Becker v. FEC, 230 F.3d 381, 386 n.3 (1st Cir. 2000). Defendants do not suggest that Plaintiffs lacked standing — or that their claims were not ripe — when the Complaint was filed. If anything, arguing that Plaintiffs lack standing because of the rescission implies that they had standing before the rescission.

Standing relates both to "questions of ripeness — whether the

14

harm asserted has matured sufficiently to warrant judicial intervention — and of mootness — whether the occasion for judicial intervention persists." Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975). But under circumstances where, as here, the plaintiffs had standing at the outset (and their claims were ripe), but the defendants' intervening conduct raises the question whether a case or controversy remains, mootness is the relevant inquiry. See Becker, 230 F.3d at 386 n.3 ("[A] plaintiff must have a personal interest at stake throughout the litigation of a case, [but] such an interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter."); Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" (quoting U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980))).

In short, Plaintiffs had standing before the NEA rescinded its implementation of the EO and, at the time, their claims were fit for judicial review. See Thomas v. Union Carbide Agr. Prods. Co., 473 U.S. 568, 581 (1985) ("One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." (quoting

Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 142 (1974))).
What the Court must now decide is whether, because of the
rescission, Plaintiffs' claims are moot.  See West Virginia v.
EPA, 597 U.S. 697, 719 (2022) ("It is the doctrine of mootness,
not standing, that addresses whether 'an intervening circumstance
[has] deprive[d] the plaintiff of a personal stake in the outcome
of the lawsuit." (emphasis and alterations in original) (quoting
Genesis HealthCare Corp. v. Symczyk, 569 U.S. 66, 72 (2013))).

**B. Voluntary Cessation**

Plaintiffs argue their claims are not moot under the voluntary
cessation doctrine, which stands for the principle that "a
defendant cannot automatically moot a case simply by ending its
unlawful conduct once sued." Already, LLC v. Nike, Inc., 568 U.S.
85, 91 (2013).  The doctrine is thus designed to prevent defendants
from manipulating a court's jurisdiction to evade judicial review
of a challenged practice.  See FBI v. Fikre, 601 U.S. 234, 241
(2024) ("A live case or controversy cannot be so easily disguised,
and a federal court's constitutional authority cannot be so readily
manipulated.").

To prevent this kind of gamesmanship, the voluntary cessation
doctrine imposes on defendants a "formidable burden." Id. (quoting
Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,
528 U.S. 167, 190 (2000)).  For a case to be mooted by the halting

16

of a defendant's conduct, the "defendant must prove 'no reasonable expectation' remains that it will 'return to [its] old ways.'" Id. (quoting United States v. W. T. Grant Co., 345 U.S. 629, 632-33 (1953)).  Put differently, "a defendant's 'voluntary cessation of a challenged practice' will moot a case only if the defendant can show that the practice cannot 'reasonably be expected to recur.'"  Id. (quoting Friends of the Earth, 528 U.S. at 189).

Importantly, two challenged practices are at issue here: the certification requirement and the eligibility bar.  Each must be examined independently.  At least in the context of this grant cycle, Defendants have met their burden with respect to the certification requirement.  But because it is reasonable to expect that once the NEA completes its upcoming "evaluation process" it may reimpose an eligibility bar during this cycle — and after proposals have been submitted — Defendants cannot meet their formidable burden to demonstrate that the case is moot.

**1. Certification Requirement**

Before the NEA rescinded its implementation of the EO, it was requiring each grant applicant to certify that, if selected, it "will comply with all applicable Executive Orders while the award is being administered." Compl. ¶ 51.  The application specifically alerted applicants to the EO, and it required them to acknowledge that — pursuant to the EO — "federal funds shall not be used to

17

promote gender ideology." Id. These two provisions, working together, made up the certification requirement.

The certification requirement operated as a precondition to submission of an application for NEA funding. But on March 10, the NEA pushed back the application deadline — from March 24 to April 7 — and declared that it would not impose a certification requirement on applicants until the conclusion of this litigation. Eilers Decl. ¶¶ 8-9. Because the litigation had only just begun and the deadline was mere weeks away, the Eilers Declaration all but foreclosed the possibility that applicants would have to sign the certification requirement to submit applications for the current grant cycle. But that possibility increased, however slightly, with the publication of the Carter Memo on March 17.

According to the Carter Memo, the NEA has initiated a new "consideration and evaluation process" regarding whether, and how, to implement the EO in its grantmaking activities. Carter Memo 2. It further provides that the process "will complete by April 16, 2025 and the agency will implement and make public the final decision resulting from that process by April 30, 2025." Id. In the meantime, the Carter Memo says that the NEA will not implement the EO during any grant cycles until that process is complete, nor will it require "any applicant for any agency funds to certify

their compliance with the EO during this time." Id.

Reading between the lines, the Carter Memo leaves open the remote possibility — indeed, it arguably suggests — that the NEA could reimpose a certification requirement on applications for the current grant cycle after it concludes the evaluation process. But based on the timeline delineated in the Carter Memo, it appears practically impossible for this to occur.

For one, the April 7 application deadline is days away. And three to four weeks is not much time for the NEA to conduct its process — while considering the effect of this and other judicial decisions cited in the Carter Memo — in deciding whether and how to implement the EO. See id. at 1 (noting that the NEA intends to address how "recent judicial activity" affects its implementation of the EO, if at all). To be sure, it is theoretically possible that following the evaluation process, the NEA will retroactively require applicants who have already submitted their projects for approval to confirm that those projects comply with the EO. But such an approach is highly unlikely given the broad assurances of the Carter Memo and the practical infeasibility of such a requirement, so the Court cannot reasonably expect the NEA to do that.

Because the NEA cannot reasonably be expected to reimpose a certification requirement on applications submitted for the

current grant cycle, Defendants have met their burden under the voluntary cessation doctrine.  The NEA does not disclaim reimposing the requirement, but for the reasons discussed above, if it did, the requirement would apply to future grant cycles and not to the current one.  Although TCG and likely some of its members intend to apply for NEA funding during the next grant cycle,[2] it is the current cycle that is the subject of the PI Motion.  Therefore, Plaintiffs' request for injunctive relief regarding the certification requirement is moot.

### 2. Eligibility Bar

As noted above, the NEA initially sought to implement the EO by adding two provisions to its grant application form.  The first provision requires each applicant to certify its compliance with all applicable Executive Orders if selected as a grant recipient; and the second provision asks each applicant to acknowledge "that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168."  Compl. ¶ 51.  When combined, these provisions operate to form the certification requirement considered above.  But the second provision also has a freestanding effect: it notifies applicants that the NEA will not consider applications deemed to promote gender ideology.  In

---

[2] The NEA currently permits only one application per year. Pls.' Reply 18.

Plaintiffs' words, it serves as a "new, extra-statutory eligibility criterion." PI Mem. 17.[3]

Although Defendants cannot reasonably be expected to retroactively impose the certification requirement on applications submitted during the current funding cycle, the same cannot be said with respect to the prospective application of the eligibility bar. Therefore, the voluntary cessation exception to the mootness doctrine applies to Plaintiffs' claims regarding the NEA's categorical prohibition of projects deemed to promote gender ideology.

The Court reaches this conclusion for three reasons. First, the NEA has not disclaimed implementation of the EO. Pls.' Reply 4. And the timeline delineated in the Carter Memo suggests a probability that it will implement the EO during the current grant cycle.

Second, agency action is imminent. The question is not an

---

[3] The "Legal Requirements and Assurance of Compliance" section of the grant application, where the certification requirement and eligibility bar appear, includes a provision that "[p]rojects or programs that are determined to be obscene are without artistic merit and shall not be funded." Decl. Vera Eidelman Ex. 2, at 7, ECF No. 2-2. The obscenity bar is not extra-statutory like the eligibility bar on the promotion of gender ideology here, see 20 U.S.C. § 954(d)(1)-(2), but the bars' resemblance suggests the NEA meant to categorically proscribe the promotion of gender ideology just as Congress did for obscenity.

abstract one of whether a defendant will resume a challenged practice at an unspecified future date.  Here, the date is specified and, unless the NEA foregoes implementation of the EO, the practice will likely resume in some form.  The only question is how much that practice will resemble the challenged one.

Third, the text of the EO appears to require the NEA to impose an eligibility bar.  The EO provides that "[f]ederal funds shall not be used to promote gender ideology."  Exec. Order No. 14168, § 3(g), 90 Fed. Reg. at 8616.  To be sure, Section 8(b) of the EO requires it to be "implemented consistent with applicable law." Id. § 8(b), 90 Fed. Reg. at 8618.  So it is certainly possible that the NEA will moderate its approach to implementing the EO in light of the statutory language of the NFAHA and the input of this Court and others.  But given the text of the EO, it is just as reasonable to expect that the NEA will conclude that the promotion of "gender ideology" will be considered as a significant factor weighing against a project's approval.

For these reasons, although the NEA has rescinded its prior implementation of the EO, the NEA can reasonably be expected to reimpose the eligibility bar during the current grant cycle. Therefore, the voluntary cessation exception applies with respect to the eligibility bar, the case is not moot in that respect, and the Court must consider Plaintiffs' request for preliminary

relief.

**C. Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right," Winter, 555 U.S. at 24, and courts "should pay particular regard for the public consequences" of granting one, id. (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).    Moreover, "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."    Lackey v. Stinnie, 145 S. Ct. 659, 667 (2025) (quoting Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579 (2017) (per curiam)).

The NEA has rescinded its implementation of the EO pending further administrative review.    But under the voluntary cessation doctrine, the rescission has not mooted the case, and Plaintiffs' claims about the eligibility bar are live.    Therefore, the Court must consider Plaintiffs' request for preliminary relief.    That entails reviewing the merits of Plaintiffs' legal claims.    On that note, two qualifications are in order.    First, one should resist "improperly equat[ing] 'likelihood of success' with 'success'" and treating the Court's preliminary review of Plaintiffs' claims "as 'tantamount to decisions on the underlying merits.'"    Id. (alteration in original) (quoting Univ. of Tex. v. Camenisch, 451

23

U.S. 390, 394 (1981)).  Second, requests for preliminary injunctive relief — especially when the window for review is small and the questions are big, as in this case — often require courts "to assess the merits of important cases earlier and more quickly than is ordinarily preferable, and to do so without the benefit of full merits briefing and oral argument."  Labrador v. Poe by & through Poe, 144 S. Ct. 921, 928 (2024) (mem.) (Kavanaugh, J., concurring). With those qualifications noted, the Court proceeds to the preliminary-injunction analysis.

### 1. Likelihood of Success on the Merits

Plaintiffs can demonstrate a likelihood of success on the merits of their APA and First Amendment claims, but not their Fifth Amendment claim.

#### a. APA Claims

The Court finds that the eligibility bar likely violates the APA.  Plaintiffs bring three APA claims: that the eligibility bar (1) exceeds statutory authority, (2) is arbitrary and capricious, and (3) is contrary to a constitutional right.  Compl. ¶¶ 96-108. The Court only addresses the first APA claim under this subsection and, given the preliminary nature of its review, simply folds the third APA claim into its analysis of Plaintiffs' constitutional claims in the following subsections.  The Court does not address

24

Plaintiffs' arbitrary-and-capricious claim.

The APA requires a court to "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). As the Supreme Court has recently explained, "the command of the APA" is "that 'the reviewing court' — not the agency whose action it reviews — is to 'decide <u>all</u> relevant questions of law' and 'interpret . . . statutory provisions.'" <u>Loper Bright Enters. v. Raimondo</u>, 603 U.S. 369, 398 (2024) (quoting 5 U.S.C. § 706). Therefore, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." <u>Id.</u> at 412. Indeed, even where an agency's authorizing statute is ambiguous with respect to the question at issue, the agency's interpretation of that statute is "<u>not</u> entitled to deference." <u>Id.</u> at 392. Here, the question is whether the eligibility bar, as it was originally imposed, is inconsistent with the NEA's authorizing statute, the NFAHA.

In response to Plaintiffs' claims that the eligibility bar violates the APA, Defendants argue only that because the NEA has rescinded the eligibility bar (in response to this litigation) pending further administrative review, no final agency action has occurred and, therefore, the APA does not apply. Defs.' Resp. 14.

But as explained above, the voluntary cessation doctrine applies to Plaintiffs' challenge against the eligibility bar despite the rescission.  See supra Part III(B)(2).  Accordingly, the Court must review the eligibility bar under the APA to determine whether Plaintiffs have met their burden in their request for preliminary relief.

Before deciding whether the eligibility bar can be reconciled with the NEA's authorizing statute, the Court looks to the statute itself.  The NFAHA creates a multistep process to guide the NEA's review of each grant application.  First, the statute requires the Chairperson to "utilize advisory panels to review applications" and provides that "such panels shall recommend applications" to the Council "solely on the basis of artistic excellence and artistic merit."  20 U.S.C. § 959(c).  From there, the Council's eighteen voting members, all of whom must be private citizens with strong connections to the arts, id. § 955(b)(1)(C), "shall make recommendations to the Chairperson concerning . . . whether to approve particular applications . . . that are determined by panels . . . to have artistic excellence and artistic merit," id. § 955(f), (f)(1).  At the final step, the Chairperson must decide whether to approve or disapprove each application recommended by the Council.  Id. § 955(f)(2).  The Chairperson "may not approve an application with respect to which the Council makes a negative

recommendation." <u>Id.</u>

The Court reads the decision-making structure outlined in the NFAHA to significantly constrain the Chairperson's discretion over whether to approve a given application.  With respect to each step of the decision-making process, the statute underscores that "artistic excellence and artistic merit are the criteria by which applications are judged." <u>Id.</u> § 954(d)(1); <u>see</u> <u>id.</u> §§ 955(f)(1), 959(c).  To be sure, § 954(d)(1) instructs the Chairperson to ensure that applications are assessed by these criteria while "taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." <u>Id.</u> § 954(d)(1).  This reasonably provides the NEA with at least some discretion over which applications to select, but that discretion must be exercised within the contours of the broader assessment of artistic excellence and artistic merit.  In other words, the Court does not read the decency and respect clause to empower the NEA to reject an application based on a sole criterion, regardless of its artistic qualities. <u>Cf.</u> <u>Nat'l Endowment for the Arts v. Finley</u>, 524 U.S. 569, 582 (1998) (explaining "[t]hat § 954(d)(1) admonishes the NEA merely to take 'decency and respect' into consideration and that [it] was aimed at reforming procedures rather than precluding speech").

Furthermore, the NFAHA makes clear that each application is

to be reviewed on an individual basis, and that none should be presumed ineligible based on its content or viewpoint, with one exception.  That exception is § 954(d)(2), which instructs the NEA to establish regulations and procedures that "clearly indicate that obscenity is without artistic merit, is not protected speech, and shall not be funded," and prohibits the NEA from supporting projects that are "determined to be obscene."  20 U.S.C. § 954(d)(2).  According to the NFAHA, "[t]he term 'determined to be obscene' means determined, in a final judgment of a court of record and of competent jurisdiction in the United States, to be obscene."  Id. § 952(j).

The relevance of § 954(d)(2) is threefold.  First, as the Supreme Court has noted, "[w]hen Congress has in fact intended" the NEA to prohibit the funding of certain classes of speech, "it has done so in no uncertain terms."  Finley, 524 U.S. at 581. Against the categorical language of a provision like § 954(d)(2), it is difficult to envision how a provision like § 954(d)(1), with its "vague exhortation" to consider decency and respect when making selections, could reasonably be used to proscribe a whole class of speech.  Id. at 583.  Second, § 954(d)(2)'s prohibition against funding obscenity is content based, not viewpoint based, and obscenity is not protected under the First Amendment.  See United States v. Williams, 553 U.S. 285, 288 (2008) ("We have long held

that obscene speech . . . is not protected by the First Amendment."
(citing Roth v. United States, 354 U.S. 476, 484-85 (1957))); see
also Miller v. California, 413 U.S. 15, 23 (1973).  Therefore, if
the NEA used § 954(d)(1) to impose a viewpoint-based
disqualification of protected speech, it would be going well beyond
what Congress did in § 954(d)(2).  Third, based on the statutory
definition of "determined to be obscene," it appears that the NEA
does not have power to decide which projects cannot be funded
because they are obscene; rather, that determination requires the
final judgment of a court.  20 U.S.C. § 952(j).

In light of the text and structure of the NFAHA, the Court is
unable to reconcile the eligibility bar with the NEA's authorizing
statute.  The NFAHA sets forth a multistep review process to guide
the NEA's selection of grant applications; and at each step of the
process, the statute reiterates that artistic excellence and
artistic merit — and nothing more — are the criteria by which
applications are to be judged.  Congress has instructed the NEA to
ensure that "general standards of decency and respect for the
diverse beliefs and values of the American public" are "tak[en]
into consideration" during the review process.  Id. § 954(d)(1).
But the Court does not read this "vague exhortation" to empower
the NEA to disqualify an entire class of projects based on the
viewpoints they express and without regard to their artistic

29

qualities.  Finley, 524 U.S. at 583.  Because the eligibility bar does just that, and because the Court cannot find any provision of the NFAHA that would seem to justify it, the Court finds that the NEA's EO-based eligibility bar would likely exceed the NEA's statutory authority.

Because the Court finds that Plaintiffs have shown that the eligibility bar likely exceeds the NEA's authority under the NFAHA, the Court need not consider their second APA claim — that the eligibility bar is arbitrary and capricious — at this juncture. As for Plaintiffs' third APA claim — that the eligibility bar violates the APA because it is contrary to a constitutional right — the Court finds that Plaintiffs can demonstrate a likelihood of success on this claim for the reasons described immediately below.

### b. First Amendment Claim

In addition to likely violating the APA, the eligibility bar likely runs afoul of the First Amendment.  As mentioned above, the Supreme Court considered a First Amendment challenge related to the NEA's grantmaking process in its seminal Finley decision.  See id. at 572-73.  There, grant applicants brought a facial challenge to § 954(d)(1), arguing that its "decency and respect" clause was a viewpoint-based restriction on protected speech, in violation of the First Amendment, and was void for vagueness under both the

First and Fifth Amendments.  Id. at 577-79.

The Court rejected both challenges and upheld § 954(d)(1), reasoning that its "vague exhortation" for decency and respect to be taken into consideration does not "silence speakers by expressly 'threaten[ing] censorship of ideas.'"  Id. at 583-84 (alteration in original) (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 393 (1992)).  As for the plaintiffs' void-for-vagueness challenge, although the Court described the terms of § 954(d)(1) as "undeniably opaque," it found it "unlikely . . . that speakers will be compelled to steer too far clear of any 'forbidden area' in the context of grants of this nature."  Id. at 588.  When applying for competitive grants based on subjective criteria like artistic excellence and artistic merit, the Court reasoned that it was to be expected that artists "conform their speech to what they believe to be the decisionmaking criteria in order to acquire funding."  Id. at 589.  And "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe."  Id.

On the First Amendment challenge, the Court observed that "the text of § 954(d)(1) imposes no categorical requirement" and "stands in sharp contrast to congressional efforts to prohibit the funding of certain classes of speech."  Id. at 581.  The Court further explained that "[i]n cases where we have struck down

31

legislation as facially unconstitutional, the dangers were both more evident and more substantial," such as where a criminal provision "set forth a clear penalty, proscribed views on particular 'disfavored subjects,' and suppressed 'distinctive idea[s], conveyed by a distinctive message.'" Id. at 582 (second alteration in original) (citations omitted) (quoting R.A.V., 505 U.S. at 391, 393).

Notwithstanding the deferential approach articulated above, the Court did not rule out the possibility of a successful First Amendment challenge to the implementation of § 954(d)(1):

> [W]e have no occasion here to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination. If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case. We have stated that, even in the provision of subsidies, the Government may not "ai[m] at the suppression of dangerous ideas," and if a subsidy were "manipulated" to have a "coercive effect," then relief could be appropriate. In addition, as the NEA itself concedes, a more pressing constitutional question would arise if Government funding resulted in the imposition of a disproportionate burden calculated to drive "certain ideas or viewpoints from the marketplace." Unless § 954(d)(1) is applied in a manner that raises concern about the suppression of disfavored viewpoints, however, we uphold the constitutionality of the provision.

Id. at 587 (alteration in original) (emphasis added) (citations omitted) (first quoting Regan v. Tax'n With Representation of Wash., 461 U.S. 540, 550 (1983); then quoting Ark. Writers'

Project, Inc. v. Ragland, 481 U.S. 221, 237 (1987) (Scalia, J.,
dissenting); and then quoting Simon & Schuster, Inc. v. Members of
N.Y. State Crime Victims Bd., 502 U.S. 105, 116 (1991)).

That "different case" is quite nearly the one now before this
Court.  Id.  To be sure, this is not an as-applied challenge to a
particular funding decision, nor is it a challenge to the statute.
But the categorical nature and breadth of the eligibility bar seem
to all but guarantee that a whole class of projects will be
rejected based on viewpoint alone: with the eligibility bar in
place, federal funding is being used to impose a "disproportionate
burden calculated to drive 'certain ideas or viewpoints from the
marketplace.'"  Id. (quoting Simon & Schuster, 502 U.S. at 116).
Defendants seem to acknowledge this, because their response is not
to deny the obvious reality, but to claim that the First Amendment
does not apply.  They argue that NEA-funded art is not private
speech at all — which is protected by the First Amendment — but
government speech, which has no First Amendment protection:

> The NEA's selective, grantmaking decisions do not create
> any fora for any private citizens' exercise of free
> speech.  Instead, the NEA's decisions about which art
> projects it selects for awards — and which it does not
> — constitute a form of government speech, and are
> therefore not subject to the First Amendment.

Defs.' Resp. 9.  The Court must therefore decide whether the NEA's
grant program is "designed to facilitate private speech" or instead
to "promote a governmental message."  Legal Servs. Corp. v.

33

Velazquez, 531 U.S. 533, 542 (2001).

We begin with the premise that the Free Speech Clause of the First Amendment "restricts government regulation of private speech; it does not regulate government speech." Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009). But "[t]he boundary between government speech and private expression can blur where, as here, a government invites the people to participate in a program." Shurtleff v. City of Boston, 596 U.S. 243, 252 (2022). To help determine whether, in these situations, "the government intends to speak for itself or to [facilitate] private expression," the Supreme Court has developed a "holistic" multifactor test. Id. A court should consider "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." Id. (citing Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 209-14 (2015)).

Applying these factors "without the benefit of full merits briefing" or a factual record, Labrador, 144 S. Ct. at 928 (Kavanaugh, J., concurring), the Court finds that the NEA's grantmaking program was designed to facilitate private speech. First, the history of the expression at issue, defined narrowly as NEA-funded art, favors Plaintiffs' argument that such art is

private speech.  In this case, defining the expression at issue is an awkward task.  In Shurtleff, the expression at issue was "flag flying, particularly at the seat of government."  596 U.S. at 253. In Walker, it was license plates.  576 U.S. at 210-11.  And in Summum, it was monuments built with the support of private funds but "display[ed] to the public on government land."  555 U.S. at 471.  Here, the expression at issue could be defined as artwork by private actors that is performed or displayed in nongovernment-owned spaces, but this would not capture the public-funding element.

Alternatively, it could be described simply as publicly funded art, but that would lump it together with situations in which the government exercises far more creative control over the production than is contemplated by the NFAHA, such as in cases involving public art exhibits, Smithsonian-commissioned portraits, or public monuments.  See People for the Ethical Treatment of Animals, Inc. v. Gittens, 414 F.3d 23, 25, 29-31 (D.C. Cir. 2005) (holding that District of Columbia, by inviting artists to submit designs for decorating sculptures of donkeys and elephants — symbols of the main political parties — "installed at prominent city, federal and private locations," was engaged in government speech); Raven v. Sajet, 334 F. Supp. 3d 22, 28 (D.D.C. 2018) (holding National Portrait Gallery's art selections are government

speech); <u>Matal v. Tam</u>, 582 U.S. 218, 238 (2017) ("Governments have used monuments to speak to the public since ancient times; . . . '[p]ublic parks are often closely identified in the public mind with the government unit that owns the land' . . . ." (alteration in original) (quoting <u>Summum</u>, 555 U.S. at 472)). The text and structure of the NFAHA make clear that the purpose of the NEA is to fund art for art's sake, not to advance specific views. <u>See</u> <u>supra</u> Part III(C)(1)(a). And, as noted at the outset, the drafters and subsequent amenders of the NFAHA went lengths to ensure that NEA funds were not leveraged to promote a particular political or governmental message. <u>See</u> <u>supra</u> Part I(A). In that respect, the NEA is distinct from programs like those cited above where the government speaks through its selection, display, and maintenance of art.

The second factor — "the public's likely perception as to who (the government or a private person) is speaking" — also supports the argument that NEA-funded art is private speech. <u>Shurtleff</u>, 596 U.S. at 252. To borrow Plaintiffs' words, "no one thinks an NEA artist speaks for the government." Pls.' Reply 25. Indeed, not even the Supreme Court thinks so: If artists have no First Amendment interest in what they produce using NEA funds, then the <u>Finley</u> Court would not have engaged in its lengthy analysis of the plaintiffs' claims or suggested that violations of the First

36

Amendment could occur in the grantmaking context.  See Finley, 524 U.S. at 587.

Finally, the third factor also favors this conclusion.  "[T]he extent to which the government has actively shaped or controlled the expression" is minimal here.  Shurtleff, 596 U.S. at 252.  Of course, the NEA "maintain[s] control over the selection" of proposals, Walker, 576 U.S. at 210, but for the reasons described in the Court's discussion of Plaintiffs' APA claims, this control does not extend to the content or viewpoint of the message conveyed, see supra Part III(C)(1)(a).  As this Court has repeatedly observed, artistic excellence and artistic merit are the only criteria by which proposals are to be judged; and further, the intent of the NFAHA is to "encourage[] . . . free inquiry and expression."  Compl. ¶ 21 (quoting S. Rep. No. 89-300, at 3-4).

Because the Court finds that NEA-funded art is likely private speech and not government speech, the eligibility bar amounts to impermissible viewpoint discrimination in violation of the First Amendment.  "At its most basic, the test for viewpoint discrimination is whether — within the relevant subject category — the government has singled out a subset of messages for disfavor based on the views expressed."  Matal, 582 U.S. at 248 (Kennedy, J., concurring).  That is exactly what the NEA has done by imposing

the eligibility bar.

This conclusion is also consistent with the related line of Supreme Court cases that address the power of government to impose speech-related conditions on the receipt of public funds. In these cases, the Court has outlined several considerations that distinguish permissible restrictions from impermissible ones. First, the government can extend a benefit that requires recipients to refrain from certain First Amendment activities, such as lobbying, without violating the First Amendment. See Regan, 461 U.S. at 545-46. But the Court has made clear that the permissibility of such activity-based restrictions does not mean the government can use subsidies to suppress "dangerous ideas." Id. at 548 (quoting Cammarano v. United States, 358 U.S. 498, 513 (1959)); see also FCC v. League of Women Voters of Cal., 468 U.S. 364, 380-81, 398-99 (1984) (holding grant condition preventing broadcasters from sharing their own partisan opinions was unconstitutional viewpoint discrimination). In this set of cases, the government is not communicating through its funding decisions, but rather is deciding whether to subsidize certain activities. And here the line between a content-based restriction and a

viewpoint-based restriction is significant.[4]

A second set of cases involves the government controlling the speech of funding recipients in order to "promote a governmental message." Velazquez, 531 U.S. at 542. In these government speech cases, the line drawn is not between content and viewpoint, but rather between speech-related conditions that "define the limits of the government spending program" and those that "seek to leverage funding to regulate speech outside the contours of the program itself." Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 214-15 (2013). A speech-based restriction in this context is permissible if the recipient is free to participate in activities that conflict with the government's message "on its own time and dime." Id. at 218; see, e.g., Rust v. Sullivan, 500 U.S. 173, 196-200 (1991). But if the condition "goes beyond defining the limits of the federally funded program to defining the recipient," constitutional problems arise. All. for Open Soc'y, 570 U.S. at 218.

Finally, the Supreme Court has held that where a funding program is designed not to promote a governmental message, but to facilitate private speech, any content- or viewpoint-based

---

[4] The Court notes that "[d]eciding whether a particular regulation is content based or content neutral is not always a simple task." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994).

condition on the receipt of funding raises constitutional concerns.  See Velazquez, 531 U.S. at 542, 548 (noting legal services program "was designed to facilitate private speech, not to promote a governmental message," and that Congress could not define the program's scope "to exclude certain vital theories and ideas"); Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 834 (1995) ("It does not follow . . . that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers.  A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles.").

To be sure, there is some overlap between the first two sets of cases, and the Supreme Court's line drawing is not always clear. Furthermore, although the eligibility bar is a precondition on the receipt of federal funds, the cases discussed above involve challenges to funding conditions that were enacted as an intrinsic part of a specific government program.  In contrast, here we have an effort to impose an extrinsic, extra-statutory condition on top of an existing program.  In the Court's preliminary view, and for all the reasons discussed above, it seems clear that the NEA's

grantmaking process was designed to facilitate private speech, and not to promote a governmental message. NEA-funded art is therefore protected under the First Amendment; and where, as here, the government has imposed a viewpoint-based condition on the receipt of those funds, there is a clear First Amendment violation.

### c. Fifth Amendment Claim

The Court finds that given the current posture of the case, where the certification requirement is mooted by the rescission but the eligibility bar is not, Plaintiffs have not demonstrated a likelihood of success on the merits of their claim that the eligibility bar is unconstitutionally vague in violation of the Fifth Amendment. The primary thrust of Plaintiffs' vagueness argument is that the application instructed them to sign the certification requirement subject to potential criminal penalties for making false statements. Compl. ¶¶ 120-123; see also PI Mem. 28-29. But as discussed above, the NEA rescinded the certification requirement and cannot reasonably be expected to reimpose one as a precondition to applying for a grant in this cycle. See supra Part III(B)(1). Therefore, Plaintiffs' certification-requirement claim is moot, and the risk of penalties for any statements made in relation to the EO within the context of the grant application is no longer an issue.

As to the eligibility bar in particular, Plaintiffs argue

that even if there is no threat of criminal penalties, the bar nevertheless violates the Fifth Amendment because it affords the NEA excessive discretion over the grantmaking process. Pls.' Reply 26-27 (citing Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 94 (1st Cir. 2004)). But as the Supreme Court noted in Finley, the NFAHA "vests the NEA with substantial discretion to award grants," and "identifies only the broadest funding priorities." Finley, 524 U.S. at 573. If anything, the eligibility bar severely narrows the discretion of NEA personnel in deciding which projects to approve, and that is precisely why it likely violates both the APA and the First Amendment.

### 2. Irreparable Harm

Because Plaintiffs can demonstrate a likelihood of success on the merits of their First Amendment claim, the Court does not need to perform a separate irreparable-harm analysis. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). Irreparable harm is thus "presumed upon a determination that [Plaintiffs] are likely to prevail on their First Amendment claim." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 11 (1st Cir. 2012).

### 3. Balance of the Equities and Public Interest

As noted above, the NEA's rescission of the eligibility bar

has not mooted Plaintiffs' claims.  This is because the Court can reasonably expect the NEA to reimpose the eligibility bar in some form, and on applications submitted during the current grant cycle, when it completes its review process regarding implementation of the EO later this month.  And because the eligibility bar (as initially imposed) likely violates the APA and the First Amendment, Plaintiffs can satisfy the first two elements of the preliminary injunction test.

But "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." Winter, 555 U.S. at 32 (citing Romero-Barcelo, 456 U.S. at 313 ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.") (alteration in original))).  And here, the balance of the equities tips against granting an injunction, at least for the present time.

Granting a preliminary injunction in these circumstances would impose significant hardship on the NEA with little practical benefit to Plaintiffs.  If the Court enjoins the NEA from imposing an eligibility bar at this juncture, it will in effect short circuit the ongoing administrative review process set to conclude in a matter of days.  This would rob the NEA of the opportunity to make its own considered decision about whether to implement the EO at all, given the obvious tension between the EO and the explicit

language of the NFAHA.  It is possible that the NEA will conclude that the two are irreconcilable, the statute governs, and the EO cannot be lawfully implemented absent congressional action.  For the Court to intercede and mandate this outcome would raise obvious separation-of-powers concerns.

It is also possible that the NEA might forge a middle position by attempting to harmonize the EO with Congress's statutory mandate.  This could, for example, take the form of expressing a preference for proposals that promote certain themes and shy away from others (including "gender ideology").  Plaintiffs' counsel, when asked about this possibility at oral argument, acknowledged that this would present a more difficult case.  The Court is in no position to anticipate this action or comment upon its legality.  Again, to do so would raise serious separation-of-powers concerns.

On the other side of the ledger, the benefits to Plaintiffs of granting an injunction are minimal.  NQT and TTO have already stated they intend to submit their preferred applications despite the eligibility bar because they have concluded it is unlawful.  Compl. ¶¶ 74, 79.  Only RILA — and presumably some of TCG's members — are considering submitting an alternative proposal in lieu of one that might run up against the eligibility bar.  Id. ¶¶ 63-67, 84-92.

While an injunction might provide RILA and other applicants

with the assurance they desire that their preferred applications will not be rejected outright based on their content or the viewpoints they express, such an order provides less help than it may appear.  First, Plaintiffs now not only have their own legal opinions regarding the unlawfulness of an eligibility bar but have this Court's preliminary review of the merits as well.  RILA and the TCG members who are on the fence may now follow the example of the other Plaintiffs who already intend to submit their preferred applications.  If they do so, they are not harmed by the lack of injunctive relief.[5]

Furthermore, Plaintiffs must recognize that preliminary relief is inevitably fleeting: only the Court's final judgment can either vindicate or invalidate their claims.  And of course, nothing in life is certain.  Notwithstanding its initial view of the merits, this Court (or the Court of Appeals) might ultimately uphold whatever the NEA comes up with after its review.  Plaintiffs must make choices that hopeful grant applicants make all the time about what to propose in their application, to enhance their chances of success.  The Court cannot make the process free of

---

[5] Plaintiffs formerly faced a potential harm of civil, criminal, or administrative penalties for making false statements, tied to compliance with the EO, in submitting their applications. Compl. ¶¶ 42-46.  However, the removal of the certification requirement has eliminated that potential harm.  Eilers Decl. ¶ 8.

45

difficult choices.

Plaintiffs who have yet to submit an application must decide whether to play it safe and submit a backup proposal or possibly take a calculated risk and submit their preferred application. As Defendants suggest in their Response, when it comes to selective grant competitions such as this one, each applicant must consider a range of factors in deciding what kind of application to submit, and there is no guarantee of success. Defs.' Resp. 11. The Court's preliminary analysis of the merits just adds another factor to this calculation.

The bottom line is this: Although Plaintiffs can show a substantial likelihood of success on the merits of their (not moot) eligibility-bar claim, the balance of the equities and public interest weigh heavily against preliminary injunctive relief, at this time, for all the reasons discussed above. Once the NEA completes its process, Plaintiffs may well return to the Court for relief — or, if the NEA declines to adopt the EO in any way, they may drop the curtain on this action altogether. But for now, the PI Motion is denied.

## IV.    CONCLUSION

For the reasons above, Plaintiffs' Motion for a Preliminary Injunction, Expedited Hearing, and/or a Temporary Restraining Order ("PI Motion"), ECF No. 2, is DENIED.


IT IS SO ORDERED.

_____
William E. Smith
Senior District Judge
Date: April 3, 2025