# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP,<br><br>*Plaintiffs*,<br><br>v.<br><br>NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts,<br><br>*Defendants*. | Case No. 25-79 WES |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This lawsuit seeks to enjoin an unlawful and unconstitutional exercise of executive power that has sowed chaos in the funding of arts projects across the United States, causing grievous irreparable harm to Plaintiffs and other organizations.

2.      Plaintiffs are four arts nonprofit corporations that have received funding from the National Endowment for the Arts ("NEA") in the past and that seek to apply for NEA funding in the future, including in the current March 2025 application cycle. They are each committed to creating, producing, and promoting art that, among other things, affirms the equal dignity of all people—regardless of race, sex, religion, sexuality, or gender identity. In particular, they have created and promoted art in the past that promotes and affirms the lived experiences of transgender and nonbinary people, by casting transgender and nonbinary actors, and by promoting and producing art that features transgender and nonbinary themes.

3.    As directed by federal statute, the NEA administers tens of millions of dollars appropriated by Congress each year to funding for the arts. Congress established the NEA to "help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." 20 U.S.C. § 951(7). Congress made clear that, when choosing which projects to fund, "artistic excellence and artistic merit" are the only criteria for judging applications. *Id*. at § 954(d)(1).

4.    But on the day he took office, President Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO" or "EO"), directing that "federal funds shall not be used to promote gender ideology." 90 Fed. Reg. 8615 (Jan. 30, 2025) at §2(f). The EO defines "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." *Id.* at §2(g).

5.    Shortly thereafter, the NEA implemented the Gender Ideology EO by requiring all grant applicants to certify their understanding that "federal funds shall not be used to promote gender ideology," pursuant to the EO. It also ~~makes~~made applications for projects that appear to "promote" what the government deems "gender ideology" ineligible for funding.

6.    Because ~~they~~Plaintiffs seek to affirm transgender and nonbinary identities and experiences in the projects for which they seek funding, ~~Plaintiffs are~~and were effectively barred by the "gender ideology" certification and prohibition (together, "gender ideology prohibition") from receiving NEA grants on artistic merit and excellence grounds. ~~Some of their proposed work appears to be ineligible for NEA funding under the new "gender ideology" prohibition, even though similar work has been funded in the past. Moreover, the vagueness of the prohibition requires them to~~, they filed this lawsuit challenging the prohibition on March 6, 2025, accompanied by a motion for preliminary relief.

~~guess as to what if anything they can create, produce, or promote that addresses themes of gender,~~

~~or that affirms the identities of all people regardless of their gender identity.~~

7.    ~~The NEA's "gender ideology" prohibition~~Following that filing, the NEA took several actions:

a.   First, on March 10, 2025, it declared that it would remove the certification requirement and that it would not reimpose the requirement "while the outcome of this litigation is pending." The NEA removed the certification requirement on March 11, 2025.

b.   Second, on March 17, 2025, the NEA issued a memorandum stating that "the NEA has rescinded all implementation of the EO, as it applies to the NEA's grantmaking activities" and would undergo "a new evaluation of the EO," which would be "complete[d] by April 16, 2025" and be "implement[ed] and ma[d]e public . . . by April 30, 2025."

c.   Finally, on April 30, 2025, the NEA announced the resulting policy ("Final EO Implementation"), which stated that "appropriate action is needed to incorporate the EO in the NEA's grant application review process" and that the NEA "intend[s] action to implement [the EO]." In particular, it announced that the Chair will review grant applications on a case-by-case basis "for artistic excellence and merit, including whether the proposed project promotes gender ideology."

8.    The "gender ideology" prohibition, comprising both the certification requirement and the eligibility bar; any other action to disqualify any project that promotes what the government deems to be "gender ideology" from NEA funding; and any other action to make any such project less likely to receive NEA funding is contrary to the agency's governing statute, arbitrary and capricious, and violates the First and Fifth Amendments by imposing a vague and viewpoint-based restriction on artists' speech. Plaintiffs request that the Court declare the "gender ideology" prohibition, the Final EO Implementation, and any

other viewpoint-based effort by the NEA to implement the EO unlawful, set ~~it~~them aside, and enjoin ~~its~~their application facially and as to Plaintiffs.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705-06.

10.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because this action seeks relief against an agency of the United States and an officer of that agency acting in her official capacity and Plaintiff Rhode Island Latino Arts resides in this district.

## PARTIES

### A.      Plaintiffs

11.     Rhode Island Latino Arts ("RILA") is a 501(c)(3) nonprofit corporation based in Rhode Island. Its mission is to promote, encourage, and preserve the art, history, heritage, and cultures of Latinos in Rhode Island. It is committed to supporting the equal dignity of all artists, including transgender and nonbinary artists, and its work often features such artists and themes. RILA offers programming of every genre of art, including visual art, dance, and music. It puts on theatrical and musical performances, Latin percussion sessions, dancing events, script readings, and storytelling events. It also has a gallery to showcase artwork, and operates literacy programs. RILA has previously received NEA funding in 2019, 2020, and 2022.

12.     National Queer Theater, Inc. ("NQT") is a 501(c)(3) nonprofit corporation based in New York. It is a theater collective dedicated to celebrating the brilliance of generations of LGBTQ+ artists and providing a home for unheard storytellers and activists. Its work regularly features transgender and nonbinary individuals and themes. NQT was awarded NEA grants in 2023 and 2024 for its Criminal

Queerness Festiva ("CQF"). In addition, NQT was offered an NEA grant in 2025 for CQF, and that award is pending processing.

13.    The Theater Offensive, Inc. ("TTO") is a 501(c)(3) nonprofit corporation based in Massachusetts. It is a theatrical organization whose mission is to present liberating art by, for, and about queer and trans people of color that transcends artistic boundaries, celebrates cultural abundance, and dismantles oppression. Although TTO is open to all without regard to race, sex, or other identifying characteristics, it seeks in particular to support the voices of trans, nonbinary, and queer people, including people of color, who are often the most underserved in the theatrical community both on and offstage. Its work regularly features transgender and nonbinary artists and themes. TTO has previously received six grants from the NEA, in 2016, 2017, twice in 2022, 2023, and 2025.

14.    Theatre Communications Group ("TCG") is a 501(c)(3) nonprofit corporation based in New York. It is a national theater organization with over 600 member theaters and affiliates and over 3,500 individual members. TCG offers networking and knowledge-building opportunities through research, communications, and events, and it publishes the nation's only general-circulation magazine related to theater, *American Theatre*. TCG supports theater professionals through annual convenings, industry reports, workshops, webinars, and the publication of *American Theatre* magazine and TCG Books, while also awarding $43 million in funding and professional development support to more than 900 organizations and 1,300 individuals over its history of grantmaking.

### B.    Defendants

15.    Defendant National Endowment for the Arts ("NEA") is an independent agency of the United States Government headquartered in Washington, D.C. It is responsible for processing and overseeing arts grants to individuals and organizations across the country.

16.     Defendant Mary Anne Carter is the Acting Chair of the NEA. She is sued in her official capacity only.

## ALLEGATIONS

### A.     Congress Establishes the NEA

17.     In 1965, Congress enacted the National Endowment for the Arts and Humanities Act (the "Act"), which established the NEA. 79 Stat. 845 (codified as amended at 20 U.S.C. § 951 *et seq.*). The Act sets forth "a broadly conceived national policy of support for the humanities and the arts in the United States," 20 U.S.C. § 953(b), and commits federal funding "to help create and sustain . . . the material conditions facilitating the release of this creative talent," *id.* at § 951(7).

18.     In response to concerns that government support for the arts might lead to "attempts at political control of culture," H.R. Rep. No. 89-618, at 21, *reprinted in* 1965 U.S.C.C.A.N. 3186, 3205 ("H.R. Rep. No. 618"), Congress took several steps to insulate the agency from political pressures, and to insulate private grantees' speech from government control.

19.     First, Congress articulated that funding criteria must be based on artistic excellence and merit. 79 Stat. 846–47, § 5(c)(1). The Act originally reflected this standard in the description of the productions to receive NEA funding, *e.g.* "productions which have substantial artistic and cultural significance" and "productions, meeting professional standards of or standards of authenticity, irrespective of origin which are of significant merit." *Id.* at § 5(c)(1)–(2). As the Senate Report explained, the standard for grants would be "artistic and humanistic excellence." S. Rep. No. 300, 89th Cong., 1st Sess. at 4 (1965); *see also Hearing on the Grant Making Process of the National Endowment for the Arts,* Before the Subcomm. on Postsecondary Educ. of the House Comm. on Educ. and Labor, 98th Cong., 2d Sess. 4-5 (June 28, 1984) (hereinafter "*1984 Grant Making Hearing*") ("The only criterion was to be artistic excellence, and that is the criterion used today.") (statement of former NEA chair Frank Hodsoll). The

Act also now explicitly provides that "artistic excellence and artistic merit are the criteria by which applications are judged." 20 U.S.C. § 954(d)(1).

20.     Second, Congress enacted a provision that forbade the NEA from "exercis[ing] any direction, supervision, or control over the policy determination, personnel, or curriculum, or the administration or operation of any school or other non-federal agency, institution, organization, or association." 20 U.S.C. § 953(c). The House Report described this provision as an "assurance against federal interference in the arts." H.R. Rep. No. 618, 1965 U.S.C.C.A.N. at 3200.

21.     Third, Congress made the NEA an agency of arts professionals guided by artistic merit rather than of politicians who might be driven by political concerns. It required that the NEA's decisionmakers—the Chair and the National Council on the Arts—be experts in the arts.  *See* 78 Stat. 905, § 5(a) (requiring National Council on the Arts members to be selected "for their broad knowledge of or experience in, or for their profound interest in the arts," include those "professionally engaged in the arts," and from "the major art fields"); 79 Stat. at 849, § 6(a) (transferring the National Council on the Arts to the NEA); *see also* 135 Cong. Rec. 16284 (1989) (statement of Senator Pell) ("When we structured the Endowment, we were careful to put the artistic decisionmaking in the hands of outside experts and away from the influence of government . . . ."); *1984 Grant Making Hearing* (statement of former NEA chair Hodsoll) ("[T]here would be no federal agencies to fund the arts and the humanities without statutory guarantees that Washington bureaucrats would not make the artistic content decisions involved in federally funded projects. Rather, these decisions were to be left to the individual artists and their organizations."). The Act continues to reflect Congress's desire that the NEA's decisionmakers be arts professionals, providing that 18 members of the National Council on the Arts be appointed according to similar criteria. *See* 20 U.S.C. § 955(b).

22.     Fourth, the Senate Report devoted an entire section to "Freedom of Expression":

It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of artistic and humanistic expression. One of the artist's and humanist's great values to society is the mirror of self-examination which they raise so that society can become aware of its shortcomings as well as its strengths . . . . Countless times in history artists and humanists who were vilified by their contemporaries because of their innovations in style or mode of expression have become prophets to a later age. Therefore, the committee affirms that the intent of this act should be the encouragement of free inquiry and expression. . . . [C]onformity for its own sake is not to be encouraged, and . . . no undue preference should be given to any particular style or school of thought or expression.

S. Rep. No. 300, 89th Cong., 1st Sess. at 3–4 (1965). As one member stated, Congress's intent was to have "Government assistance, but not intervention . . . support but not control . . . stimulation but not participation." 111 Cong. Rec. 23963 (1965) (statement of Cong. Monagan); *see also* 111 Cong. Rec. 23969 (1965) (statement of Cong. Helstoski) ("The Federal Government will supply the money, but the artists and their organizations will suggest the proposals, select the performances which are to be produced and do all the planning. The Federal Government will be the means, but the end product will be the sole responsibility of the performing artists.").

23.    Since its founding, the NEA has awarded more than $5.5 billion in funding to individuals and organizations working to bring the arts to communities throughout the nation.[1] It has regularly supported art that features transgender and nonbinary artists and themes, including by the Plaintiffs in this case. On January 14, 2025, the NEA announced its latest tranche of awards, numbering "1,474 awards totaling $36,790,500 to support the arts in communities in all 50 states, Puerto Rico, and Washington, DC."[2]

### B.    The Structure and Grantmaking Authority of the NEA

---

[1] *Impact*, Nat'l Endowment for the Arts, https://www.arts.gov/impact

[2] *National Endowment for the Arts Supports the Arts with Nearly $36.8 Million in Funding Nationwide*, Nat'l Endowment for the Arts (Jan. 14, 2025), https://www.arts.gov/news/press-releases/2025/national-endowment-arts-supports-arts-nearly-368-million-funding-nationwide

24.    The Act "authorize[s]" the NEA's Chair "to establish and carry out a program of contracts with, or grants-in-aid or loans to, groups or, in appropriate cases, individuals of exceptional talent engaged in or concerned with the arts." 20 U.S.C. § 954(c). The broadly defined funding priorities identified by the Act include, *inter alia*, "projects and productions which have substantial national or international artistic and cultural significance"; "projects and productions which have substantial artistic and cultural significance and that reach, or reflect the culture of, a minority, inner city, rural, or tribal community"; and "projects and productions that will encourage public knowledge, education, understanding, and appreciation of the arts." *Id*. §§ 954(c)(1)–(10).

25.    The Act directs the Chair to "utilize advisory panels to review applications, and to make recommendations to the National Council on the Arts." *Id*. § 959(c). These advisory panels must be "composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view." *Id*. § 959(c)(1). They must also "include representation of lay individuals who are knowledgeable about the arts but who are not engaged in the arts as a profession and are not members of either artists' organizations or arts organizations." *Id*. § 959(c)(2).

26.    The National Council on the Arts reviews the recommendations made by the advisory panels and advises the Chair on whether to approve or deny funding. *Id*. § 955(f). The Chair has "final authority to approve each application, except that the Chairperson may only provide to an applicant the amount of financial assistance recommended by the Council and may not approve an application with respect to which the Council makes a negative recommendation." *Id*. § 955(f)(2).

**C.     The "Decency and Respect" Clause and *NEA v. Finley*, 524 U.S. 569 (1998)**

27.    Prior to 1989, "only a handful of the agency's . . . awards ha[d] generated formal complaints about misapplied funds or abuse of the public's trust." *NEA v. Finley*, 524 U.S. 569, 574 (1998). That year, however, controversy arose concerning the funding of a Robert Mapplethorpe retrospective that included

homoerotic photographs, and an Andres Serrano piece entitled Piss Christ, which featured a photograph of a crucifix covered in urine. *Id.*

28.    Congress initially responded by stipulating in the 1990 appropriations bill that no NEA funds "may be used to promote, disseminate, or produce materials which in the judgment of [the NEA] may be considered obscene, including but not limited to, depictions of sadomasochism, homoeroticism, the sexual exploitation of children, or individuals engaged in sex acts and which, when taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id.* at 575 (alteration in original) (quoting Department of the Interior and Related Agencies Appropriations Act, 1990, 103 Stat. 738-742). The NEA instituted "a requirement that all grantees certify in writing that they would not utilize federal funding to engage in projects inconsistent with the criteria in the 1990 appropriations bill." *Id.* A federal district court subsequently struck the certification down as unconstitutionally vague and unduly chilling of speech. *See id.* (citing *Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F.Supp. 774 (C.D. Cal. 1991)).

29.    The 1990 appropriations bill also created "an Independent Commission of constitutional law scholars to review the NEA's grant-making procedures and assess the possibility of more focused standards for public arts funding." *Id.* The Commission recommended in its report "that the NEA rescind the certification requirement and cautioned against legislation setting forth any content restrictions." *Id.* Instead, it proposed "procedural changes to enhance the role of advisory panels and a statutory reaffirmation of 'the high place the nation accords to the fostering of mutual respect for the disparate beliefs and values among us.'" *Id.* at 575–76 (quoting Independent Commission, Report to Congress on the National Endowment for the Arts 83–91 (Sept. 1990)).

30.    Congress subsequently "debated" and "rejected" several proposed reforms when "it considered the agency's reauthorization in the fall of 1990." *Id.* at 576. Among those proposals was an amendment that would have prohibited "awarding any grants that could be used to 'promote, distribute, disseminate, or produce matter that has the purpose or effect of denigrating the beliefs, tenets, or objects

of a particular religion' or 'of denigrating an individual, or group of individuals, on the basis of race, sex, handicap, or national origin.'" *Id.* (quoting 136 Cong. Rec. 28657–64).

31.    Instead, Congress adopted the Williams/Coleman Amendment, codified at 20 U.S.C. § 954(d)(1), which directs the Chair, in establishing regulations and procedures for funding projects and productions, to "ensure that . . . artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *See also Finley*, 524 U.S. at 576. The Amendment also directs that the regulations and procedures must "clearly indicate that obscenity is without artistic merit, is not protected speech, and shall not be funded." 20 U.S.C. § 954(d)(2).

32.    Shortly after the enactment of the Williams/Coleman Amendment, four performance artists and the National Association of Arts Organizations challenged the constitutionality of the "decency and respect" clause on the ground that, among other things, it violated the First Amendment because it constituted viewpoint discrimination. *Finley*, 524 U.S. at 577–78.

33.    In *NEA v. Finley*, the Supreme Court held that § 954(d)(1) does not violate the First Amendment, because the "decency and respect" clause "imposes no categorical requirement" on the viewpoint of artistic works eligible for NEA funding. *Id*. at 581. The Court noted that "[t]he Independent Commission had cautioned Congress against the adoption of distinct viewpoint-based standards for funding," and that Congress had heeded this warning by "declin[ing] to disallow any particular viewpoints." *Id*. at 581–82. The Court specifically highlighted that the sponsors of § 954(d)(1) had stated: "[I]f we start down that road of prohibiting categories of expression, categories which are indeed constitutionally protected speech, where do we end? Where one Member's aversions end, others with different sensibilities and with different values begin.'" *Id*. at 582 (alteration in original) (quoting 136 Cong. Rec. 28624 (statement of Rep. Coleman)). In light of these considerations, the Court agreed with the NEA that the "decency and respect" clause is "merely hortatory," and that § 954(d)(1) "does not

preclude awards to projects that might be deemed 'indecent' or 'disrespectful,' nor place conditions on grants, or even specify that those factors must be given any particular weight in reviewing an application." *Id*. at 580–81.

34.    In upholding the "decency and respect" clause, the Court was careful to note that it "would confront a different case" if the NEA were to deny, or disfavor, grants to projects or productions expressing disfavored viewpoints. *Id*. at 587. The Court reaffirmed "that, even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas,'" *id.* at 587 (alteration in original) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U. S. 540, 550 (1983)), especially if doing so "result[s] in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace,'" *id.* (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991)).

**D.    The NEA Grants for Arts Projects**

35.    The Grants for Arts Projects ("GAP") is the NEA's "principal grants category." GAP makes grants "available for arts projects of all sizes in a wide variety of artistic disciplines."[3]

36.    GAP applicants may request an amount between $10,000–$100,000.[4]

37.    The NEA accepts GAP applications during two funding cycles each year. For fiscal year 2026, the NEA is accepting applications in the March Cycle and July Cycle.[5]

38.    For the March Cycle, the submission deadline iswas March 24, 2025 when this case was filed, and the notification for acceptance or rejection is December 2025. Though the deadline had initially been set for February 13, 2025, the NEA extended it to March 24, 2025 when it amended the GAP application guidelines in early February, including by newly requiring applicants to certify that they would

---

[3] *Grants*, Nat'l Endowment for the Arts, https://www.arts.gov/grants.

[4] *Grants for Arts Projects*, Nat'l Endowment for the Arts, https://www.arts.gov/grants/grants-for-arts-projects.

[5] *Id*.

not "promote gender ideology." Following the filing of this suit, the NEA extended the deadline again, to April 7, 2025. For the March Cycle, the earliest project start date is January 1, 2026.[6]

39.    For the July Cycle, the submission deadline is July 22, 2025, and the notification for acceptance or rejection is April 2026. The earliest project start date is June 1, 2026.[7]

40.    The NEA anticipates awarding $62,245,000 for fiscal year 2026. It anticipates 4,500 applications and anticipates 2,075 awards.[8]

### E.    The GAP Application Process

41.    The GAP application process has two parts. In Part 1, applicants must complete the Application for Federal Domestic Assistance/Short Organization Form, a brief form that collects basic information about the applicant organization, and submit it on Grants.gov. For the March Cycle, Part 1 iswas due March 11, 2025.

42.    In Part 2, an applicant must complete the Grant Application Form, which constitutes the majority of the application material, including information about the organization, like history and budget; the project description, timeline, and budget information; and work samples, and submit it on the NEA's applicant portal. For the March Cycle, Part 2 iswas due on March 24, 2025 when this case was filed; that deadline was later extended to April 7, 2025.

43.    When this suit was filed, both Parts 1 and 2 requirerequired an applicant to agree to the following certification:

> By signing this certification, I certify (1) to the statements contained in the list of certifications* and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances* and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001).

---

[6] *Id.*

[7] *Id.*

[8] *Notice of Funding Opportunity: FY26 Grants for Arts Projects (GAP) Grant Program Details* 4, Nat'l Endowment for the Arts, February 2025, https://www.arts.gov/sites/default/files/FY26-GAP-Grant-Program-Details-FebRevFinal4.pdf.

44.     In order to submit Parts 1 and 2 of the GAP application, an applicant must agree to the

certification by checking a box labeled "I agree."

---

8 *Notice of Funding Opportunity: FY26 Grants for Arts Projects (GAP) Grant Program Details* 4, Nat'l Endowment for the Arts, February 2025, https FebRevFinal4.pdf.

52.45.  Below the certification text is the following explanatory asterisk: "The list of certifications and assurances, or an Internet site where you may obtain this list, is contained in the announcement or agency specific instructions."

53.46.  The agency specific instructions for the GAP application are available in the GAP Grant Program Details for fiscal year 2026, which includes a detailed description of the grant program and eligibility information.[9] The GAP Grant Program Details states that "[b]y signing and submitting the application form . . . , the Applicant certifies that it is in compliance with the statutes outlined in the Assurance of Compliance and all related National Endowment for the Arts regulations as well as all applicable executive orders . . . ." It also provides a hyperlink to the Assurance of Compliance, which is available on the NEA website.

54.47.  Accordingly, by agreeing to the certification when submitting the GAP application, an applicant certifies their agreement with the Assurance of Compliance.

## F.    Executive Order 14168 and the NEA's Implementation of the Order through the Assurance of Compliance

55.48.  On January 20, 2025, President Donald J. Trump signed Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO" or "EO").

0.    The Gender Ideology EO claims that "ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers." 90 Fed. Reg. 8615 (Jan. 30, 2025) at § 1. The Order asserts that "[e]fforts to eradicate the biological reality of sex" and "attack

---

[9] *Id.*

[9] *Id.*

60.49.  . . . the ordinary and longstanding use and understanding of biological and scientific terms . . . unmoored from biological facts" amounts to an "attack" on "women" and "on the validity of the entire American system." *Id*. It accordingly states that "my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male." *Id*.

61.50.  In order to pursue this objective, the Gender Ideology EO directs: "Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id*. at § 3(g).

62.51.  Section 2(f) of the Gender Ideology EO defines "gender ideology" as follows:

> "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

63.52.  The NEA subsequently implemented the President's Gender Ideology EO. On February 6, 2025, the agency announced updates to its grants for fiscal year 2026, including GAP grants. On or about the same day, the NEA amended its Assurance of Compliance to include the language:

> [T]he applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:
>
> - The applicant will comply with all applicable Executive Orders while the award is being administered. Executive orders are posted at whitehouse.gov/presidential-actions.
> . . .
> - The applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.

64.53.  The Assurance of Compliance states that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these . . . executive orders" and that "[i]f

the NEA determines that a recipient has failed to comply . . . , it may suspend or terminate the award, and/or recover the funds." It further states that the "[t]he applicant's assurance of compliance is subject to judicial enforcement." It later reiterates that "[t]he United States has the right to seek judicial or administrative enforcement of this assurance."

### G. *National Association of Diversity Officers in Higher Education v. Trump*

~~65.~~54.  On February 21, 2025, the U.S. District Court for the District of Maryland enjoined a different certification requirement that appeared in the NEA's new Assurance of Compliance, when it also added the "gender ideology" prohibition. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (hereinafter "*NADOHE*"), No. 25-cv-333, 2025 WL 573764 (D. Md. Feb. 21, 2025). That certification requirement read: "The applicant will not operate any programs promoting 'diversity, equity, and inclusion' (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173" ("DEI certification").

~~66.~~55.  President Trump signed Executive Order No. 14173 ("DEI EO"), entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," on January 21, 2025. 90 Fed. Reg. 8633 (Jan. 31, 2025). In relevant part, the DEI EO directs all agencies to "include in every contract or grant award," a certification, enforceable through the False Claims Act, that the contractor or grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."

~~67.~~56.  On February 3, 2025, the National Association of Diversity Officers in Higher Education, the American Association of University Professors, Restaurant Opportunities Centers United, and the Mayor and City Council of Baltimore challenged, *inter alia*, the certification requirement in the DEI EO, on the grounds that it violates the First Amendment and the separation of powers. Compl., *NADOHE*, ECF No. 1, at ¶¶ 193–210 (Feb. 3, 2025). On February 13, 2025, the plaintiffs moved for a temporary restraining order and/or preliminary injunction, including on these claims. Mot. for TRO, *NADOHE*, ECF No. 27 (Feb. 13, 2025).

68.57.  On February 21, 2025, the district court held that the plaintiffs had shown a likelihood of success that the certification requirement in the DEI EO violates the First Amendment because it is a "content-based prior restraint on their speech" and "operates as a facially viewpoint-discriminatory order as well." *NADOHE*, 2025 WL 573764, at *22. It also held that the plaintiffs had demonstrated irreparable injury and that the balance of the equities and public interest tip in their favor. *Id.* at *27–28. On that basis, the court ordered that the defendants "shall not: . . . require any grantee or contractor to make any 'certification' or other representation pursuant to the Certification Provision." Prelim. Inj., *NADOHE*, ECF No. 45, at 3.

69.58.  Following the Court's issuance of its preliminary injunction order, the NEA updated its Assurance of Compliance to include the following language after the DEI certification:

> *PLEASE NOTE: Due to the preliminary injunction issued on February 21, 2025, by the United States District Court for the District of Maryland, Case No. 1:25-cv-00333-ABA, the NEA is not currently requiring any grantee or contractor to make any "certification" or other representation pursuant to Executive Order No. 14173. This term will not apply to your award as long as this preliminary injunction remains in effect.*

59.    On March 14, 2025, the Fourth Circuit stayed the preliminary injunction pending appeal.

60.    As of May 12, 2025, the language regarding the NEA not currently requiring any grantee to make "any 'certification' or other representation pursuant to Executive Order No. 14173" continues to appear on the Assurance of Compliance.

**H.    Changes to NEA Policy Following the Filing of this Lawsuit**

61.    On March 6, 2025, Plaintiffs filed suit, seeking to enjoin the gender ideology prohibition, accompanied by a motion for preliminary relief, in light of the upcoming deadlines: March 11 for Part 1, and March 24 for Part 2.

62.     On March 10, 2025, the NEA submitted a declaration to this Court stating that the NEA would remove the certification requirement before Part 1 was due, and that the March 24, 2025 deadline would be extended to April 7, 2025.

63.     On March 11, 2025, the NEA removed the certification requirement from the Assurance of Compliance. The Assurance now states that the NEA will "no longer require applicants to certify their compliance with [the EO] while the outcome of this litigation is pending."

64.     On March 17, 2025, Defendant Carter issued a memorandum ("March 17 Memorandum") to NEA grantmaking staff, stating that "the NEA has rescinded all implementation of the EO, as it applies to the NEA's grantmaking activities" and announcing that the NEA "is initiating a new evaluation of the EO in accordance with the Administrative Procedure Act." The Memorandum explained that the NEA would not implement the EO in any grant evaluations "until . . . the agency's process of deliberating and considering this EO has completed," which would occur "by April 16, 2025" and be "implement[ed] and ma[d]e public . . . by April 30, 2025." The NEA also specified that it "will not require any applicant for any agency funds to certify their compliance with the EO during this time."

65.     On April 3, 2025, this Court issued a Memorandum and Order denying Plaintiffs' request for preliminary relief. The Court found that "Plaintiffs have demonstrated a likelihood of success on the merits of their APA and First Amendment claims and that they would suffer irreparable harm if the prohibition were imposed." In particular, the Court concluded that the eligibility bar is not reconcilable with the NEA's authorizing statute, and that it likely runs afoul of the First Amendment because "the NEA's grantmaking program was designed to facilitate private speech," not government speech, and the eligibility bar "all but guarantee[s] that a whole class of projects will be rejected based on viewpoint alone." At the same time, because the NEA had "rescinded its implementation of the EO pending further administrative review," the Court concluded that "the balance of equities tips in Defendants' favor and . .

. an injunction is not in the public interest at this time." The Court noted that "[o]nce the NEA completes its process, Plaintiffs may well return to this Court for relief[.]"

66.    The NEA completed its process on April 16, 2025, and announced the resulting policy ("Final EO Implementation") on April 30. The Final EO Implementation states that "appropriate action is needed to incorporate the EO in the NEA's grant application review process," that the NEA "intend[s] action to implement [the EO]," and that the Chair will review grant applications "for artistic excellence and merit, including whether the proposed project promotes gender ideology."

67.    At the same time, the Final EO Implementation asserts that the new process "essentially utilizes the existing statutory review scheme that the agency currently follows." "[T]he Chair will implement [the EO] by evaluating projects that promote gender ideology based on the existing statutory criteria"; "the only criteria all applications are subject to are those set forth in the enabling statute"; and "[u]nder these criteria, there is no room for viewpoint discrimination." "For example, in reviewing an application that promotes gender ideology," the NEA explains, "the Chair could consider whether or not the specific elements of that project align with general standards of decency and respect for the diverse beliefs and values of the American public, or whether those elements indicate a sufficient level of anticipated public interest in or appreciation of the project, or are likely to be suitable for or appeal to intended audiences," but "[t]he process does not include an eligibility bar[.]"

68.    The Final EO Implementation also states that "[a]pplicants will not be required to certify that no federal funds are used to promote gender ideology." However, the Assurance of Compliance continues to state that no such certification will be required only "while the outcome of this litigation is pending."

## ~~H.~~I.    Harm to Plaintiffs

### *Rhode Island Latino Arts*

70.69.  RILA isWhen Plaintiffs filed this suit, RILA was in the process of applying for NEA funding in the March 2025 GAP cycle to support programming in 2026.

71.70.  RILA originally planned to seek support for a production of "Faust," in which the lead character is gay and queer. RILA was considering casting a nonbinary actor who uses they/them pronouns for that role. In the past, this actor has chosen to dress as a man during one performance and dress as a woman in the next performance, while performing the same role.

72.71.  Because, at the time that RILA was preparing its application and choosing which proposal to put forth, the NEA's Assurance of Compliance now requiresrequired certifying that federal funds will "not be used to promote gender ideology," RILA decided not to apply for a grant to support "Faust."

73.72.  RILA also considered applying to support its storytelling program. In its storytelling program, RILA allows performing artists to tell their stories without restrictions, based on the principle that artistic freedom should allow them to say what they want. The program is open to all performers, including nonbinary and transgender performers, and it allows them to speak about or interpret their art based on their personal lives. RILA will not tell performers to stay away from topics that could be interpreted as "promoting" what the government deems to be "gender ideology."

74.73.  RILA decided not to apply for a grant to support the storytelling program because of the NEA's new Assurance of Compliance and "gender ideology" prohibition in place when the lawsuit was filed.

75.74.  Though it is not the project for which RILA wanted to apply, in the absence of judicial relief, RILA will applyhas applied for an NEA grant to support performance tours and an oral history performance highlighting the contributions of Latinos to American history and Rhode Island history. Without the "gender ideology" requirementprohibition in place when the suit was filed, the scope would behave been different; RILA would applyhave applied for a grant that would affirmatively

~~include~~included celebrating transgender, queer, and nonbinary identity and featuring artists and characters with those identities.

76.75.  Though RILA ~~objects~~objected to the "gender ideology" prohibition, RILA submitted Part 1 of its application on February 14, 2025, and agreed to the Assurance of Compliance, with the intention of proceeding with a more restricted project that would comply with the "gender ideology" prohibition. After the certification requirement had been removed, RILA withdrew and then resubmitted Part 1.

77.76.  ideology" prohibition. If~~Similarly, because RILA had to submit Part 2 of its application by April 7, before the NEA issued its Final EO Implementation, and~~ there ~~were~~was no ~~assurance that the NEA would not reimpose the~~ "gender ideology" prohibition, RILA ~~would~~did not expand the scope of the project in Part 2 of its application to reflect its ~~intention~~desire to support transgender, queer, and nonbinary artists, characters, and themes within the scope of its NEA-funded programming.

78.77.  Because what it means to "promote" what the government deems to be "gender ideology" is not clear, RILA is forced to guess as to the parameters, including whether it prohibits allowing a transgender, queer, or nonbinary individual to participate in NEA-funded programming, including any mention of these identities in RILA's work, or including any fictional characters who are transgender, nonbinary, or queer. Given the lack of clarity, RILA fears that even describing itself as an organization that supports transgender, nonbinary, and queer artists might run afoul of the "gender ideology" prohibition. The lack of clarity also denies RILA the ability to provide artists the creative freedom to which RILA is committed as an organization, and it precludes RILA from expressing viewpoints affirming all identities, including those of transgender, nonbinary, and queer individuals, even though RILA is committed to those views as an artistic organization.

78.    In addition, because the NEA's Final EO Implementation is not clear with regard to what role the NEA's perception that a project "promotes gender ideology" will play in its grantmaking determinations, RILA is forced to guess as to whether expressing any views that "promote" what the government deems to be "gender ideology" will effectively make it ineligible for, or less likely to receive, an NEA grant in this or future funding cycles.

79.    RILA believes that it has the right, as an artistic organization, to apply for NEA funding to promote art that meets the artistic merit requirements set out by Congress, whether or not it "promotes" what the government deems to be "gender ideology." RILA seeks to affirm all gender identities, including

transgender, nonbinary, and queer identities. Yet any work that might be seen as "promoting" these identities risks violating the NEA's "gender ideology" prohibition.

80.    RILA also intends to apply for NEA grants in future grant cycles to support works of artistic merit that meet all of the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through that art. But as long as the promotion of what the government deems to be "gender ideology" prohibition is in placeaffects eligibility for, or likelihood of, receiving an NEA grant, RILA is barred from seeking suchwill be forced to censor the projects it submits for NEA support.

### *National Queer Theater*

81.    When this lawsuit was filed, NQT intendsintended to apply for NEA funding in the March 2025 GAP cycle to support its Criminal Queerness Festival ("CQF"), as it has successfully in the past. Since the suit was filed, NQT submitted a proposal for CQF 2026 in the March funding cycle. The NEA funds would be used for artist and production expenses.

82.    The 2026 CQF will be NQT's eighth annual one. In January 2025, NQT received an Obie Award for the Festival in the "Theatre Grants" category. The prestigious Obie Awards, established in 1955, honor the highest caliber of off-Broadway and off-off Broadway theater to recognize brave work, champion new material, and advance careers in theater.

83.    CQF is devoted to freedom of expression and to fighting censorship and criminalization of sexuality and gender identity in other countries. It is meant to be a beacon for the queer community here and abroad, by affirming the equal dignity of people to be who they are, without being compelled to adhere to traditional heterosexual stereotypes. CQF has featured works from emerging artists from countries that criminalize homosexuality. The plays are accompanied by talkback discussions facilitated by the playwrights, human rights advocates, and other subject matter experts.

84.    The plays featured in the festival are chosen by a curatorial committee of prior CQF playwrights. Supporting transgender, nonbinary, and gender queer writers and themes has always been a

part of the festival, including in the years that it has received NEA funding. In 2023, the festival featured one play about intersex identity. In 2024, two plays were written by transgender writers and about trans identity. For 2025, all three playwrights identify as nonbinary or gender queer, and one play has nonbinary characters.

85.    Because the "gender ideology" prohibition ~~is~~in place when the lawsuit was filed was unclear, it ~~has~~ forced NQT to guess as to what, if anything, it could do that would avoid the open-ended prohibition. For example, it is not clear whether "promoting" what the government deems to be "gender ideology" includes merely working with actors, playwrights, and other artists who identify as transgender, nonbinary, or queer, regardless of the content of the art they produce. It is also unclear whether the mere existence of a transgender, nonbinary, or queer character in a piece violates the prohibition. NQT fears that its very mission as an organization dedicated to celebrating LGBTQ+ artists might also run afoul of the "gender ideology" prohibition.

86.    In addition, because the NEA's Final EO Implementation is not clear with regard to what role, if any, the NEA's perception that a project "promotes gender ideology" will play in its grantmaking determinations, NQT is forced to guess as to whether expressing any views that "promote" what the government deems to be "gender ideology" will effectively make it ineligible for, or less likely to, receive an NEA grant in this or future funding cycles.

~~86.~~87.  NQT believes that it has the right, as an organization of artists, to apply for NEA funding to promote art that meets the merit requirements set out by Congress, whether or not it "promotes" what the government deems to be "gender ideology." NQT seeks to affirm all gender identities, including transgender, nonbinary, and queer identities. Yet any work that promotes these identities risks violating the NEA's "gender ideology" prohibition, or its Final EO Implementation.

~~87.~~88.  Only because one ~~cannot~~could not register to apply for NEA funding without checking the box agreeing to the certification in the application, NQT ~~intends~~intended to check that box. ~~But it will~~

when this lawsuit was filed, while simultaneously ~~make~~making clear in writing on the application that it ~~is~~was not agreeing to the "gender ideology" prohibition because it believes it is legally invalid. Because the NEA revoked the certification requirement while this litigation is pending, NQT did not have to agree to the "gender ideology" certification in this funding cycle.

88.89.  NQT ~~intends to apply~~applied for the March 2025 cycle and not the July 2025 cycle so that it can receive the grant notification in December, which is also when NQT passes its budget. Because NQT operates on a calendar year, receiving the grant notification in December would give it six months to plan, budget, and fundraise for CQF 2026. If NQT were to wait until the July 2025 cycle, that would force it to wait until April 2026 for the grant notification, leaving NQT with only two months before CQF 2026, which is not enough time for the necessary planning.

89.90.  NQT also intends to apply for NEA funding in the future, as it has consistently done in the past, to support its work affirming transgender, queer, and nonbinary identities. ~~But as long~~But as long as the promotion of what the government deems to be "gender ideology" affects eligibility for, or likelihood of receiving, an NEA grant, NQT will be effectively barred from seeking such support.

as the NEA requires that no funds can be used to "promote" what the government deems to be "gender ideology," NQT is barred from seeking such support.

### *The Theater Offensive*

91.    ~~TTO intends~~When this lawsuit was filed, TTO intended to apply for NEA funding in the March 2025 GAP cycle to support the production of a new play titled "Smoke," written by a transgender playwright. Since the suit was filed, TTO has applied for these funds. Set in 1960's D.C., "Smoke" explores love, found family, motherhood, and healing, and reveals the complexities of transgender life. The production will feature two transgender actors in the leading roles. The NEA funds would be used to support the artists in the play, which would begin rehearsals in May 2026.

92.    When this lawsuit was filed, the certification requirement ~~poses~~posed an obstacle for TTO, because it ~~wants~~wanted to apply for funding, but believes it has a right to be considered without regard to whether the views its project expresses "promote" what the government deems to be "gender ideology."

93.    Accordingly, when the suit was filed, TTO ~~intends~~intended to check the box agreeing to the certification in the application only because doing so ~~is~~was necessary to submit an application, but ~~it will~~planned to simultaneously make clear in writing on the application that it is not agreeing to the "gender ideology" prohibition because it believes it is legally invalid. Because the NEA revoked the certification requirement while this litigation is pending, TTO did not have to agree to the "gender ideology" certification in this funding cycle.

94.    TTO ~~finds~~found the certification requirement and eligibility bar unclear as to what constitutes "promoting" what the government deems to be "gender ideology"; ~~the requirement~~they thereby ~~forces~~forced TTO to guess as to what it can and cannot do with an NEA grant. For example, it does not make clear whether "promoting" what the government deems to be "gender ideology" includes working with actors, playwrights, and other artists who identify as transgender and/or nonbinary, without

more, or whether it prohibits only certain messages, themes, or views. The requirement ~~is~~was also unclear as to whether the existence of a transgender and/or nonbinary character in a piece constitutes "promoting" what the government deems to be "gender ideology." Nor is it clear what views are proscribed. TTO fears that its very mission as an organization dedicated to queer and trans people might run afoul of the "gender ideology" prohibition.

95.    ~~TTO would like to apply~~In addition, because the NEA's Final EO Implementation is not clear with regard to what role, if any, the NEA's perception that a project "promotes gender ideology" will play in its grantmaking determinations, TTO is forced to guess as to whether expressing any views that "promote" what the government deems to be "gender ideology" will effectively make it ineligible for, or less likely to, receive an NEA grant in this or future funding cycles.

~~95.~~96.  TTO applied for the March 2025 cycle and not the July 2025 cycle in order to have enough planning time for "Smoke." Every production requires significant lead time in order to ensure that proper funding is in place, and the production process requires time to secure a venue, actors, creative and production team members, security, and more. Having a year to adequately plan and secure the necessary funding is best practice for organizations like TTO.

~~96.~~97.  It ~~is~~was also important for TTO to apply in the March 2025 cycle because March applicants will not know if their application was recommended or rejected for funding until December 2025, and the earliest start date for any funded project is January 2026. If TTO were to apply in the second cycle of funding, it would not allow the project to start until June 1, 2026, which would be too late for Smoke's production timeline.

~~97.~~98.  TTO also intends to apply for NEA grants in future grant cycles to support works of artistic merit that meet all the NEA's statutory requirements, and that affirm transgender and/or nonbinary identities through its artistic expression. But as long as the ~~NEA requires that no funds can be used to~~

"~~promote~~promotion of" what the government deems ~~to be~~ "gender ideology~~,~~"" affects eligibility for, or likelihood of receiving, an NEA grant, TTO ~~is~~will be effectively barred from seeking such support.

### *Theatre Communications Group*

~~98.~~99.    Many of TCG's members apply for and receive funding from the NEA to support their artistic endeavors. When this lawsuit was filed, many of them ~~want~~intended to apply for NEA funding in the March 2025 GAP cycle, and many have applied in the weeks since.

~~99.~~100.        Because, at the time that the suit was filed, the NEA's Assurance of Compliance ~~now requires~~required certifying that federal funds will "not be used to promote gender ideology," many of TCG's members ~~have been~~were deterred from applying for funding in the March 2025 cycle, though they had otherwise planned to and would ~~like~~have liked to. These members ~~object~~objected to having to make such a certification, and ~~fear~~feared the penalties that could flow to them if they are deemed to have made a false certification. ~~If the "gender ideology" prohibition were lifted, these members would apply for NEA funding in the March 2025 cycle.~~

~~100.~~101.        Many of TCG's members also fear that if the ~~ban on "promot[ing]"~~promotion of what the government deems to be "gender ideology" ~~would bar~~affects eligibility for, or likelihood of receiving, an NEA grant, they will be effectively barred them from even being considered for NEA funding because they work with, or are, transgender, nonbinary, or queer artists, and are committed to treating all artists with equal dignity.

~~101.~~102.        For example, one member theater, which has received several NEA grants and whose mission includes presenting "diverse" stories of the American identity, had planned to apply in the March 2025 cycle. ~~However,~~However, when this lawsuit was filed, it had decided not to apply because it cannot and will not agree to the Assurance of Compliance because it fundamentally disagrees with the "gender ideology" prohibition. Transgender people are part of the theater's workforce, audience, and arts education programs, and the theater recognizes all gender identities. It believes that not acknowledging

transgender people or identity is discriminatory. As a result, the theater ~~is unable to~~did not apply for an NEA grant that would otherwise cover 25 percent of their production cost.

~~102.~~103.    ~~The~~If the promotion of what the government deems to be "gender ideology" ~~prohibition also bars~~affects eligibility for, or likelihood of receiving, an NEA grant, many of TCG's members will also be effectively barred from being considered for an NEA grant without regard to whether their projects express views that "promote" what the government deems to be "gender ideology." TTO~~is one~~, RILA, and NQT are all such ~~member.~~members.

~~103.~~104.    Many of TCG's members, including TTO, RILA, and NQT, find the "gender ideology" prohibition unclear, and it thereby forces them to guess as to what is and is not permitted with an NEA grant.

105.    In addition, because the NEA's Final EO Implementation is not clear with regard to what role, if any, the NEA's perception that a project "promotes gender ideology" will play in its grantmaking determinations, many of TCG's members, including TTO, RILA, and NQT, are forced to guess as to whether expressing any views that "promote" what the government deems to be "gender ideology" will effectively make them ineligible for, or less likely to receive, an NEA grant in this or future funding cycles.

~~104.~~106.    When this lawsuit was filed, TCG ~~has~~had heard from members that they ~~are~~were uncertain about how to proceed, unsure of whether to apply knowing they ~~will~~would be barred from eligibility because their project may express views that "promote" what the government deems to be "gender ideology," to apply with a different project, or forego applying for NEA funding altogether. These members ~~feel~~felt that they ~~require~~required legal advice to understand how to handle the uncertainty that has been imposed on them, and many ~~are~~were unable to access it in time. In addition, many members, especially smaller theaters do not have existing relationships with lawyers or the money to support access to legal counsel, particularly on such a quick timeline.

105.107.    When this lawsuit was filed, many TCG members have expressed dismay at being forced to compromise on their commitment to free artistic expression and their ideals in order to seek NEA funding. These organizations seek to affirm all gender identities, including transgender, nonbinary, and queer identities.

106.108.    Some TCG members have also told TCG about the financial impact of losing NEA funding. For example, for one small theater, an NEA grant would cover their entire design team's wages, pension, and health. These members would like to apply for NEA funding but for the ban on, or disfavoring of, "promoting" what the government deems to be "gender ideology," and." They would do so in have liked to apply for the March 2025 cycle if this Court provides relief invalidating that restriction while this case is pending, and intend to apply in future cycles.

107.109.    The "gender ideology" prohibition has also caused TCG to divert a great deal of its time and resources. For example, TCG has diverted some of its research into polling members about how the requirement has affected their plans to apply, or not apply, for NEA funding. In addition, TCG's programming team has had to quickly pivot to provide its members and the larger field with informational webinars, federal action updates, and resource materials to help them assess their level of risk and guide their choices with respect to applying for NEA funding. Similarly, after the NEA issued its Final EO Implementation, TCG had to divert resources to poll members to understand how they have been impacted and to alter programming to offer related guidance.

108.110.    Many of TCG's members, including TTO, RILA, and NQT, intend to apply for NEA grants in future grant cycles as well to support works of artistic merit that meet all of the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through their artistic expression. But as long as the NEA requires that no funds can be used promotion of what the government deems to "promote" be "gender ideology," affects eligibility for, or makes an applicant less likely to

receive, an NEA grant, they ~~are~~will be forced to self-censor or be effectively barred from seeking such support. This is true for TCG as well.

~~109.~~111.    If the Court invalidates the "gender ideology" prohibition, — and any related policy where the NEA considers the promotion of "gender ideology" in determining eligibility for or likelihood of receiving an NEA grant—TCG intends to apply for an NEA grant during the July 2025 cycle to support fieldwide convenings and research. Last year, TCG's national conference, supported in part by the NEA, included a panel on gender identity and a presentation by a trans woman. TCG is in preliminary planning stages for the next conference in 2026, and TCG is committed to including in the conference discussion about gender identity, affirming trans, nonbinary, and queer members of the community.

## CLAIMS

### FIRST CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act—Exceeds Statutory Authority
### (Against All Defendants)

~~110.~~112.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

~~111.~~113.    A reviewing court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

~~112.~~114.    Defendants' ~~amendments to the Assurance of Compliance to implement Executive Order 14168~~"gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation are ~~a~~all final agency ~~action~~actions reviewable under 5 U.S.C. §§ 702 and 706.

~~113.~~115.    Defendants' ~~action exceeds~~actions exceed the NEA's statutory authority under its enabling statute, the National Endowment for the Arts and Humanities Act of 1965, codified at 20 U.S.C. § 951 *et seq*. The Act authorizes the NEA to "ensure that . . . artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id*. § 954(d)(1). The Act explicitly

identifies one category of speech ineligible for funding—obscenity. *Id*. § 954(d)(2). The Act therefore does not authorize the NEA to render any other categories—or viewpoints—of speech ineligible for, ~~or less likely to receive,~~ funding.

~~114.~~116.    Defendants' actions exceed their statutory authority under the Act, and the Court must hold them unlawful and set them aside.

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act—Arbitrary and Capricious**
**(Against All Defendants)**

~~115.~~117.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

~~116.~~118.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

~~117.~~119.    Defendants' ~~amendments to the Assurance of Compliance to implement Executive Order 14168~~"gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation are ~~a~~all final agency ~~action~~actions reviewable under 5 U.S.C. §§ 702 and 706.

~~118.~~120.    Defendants' ~~action is~~actions are arbitrary and capricious. Defendants have failed to adequately justify their action; have relied on factors Congress did not authorize them to consider; have failed to consider important aspects of the problem; and have failed to acknowledge or justify their change of position. The Court must hold them unlawful and set them aside.

**THIRD CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act—Contrary to Constitutional Right**
**(Against All Defendants)**

~~119.~~121.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

~~120.~~122.    A reviewing court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

121.123.    Defendants' amendments to the Assurance of Compliance to implement Executive Order 14168"gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation are aall final agency actionactions reviewable under 5 U.S.C. §§ 702 and 706.

122.124.    For the reasons described in the Fourth and Fifth Claims for Relief, and incorporated here, Defendants' actions are contrary to constitutional right, and the Court must hold them unlawful and set them aside.

### FOURTH CLAIM FOR RELIEF
### Violation of the First Amendment
### (Against All Defendants)

123.125.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

124.126.        ~~The Assurance of Compliance, as amended by Defendants to implement Executive Order 14168, violates~~Defendants' "gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation all violate the First Amendment by imposing a viewpoint-based bar on federal arts funding. ~~In particular,~~, or by necessarily requiring the ~~amendment requires GAP applicants to certify~~NEA to disfavor projects that ~~NEA funds will "not be used to~~ "promote" what the government deems to be "gender ideology," which is defined to include the "false claim" "that there is a vast spectrum of genders that are disconnected from one's sex."

125.127.        When it comes to "what is good art," "[o]ur system of government" intentionally "accommodat[es] . . . the widest varieties of tastes and ideas," for it is a judgment that "varies with individuals as it does from one generation to another." *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 157 (1946).

126.128.        In the arts, as in other contexts, the First Amendment rests on "[t]he bedrock principle of viewpoint neutrality," which "demands that the state not suppress speech" due to "disagreement with the underlying ideology or perspective that the speech expresses." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004).

127.129.        As the Supreme Court recognized in *Finley*, "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Finley*, 524 U.S. at 587 (quoting *Regan*, 461 U.S. at 550) (alteration in original).

128.130.        The Supreme Court's decisions regarding other government benefits echo this rule. *See, e.g., Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679, 682 (2010) (recognizing that official recognition of a student group is "effectively a state subsidy" and cannot be withheld based on viewpoint).

129.131.    The prohibition on viewpoint discrimination also applies where the government provides support to speech through any kind of forum, even, as here, a nonpublic forum. And it applies not only to eligibility bars, but also to policies that disfavor particular viewpoints.

130.132.    Yet the NEA's "gender ideology" prohibition, or any policy enacted through the Final EO Implementation requiring the NEA to disfavor projects that "promote" what the government deems to be "gender ideology," is a textbook example of viewpoint discrimination. It singles out messages and perspectives that the government does not like for worse treatment.

131.133.    The Assurance of Compliance and funding prohibitionThe "gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation violate the First Amendment facially and as applied to Plaintiffs.

### FIFTH CLAIM FOR RELIEF
### Violation of the Fifth Amendment
### (Against All Defendants)

132.134.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

133.135.    The Due Process Clause of the Fifth Amendment prohibits laws that are unconstitutionally vague, and applies with particular force where government regulations affect speech, out of concern that vague regulations will chill protected speech by causing individuals to steer clear of the prohibited zone.

134.136.    The requirement is also heightened where, as here, criminal penalties are at stake. *See* 18 U.S.C. § 1001(a) (knowingly and willfully making "any materially false, fictitious, or fraudulent statement or representation" can result in fines and/or imprisonment up to five years).

135.137.    ~~The Assurance of Compliance~~The "gender ideology" certification is unconstitutionally vague on its face and as applied to Plaintiffs. It fails to adequately define what speech is prohibited and, in particular, what it means "to promote gender ideology." Although Executive Order 14168 defines gender ideology to "includ[e] the idea that there is a vast spectrum of genders that are disconnected from one's sex," it neither limits the definition to that idea nor provides any indication of which ideas might fall within the term's ambit. 90 Fed. Reg. 8615 (Jan. 30, 2025) at § 2(f). Even if the amended Assurance of Compliance adequately defined what constitutes "gender ideology," it provides no criteria for determining whether a work of art "promote[s]" these ideas.

138.    Though the NEA has updated its Assurance of Compliance to no longer require a certification that grantees will not "promote" what the government deems to be "gender ideology," the Assurance currently states that the requirement is only suspended until this litigation concludes, and pending its outcome.

139.    The vagueness of the "gender ideology" ~~prohibition both~~certification, "gender ideology" eligibility bar, and Final EO Implementation fail to provide adequate notice about what speech is prohibited and also invite arbitrary or selective enforcement by the NEA.

136.140.    In the alternative, if the Final EO Implementation is determined not to disfavor any project that promotes what the government deems to be "gender ideology," the vagueness of the Final EO Implementation, including whether or not it requires the NEA to disfavor specific viewpoints, also fails to provide adequate notice about what speech is prohibited and ~~invites~~grants the NEA unfettered discretion, thereby inviting arbitrary or selective enforcement ~~by the NEA~~.

137.141.      Because Defendants' ~~amendments to the Assurance of Compliance to implement the Executive Order~~"gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation fail to provide fair notice to enable ordinary people to understand what speech the statute prohibits, ~~it is~~they are unconstitutionally vague and ~~violates~~violate the Fifth Amendment to the U.S. Constitution.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

a.      Declare that Defendants' ~~amendments to the Assurance of Compliance, Defendants' prohibition on funding~~"gender ideology" certification; "gender ideology" eligibility bar; Final EO Implementation, including any requirement that any projects that "promote gender ideology~~,~~" are disfavored; and Defendants' other actions to implement Executive Order 14168 are unconstitutional and unlawful;

b.      Vacate and set aside Defendants' ~~amendments to the Assurance of Compliance,~~ Defendants' ~~prohibition on funding~~"gender ideology" certification; "gender ideology" eligibility bar; Final EO Implementation, including any requirement that any projects that "promote gender ideology~~,~~" are disfavored; and Defendants' other actions to implement Executive Order 14168;

c.      Temporarily restrain and/or preliminarily and permanently enjoin Defendants from implementing or giving effect to Executive Order 14168~~;~~: Defendants' ~~amendments to the Assurance of Compliance to implement Executive Order 14168, Defendants' prohibition on funding~~"gender ideology" certification; "gender ideology" eligibility bar; Final EO Implementation, including any

requirement that any projects that "promote gender ideology," are disfavored; and

anyDefendants' other actions by Defendants to implement Executive Order 14168;

d.      Temporarily restrain and/or preliminarily and permanently enjoin Defendants from taking any other action that prevents Defendants from fulfilling their statutory duty to judge grant applications using the criteria set forth in the Act of "artistic excellence and artistic merit";

e.      Award Plaintiffs reasonable attorneys' fees and costs; and

f.      Grant such other and further relief as the Court may deem appropriate.


Dated: March 6May 12, 2025                    Respectfully submitted,

                                             /s/Vera Eidelman
                                             Vera Eidelman*
                                             Scarlet Kim*
                                             Lauren Yu*
                                             Brian Hauss*
                                             AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION
                                             125 Broad Street, 18th Floor
                                             New York, NY 10004
                                             veidelman@aclu.org
                                             scarletk@aclu.org
                                             lyu@aclu.org
                                             bhauss@aclu.org


                                             /s/ Lynette Labinger
                                             Lynette Labinger, Esq., (Bar No. 1645)
                                             128 Dorrance Street, Box 710
                                             Providence, RI 02903
                                             401.465.9565
                                             LL@labingerlaw.com
                                             Cooperating counsel
                                             AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION OF RHODE ISLAND

David D. Cole*
600 New Jersey Ave. NW
Washington, DC 20001
(202) 622-9078
cole@georgetown.edu

*Attorneys for Plaintiffs*

~~*Pro Hac Vice Application Forthcoming*~~
Admitted *pro hac vice*