# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS,
NATIONAL QUEER THEATER,THE
THEATER OFFENSIVE, and
THEATRE COMMUNICATIONS GROUP,

*Plaintiffs*,

*v.*

NATIONAL ENDOWMENT
FOR THE ARTS, and MARY ANNE
CARTER, in her official capacity as Acting
Chair of the National Endowment for the
Arts,

*Defendants*.

Case No. 25-cv-79-WES-PAS

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .....................................................................................................................1

BACKGROUND .......................................................................................................................2

LEGAL STANDARD ................................................................................................................6

ARGUMENT .............................................................................................................................7

    I.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIRST AMENDMENT CLAIM ........................................................................................7

        A.  The Final EO Implementation Imposes an Unconstitutional Viewpoint-Based Burden in a Government Program Designed to Facilitate Private Speech ...........................................................................................7

        B.  NEA Funding Facilitates Private Speech, Not Government Speech ...............11

             i.   The History of NEA-Funded Art Shows That it is Private Speech. ............................................................................................ 12

             ii.  The Public is Likely to Perceive NEA-Funded Art as Private Speech.. ........................................................................................... 14

            iii.  The Government's Control Over NEA-Funded Art is Minimal ........ 15

    II.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR APA CLAIMS ..................................................................................................................17

        A.  The Final EO Implementation Is Final Agency Action ..................................17

        B.  The Notice Exceeds the NEA's Statutory Authority .......................................19

        C.  The Final EO Implementation Is Arbitrary and Capricious.............................22

    III. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIFTH AMENDMENT CLAIM..........................................................................................25

CONCLUSION........................................................................................................................30

CERTIFICATE OF SERVICE ...............................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*American Federation of Government Employees, AFL-CIO v. Trump,*
  No. 25-cv-03698-SI, 2025 WL 1358477 (N.D. Cal. May 9, 2025).........................................18

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ......................................................................................................... 6

*Bella Lewitzky Dance Found. v. Frohnmayer,*
  754 F. Supp. 774 (C.D. Cal. 1991) ..................................................................................26

*Bennett v. Spear,*
  520 U.S. 154 (1997).................................................................................................. 17, 18

*Burlington Truck Lines v. United States,*
  371 U.S. 156 (1962) .......................................................................................................22

*California v. Bernhardt,*
  472 F. Supp. 3d 573 (N.D. Cal. 2020) .............................................................................23

*Celotex Corporation v. Catrett,*
  477 U.S. 317 (1986)......................................................................................................... 6

*City of Chicago v. Morales,*
  527 U.S. 41 (1999)..........................................................................................................25

*Dillmon v. National Transportation Safety Board,*
  588 F.3d 1085 (D.C. Cir. 2009) ......................................................................................22

*FCC v. Fox Television Stations, Inc.,*
  556 U. S. 502 (2009)........................................................................................... 21, 22, 26

*Frese v. Formella,*
  53 F.4th 1 (1st Cir. 2022)................................................................................................26

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972).................................................................................................. 25, 29

*Iancu v. Brunetti,*
  588 U.S. 388 (2019).......................................................................................................21

*Johanns v. Livestock Marketing Association,*
  544 U.S. 550 (2005).......................................................................................................17

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
  385 U.S. 589 (1967).......................................................................................................28

*Legal Services Corporation v. Velazquez*,
    531 U.S. 533 (2001)............................................................................................ 7, 25

*Local 8027 v. Edelblut*,
    651 F. Supp. 3d 444 (D.N.H. 2023).......................................................................... 28

*Local 8027 v. Edelblut*,
    No. 21-cv-1077, 2024 WL 2722254 (D. N.H. May 28, 2024) .................................. 27, 28, 29

*Loper Bright v. Raimondo*,
    603 U.S. 369 (2024)................................................................................................. 19

*Louisiana v. Biden*,
    543 F. Supp. 3d 388 (W.D. La. 2021)...................................................................... 23

*Matal v. Tam*,
    582 U.S. 218 (2017)......................................................................................... passim

*McCarthy v. North West Airlines, Inc.*,
    56 F.3d 313 (1st Cir. 1995)......................................................................................... 6

*McGuire v. Reilly*,
    386 F.3d 45 (1st Cir. 2004)......................................................................................... 8

*Miller v. California*,
    413 U.S. 15 (1973)................................................................................................... 20

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)................................................................................................... 9

*Motor Vehicles Manufacturers. Association v. State Farm Mutual Automobile Insurance Company*,
    463 U.S. 29 (1983)............................................................................................. 22, 24

*NAACP v. Button*,
    371 U.S. 415 (1963)................................................................................................. 26

*National Council of Nonprofits v. Office of Management & Budget*,
    No. 25-239, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ....................................... 22, 23

*NEA v. Finley*,
    524 U.S. 569 (1998)......................................................................................... passim

*Orr v. Trump*,
    No. 25-cv-10313, 2025 WL 1145271 (D. Mass. Apr. 18, 2025)............................... 23

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009)................................................................................................. 17

*Regan v. Taxation With Representation of Washington*,
    461 U.S. 540 (1983) .................................................................................................. 8, 10

*Reno v. ACLU*,
    521 U.S. 844 (1997) ...................................................................................................... 27

*Rhode Island v. Trump*,
    No. 25-cv-128, 2025 WL 1303868 (D.R.I. May 6, 2025) ..................................... 23

*Ridley v. Mass. Bay Transp. Auth.*,
    390 F.3d 65 (1st Cir. 2004) ............................................................................................ 8

*Rosenberger v. Rector and Visitors of the University of Virginia*,
    515 U.S. 819 (1995) ............................................................................................... 7, 9, 29

*Schiff v. U.S. Office of Personnel Management*,
    No. CV 25-10595-LTS, 2025 WL 1481997 (D. Mass. May 23, 2025) .......................... 10, 24

*Shurtleff v. City of Boston*,
    596 U.S. 243 (2022) ........................................................................................... 11, 12, 16

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Board*,
    502 U.S. 105 (1991) ........................................................................................................ 8, 9

*Speiser v. Randall*,
    357 U.S. 513 (1958) .......................................................................................................... 9

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
    600 U.S. 181 (2023) ........................................................................................................ 10

*Terminiello v. City of Chicago*,
    337 U.S. 1 (1949) ............................................................................................................ 27

*Trafalgar Capital Associates., Inc. v. Cuomo*,
    159 F.3d 21 (1st Cir. 1998) ........................................................................................... 18

*United States v. Miselis*,
    972 F.3d 518 (4th Cir. 2020) ........................................................................................ 29

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000) ................................................................................................... 7, 12

*United States v. Rundo*,
    990 F.3d 709 (9th Cir. 2021) ........................................................................................ 29

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ........................................................................................................ 26

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) .............................................................................................. 17

*Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*,
No. 25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ........................... 22, 23

**Statutes**

20 U.S.C. § 951 ............................................................................................ 2, 13, 21, 25

20 U.S.C. § 952 ............................................................................................................ 13

20 U.S.C. § 953 ........................................................................................... 2, 13, 14, 25

20 U.S.C. § 954 ..................................................................................................... passim

20 U.S.C. § 955 .............................................................................................................. 2

5 U.S.C. § 704 ............................................................................................................... 17

5 U.S.C. § 706 ............................................................................................... 17, 19, 22

Pub. L. No. 88-579, 78 Stat. 905 (1964) ....................................................................... 2

Pub. L. No. 89-110, 79 Stat. 845 (1965) ....................................................................... 2

**Other Authorities**

135 Cong. Rec. 16284 (1989) ........................................................................................ 3

Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ........................... passim

NEA Grant Search, American Conservatory Theatre Foundation: Grant 1934952-32-
25 (2025) .................................................................................................................. 15

NEA Grant Search, Concerned Citizens for Humanity, Ltd.: Grant 98-4200-5009 (1998) ......... 15

NEA Grant Search, Phoenix Theatre, Inc.: Grant 01-3200-5140 (2001) ..................... 15

NEA Grant Search, Shakespeare Theatre: Grant 1917104-32-24 (2024) .................... 15

S. Rep. No. 89-300 (1965) ........................................................................................... 14

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................... 6

## INTRODUCTION

This case challenges Defendants' imposition of a viewpoint-based penalty in funding decisions by the National Endowment for the Arts ("NEA"). Congress created the NEA to fund private art projects that exhibit artistic excellence and merit—not to create official state art that promotes government-sanctioned views. Nevertheless, Defendants implemented Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("the EO" or "Gender Ideology EO"), by requiring the NEA Chair to consider whether proposed projects "promote" what the government deems to be "gender ideology" and to assign only a negative weight to any such project. As a result, for the first time in NEA history, and without Congressional sanction, artistic projects that express a message the government does not like will be disfavored, no matter how excellent or meritorious they are.

Defendants initially implemented the EO by making any project that appeared to "promote gender ideology" ineligible for NEA funding and requiring all applicants to certify that they would not use NEA funds to express such officially proscribed views ("February 6 Policy"). After Plaintiffs challenged that policy, but before the Court could rule on it, Defendants rescinded the policy and announced a new one on April 30, 2025 ("Final EO Implementation"), which governs today. Pursuant to the Final EO Implementation, a project's "promotion" of "gender ideology" is (1) relevant to and (2) can serve only as a negative factor in Defendants' funding decisions.

In addition, Defendants have resurrected the certification requirement by requiring all applicants to certify that they will "comply with all applicable Executive Orders," with no exception for the Gender Ideology EO.

Defendants' implementation of the EO is contrary to the NEA's authorizing statute and constitutes viewpoint-based discrimination. For those reasons, it violates the First Amendment. It also violates the Administrative Procedure Act ("APA") by exceeding the NEA's statutory

authority and because it is arbitrary and capricious. And it violates the Fifth Amendment because it does not provide fair notice and authorizes arbitrary and discriminatory decisions. For these reasons, Plaintiffs now move for summary judgment.

## BACKGROUND

Congress established the NEA in 1965 pursuant to the National Foundation on the Arts and the Humanities Act ("NFAHA" or "the Act"), which "declares . . . that '[t]he arts . . . belong to all the people of the United States,'" and that "it is necessary . . . for the Federal Government to help create and sustain" both "a climate encouraging freedom of thought, imagination, and inquiry" and "also the material conditions facilitating the release of this creative talent." Mem. and Order 2, ECF No. 13 (second and third alteration in original) (quoting 20 U.S.C. § 951(1), (7)).

"Because the drafters and subsequent amenders of the NFAHA were concerned about the NEA being leveraged as an instrument of political control of culture, they took several steps to ensure that grants are awarded based on talent alone, irrespective of the artists' identities, backgrounds, viewpoints, or perspectives." *Id.* at 3 (cleaned up). First, Congress required that funding criteria be based on artistic merit. *See* Pub. L. No. 89-110, § 5(c)(1), 79 Stat. 845, 846–47 (1965) (codified as 20 U.S.C. §§ 951, 954(d)(1)). Second, Congress prohibited "federal supervision or control over the policies, personnel, or operations of grant recipients." Mem. and Order 3, ECF No. 13 (citing 20 U.S.C. § 953(c)). Third, it established a "multilayer review process" that "ensures a diversity of viewpoints and backgrounds," as well as expertise or interest in the arts, not politics, at each stage of review: first, by advisory panels, next by the National Council on the Arts, and finally by the Chair. *Id.* at 3–5; *see also* Pub. L. No. 88-579, § 5(a), 78 Stat. 905 (1964) (requiring Council members to be selected "for their broad knowledge of or experience in, or for their profound interest in the arts"); 20 U.S.C. § 955(b) (similar requirements for Chair and Council). Through this structure, Congress was "careful to put the artistic

2

decisionmaking in the hands of outside experts and away from the influence of government[.]" 135 Cong. Rec. 16284 (1989) (statement of Sen. Claiborne Pell).

In 1990, Congress barred the NEA from funding obscenity, and amended the Act to task the Chair with ensuring not only that "artistic excellence and artistic merit are the criteria by which applications are judged," but also that the process "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). Artists challenged the "decency and respect" clause as imposing a viewpoint-based restriction on grants, but the Supreme Court held that the language did not require that any negative weight be given to "decency and respect," or any other viewpoint, in funding decisions. *See NEA v. Finley*, 524 U.S. 569, 580–81 (1998).

On January 20, 2025, President Trump issued Executive Order 14168. *See* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025). The EO defines "gender ideology" as a "wrong" and "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex," and "maintains that it is possible for a person to be born in the wrong sexed body." *Id*. § 2(f). It describes the viewpoint that "males can identify as and thus become women and vice versa" as "false." *Id.* The EO directs all agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id*. § 3(g) . It additionally states that "[f]ederal funds shall not be used to promote gender ideology." *Id.*

In response to the EO, on February 6, 2025, Defendants (1) required all applicants to certify that, if selected, they would not use "federal funds . . . to promote gender ideology, pursuant to

3

[the EO]," and (2) barred all projects that appear to "promote gender ideology" from eligibility for NEA funding. SUF ¶¶ 28–30.

Plaintiffs are three individual arts organizations, Rhode Island Latino Arts ("RILA"), National Queer Theater ("NQT"), and The Theater Offensive ("TTO"), and one member organization, Theatre Communications Group ("TCG"), suing on behalf of itself and its members across the country, who have applied for NEA funding in the past and/or intend to do so in the future. SUF ¶¶ 48–51, 61, 63, 75, 79, 87, 89, 101, 105–08, 111, 118, 119, 121–22, 143. Based on the artistic merit and excellence of their work, Plaintiffs have collectively been offered more than 50 NEA grants since 1998. SUF ¶¶ 48, 105, 79, 88, 138.

RILA, NQT, and TTO each applied for funding in the March 2025 cycle. SUF ¶¶ 50–51, 61–63, 89, 107, 111. Many of TCG's members intend to apply for funding in the upcoming July 2025 cycle, and in future grant cycles, though fewer are intending do so than had previously planned to because of the Final EO Implementation and current Assurance of Compliance. *See* SUF ¶¶ 135–7. All Plaintiffs would like to submit applications for projects that involve transgender, nonbinary, intersex, and queer characters or actors; otherwise celebrate and affirm transgender, nonbinary, intersex, and queer people; or more broadly explore themes of sex, gender, and identity that administration officials could consider to "promote gender ideology." SUF ¶¶ 60, 67–69, 80, 82, 92, 95, 103, 104, 107, 114, 139–140.. Indeed, the projects that NQT and TTO submitted for the NEA's March 2025 cycle involve transgender characters and actors, celebrate their identities, and explore themes of gender. *Id.* ¶¶ 81–89, 107–08. Meanwhile, RILA steered clear of appearing to "promote gender ideology" in its proposal because of the NEA's new policies. *Id.* ¶¶ 61–62.

4

Plaintiffs sued to challenge Defendants' original implementation of the EO on March 6, 2025, asking for relief by the then-forthcoming application deadline of March 24, 2025.

On March 11, 2025, the NEA rescinded the certification requirement, specifically tying that change to this action. SUF ¶¶ 31–32. Defendants amended the "Assurance of Compliance" to which applicants must swear, to explicitly state that the NEA will "no longer require applicants to certify their compliance with [the Gender Ideology EO] while the outcome of this litigation is pending." SUF ¶ 32.

Defendants also extended the application deadline to April 7, 2025. *Id.* ¶ 31. On March 17, 2025, days before the deadline for its opposition to Plaintiffs' motion, the NEA temporarily "rescinded all implementation of the [Gender Ideology] EO," pending "a new evaluation of the EO in accordance with the Administrative Procedure Act." SUF ¶ 33.

On April 3, 2025, the Court denied Plaintiffs' motion for a preliminary injunction in light of these changes. While concluding that "Plaintiffs can demonstrate a likelihood of success on the merits of their APA and First Amendment claims," the Court gave the NEA "the opportunity to make its own considered decision about whether to implement the EO at all, given the obvious tension between the EO and the explicit language of the NFAHA." Mem. and Order at 24, 43–44, ECF No. 13.

On April 30, 2025, Defendants announced their new policy ("Final EO Implementation"). SUF ¶ 34. The new policy states that the existing application review process was not sufficient to address the EO and that "appropriate action [wa]s needed to incorporate the EO in the NEA's grant application review process." *Id.* ¶ 35. Pursuant to the new policy, the Chair will now review grant applications for "whether the proposed project promotes gender ideology." *Id.* Defendants "[d]enied" that, pursuant to the Final EO Implementation, their conclusion that a proposed project

"promotes gender ideology" will make no difference as to whether the project will receive an NEA grant, and instead "[a]dmitted" that it could only "weigh against the project's final approval." SUF ¶¶ 37–39.

Defendants have also resurrected the certification requirement by amending the "Assurance of Compliance" again, such that it now reads "[t]he applicant will comply with all applicable Executive Orders," with no exception for the Gender Ideology EO. *Id.* ¶ 41.

But for the Final EO Implementation and the current Assurance of Compliance, RILA, NQT, and TCG would apply for NEA funding in future cycles. *Id.* ¶¶ 75, 101, 144. TTO plans to continue to apply for funding, notwithstanding the Final EO Implementation and TTO's desire desire to affirm, celebrate, and discuss transgender, nonbinary, intersex, and queer people. *Id.* ¶ 118.

## LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue exists only if specific facts—not conclusory allegations, improbable inferences, or unsupported speculation—would allow a reasonable jury to return a verdict in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). After the movant has identified the basis for its motion, the nonmovant must identify specific facts that reveal a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Where, as here, "the summary judgment target bears the ultimate burden of proof," it "cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. N.W. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995).

## ARGUMENT

## I.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIRST AMENDMENT CLAIM.

This Court has already held that the NEA's now-rescinded policy barring any project that "promotes gender ideology" from receiving funding "likely runs afoul of the First Amendment" because, pursuant to the policy, "federal funding is being used to impose a 'disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace.'" Mem. and Order 33, ECF No. 13 (quoting *Finley*, 524 U.S. at 587 (cleaned up)). The NEA's current policy fares no better. That it imposes a burden, rather than a ban, does not change the constitutional analysis, for under the First Amendment "burdens must satisfy the same rigorous scrutiny as . . . bans." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000).

### A.    The Final EO Implementation Imposes an Unconstitutional Viewpoint-Based Burden in a Government Program Designed to Facilitate Private Speech.

Where, as here, "the government does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers," "viewpoint-based restrictions are [not] proper." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (cleaned up) (quoting *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 834 (1995)); *see also* Mem. in Supp. of Mot. for Prelim. Inj. and TRO 22–28, ECF 2-1. The First Amendment's prohibition on viewpoint-based restrictions in programs that support private speech encompasses not only categorical bans, but also burdens. "It is of no moment that [a policy] does not impose a complete prohibition." *Playboy Ent. Grp., Inc.*, 529 U.S. at 812. Instead, "[t]he distinction between laws burdening and laws banning speech is but a matter of degree," and both are subject to the same rigorous scrutiny. *Id.*

The Supreme Court's decision—and the precise language it used—in *NEA v. Finley* is instructive on this point. As this Court has already recognized, "the Court did not rule out the

possibility of a successful First Amendment challenge to the implementation of § 954(d)(1)" or NEA funding more broadly. Mem. and Order at 32, ECF No. 13. To the contrary, *Finley* reaffirmed that, "even in the provision of subsidies, the Government may not 'aim at the suppression of dangerous ideas,'" 524 U.S. at 587 (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 550 (1983)), nor impose "a disproportionate burden calculated to drive 'certain ideas or viewpoint from the marketplace,'" *id.* (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)). In demarcating a First Amendment claim in the context of NEA funding, the Court spoke in terms of penalties that aim to burden certain views— not categorical prohibitions that necessarily succeed in silencing them. "If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty" (not a prohibition) "on disfavored viewpoints" or apply it "in a manner that raises concern about" or "threatens" "the suppression of disfavored viewpoints," it would cross the First Amendment line. *Id.* at 583, 587.

The First Amendment's prohibition on viewpoint-based burdens or penalties is not unique to the funding context. Instead, as this Court has already explained, "[a]t its most basic, the test for viewpoint discrimination is whether — within the relevant subject category — the government has singled out a subset of messages *for disfavor* based on the views expressed." Mem. and Order 37, ECF No. 13 (emphasis added) (quoting *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring)). "The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another." *McGuire v. Reilly,* 386 F.3d 45, 62 (1st Cir. 2004); *see also Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004) (defining viewpoint-based discrimination in terms of "prefer[ence]s," not suppression). The constitutional

8

concern is not merely about "silenc[ing] . . . the expression of disfavored viewpoints," but also about "muffl[ing]" them. *Matal*, 582 U.S. at 235.

The Supreme Court has applied that rule to all manner of burdens short of categorical bans—from the imposition of a tax, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582–83 (1983), to the "denial of a tax exemption," *Speiser v. Randall*, 357 U.S. 513, 518 (1958), to the exclusion from a benefit, *Rosenberger*, 515 U.S. at 830, to a bar on access to publishing proceeds, *Simon & Schuster, Inc.*, 502 U.S. at 118, to a limitation on trademark registration, *Matal*, 582 U.S. at 235. None of those cases considered a policy that fully prohibited speech, yet each one applied the same rigorous scrutiny that would apply to an outright ban.

Similarly, in *Finley*, the Court rejected the plaintiffs' challenge to Section 954(d)(1) not only because the NEA's implementation of the statute at that time did not "preclude awards to projects that might be deemed 'indecent' or 'disrespectful,'" but also because it did not "even specify that those factors must be given any particular weight in reviewing an application." 524 at 570. Far from burdening speech, the NEA's implementation "aimed at reforming procedures" by "merely . . . ensuring the representation of various backgrounds and points of view on the advisory panels that analyze grant applications." *Id.* at 580–81, 582.

As Justice Scalia explained in his *Finley* concurrence, consideration of a proposed project's viewpoint constitutes viewpoint-based discrimination even if it is not "conclusive." *Id.* at 592 (Scalia, J., concurring). If "the decisionmaker, all else being equal, will favor applications that display [the government's preferred view], and disfavor applications that do not," the NEA's policy "unquestionably constitutes viewpoint discrimination." *Id.* at 593 (Scalia, J., concurring). "That conclusion is not altered by the fact that the statute does not compel the denial of funding, any more than a provision imposing a five-point handicap on all black applicants for civil service

9

jobs is saved from being race discrimination by the fact that it does not compel the rejection of black applicants." *Id.* (Scalia, J., concurring); *cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 218 (2023) (holding that the Equal Protection Clause's prohibition on racial discrimination means that "race may never be used as a 'negative'").[1]

That is precisely what is at issue here: The government has "[d]enied" that a project's expression of this disfavored viewpoint "will make no difference" and instead "[a]dmitted" that it will "make it less likely that the project will receive an NEA grant." SUF ¶¶ 37–39. It is not hard to imagine how a negative thumb on the scale, even if not technically an eligibility bar, will prove to be material in a process as competitive as NEA grantmaking. *Id.* ¶¶ 92, 100. The Final EO Implementation singles out projects that "promote gender ideology" for disfavored treatment, imposing a "penalty" and "disproportionate burden" that "punish[es] the expression of particular views." *See Finley*, 524 U.S. at 587. The very purpose is to "aim at the suppression of dangerous ideas," *see* Exec. Order No. 14168 § 2(f) (describing the viewpoint that "males can identify as and thus become women and vice versa" as a "false claim"), and it is therefore impermissible, *Regan*, 461 U.S. at 550. *See also Schiff v. U.S. Off. of Pers. Mgmt.*, No. CV 25-10595-LTS, 2025 WL 1481997, at *7 (D. Mass. May 23, 2025) (holding that government's implementation of the Gender Ideology EO through removal of articles that included the words or terms "transgender" and "LGBTQ" from limited public forum constituted viewpoint discrimination).

In addition, the Assurance of Compliance requires applicants to agree to comply with all EOs, with no carveout for the Gender Ideology EO's prohibition on the use of federal funds to "promote gender ideology." SUF ¶¶ 41–42. Accordingly, it separately prohibits NEA grantees from expressing viewpoints that "promote gender ideology" even if their application is approved.

---

[1] Justice Scalia would have upheld even such viewpoint discrimination, but the majority did not.

*Id.*; Exec. Order No. 14168 § 3(g) (prohibiting use of federal funds to "promote gender ideology); *see also* SUF ¶¶ 41–44, 65–66, 96–97, 115, 134. This, too, is impermissible viewpoint-based discrimination—and it is the kind of categorical ban this Court has already deemed to be unconstitutional.

### B.    NEA Funding Facilitates Private Speech, Not Government Speech.

This Court has already concluded that "the NEA's grantmaking program was designed to facilitate private speech," not deliver an official government message. Mem. and Order 34, ECF No. 13. The NEA supports private art, not government propaganda.

Yet Defendants again assert in the Final EO Implementation that "[t]he NEA's grantmaking decisions constitute a form of government speech and therefore are not subject to scrutiny under the Free Speech Clause of the First Amendment." Final EO Implementation 6, ECF No. 17. That is incorrect. Indeed, as this Court noted in rejecting that argument in ruling on the motion for a preliminary injunction, "[i]f artists have no First Amendment interest in what they produce using NEA funds, then the *Finley* Court would not have engaged in its lengthy analysis of the plaintiffs' claims or suggested that violations of the First Amendment could occur in the grantmaking context." Mem. and Order 36–37, ECF No. 13. Yet the *Finley* Court recognized that "the First Amendment certainly has application in the subsidy context," including when it comes to NEA grants specifically. *Finley*, 524 U.S. at 587.

Even if the Supreme Court's analysis in *Finley* did not foreclose Defendants' government speech argument, application of the "'holistic' multifactor test" for government speech—including "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression"—would lead to the same result. *See* Mem. and Order 34, ECF No. 13 (quoting *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022)). Each factor weighs in favor of the

conclusion that "the expression at issue, defined narrowly as NEA-funded art," *id.* , constitutes private speech.[2]

And that is particularly true here given two additional considerations. First, the Supreme Court's admonition that courts "must exercise great caution before extending our government-speech precedents," for "it is a doctrine that is susceptible to dangerous misuse"—namely in the form of obscuring or excusing viewpoint-based discrimination. *Matal*, 582 U.S. at 235. And second, that "[w]hen First Amendment compliance is the point to be proved," the government, "not . . . the citizen," bears the burden of "[]persuasion." *Playboy Ent. Grp., Inc.*, 529 U.S. at 818; *see also Matal*, 582 U.S. at 238 (rejecting government speech argument in part because government failed to offer "evidence that the public associates the contents of trademarks with the Federal Government").

### i.    The History of NEA-Funded Art Shows That it is Private Speech.

"First, the history of the expression at issue . . . favors Plaintiffs' argument that such art is private speech." Mem. and Order 34–35, ECF No. 13. "The text and structure of the NFAHA make clear that the purpose of the NEA is to fund art for art's sake, not to advance specific views." *Id.* at 36. Defendants are wrong to suggest, in the Final EO Implementation, that Congress' intent was instead to communicate a particular message. Final EO Implementation 7, ECF No. 17-1; *see also* Defs' Resp. to Pls' Mot. for Summ. J. 9–10, ECF No. 11. As this Court has already found, "the drafters and subsequent amenders of the NFAHA went lengths to ensure that NEA funds were not

---

[2] As this Court has already recognized, *see* Mem. and Order 34, ECF No. 13, in conducting this analysis, it "must examine the details of *this* [art-funding] program," not the history of, perception of, and government control involved in arts funding generally. *Shurtleff*, 596 U.S. at 255 (holding that the general history of governments using flags to convey a message does not suffice to establish government speech); *id.* at 255–256 (noting that the second factor must consider the public's perception of "the flags at issue here," not "a flag's message" more generally).

leveraged to promote a particular political or governmental message." Mem. and Order 36, ECF No. 13.

Start with the Act's declaration of findings and purposes. In establishing the NEA, Congress found that "[t]he arts . . . belong to all the people of the United States," *id.* at 2 (quoting 20 U.S.C. § 951(1)), and declared that, because "[d]emocracy demands wisdom and vision in its citizens," the NEA must support art "designed to make people . . . masters of their technology and *not its unthinking servants*." 20 U.S.C. § 951(4) (emphasis added). Congress created the NEA "for the Federal Government to help create and sustain . . . a climate encouraging freedom of thought, imagination, and inquiry," to "support new ideas," to reflect "the nation's rich cultural heritage," to foster "mutual respect for the diverse beliefs and values of all persons and groups," and to achieve the "continuation of a free society"—not to inhibit those freedoms through government mandates, or even to convey the government's stamp of approval. *Id.* § 951(6), (7), (9), (10) (11).

Even the NFAHA's definitions show the breadth of support it meant to offer to private artistic expression, *see, e.g.*, *id.* § 952(b) (defining "the arts" to include "all those . . . arts practiced by the diverse peoples of this country"), and the purposes identified throughout the statute similarly confirm that the Act's goal is to fund art, whatever that means to the American people. "The purpose . . . shall be to develop and promote *a broadly conceived* national policy of support for . . . the arts in the United States." 20 U.S.C. § 953(b) (emphasis added); *see also* 20 U.S.C. § 954(c) (1), (3) (defining the Chair's purpose in awarding grants as, *inter alia*, "giving emphasis to American creativity and cultural diversity," and "encourag[ing] and assist[ing] artists and enabl[ing] them to achieve wider distribution of their works"). Far from imposing government control on artistic expression, the Act's intention was to create the material conditions for the exact opposite. *See also* 20 U.S.C. § 951(7).

13

The Act's requirements and prohibitions also highlight the NEA's history—and statutory duty—of supporting private speech. It establishes "artistic excellence and artistic merit"—not a work's expression of a particular, pre-defined government message—as "the criteria by which applications are judged." 20 U.S.C. § 954(d)(1). "The NEA's mandate is to make esthetic judgments" about "excellence," *Finley*, 524 U.S. at 586, not to propagate official viewpoints. The Act forbids "federal supervision or control over the policies, personnel, or operations of grant recipients." Mem. and Order 3, ECF No. 13 (citing 20 U.S.C. § 953(c)). And it establishes a multilayer review process that "demonstrates Congress's intent to insulate the NEA from political control and to encourage the freedom of expression," *id.* at 5, including by requiring that all relevant decisionmakers be interested or expert in the arts, not politics, and reflect "a diversity of viewpoints and backgrounds." *Id.* at 3–5; *see also* Mem. in Supp. of Mot. for Prelim. Inj. and TRO 3, ECF No. 2-1 (detailing relevant legislative history). The legislative history is equally clear on this point. The Act's intent was "the encouragement of free inquiry and expression," not "conformity" with or a preference for "any particular style or school of thought or expression." Mem. and Order 5–6, ECF No. 13 (quoting S. Rep. No. 89-300, at 3–4 (1965)).

### ii. The Public is Likely to Perceive NEA-Funded Art as Private Speech.

The second inquiry in a government speech analysis "also supports the argument that NEA-funded art is private speech" because "no one thinks an NEA artist speaks for the government." *Id.* at 36. Just as with trademark registration, "it is unlikely that more than a tiny fraction of the public has any idea what [federal funding of an art project even] means." *Matal*, 582 U.S. at 237 . An audience member at any of Plaintiffs' past productions—funded in part by the NEA, but not authored, produced, acted, directed, or put on by the government—could not have left thinking they had just seen the federal government speak. The plays and other art are billed as the work of

Plaintiffs, not the NEA. *See* SUF ¶ 21. They are put on either at private theaters or in public streets or parks that require separate permissions from and agreements with private entities or other government bodies. *Id.* ¶ 24. The work often sits within a body of past work by the funded organization that reflects the mission and audience of that organization. *Id.* ¶ 22. While the NEA is listed as a funder in the programs, it is, by requirement, one among many. *Id.* ¶ 23. And the funded organizations retain all intellectual property rights in the works. *Id.* ¶ 26.[3]

### iii.    The Government's Control Over NEA-Funded Art is Minimal.

The third factor, too, "favors th[e] conclusion" that NEA-funded art is private speech, for the NEA's control over the funded works' expression "is minimal" and "does not extend to the content or viewpoint of the message conveyed." Mem. and Order 37, ECF No. 13. The NEA chooses whether or not to fund a project, but it does not otherwise shape that project. In Plaintiffs' experience, the NEA does not suggest substantive changes to projects. *See* SUF ¶¶ 17–19. While program officers may help applicants frame their projects in the most competitive way possible, they do not offer any changes to or suggestions for the substance of the projects themselves. *Id.* ¶ 18.

---

[3] Moreover, as with trademarks, if the NEA were speaking through the work it funds, "the Federal Government [would be] babbling prodigiously and incoherently," "saying many unseemly things," and "expressing contradictory views." *See Matal*, 582 U.S. at 236. *Compare, e.g.,* NEA Grant Search, American Conservatory Theatre Foundation: Grant 1934952-32-25 (2025), https://perma.cc/95GS-XYXS (funding play about "entrepreneurs attempting to secure venture capital in Silicon Valley" for "audiences in San Francisco") *with* NEA Grant Search, Shakespeare Theatre: Grant 1917104-32-24 (2024) https://perma.cc/WHZ2-DDWN (funding play that "examine[s] capitalism and the personal choices that led to one of the largest financial crises in US history); *compare* NEA Grant Search, Concerned Citizens for Humanity, Ltd.: Grant 98-4200-5009 (1998), https://perma.cc/RPK8-TDZQ (funding creative "public information materials that promote sexual responsibility and abstinence") *with* NEA Grant Search, Phoenix Theatre, Inc.: Grant 01-3200-5140 (2001), https://perma.cc/D8Q5-JCBN (funding " 'Fourplay,' a series of plays that explore sexual mores at the beginning of a new century").

That the NEA *chooses* a project to fund falls far short of establishing that the government *controls* that project. *Contra* Final EO Implementation 7, ECF No. 17-1 (asserting that "final approval authority" shows the NEA's control). The question is not whether the government offers any support or even suggests some approval through its involvement—whether in the form of trademark registration, *Matal*, 582 U.S. 218, or "a hand crank so that groups could rig and raise their chosen flags," *Shurtleff*, 596 U.S. at 256—but rather whether the government exercises "control over the [art's] content and meaning." *Id.* Indeed, the Supreme Court rejected the idea that approval suffices in *Matal*, concluding that, "[t]hough the [government] had to approve each proposed [trademark], it did not exercise sufficient control over the nature and content of those [marks] to convey a governmental message in so doing." *Shurtleff*, 596 U.S. at 252–53 (discussing *Matal*). Here, as with trademark registration, "[t]he Federal Government does not dream up [NEA-funded projects], and it does not edit [works] submitted for [funding.]" *Matal*, 582 U.S. at 235. The government "does not inquire whether any viewpoint conveyed by a [project] is consistent with Government policy or whether any such viewpoint is consistent with that expressed by other [projects] already [funded by the NEA]." *Id.* "If private speech could be passed off as government speech simply by affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id.*

The NEA's lack of control over the art it funds stands in sharp contrast to the few situations in which the Supreme Court has held that the government's level of control supports a finding of government speech. For example, in *Johanns v. Livestock Marketing Association*, the Supreme Court held that the beef promotion ads at issue were government speech in part because the ads were "prescribed by law in their general outline and . . . developed under official government supervision"; the Secretary of Agriculture "exercise[d] final approval authority over every word

16

used in every ad," in terms of both "substance and wording"; and Congress had "directed the implementation of a 'coordinated program'" specifically "to advance" a particular message. 544 U.S. 550, 560–62 (2005). In *Pleasant Grove City v. Summum*, the government literally took "ownership" of the public monuments at issue and "put [them] on permanent display" on government-owned property "for the purpose of presenting the image of [the government] that it wishes to project." 555 U.S. 460, 473–74 (2009); *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015) (noting that government "t[ook] ownership of each" license plate design). Here, the NEA exercises no comparable level of control, whether through process or ultimate ownership of the works.

## II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR APA CLAIMS.

Defendants' contravention of the letter and purpose of the NFAHA is additionally and independently unlawful under the APA because it exceeds Defendants' statutory authority. Defendants' failure to offer any reasoned explanation for the Final EO Implementation also renders it arbitrary and capricious under the APA.[4]

### A.    The Final EO Implementation Is Final Agency Action.

The APA authorizes courts to review "final agency action," 5 U.S.C. § 704—i.e., action that "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up). "The core question [for finality] is whether the agency has completed its

---

[4] The APA also requires courts to "hold unlawful and set aside" agency action "found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). As explained above and below, the Final EO Implementation violates the First Amendment and is unconstitutionally vague under the Fifth Amendment. *See supra* section I; *infra* III.

17

decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) (cleaned up).

The Final EO Implementation marks the consummation of Defendants' decisionmaking with respect to implementing the EO. *See* Exec. Order No. 14168 § 3(g). It specifically states that, because the Chair "has determined that appropriate action is needed to incorporate the EO in the NEA's grant application review process" "[i]n order to implement the President's [EO]," the NEA is "publish[ing the Final EO Implementation as an] explanation of its intended action to implement [the EO]." SUF ¶ 35. It explains, along similar lines, that "its purpose is to "outline[ ] . . . how it will implement [the EO] in [the NEA's] review process." *Id.*

While Defendants have argued that the Implementation merely constitutes "the NEA's predecisional guidance" and that the operative agency action is how the Chair implements the EO "in each individual case," Defs.' Mot. for Protective Order 2, ECF No. 17, that misunderstands Plaintiffs' challenge: it is not to any particular denial of funding, but rather to Defendants' policy of explicitly taking into account "whether the proposed project promotes gender ideology," SUF ¶¶ 35, 37, and having that factor "weigh against the project's final approval," *id.* ¶ 38. The decision to implement the EO through this policy is not "merely tentative or interlocutory." *Bennett*, 520 U.S. at 178. "[N]owhere do defendants assert that" the Final EO Implementation "itself is subject to change or is in draft form." *Am. Fed'n of Gov't Emp., AFL-CIO v. Trump*, No. 25-cv-03698-SI, 2025 WL 1358477, at *21 (N.D. Cal. May 9, 2025). Its issuance is "done and final." *Id.*

The Final EO Implementation also has "direct and immediate consequences" for Plaintiffs and their members. *Trafalgar Cap. Assocs., Inc.*, 159 F.3d at 35. Defendants admit that "[i]f the NEA Chair concludes that a proposed project 'promotes gender ideology,'" that "will weigh against the project's final approval." SUF ¶ 38. Thus, the NEA Chair will consider whether

18

Plaintiffs' grant applications "promote" what the government deems to be "gender ideology," and that factor can only weigh against them. *Id.* ¶¶ 37–38. Defendants' discrimination against proposed projects that "promote gender ideology" has pushed some Plaintiffs to avoid any application that might be deemed to promote "gender ideology," thus chilling their protected speech. *Id.* ¶ 62. Others have decided not to apply again as long as the Final EO Implementation is in place, rather than having to censor their speech in order to have a shot at getting funding, thus foregoing a funding opportunity. *Id.* ¶¶ 72, 75, 101, 143–44. These harms warrant judicial resolution of Plaintiffs' APA challenge.

### B.    The Notice Exceeds the NEA's Statutory Authority.

Defendants' discrimination against a specific viewpoint is contrary to the Act, which directs the NEA to fund meritorious art without regard to its viewpoint. "The NFAHA sets forth a multistep review process to guide the NEA's selection of grant applications; and at each step of the process, the statute reiterates that artistic excellence and artistic merit—and nothing more— are the criteria by which applications are to be judged." Mem. and Order 29, ECF No. 13. Just as the Act does not authorize the executive branch to assign a negative weight to a grant application that "promotes liberal ideology" or "is critical of the administration's policies," so it does not authorize Defendants to disfavor art that "promotes gender ideology."

The APA directs courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Under *Loper Bright Enters. v. Raimondo*, courts afford no deference to the agency, but instead "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." Mem. and Order 25, ECF No. 13 (quoting *Loper Bright v. Raimondo*, 603 U.S. 369, 412 (2024)).

Here, the Act provides that "the Chairperson shall ensure that

> (1)    artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public; and
>
> (2)    applications are consistent with the purposes of this section. Such regulations and procedures shall clearly indicate that obscenity is without artistic merit, is not protected speech, and shall not be funded. . . .

20 U.S.C. § 954(d)(1)–(2).

Thus, "artistic excellence and artistic merit are *the* criteria by which applications are judged." *Id.* (emphasis added). The statute "does not . . . specify that [certain] factors must be given any particular weight in reviewing an application." *Finley*, 524 U.S. at 581. Defendants have imposed an extra-statutory *negative* weight to *one* specific factor—whether an application "promotes" what the government deems to be "gender ideology." The NEA's discrimination against this viewpoint fundamentally subverts Congress' directive that the agency award grants based solely on artistic excellence and merit.

The statute's focus on "artistic merit and excellence"—without regard to any particular viewpoint—is underscored by § 954(d)(2). In § 954(d)(2), Congress instructed that "obscenity is without artistic merit, is not protected speech, and shall not be funded." *Id.* Thus, the statute identifies *only* obscenity—an unprotected category of speech—as "without artistic merit." *See Miller v. California*, 413 U.S. 15 (1973). That choice emphasizes that the agency is to be guided by artistic merit and excellence only. Yet Defendants' policy expressly discounts otherwise meritorious art simply *because* it "promotes gender ideology"—a factor that Defendants do not assert has anything to do with artistic merit or excellence, but that they imposed simply because the President objects to that viewpoint being expressed at all.

Defendants' viewpoint discrimination directly undermines Congress's purpose in establishing the NEA, which was to fund a broad range of private artistic expression, *without*

exercising any control over the viewpoints expressed therein. Indeed, by disfavoring only expression that "promotes gender ideology"—and not expression that opposes it—the condition flouts the Act's express purpose of cultivating "mutual respect for the diverse beliefs and values of *all* persons and groups," 20 U.S.C. § 951(6) (emphasis added), and "freedom of thought, imagination, and inquiry," *Finley*, 524 U.S. at 573 (quoting 20 U.S.C. § 951(7)).

Finally, the Act's statutory and legislative history supports the plain meaning of the text, and makes clear that it does not authorize the NEA to assign negative weight to grant applications that express a specific viewpoint. When Congress added the "decency and respect" clause, it did so in response to a congressionally appointed commission that "cautioned Congress against the adoption of distinct viewpoint-based standards for funding." *Finley,* U.S. at 581–82. "In keeping with that recommendation, the criteria in § 954(d)(1) inform the assessment of artistic merit, but Congress declined to disallow any particular viewpoints." *Id*. at 582. By seeking to impose a negative weight on one specific viewpoint, Defendants expressly defy Congress's intent that *no* "viewpoint-based standard[]" corrupt the NEA's funding of the arts.[5]

---

[5] The text, structure, purpose, and history of the Act establish that the Act does not authorize the NEA to assign a negative weight to a grant application because it "promotes gender ideology." But even if the Act were ambiguous, the constitutional avoidance doctrine counsels the same reading. *Iancu v. Brunetti*, 588 U.S. 388 (2019) ("This Court, of course, may interpret 'ambiguous statutory language' to 'avoid serious constitutional doubts.'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U. S. 502, 516 (2009)). Indeed, the *Finley* Court recognized that "[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case." *Finley*, 524 U.S. at 587. As noted above, it specifically warned that "a more pressing constitutional question would arise if Government funding resulted in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" *Id*. That scenario has now squarely presented itself: Defendants seek to impose "a disproportionate burden" on grant applications that "promote gender ideology." Interpreting this action to fall outside the bounds of the Act would avoid the "pressing constitutional question."

### C.    The Final EO Implementation Is Arbitrary and Capricious.

The APA also requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that standard, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). It cannot "rel[y] on factors which Congress has not intended it to consider," ignore "an important aspect of the problem," "offer[ ] an explanation . . . that runs counter to the evidence," or rely on an "implausible" explanation. *Id.* (citation omitted). Nor can an agency "depart[] from agency precedent without explanation," *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1090 (D.C. Cir. 2009), or *"sub silentio,"* *Fox Television Stations*, 556 U.S. at 515. An agency "must show that there are good reasons for the new policy." *Id.*

Defendants' imposition of a negative weight against grant applications that "promote gender ideology" is "arbitrary and capricious" because it marks a radical departure from longstanding agency precedent without "a satisfactory" or "rational" explanation. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. "The APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agriculture*, No. 25-cv-00097, 2025 WL 1116157, at *18 (D.R.I. Apr. 15, 2025) (quoting *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025)). Here, there is none.

The administrative record, which consists only of the Act, a smattering of cases, the EO, the Grants for Arts Projects guidelines, and the Final EO Implementation, is devoid of any reasoned decisionmaking. Nor does the Implementation itself explain the agency's decision to

disfavor the specific viewpoint of promoting "gender ideology," other than the conclusory statement that it "seeks to serve the public by . . . furthering the current administration's priorities as provided in [the EO]" and "to comply with the President's mandates and Administration priorities." SUF ¶ 36. The agency makes no attempt to explain how "promoting gender ideology" has anything whatsoever to do with artistic merit or excellence, the criteria Congress directed that it use. Instead, it effectively says, "the President made us."

"A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order." *Louisiana v. Biden*, 543 F. Supp. 3d 388, 414 (W.D. La. 2021), *vacated and remanded on other grounds*, 45 F.4th 841 (5th Cir. 2022). "While the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration"; "[t]he APA requires reasoning, deliberation, and process." *California v. Bernhardt*, 472 F. Supp. 3d 573, 600–01 (N.D. Cal. 2020). To hold otherwise "would contravene settled precedent and would improperly insulate wide swaths of agency action from judicial review." *Orr v. Trump*, No. 25-cv-10313, 2025 WL 1145271, at *19 (D. Mass. Apr. 18, 2025). Accordingly, recent district court decisions in this Circuit, including in this district, have uniformly rejected agency reliance on an underlying EO to shield their actions from APA review. *See id.*; *Rhode Island v. Trump*, No. 25-cv-128, 2025 WL 1303868, at *11 (D.R.I. May 6, 2025) (finding agencies' "rational connections" to be "absent" where they "have been couched in mere conclusory statements—most of which merely defer to the [underlying] EO"); *Woonasquatucket*, 2025 WL 1116157, at *18 ("[A]n agency cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant EO. After all, 'furthering the President's wishes cannot be a blank check' for the Agencies to do as they please." (quoting *Nat'l Council of Nonprofits*, 2025 WL 368852, at *11).

Moreover, the EO fails to provide a "satisfactory explanation." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. The EO offers no explanation of how "gender ideology" relates to artistic merit or excellence; indeed, it does not even mention arts funding or the NEA. And by directing that "grant funds" not "promote gender ideology," the EO requires the NEA to consider a factor "which Congress has not intended it to consider." *Id*. In addition, "the choice made"—assigning a negative weight to grant applications that "promote gender ideology"—does not even conceivably further the EO's stated aim of "defend[ing] women's rights and protect[ing] freedom of conscience." Exec. Order 14168 § 1. Art that "promotes gender ideology" does not deny women any rights or intrude on anyone's freedom of conscience. As another court recently noted, "wholly absent from this process . . . was any consideration or reasoned explanation of what language 'promotes' . . . gender identity," "what information furthers the EO's stated purpose of defending individuals it defines as 'women,'" or how the answers to these questions bear any relevance to the NEA's mission of funding excellent art. *See Schiff*, 2025 WL 1481997, at *10.

Defendants have also "entirely failed to consider . . . important aspect[s] of the problem." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. As discussed in more detail below, the NEA's discrimination against grant applications that "promote gender ideology" is unconstitutionally vague and will capture vast swaths of artistic expression. *See infra* section III. Yet the NEA has made no effort whatsoever—in the Final EO Implementation or elsewhere—to clarify what does and does not constitute the "promotion" of "gender ideology." This lack of clarity will result in organizations self-censoring in future proposed projects, or reduce the likelihood that any grant application that "promotes gender ideology" will receive funding, actively undermining the NEA's purpose of "develop[ing] and promot[ing] a broadly conceived national policy of support for the humanities and the arts" and "creat[ing] and sustain[ing] not only a climate encouraging freedom

of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." 20 U.S.C. §§ 951(7), 953(b). As authorized by Congress, the NEA exists to "giv[e] emphasis to American creativity and cultural diversity," 20 U.S.C. § 954(c)(1), and it has procedures to take into account "respect for the diverse beliefs and values of the American public," *id.* § 954(d)(1). By assigning negative weight to the expression of one viewpoint held by members of the American public—that gender is real and is not determined by "biological sex"—the policy "distort[s the] usual functioning" of NEA funding. *Cf. Velazquez*, 531 U.S. at 543.

## III.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIFTH AMENDMENT CLAIM.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A policy can be vague for two independent reasons: if the government fails to "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or if it would "authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). The Final EO Implementation and the current Assurance of Compliance both fail each of these standards.

At the preliminary injunction stage, this Court considered only the original eligibility bar, and found that "Plaintiffs have not demonstrated a likelihood of success on the merits of their [vagueness] claim,", taking into account *Finley*'s note that the NEA funding process is inherently discretionary. Mem. and Order 41–42, ECF No. 13. But *Finley* rejected a vagueness claim only after holding that the provision at issue there was merely hortatory and, at most, procedural, such that it did not implicate speech at all, so "the consequences of imprecision [were] not constitutionally severe." *Finley*, 524 U.S. at 588–89. As interpreted by the agency and the Supreme Court, the "decency" provision did not alter the criteria to be applied—which remain "artistic

merit" and "artistic excellence"—terms that both have meaning within the arts profession. The Court's conclusion that the challenged provision didn't impose any viewpoint-based burden on speech informed its finding that it was "unlikely . . . that speakers will be compelled to steer too far clear of any 'forbidden area'" because of the provision. *Id.* at 589. But that is only because the decency provision had been interpreted and applied in such a way that it disadvantaged no particular views.

Here, by contrast, the Final EO Implementation directly disadvantages art expressing particular viewpoints—while failing to explain what those viewpoints are, beyond the unhelpful "promote gender ideology" moniker. This difference is critical to the vagueness analysis, for when a policy burdens speech, the "government may regulate in the area only with narrow specificity," *NAACP v. Button*, 371 U.S. 415, 433 (1963), and particularly "rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox Television Stations, Inc.*, 567 U.S. at 253–54; *see also Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). Accordingly, courts "apply a 'heightened standard' in cases involving the First Amendment and 'require[] a "greater degree of specificity."'" *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (citations omitted). The discretionary nature of the process itself does not bar a finding of unconstitutional vagueness. *See Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F. Supp. 774, 781–82 (C.D. Cal. 1991) (citation omitted) (holding that NEA's implementation of prohibition on obscenity that left "the determination of obscenity in the hands of the NEA" was unconstitutionally vague in part because of impact on speech).[6]

---

[6] *Bella Lewitzky*'s prohibition on obscenity involved a certification requirement, but the court's vagueness analysis centered around the plaintiffs' argument that they were "left to speculate about how the NEA will assess obscenity" and did not factor the certification aspect into its analysis. 754 F. Supp. at 781–82.

And the vagueness of what constitutes "promoting gender ideology" has already caused applicants to steer "far clear" of anything that might be deemed to do so.[7] RILA avoided applying for funding to support a play in which the lead character is gay and queer, or to support a storytelling program in which nonbinary and transgender performers might talk about their personal lives. SUF ¶¶ 52–62. TCG and multiple TCG members chose to forgo applying for NEA funding entirely, and NQT may do so in the future if the EO Implementation remains in place. SUF ¶¶ 101, 124, 140–41, 143. "Such self-censorship is inimical to our democracy, as '[t]he right to speak freely and to promote diversity of ideas and programs is . . . one of the chief distinctions that sets us apart from totalitarian regimes.'" *Local 8027 v. Edelblut*, No. 21-cv-1077, 2024 WL 2722254, at \*6 (D. N.H. May 28, 2024) (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949)) *appeal docketed* No. 24-1690 (1st Cir. July 26, 2024).

With respect to the Assurance of Compliance, the violation is all the more obvious because criminal penalties are involved. Vagueness review is at its zenith when both speech and criminal penalties are involved. *See Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). The Assurance of Compliance states that applicants agree to comply with "all applicable executive orders" and gives the government "the right to seek judicial or administrative enforcement of this assurance." SUF ¶¶ 41, 43. Part 1 of the NEA's application, which requires certifying to that Assurance, additionally threatens "criminal, civil, or administrative penalties" for a false certification. SUF ¶¶ 6–7. Because the Gender Ideology EO prohibits the use of federal funds to "promote gender ideology," Exec. Order 14168 § 3(g), the Assurance of Compliance could be read to require applicants not to

---

[7] In addition, *Finley*'s concern that other programs that award scholarships and grants on the basis of subjective criteria such as "excellence," 524 U.S. at 589, does not apply here. That "promoting gender ideology" may decrease, but never increase, a project's chances of receiving NEA funding communicates to applicants that there is a disfavored viewpoint to avoid; the same cannot be said for programs that reward "excellence."

express views that "promote gender ideology" if they succeed in receiving NEA funds, or else face criminal penalties—an interpretation that is no longer disclaimed by the Assurance of Compliance. *Compare* SUF ¶ 32 *with id.* ¶ 42. The lack of clarity around what it means to "promote gender ideology" is particularly troubling in this context. And the fact that the Final EO Implementation states that there is no certification requirement does not mitigate this harm; instead, it only adds to the confusion as to how the NEA will enforce the Final EO Implementation.

Both "gender ideology" and what it means to "promote" it are insufficiently clear, forcing Plaintiffs to give a wide berth to anything that might be perceived as "promoting gender ideology." The EO's definition of "gender ideology" states the government's preference for views recognizing "the immutable biological reality of sex," rather than "an internal, fluid, and subjective sense of self unmoored from biological facts." Exec. Order 14168 § 1. However, there is no clarification as to how this affects, for example, actors appearing in drag, or a male actor playing a female role, or vice versa. SUF ¶ 113; *cf. Local 8027 v. Edelblut*, 651 F. Supp. 3d 444, 461 (D.N.H. 2023) (finding that bans on teaching certain concepts did not provide the guidance needed "to find the line between what the [bans] prohibit and what they permit," such as whether "merely impl[ying] the truthfulness of a banned concept" would violate the ban); *Edelblut*, 2024 WL 2722254, at *12–13 (same, on summary judgment). Nor does the Final EO Implementation clarify whether the mere presence of a nonbinary or transgender actor or character qualifies as "promoting" the disfavored ideas. SUF ¶¶ 64, 94, 113; *cf. Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 599–601 (1967) ("[I]n prohibiting 'advising' the 'doctrine' of unlawful overthrow does the statute prohibit mere 'advising' of the existence of the doctrine, or advising another to support the doctrine? . . . Does the teacher who informs his class about the precepts of Marxism or the Declaration of Independence violate this prohibition?") Multiple courts have

28

further recognized that terms like "promote" can be impermissibly vague. *See, e.g.*, *Rosenberger*, 515 U.S. at 836 (noting the "vast potential reach" of the terms "promotes" and "manifests"); *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020) (prohibition on "encourag[ing]" or "promot[ing]" a riot was overbroad);[8] *United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021) (same), *cert. denied*, 142 S. Ct. 865 (2022) (mem.).

In addition, at the preliminary injunction stage, the Court concluded that, if anything, the categorical eligibility bar then before the Court "severely *narrows* the discretion of NEA personnel," because every project that "promotes gender ideology" was, by definition, out of the running, thereby mitigating vagueness. Mem. and Order 42, ECF No. 13 (citing *Finley*, 542 U.S. at 573). The Final EO Implementation, however, significantly *broadens* the discretion of one person—the Chair, exacerbating the potential for arbitrary or discriminatory enforcement. The Final EO Implementation leaves the determination of what constitutes "promoting gender ideology" entirely to the Chair's subjective judgment. "[I]n numerous other cases, [the Supreme Court has] condemned broadly worded licensing ordinances which grant such standardless discretion to public officials that they are free to censor ideas and enforce their own personal preferences." *Grayned*, 408 U.S. at 113 n.22; *cf. Edelbut*, 2024 WL 2722254, at *15–17 (finding that the New Hampshire Department of Education's reliance on its commissioner's "personal views to serve as gap-filler" "threaten[ed] teachers with enforcement on an 'ad hoc and subjective basis' guided by the 'personal preferences' of an unelected official rather than clearly delineated statutory standards").

---

[8] Because the court found those statutory terms overbroad, it had no occasion to resolve whether they were also unconstitutionally vague. *Miselis*, 972 F.3d at 546.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs hereby respectfully request that this Court grant their motion for summary judgment.

Dated: June 30, 2025                    Respectfully submitted,

*/s/ Vera Eidelman*

Vera Eidelman*
Scarlet Kim*
Lauren Yu*
Brian Hauss*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
veidelman@aclu.org
scarletk@aclu.org
lyu@aclu.org
bhauss@aclu.org

*/s/ Lynette Labinger*
Lynette Labinger, Esq., (Bar No. 1645)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF RHODE ISLAND
128 Dorrance Street, Box 710
Providence, RI 02903
401.465.9565
LL@labingerlaw.com
Cooperating counsel

David D. Cole*
600 New Jersey Ave. NW
Washington, DC 20001
(202) 622-9078
cole@georgetown.edu

* Admitted *Pro hac vice*

30

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the within document via the ECF system on this 30th day of

June, 2025 and that it is available for viewing and downloading to all counsel of record.

By:        */s/ Vera Eidelman*

Vera Eidelman