## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS, et al.,

                            *Plaintiffs*,

                *v.*

NATIONAL ENDOWMENT
FOR THE ARTS, et al.,

                          *Defendants*.

Case No. 1:25-cv-00079-WES-PAS

## STATEMENT OF UNDISPUTED FACTS

### NEA Grants for Arts Projects

1.      The Grants for Arts Projects ("GAP") is the NEA's "principal grants category." Suppl. Eidelman Decl. Ex. 1.

2.      GAP makes grants "available for arts projects of all sizes in a wide variety of artistic disciplines." *Id.*

3.      GAP applicants may request an amount between $10,000–$100,000. Suppl. Eidelman Decl. Ex. 2.

4.      The GAP application process has two parts. *Id.*

5.      In Part 1, applicants must complete the Application for Federal Domestic Assistance/Short Organization Form, a brief form that collects basic information about the applicant organization, and submit it on Grants.gov. Eidelman Decl. Ex. 1 at 21.

6.      To submit Part 1, applicants must agree to an "Application Certification" that states "I certify (1) to the statements contained in the list of certifications* and (2) that the statements herein are true, complete and accurate to the best of my knowledge." In addition, they must

"provide the required assurances* and agree to comply with any resulting terms if [they] accept an award." Odsess-Rubin Decl. Ex. A.

7.      The Certification also states, "I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001)." *Id*.

8.      The asterisk in the Certification provides "The list of certifications and assurances . . . is contained in the announcement or agency specific instructions." *Id.* For the NEA, the relevant list of certifications and assurances is contained in the NEA's "Assurance of Compliance." *See* Eidelman Decl. Ex. 2; Suppl. Eidelman Decl. Ex. 3.

9.      In Part 2, an applicant must complete the Grant Application Form, which constitutes the majority of the application material, including information about the organization, like history and budget; the project description, timeline, and budget information; and work samples, and submit it on the NEA's applicant portal. Eidelman Decl. Ex. 1 at 21.

10.     The GAP program has two cycles each calendar year. Suppl. Eidelman Decl. Ex 2 at 4.

11.     For the March 2025 Cycle, applicants will be notified of acceptance or rejection in December 2025. *Id.*

12.     For the March 2025 Cycle, the earliest project start date is January 1, 2026. *Id.*

13.     For the July 2025 Cycle, the submission deadline is July 29, 2025, and the notification for acceptance or rejection is April 2026. *Id.*

14.     For the July 2025 Cycle, the earliest project start date is June 1, 2026. *Id.*

15.     For fiscal year 2026, the NEA anticipates 4,500 applications.  Eidelman Decl. Ex. 1, at 4.

16.    For fiscal year 2026, the NEA anticipates 2,075 awards totaling $62,245,000. *Id.*

**History and Perception of NEA Funding**

17.    In the past, the NEA has not suggested to applicants that they should make substantive changes to their projects.  Second Suppl. Martínez Decl. ¶ 13; Suppl. Odsess-Rubin Decl. ¶ 14; Suppl. Byrd Decl. ¶ 12.

18.    In the past, the NEA has not otherwise offered feedback on the substance of a project. Second Suppl. Martínez Decl. ¶ 13; Suppl. Odsess-Rubin Decl. ¶ 14; Suppl. Byrd Decl. ¶ 12.

19.    When the NEA has given feedback on proposals, it has been about how to better frame an applicant's pitch to make it a more competitive application, not about changing the project itself. Second Suppl. Martínez Decl. ¶ 13; Suppl. Byrd Decl. ¶ 12.

20.    The NEA has never suggested removing themes, actors, or other aspects of a proposal because of its substance. Second Suppl. Martínez Decl. ¶ 13; Suppl. Byrd Decl. ¶ 12; *see also* Suppl. Odsess-Rubin Decl. ¶ 14.

21.    NEA-funded work is billed as the work of the artists and funded organization, not the NEA. Suppl. Odsess-Rubin Decl. ¶ 15; Suppl. Byrd Decl. ¶ 13.

22.    NEA-funded work sits within a body of past work by the funded organization and reflects the mission and audience of that organization. Second Suppl. Martínez Decl. ¶ 15.

23.    The NEA makes clear that grant recipients have to credit it for the funding it provided, but it typically appears in a list of many other funders. Suppl. Odsess-Rubin Decl. ¶ 16.

24.    Every project supported by the NEA is also supported by other sources of funding. Suppl. Odsess-Rubin Decl. ¶ 16; *see also* Eidelman Decl. Ex. 1 at 20 ("NEA funding cannot exceed 50% of the total cost of the project.").

25.     Work that receives NEA funding is typically performed or exhibited in private venues and galleries, or in public parks and streets not owned by the NEA, but rather other government actors who require separate, distinct approvals. Second Suppl. Martínez Decl. ¶ 14; Suppl. Odsess-Rubin Decl. ¶¶ 15–17.

26.     NEA-funded organizations retain the intellectual property rights in their NEA-funded works. Suppl. Byrd Decl. ¶ 13.

## The NEA's Implementation of Executive Order 14168

27.     On January 20, 2025, President Donald J. Trump signed Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO" or "EO"). *See* 90 Fed. Reg. 8615 (Jan. 30, 2025).

28.     On or around February 6, 2025, the NEA amended its Assurance of Compliance to include the language:

> [T]he applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:
> - The applicant will comply with all applicable Executive Orders while the award is being administered. Executive orders are posted at whitehouse.gov/presidential-actions.
> . . .
> - The applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.

Eidelman Decl. Ex. 2 at 11–12.

29.     The Assurance of Compliance stated that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these . . . executive orders" and that "[i]f the NEA determines that a recipient has failed to comply . . . , it may suspend or terminate the award, and/or recover the funds." Eidelman Decl. Ex. 2 at 10.

30.    Both Part 1 and Part 2 of the application required the applicant to certify agreement with the Assurance of Compliance. Odsess-Rubin Decl. ¶ 11.

31.    On March 10, 2025, following the filing of this action, the NEA submitted a declaration to this Court stating that the NEA would remove the certification requirement specific to the Gender Ideology EO from the Assurance of Compliance before Part 1 was due, and that the Part 2 deadline would be extended from March 24, 2025, to April 7, 2025. Eilers Decl. ¶¶ 8–9.

32.    On March 11, 2025, the NEA removed the certification requirement specific to the Gender Ideology EO from the Assurance of Compliance. The Assurance then stated that the NEA will "no longer require applicants to certify their compliance with [the Gender Ideology EO] while the outcome of this litigation is pending." Eilers Decl. ¶ 8.

33.    On March 17, 2025, Defendant Carter issued a memorandum ("March 17 Memorandum") to NEA grantmaking staff, stating that "the NEA has rescinded all implementation of the [Gender Ideology] EO, as it applies to the NEA's grantmaking activities" and announcing that the NEA "is initiating a new evaluation of the EO in accordance with the Administrative Procedure Act." Bolan Decl. Ex. C at 1.

34.    The NEA completed its process on April 16, 2025, and announced the resulting policy ("Final EO Implementation") on April 30. *See id.*; Final EO Implementation, ECF 17-1.

35.    The Final EO Implementation states that "appropriate action is needed to incorporate the EO in the NEA's grant application review process," that the NEA "intend[s] action to implement [the EO]," as described in the Final EO Implementation, that the NEA is "publish[ing the Final EO Implementation as an] explanation of its intended action to implement [the EO]," that its purpose is to "outline[ ] . . . how it will implement [the EO] in [the NEA's] review process,"

and that the Chair will "implement [the EO]" and review grant applications for "whether the proposed project promotes gender ideology." Final EO Implementation at 1–3.

36.    The Final EO Implementation explains that the Chair will engage in a "case-by-case review . . . of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology." It further explains that this review "will in general provide a significant public benefit by . . . furthering the current administration's priorities as provided in [the EO]." *Id.* at 2.

37.    Defendants "[d]enied" that the Chair's "conclusion that a proposed project 'promotes gender ideology' will make no difference as to whether the project will receive an NEA grant." ECF 21 at 2.

38.    Defendants "[a]dmitted" that the Chair's "conclusion that a proposed project 'promotes gender ideology' will make it less likely that the project will receive an NEA grant." *Id.*

39.    "If the NEA Chair concludes that a proposed project 'promotes gender ideology,' that factor could weigh against the project's final approval." *Id.*

40.    The Chair's conclusion that a proposed project "promotes gender ideology" cannot weigh in favor of the project's final approval. *Id.*

41.    The Assurance of Compliance now includes the language "The applicant will comply with all applicable Executive Orders while the award is being administered. Executive orders are posted at whitehouse.gov/presidential-actions." Suppl. Eidelman Decl. Ex. 3.

42.    The Assurance of Compliance does not exclude the Gender Ideology EO from the requirement that applicants comply with all applicable executive orders. *See id.*

43.    The Assurance of Compliance also states, "The United States has the right to seek judicial or administrative enforcement of this assurance." *Id.*

44.     The Assurance of Compliance no longer states that the NEA will "no longer require applicants to certify their compliance with [the Gender Ideology EO] while the outcome of this litigation is pending." *Id.*

### Rhode Island Latino Arts

45.     Rhode Island Latino Arts ("RILA") is a nonprofit arts organization based in Rhode Island. Martínez Decl. ¶ 2.

46.     Its mission is to promote, encourage, and preserve the art, history, heritage, and cultures of Latinos in Rhode Island. *Id.*

47.     RILA offers programming of every genre of art, including visual art, dance, and music. It puts on theatrical and musical performances, Latin percussion sessions, dancing events, script readings, and storytelling events. It also has a gallery to showcase artwork and operates literacy programs. *Id.* ¶ 3.

48.     RILA previously received NEA funding in 2019, 2020, and 2022. *Id.* ¶¶ 5–7.

49.     When Plaintiffs filed this suit, RILA was in the process of applying for NEA funding in the March 2025 GAP cycle to support programming in 2026. *Id.* ¶ 8.

50.     RILA submitted Part 1 of its application on February 14, 2025, and agreed to the Assurance of Compliance then in effect, with the intention of proceeding with a more restricted project that would comply with the "gender ideology" prohibition. *Id.* ¶ 19.

51.     After the certification requirement specific to the Gender Ideology EO had been removed, RILA withdrew and then resubmitted Part 1. Second Suppl. Martínez Decl. ¶ 4.

52.     RILA originally planned to seek support for a production of "Faust," in which the lead character is gay and queer. Martínez Decl. ¶ 12.

53.     RILA was considering casting a nonbinary actor who uses they/them pronouns for that role. In the past, this actor has chosen to dress as a man during one performance and dress as a woman in the next performance, while performing the same role. *Id.*

54.     Because, at the time that RILA was preparing its application and choosing which proposal to put forth, the NEA's Assurance of Compliance required certifying that federal funds will "not be used to promote gender ideology," RILA decided not to apply for a grant to support "Faust." *Id.* ¶ 14.

55.     RILA also considered applying to support its storytelling program. *Id.* ¶ 13.

56.     In its storytelling program, RILA allows performing artists to tell their stories without restrictions, based on the principle that artistic freedom should allow them to say what they want. The program is open to all performers, including nonbinary and transgender performers, and it allows them to speak about or interpret their art based on their personal lives. *Id.*

57.     RILA will not tell performers to stay away from topics that could be interpreted as "promoting" what the government deems to be "gender ideology." *Id.*

58.     RILA decided not to apply for a grant to support the storytelling program because of the gender ideology prohibition in place when the lawsuit was filed. *Id.* ¶ 14.

59.     Though it is not the project for which RILA wanted to apply, RILA has applied for an NEA grant to support performance tours and an oral history performance highlighting the contributions of Latinos to American history and Rhode Island history. *Id.* ¶ 15.

60.     Without the "gender ideology" prohibition in place when the suit was filed, the scope would have been different; RILA would have applied for a grant that affirmatively included celebrating transgender, queer, and nonbinary identity and featuring artists and characters with those identities. *Id.*

61.     Because RILA had to submit Part 2 of its application by April 7, before the NEA issued its Final EO Implementation, and there was no assurance that the NEA would not reimpose the "gender ideology" prohibition, RILA did not expand the scope of the project in Part 2 of its application to reflect its desire to support transgender, queer, and nonbinary artists, characters, and themes within the scope of its NEA-funded programming. Second Suppl. Martínez Decl. ¶ 5.

62.     RILA made sure to steer clear of anything that could be perceived as "promoting gender ideology" in RILA's application materials, even in how RILA describes itself as an organization. *Id.*

63.     RILA's application for March 2025 GAP funding remains pending. Second Suppl. Martínez Decl. ¶ 5.

64.     It is not clear to RILA what it means to "promote" what the government deems to be "gender ideology," and that forces RILA to guess as to the parameters, including whether it prohibits allowing a transgender, queer, or nonbinary individual to participate in NEA-funded programming, including any mention of these identities in RILA's work, or including any fictional characters who are transgender, nonbinary, or queer. Martínez Decl. ¶¶ 16–17; Second Suppl. Martínez Decl. ¶ 7.

65.     RILA's concerns about the lack of clarity regarding what it means to "promote gender ideology" is heightened by the current language of the Assurance of Compliance. Second Suppl. Martínez Decl. ¶¶ 8–9.

66.     RILA is concerned about the possibility of judicial or administrative penalties if it receives funding in the March 2025 GAP cycle and does something in its project that the government deems to be "promoting gender ideology." *Id.* ¶ 9.

9

67.     Given the lack of clarity, RILA fears that even describing itself as an organization that supports transgender, nonbinary, and queer artists might be deemed to "promote gender ideology." Martínez Decl. ¶ 16.

68.     The lack of clarity also denies RILA the ability to provide artists the creative freedom to which RILA is committed as an organization, and it precludes RILA from expressing viewpoints affirming all identities, including those of transgender, nonbinary, and queer individuals, even though RILA is committed to those views as an artistic organization. *Id.* ¶ 17.

69.     RILA would like to apply for NEA grants in future grant cycles to support works of artistic merit that meet all of the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through that art. Martínez Decl. ¶ 22.

70.     If RILA were to apply for future NEA funding, RILA would have to certify in Part 1 of the application "to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "any false, fictitious, or fraudulent statements or claims may subject [the applicant] to criminal, civil, or administrative penalties." Second Suppl. Martínez Decl. ¶ 10.

71.     The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded works makes RILA fearful of seeking NEA funds in the future, and adds to its concerns about understanding what "promoting gender ideology" does and does not cover. *Id.* ¶ 10.

72.     Because of the Final EO Implementation, and the ambiguity of the Assurance of Compliance, RILA will strongly hesitate to apply for NEA funding while they remain in place. *Id.* ¶ 11.

73.     Putting together an application for an NEA grant takes a great deal of effort for RILA, which does not have a dedicated development office. *Id*. ¶ 11.

74.     It would be very frustrating to RILA, and a drain on its resources, to go through the work of submitting an application only to be denied funding because its proposed project is deemed to express a view disfavored by the NEA. *Id*. ¶ 11.

75.     Absent the Final EO Implementation, and the ambiguity introduced by the Assurance of Compliance, RILA would seek NEA funding in the future without hesitation. *Id.* ¶ 12.

**National Queer Theater**

76.     National Queer Theater, Inc. ("NQT") is a theater organization. *See* Odsess-Rubin Decl. ¶ 2.

77.     It is a theater collective dedicated to celebrating the brilliance of generations of LGBTQ+ artists and providing a home for unheard storytellers and activists. *Id.*

78.     Its work regularly features transgender and nonbinary individuals and themes. *See id.*

79.     NQT was awarded NEA grants in 2023 and 2024 for its Criminal Queerness Festival ("CQF"). *Id.* ¶ 3.

80.     CQF is devoted to freedom of expression and to fighting censorship and criminalization of sexuality and gender identity in other countries. It is meant to be a beacon for the queer community here and abroad, by affirming the equal dignity of people to be who they are, without being compelled to adhere to traditional heterosexual stereotypes. Odsess-Rubin Decl. ¶ 6.

81.     CQF has featured works from emerging artists from countries that criminalize homosexuality. The plays are chosen by a curatorial committee of prior CQF playwrights. The

plays are accompanied by talkback discussions facilitated by the playwrights, human rights advocates, and other subject matter experts. *Id.* ¶¶ 5, 7.

82.    Supporting transgender, nonbinary, and gender queer writers and themes has always been a part of the festival, including in the years that it has received NEA funding. *Id.* ¶ 7.

83.    In 2023, the festival featured one play about intersex identity. *Id.*

84.    In 2024, two plays were written by transgender writers and about trans identity. *Id.*

85.    For 2025, all three playwrights identify as nonbinary or gender queer, and one play has nonbinary characters. *Id.*

86.    When NQT submits its application to the NEA, it has not yet determined what plays will appear in the relevant year's CQF. Odsess-Rubin Suppl. Decl. ¶ 14.

87.    NQT was offered an NEA grant in 2025 for CQF. *Id.* ¶ 4.

88.    NQT's 2025 grant was revoked months before the Festival began, forcing NQT to find funding to fill the hole in its budget. *Id.*

89.    NQT applied for NEA funding in the March 2025 cycle to support CQF 2026. *Id.* ¶ 5.

90.    Because one could not register to apply for NEA funding without checking the box agreeing to the certification in the application, NQT intended to check that box when this lawsuit was filed, while simultaneously making clear in writing on the application that it was not agreeing to the "gender ideology" prohibition because it believes it is legally invalid. Odsess-Rubin Decl. ¶ 17.

91.    Because the NEA revoked the certification requirement before NQT submitted Part 1 for the March 2025 cycle, NQT did not have to agree to the "gender ideology" certification in this funding cycle. *See* Eilers Decl. ¶ 8.

92.     Given NQT's name, NQT's mission, that it works with transgender actors, and that the vast majority of NQT projects lie at the intersection of queer—including transgender—identities, it is hard to imagine a project that NQT could pitch that would not be at a disadvantage in the review process. Odsess-Rubin Suppl. Decl. ¶ 8.

93.     At the same time, it is not clear to NQT what does and does not qualify as "promoting" what the government deems to be "gender ideology," and that forces NQT to guess as to what, if anything, it can do to avoid having its projects perceived as "promoting gender ideology." Odsess-Rubin Decl. ¶ 14.

94.     It is not clear to NQT whether "promoting" what the government deems to be "gender ideology" includes merely working with actors, playwrights, and other artists who identify as transgender, nonbinary, or queer, regardless of the content of the art they produce. It is also unclear whether the mere existence of a transgender, nonbinary, or queer character in a piece violates the prohibition. *Id.*

95.     NQT fears that its very mission as an organization dedicated to celebrating LGBTQ+ artists might also run afoul of the "gender ideology" prohibition. *Id.*

96.     NQT's concerns about the lack of clarity regarding what it means to "promote gender ideology" is heightened by the current language of the Assurance of Compliance. Suppl. Odsess-Rubin Decl. ¶¶ 10–11.

97.     If NQT were to apply for future NEA funding, NQT would also have to certify in Part 1 of the application "to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "any false, fictitious, or fraudulent statements or claims may subject [the applicant] to criminal, civil, or administrative penalties." *Id.* ¶ 12.

98.    The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded works makes NQT fearful of seeking NEA funds in the future, and only adds to its concerns about understanding what "promoting gender ideology" does and does not cover. *Id.* ¶ 12.

99.    If the Final EO Implementation remains in place, NQT is not likely to continue to apply for NEA grants. *Id.* ¶ 8.

100.    Given that NEA grants are already very competitive, anything that makes NQT less competitive is highly concerning, and could in effect mean that NQT does not stand a chance. *Id.* ¶ 7.

101.    Were it not for the Final EO Implementation, and the ambiguity introduced by the Assurance of Compliance, NQT would seek NEA funding, as it has received in the past, for future CQFs. *Id.* ¶ 13.

### The Theater Offensive

102.    The Theater Offensive, Inc. ("TTO") is a nonprofit theatrical organization whose mission is to present liberating art by, for, and about queer and trans people of color that transcends artistic boundaries, celebrates cultural abundance, and dismantles oppression. Byrd Decl. ¶ 2.

103.    Although TTO is open to all without regard to race, sex, or other identifying characteristics, it seeks in particular to support the voices of trans, nonbinary, and queer people, including people of color, who are often the most underserved in the theatrical community both on and offstage. Byrd Decl. ¶ 2.

104.    TTO's work regularly features transgender and nonbinary artists and themes. *Id.*

105.    TTO has previously received NEA grants in 2016, 2017, 2021, and 2022. Suppl. Byrd Decl. ¶ 3.

106.    In 2024, the NEA offered a grant for TTO's Queer [Re]public Festival in 2025, but the NEA revoked the grant months before the festival began, forcing TTO to find other sources of funding on short notice. *Id.*

107.    TTO applied for NEA funding in the March 2025 GAP cycle to support the production of a new play titled "Smoke," written by a transgender playwright. Set in 1960's D.C., "Smoke" explores love, found family, motherhood, and healing, and reveals the complexities of transgender life. The production will feature two transgender actors in the leading roles, and rehearsals would begin in May 2026. Byrd Decl. ¶ 10.

108.    The NEA funds would be used to support the artists in the play. *Id.*

109.    When this lawsuit was filed, TTO intended to check the box agreeing to the certification in the application because doing so was necessary to submit an application, but planned to simultaneously make clear in writing on the application that it is not agreeing to the "gender ideology" prohibition because it believes it is legally invalid. Byrd Decl. ¶ 17.

110.    Because the NEA revoked the certification requirement before TTO submitted Part 1 for the March 2025 cycle, TTO did not have to agree to the "gender ideology" certification in this funding cycle. *See* Eilers Decl. ¶ 8.

111.    TTO's application for the March 2025 cycle remains pending. Suppl. Byrd Decl. ¶ 4.

112.    TTO finds the Final EO Implementation unclear as to what constitutes "promoting" what the government deems to be "gender ideology"; it thereby forces TTO to guess as to what it can and cannot do with an NEA grant. *Id.* ¶ 6.

113.    For example, it does not make clear whether "promoting" what the government deems to be "gender ideology" includes working with actors, playwrights, and other artists who

identify as transgender and/or nonbinary, without more, or whether it prohibits only certain messages, themes, or views. It is unclear whether the existence of a transgender and/or nonbinary character in a piece constitutes "promoting" what the government deems to be "gender ideology." Nor is it clear what views are proscribed, including whether classic American works that feature drag might trigger the "gender ideology" penalty. Byrd Decl. ¶ 18; Suppl. Byrd Decl. ¶ 6.

114.    TTO fears that its very mission as an organization dedicated to queer and trans people will be deemed to "promote gender ideology." Byrd Decl. ¶ 18.

115.    TTO's concerns about the lack of clarity regarding what it means to "promote gender ideology" is heightened by the current language of the Assurance of Compliance. Suppl. Byrd Decl. ¶¶ 9–10.

116.    If TTO were to apply for future NEA funding, TTO would also have to certify in Part 1 of the application "to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "any false, fictitious, or fraudulent statements or claims may subject [the applicant] to criminal, civil, or administrative penalties." *Id.* ¶ 10.

117.    The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded works makes TTO fearful of seeking NEA funds in the future, and adds to its concerns about understanding what "promoting gender ideology" does and does not cover. *Id.*

118.    Despite the Final EO Implementation, TTO will continue to apply for NEA grants because TTO believes it is important to showcase narratives that reflect the American people. *Id.* ¶ 11.

### Theatre Communications Group

119.    Theatre Communications Group ("TCG") is a national theater organization with over 600 member theaters and affiliates and over 3,500 individual members. Cachapero Decl. ¶ 2.

120.    TCG supports theater professionals through annual convenings, industry reports, workshops, webinars, and the publication of *American Theatre* magazine and TCG Books, while also awarding $43 million in funding and professional development support to more than 900 organizations and 1,300 individuals over its history of grantmaking. *Id.*

121.    TCG has members around the country, spanning 48 states. Suppl. Cachapero Decl. ¶ 2, ECF 12-2.

122.    Many of TCG's members apply for and receive funding from the NEA to support their artistic endeavors. Cachapero Decl. ¶ 6.

123.    Many of those members wanted to apply for NEA funding in the March 2025 GAP cycle. *Id.*

124.    Some of those members were deterred from applying for funding in the March 2025 cycle, though they had otherwise planned to and would have liked to, because they feared the penalties that could flow to them if they are deemed to have made a false certification. *Id.* ¶ 9.

125.    Many of TCG's members also fear that if the promotion of what the government deems to be "gender ideology" affects the likelihood of receiving an NEA grant, they will be effectively barred from even being considered for NEA funding because they work with, or are, transgender, nonbinary, or queer artists, and are committed to treating all artists with equal dignity. *Id.* ¶¶ 9–11.

126.    For example, one member theater, which has received several NEA grants and whose mission includes presenting "diverse" stories of the American identity, had planned to apply in the March 2025 cycle. However, it decided not to apply because it would not agree to the Assurance of Compliance in place when it had to make its decision—which stated that funds would not be used to "promote gender ideology"—because the member theater fundamentally disagrees

with the "gender ideology" prohibition. Transgender people are part of the theater's workforce, audience, and arts education programs, and the theater recognizes all gender identities. It believes that not acknowledging transgender people or identity is discriminatory. As a result, the theater did not apply for an NEA grant that would otherwise cover 25 percent of their production cost. *Id.* ¶ 10.

127.    Many of TCG's members find the "gender ideology" term unclear, and it thereby forces them to guess as to what is and is not permitted with an NEA grant. *Id.* ¶ 12.

128.    When this lawsuit was filed, TCG had heard from members that they were uncertain about how to proceed, unsure of whether to apply knowing they would be barred from eligibility because their project may express views that "promote" what the government deems to be "gender ideology," to apply with a different project, or forego applying for NEA funding altogether. *Id.* ¶ 13.

129.    These members felt that they required legal advice to understand how to handle the uncertainty that had been imposed on them, and many were unable to access it in time. In addition, many members, especially smaller theaters, do not have existing relationships with lawyers or the money to support access to legal counsel, particularly on such a quick timeline. *Id.*

130.    When this lawsuit was filed, many TCG members expressed dismay at being forced to compromise on their commitment to free artistic expression and their ideals in order to seek NEA funding. These organizations seek to affirm all gender identities, including transgender, nonbinary, and queer identities. *Id.* ¶ 15.

131.    Some TCG members have also told TCG about the financial impact of losing NEA funding. For example, for one small theater, an NEA grant would cover their entire design team's wages, pension, and health. *Id.*

132.    Because the NEA's Final EO Implementation is not clear, many of TCG's members, as well as TCG itself, are forced to guess as to whether expressing any particular views will be deemed by the government to "promote gender ideology," thereby making them less likely to receive, or effectively ineligible for, an NEA grant in this or future funding cycles. Second Suppl. Cachapero Decl. ¶¶ 5, 7.

133.    TCG's concerns, and the concerns of its members, about the lack of clarity regarding what it means to "promote gender ideology" are only heightened by the current language of the Assurance of Compliance. *Id.* ¶¶ 8–9.

134.    If TCG or TCG members were to apply for future NEA funding, they would also have to certify in Part 1 of the application "to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "any false, fictitious, or fraudulent statements or claims may subject [the applicant] to criminal, civil, or administrative penalties." *Id.* ¶ 10.

135.    The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded works makes TCG and its members fearful of seeking NEA funds in the future, and only adds to its concerns about understanding what "promoting gender ideology" does and does not cover. *Id.*

136.    Many of TCG's members intend to apply for NEA funding in the July 2025 cycle and future cycles, but fewer are now planning to do so even compared to when the NEA had initially imposed the certification requirement and eligibility bar on February 6, 2025. *Id.* ¶ 11; *see also* Cachapero Decl. ¶ 18.

137.    Because of the resources necessary to complete an NEA application, TCG members worry that the application for NEA funding is not worth the risk of having grants denied because of the Chair's disapproval of their views. Second Suppl. Cachapero Decl. ¶ 11.

138.    TCG has received 42 NEA grants since 1998 to support fieldwide convenings, research, and other programming. Cachapero Decl. ¶ 5.

139.    When the lawsuit was filed, TCG intended to apply in the July 2025 funding cycle for funding for its 2026 national conference, which will include discussions about gender identity and will affirm transgender, nonbinary, and queer members of the theatre community. Second Suppl. Cachapero Decl. ¶ 12.

140.    Because of the Final EO Implementation, and the content and messages of TCG's national conference, however, TCG fears it would be unlikely to receive a grant. *Id.*

141.    TCG also fears the ambiguities and legal risks introduced by the Assurance of Compliance even if it were to receive NEA funding. *Id.*

142.    TCG no longer intends to apply in the July 2025 cycle. *Id.*

143.    But for the Final EO Implementation and the current Assurance of Compliance, TCG would apply for NEA funding in future cycles. *Id.*

144.    The NEA has been a longstanding funder for TCG, including grants in substantial amounts. *Id.* ¶ 13.

145.    No longer being competitive for NEA funding because of its desire to affirm and celebrate all gender identities would have a great impact on TCG. *Id.*

146.    The "gender ideology" prohibition caused TCG to divert a great deal of its time and resources. Cachapero Decl. ¶ 16.

147.    TCG diverted some of its research into polling members about how the requirement has affected their plans to apply, or not apply, for NEA funding. In addition, TCG's programming team has had to quickly pivot to provide its members and the larger field with informational webinars, federal action updates, and resource materials to help them assess their level of risk and guide their choices with respect to applying for NEA funding. *Id.*

148.    TCG has also had to expend substantial resources to help members respond to the Final EO Implementation, including efforts to answer their many questions and individual inquiries, more public speaking, having to create additional informational and communications resources, time and money spent monitoring developments from the NEA, and substantive changes to the work of many of TCG's teams. Second Suppl. Cachapero Decl. ¶ 14.

## CERTIFICATE OF SERVICE

I hereby certify that I filed the within document via the ECF system on this 30th day of

June, 2025 and that it is available for viewing and downloading to all counsel of record.

*/s/ Vera Eidelman*
Vera Eidelman
