**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

RHODE ISLAND LATINO ARTS, *et al.*,

                Plaintiffs,

    *v.*

NATIONAL ENDOWMENT FOR THE ARTS, *et al.*,

                Defendants.

Civil Action
No. 25-cv-79-WES-PAS

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND**
**OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................. 1

STANDARD OF REVIEW ................................................................................................ 3

BACKGROUND ............................................................................................................... 4

1965: the NEA's genesis.................................................................................................. 4

1989-1990: Public controversy, the Independent Commission, and the Act's
amendment .................................................................................................................... 8

The Supreme Court's 1998 *Finley* decision.................................................................. 11

The NEA's selective, partial grant-making process ...................................................... 13

EO 14168 ......................................................................................................................... 15

The NEA's April 16, 2025, predecisional guidance ...................................................... 15

ARGUMENT ................................................................................................................... 17

I.       Because the NEA's selection of arts projects for partial funding is government
         speech, Plaintiffs' First Amendment claim fails................................................ 17

         A.       The NEA has historically spoken (for 60 years) by selecting arts
                  projects as worthy of public and private support. ................................. 19

         B.       The public perceives the NEA's seal of approval as the government
                  speaking. ................................................................................................. 25

         C.       The NEA controls the government speech with its power to approve
                  the arts projects it funds. ....................................................................... 28

II.      The NEA's predecisional guidance does not violate the Fifth Amendment..................... 31

III.     Because the NEA's implementation of the EO will occur only when the Chair
         makes final decisions about which projects to fund, there is no final agency
         action and Plaintiffs' non-constitutional APA claims are not ripe. ...................... 33

IV.      The broad discretion delegated by Congress to the NEA's Chair encompasses
         the NEA's predecisional guidance, precluding both of Plaintiffs'
         non-constitutional APA claims. ......................................................................... 35

         A.       The Act, as amended, permits the NEA to consider more than merely
                  "artistic excellence" and "merit" in evaluating grant applications to
                  ensure accountability to the public. ..................................................... 35

         B.       The NEA's predecisional guidance is not arbitrary and capricious, and
                  instead reflects valid executive branch policy preferences.................... 37

i

CONCLUSION ................................................................................................................39

TABLE OF AUTHORITIES

**Cases**

*Advocates for the Arts v. Thomson*,
    532 F.2d 792 (1st Cir.), *cert. denied*, 429 U.S. 894 (1976) ............................................. 11

*Anderson v. Liberty Lobby Inc.*,
    477 U.S. 242 (1986) ........................................................................................................ 3

*Ark. Educ. Television Comm'n v. Forbes*,
    523 U.S. 666 (1998) .............................................................................................. 19, 28, 30

*Atieh v. Riordan*,
    797 F.3d 135 (1st Cir. 2015) ............................................................................................ 4

*Bella Lewitzky Dance Found. v. Frohnmayer*,
    754 F. Supp. 774 (C.D. Cal. 1991) .................................................................... 7, 26, 31

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................................................ 33

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002), *cert. denied*, 537 U.S. 1171 (2003) .................................. 37

*Bluestone Env't Grp., Inc. v. Zapisek*,
    No. 3:21-cv-30056-MGM, 2022 WL 16857173 (D. Mass. Nov. 10, 2022) ..................... 4

*Boston Redev. Auth. v. Nat'l Park Serv.*,
    838 F.3d 42 (1st Cir. 2016) ............................................................................................. 4

*Broderick v. di Grazia*,
    504 F.2d 643 (1st Cir. 1974) ........................................................................................... 34

*City of Fall River v. Fed. Energy Regulatory Comm'n*,
    507 F.3d 1 (1st Cir. 2007) ............................................................................................... 34

*Collins v. Yellen*,
    594 U.S. 220 (2021) ........................................................................................................ 7

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
    412 U.S. 94 (1973) .......................................................................................................... 17

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019) ........................................................................................................ 37

*Food & Drug Admin. v. Wages & White Lion Invs., LLC*,
    145 S. Ct. 898 (2025) ...................................................................................................... 33

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ........................................................................................................ 38

*Johanns v. Livestock Marketing Ass'n,*
  544 U.S. 550 (2005) ............................................................................ 17, 30

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey,*
  844 F.3d 318 (1st Cir. 2016) ................................................................ 33

*Legal Servs. Corp. v. Velasquez,*
  531 U.S. 533 (2001) ............................................................................ 18

*Little v. Llano Cnty.,*
  138 F.4th 834 (5th Cir. 2025) ............................................... 20, 21, 26

*Mandel v. Boston Phoenix, Inc.,*
  456 F.3d 198 (1st Cir.2006) .................................................................. 3

*Matal v. Tam,*
  582 U.S. 218 (2017) ............................................................... 17, 27, 29

*McGriff v. City of Miami Beach,*
  84 F.4th 1330 (11th Cir. 2023) ............................................. 19, 25, 27

*McGuire v. Reilly,*
  386 F.3d 45 (1st Cir. 2004) ................................................................ 18

*Medina-Munoz v. R.J. Reynolds Tobacco Co.,*
  896 F.2d 5, 8 (1st Cir. 1990) ................................................................ 3

*Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue,*
  460 U.S. 575 (1983) ............................................................................ 18

*Mississippi v. Johnson,*
  71 U.S. 475 (1867) .............................................................................. 38

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ............................................................................ 21

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .......................................................................... 4, 38

*Nat'l Endowment for the Arts v. Finley,*
  524 U.S. 569 (1998) ................................................................... *passim*

*Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.,*
  174 F.3d 13 (1st Cir. 1999) ............................................................ 4, 37

*Ohio Forestry Ass'n v. Sierra Club,*
  523 U.S. 726 (1998) ............................................................................ 34

*People for the Ethical Treatment of Animals, Inc. v. Gittens,*
  414 F.3d 23 (D.C. Cir. 2005) .................................................... *passim*

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009) ................................................................... *passim*

*Portela-Gonzalez v. Sec'y of the Navy*,
    109 F.3d 74 (1st Cir. 1997) ........................................................................ 34

*Pulphus v. Ayers*,
    249 F. Supp. 3d 238 (D.D.C. 2017) ................................................... *passim*

*R.I. Hosp. v. Leavitt*,
    548 F.3d 29 (1st Cir. 2008) ......................................................................... 4

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ................................................................................... 23

*Raven v. Sajet*,
    334 F. Supp. 3d 22 (D.D.C. 2018) ........................................... 19, 27, 28, 37

*Regan v. Taxation with Representation of Wash.*,
    461 U.S. 540 (1983) ................................................................................... 12

*Ridley v. Mass. Bay Transp. Auth.*,
    390 F.3d 65 (1st Cir. 2004) ........................................................... 18, 19, 32

*Rosenberger v. Rector & Visitors of Univ. of Va.*.
    515 U.S. 819 (1995) ..................................................................... 12, 17, 18

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ............................................................................ 12, 37

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ................................................................................... 33

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ................................................................................... 22

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 847 (2013) ............... 37

*Shurtleff v. City of Boston*,
    596 U.S. 243 (2022) ....................................................... 17, 27, 29, 30

*Simon & Schuster, Inc. v. Members of N.Y.*,
    502 U.S. 105 (1991) ................................................................................... 18

*Speiser v. Randall*,
    357 U.S. 513 (1958) ................................................................................... 18

*Texas v. United States*,
    523 U.S. 296 (1998) ................................................................................... 33

*Trafalgar Capital Assocs., Inc. v. Cuomo*,
    159 F.3d 21 (1st Cir. 1998) ........................................................................ 35

*United States v. Am. Library Ass'n*,
    539 U.S. 194 (2003) ....................................................... 18, 19, 22, 27

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000) ................................................................................ 18

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ........................................................................... *passim*

*Wightman v. Springfield Terminal Ry.*,
    100 F.3d 228 (1st Cir.1996) ..................................................................... 4

**Statutes**

Arts, Humanities, and Museums Amendments of 1990,
    § 101, Pub. L. 101-512, 104 Stat. 1915 (Nov. 5, 1990) .............................. 2, 10

Department of the Interior and Related Agencies Appropriations Act, 1989, Pub. L.
    No. 101–121, 104 Stat. 1915 (Nov. 5, 1990) ................................................ 8

National Foundation on the Arts and the Humanities Act of 1965 (the "Act"),
    Pub. L. No. 89-209, 79 Stat. 845 (1965) (codified at 20 U.S.C. § 951 *et seq.*) ................. 4

5 U.S.C. § 706(2)(A) ....................................................................................... 4

20 U.S.C. § 951(1) ................................................................................. *passim*

20 U.S.C. § 951(2) ............................................................................ 5, 21, 25

20 U.S.C. § 951(4) ........................................................................................ 22

20 U.S.C. § 951(5) ................................................................................. *passim*

20 U.S.C. § 951(6) ................................................................................. *passim*

20 U.S.C. § 951(7) ................................................................................. *passim*

20 U.S.C. § 951(9) ........................................................................................ 22

20 U.S.C. § 951(10) ...................................................................................... 22

20 U.S.C. § 951(11) ...................................................................................... 22

20 U.S.C. § 953(a) ......................................................................................... 4

20 U.S.C. § 953(b) ................................................................................. *passim*

20 U.S.C. § 953(c) ........................................................................ 5, 22, 23, 29

20 U.S.C. § 954(b)(1) ................................................................................. 7, 20

20 U.S.C. § 954(c) ................................................................................. *passim*

20 U.S.C. § 954(d) ................................................................................. *passim*

20 U.S.C. § 954(d)(1) ............................................................................ *passim*

20 U.S.C. § 954(d)(2) ................................................................................... 14, 36

20 U.S.C. § 954(e) ........................................................................................ *passim*

20 U.S.C. § 954(f) .......................................................................................... 28, 30

20 U.S.C. § 954(h) ................................................................................. 5, 15, 28, 30

20 U.S.C. § 954(i) .................................................................................... 5, 28, 30

20 U.S.C. § 954(i)(3) ............................................................................................ 5

20 U.S.C. § 955(b) ....................................................................................... 14, 20

20 U.S.C. § 955(b)(1) ........................................................................................ 20

20 U.S.C. § 955(b)(1)(C)(i) ............................................................................... 24

20 U.S.C. § 955(c) ............................................................................................. 20

20 U.S.C. § 955(f)(1) ......................................................................................... 14

20 U.S.C. § 955(f)(2) ................................................................................... 14, 21

20 U.S.C. § 959(a) ............................................................................................. 32

20 U.S.C. § 959(a)(1) ...................................................................................... 3, 7

20 U.S.C. § 959(a)(3) ...................................................................................... 7, 20

20 U.S.C. § 959(a)(4) ...................................................................................... 7, 20

20 U.S.C. § 959(c) ............................................................................................. 14

20 U.S.C. § 959(d) ............................................................................................... 7

20 U.S.C. §951(6) ................................................................................................ 2

## Other Authorities

131 Cong. Rec. 24,808 (Sept. 24, 1985) ............................................................ 6

136 Cong. Rec. 28,620-28,677 (Oct. 11, 1990) ......................................... 6, 9, 10

136 Cong. Rec. 29,233-29,244 (Oct. 15, 1990) ............................................... 6, 9

136 Cong. Rec. 33,443-33,478 (Oct. 24, 1990) ............................................. 9, 10

143 Cong. Rec. S9328 (Sept. 17, 1997) ............................................................. 6

Antonin Scalia & Bryan Garner, Reading Law (2012) ..................................... 23

Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ...................... 15, 37

Independent Commission, A Report to Congress on the National Endowment for the
Arts (Sept. 1990), *available at, e.g.*,
https://archive.org/details/reporttocongress00inde ............................................... 6, 8, 9, 11

Nadine Strossen, Defending Pornography: Free Speech, Sex and the Fight for
Women's Rights (1995) ........................................................................................................ 6

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................ 3

**Constitutional Provisions**

U.S. Const., Art. II, § 1, cl. 1 ................................................................................................ 22

U.S. Const., Art. II, § 3 ......................................................................................................... 22

## INTRODUCTION

This case is about the scope of the National Endowment of the Arts' ("NEA") lawful power to choose which artistic projects to fund or not. The NEA is an independent federal agency created by Congress 60 years ago to be a patron of the arts. Its government character is indisputable. The NEA makes selective, partial grants for artistic projects from limited Congressional appropriations. It is staffed by federal employees. Contractors, consultants, and experts paid only by the federal government advise the NEA. A National Counsel on the Arts, comprised only by federally elected officials and Presidential appointees confirmed by the Senate, advise the NEA's Chair. And the NEA's Chair, also appointed and removable at will by the President and confirmed by the U.S. Senate, has expansive, Congressionally delegated authority to decide, alone, whether to approve NEA funding for any proposed project.

For the last 60 years, by selecting only certain projects for partial funding, the NEA has communicated a government message: "This excellent art is worthy of public and private support." It requires grantees to prominently note NEA support in all communications about and presentations of their projects. It advises potential grant recipients on their applications, sets forth a range of funding restrictions and other requirements, and its Chair has final, exclusive authority to select grantees. These activities establish that the NEA's selective funding decisions comprise government speech, even if a consequence is to promote or facilitate private speech. The arts community seeks the NEA's approval, which helps attract other funding—a primary purpose of the act authorizing the NEA. And when the public has perceived what the NEA approves as controversial, they have directed their concern to the source—Congress.

Consistent with case law developed since the Supreme Court's recognition of the government-speech doctrine in 2009,[1] when a public entity acts as the NEA does here—as a patron of the arts—it engages in government speech to which neither the First nor Fifth Amendments apply. The Court therefore should enter summary judgment in the NEA's favor and dismiss Plaintiffs' claims that the NEA's April 16, 2025, predecisional guidance, adopting aspects of

---

[1]    *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (discussed *infra* at § I).

Executive Order 14168 (the "EO"), violates the First and Fifth Amendments and, thereby, the Administrative Procedure Act ("APA").

That leaves Plaintiffs' non-constitutional APA claims, which fail for lack of subject-matter jurisdiction because the NEA's predecisional guidance is not final agency action. That guidance leaves to the NEA's Chair the details of considering the EO relative to individual applications, which the Chair will not review until at least October 2025 based on an administrative record that is not yet complete.

Even if the Court possessed subject-matter jurisdiction, it should find that Congress's broad standards for evaluating grant applications—and Congress's express delegation to the NEA's Chair to implement them—also compel summary judgment for the NEA on the Plaintiffs' claims that the NEA's predecisional guidance violates the APA by exceeding statutory authorization (Count I) and comprising arbitrary and capricious agency action (Count II).

Contrary to Plaintiffs' contentions, the standards Congress has set for NEA grant-making are not solely judgments about artistic excellence or merit, which are themselves necessarily subjective. In responding to controversy over projects funded by the NEA, Congress amended the NEA's authorizing statute in 1990 to allow the NEA to balance artistic excellence with consideration for the differing values of federal taxpayers. In amending the statute, Congress added these findings and purposes:

> [T]he Government must be sensitive to the nature of public sponsorship. Public funding of the arts and humanities is subject to the conditions that traditionally govern the use of public money. Such funding should contribute to public support and confidence in the use of taxpayer funds. Public funds provided by the Federal Government must ultimately serve public purposes the Congress defines.
> . . . .
> The arts and the humanities reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups.

20 U.S.C. §§ 951(5) & (6) (amended by Arts, Humanities, and Museums Amendments of 1990, § 101, Pub. L. 101-512, 104 Stat. 1915, 1961 (Nov. 5, 1990)).

Congress repeated the second provision above in amending Section 954(d)(1) of Title 20, which is one of two broad delegations to the NEA's Chair to operate the NEA's funding programs. *See also* 20 U.S.C. § 959(a)(1). Section 954(d)(1) states that "artistic excellence and artistic merit are the criteria by which applications are judged." That provision also incorporates the statute's objective to secure public approval for the NEA's funding decisions by allowing the Chair to "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public[.]" 20 U.S.C. § 954(d)(1) (amended by § 103, Publ. L. 101-512, 104 Stat. 1915, 1963 (Nov. 5, 1990)). These provisions both reinforce the conclusion that the NEA's selective funding decisions comprise government speech and establish that the NEA has not exceeded its statutory authority in its predecisional guidance.

Finally, Plaintiffs may disagree with the policy preferences announced by the President (in the EO) and the NEA's leadership (in its predecisional guidance). But the NEA's adoption of those policies is neither arbitrary nor capricious. It reflects a valid exercise of executive power, the consequences of a democratic election, and the lawful judgment of public officials about what policies are necessary to ensure the NEA's accountability to American taxpayers, consistent with Congressional authorization. Such judgments deserve even more deference when they pertain to the government's own expressive conduct.

## STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute is "one that must be decided at trial because the evidence . . . would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co*., 896 F.2d 5, 8 (1st Cir. 1990). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 248 (1986).

"The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc*., 456 F.3d 198, 205 (1st Cir.2006). In such circumstances, courts "resolve all factual disputes and any competing, rational inferences in the

3

light most favorable to the party against whom summary judgment has entered." *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir.1996).

"[T]he summary judgment rubric has a special twist in the administrative law context," where "summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Boston Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (cleaned up).

The Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 23 (1st Cir. 1999) (quoting 5 U.S.C. § 706(2)(A)). "The burden is on the party challenging the agency decision"—here, Plaintiffs—"to show that the arbitrary and capricious standard has been met." *Bluestone Env't Grp., Inc. v. Zapisek*, No. 3:21-cv-30056-MGM, 2022 WL 16857173, at *4 (D. Mass. Nov. 10, 2022).

The standard of review is "narrow" and "a reviewing court may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (cleaned up). "[A]gency action is presumptively valid . . . ." *R.I. Hosp. v. Leavitt*, 548 F.3d 29, 33-34 (1st Cir. 2008) (cleaned up). An agency decision need only be "rational" to "pass muster under the APA's 'arbitrary and capricious test[.]' " *Beverly Enters.-Mass.*, 174 F.3d at 24; *see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (cleaned up).

## BACKGROUND

### 1965: the NEA's genesis

Congress created the NEA through the National Foundation on the Arts and the Humanities Act of 1965 (the "Act"). Pub. L. No. 89-209, 79 Stat. 845 (1965) (codified at 20 U.S.C. § 951 *et seq.*); § 4(a), 79 Stat. at 846 (codified at 20 U.S.C. § 953(a)). The NEA's original objectives included "develop[ing] and promot[ing] a broadly conceived national policy of support . . .

for the arts." § 4(b), 79 Stat. at 846 (codified at 20 U.S.C. § 953(b)). The Act stated that the arts, "while primarily a matter for private and local initiative, is also an appropriate matter of concern to the Federal Government." § 2(1), 79 Stat. at 845 (now codified, as amended, at 20 U.S.C. § 951(2)).

In establishing the NEA as a patron of the arts, Congress granted broad authorization to the agency to impose additional requirements on grant applicants and recipients even as it precluded the NEA from managing the operations of any recipient of the government's patronage. § 4(c), 79 Stat. at 846 (codified at 20 U.S.C. § 953(c)); § 5(e), 79 Stat. at 847 (requiring aspiring grantees to submit applications under "regulations and procedures establish by the Chair[ ]") (codified, as amended, at 20 U.S.C. § 954(d) and expanded, as amended, in 20 U.S.C. § 954(i)); § 5(i), 79 Stat. at 848 (authorizing Chair to assess grantees' compliance with Act and its purposes, to suspend grants, and to demand refunds) (codified at 20 U.S.C. § 954(h) and expanded, as amended, in 20 U.S.C. § 954(i)(3)).

Under the Act, Congress further conditioned government patronage under the Act in at least two ways relevant to this matter. First, rather than indiscriminately subsize the arts, Congress instead provided for "grants-in-aid," capped at 50% of a proposed project's total cost. §§ 5(c), (f), 79 Stat. at 846, 847 (now codified, as amended, at 20 U.S.C. §§ 954(c), (e)). Second, Congress authorized funding for only selected projects—those the NEA concluded have "substantial artistic and cultural significance." § 5(c)(1), 79 Stat. at 846 (now codified, as amended, at 20 U.S.C. § 954(d)).

Congress created the NEA funding to incentivize two byproducts—the creation of more art *and* increased private and other public funding for art that the NEA chooses to fund. *E.g.*, § 2(4), 79 Stat. at 845 (codified at 20 U.S.C. § 951(5)) ("[I]t is necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of . . . the arts by local, State, regional, and private agencies . . . ."); § 2(5), 79 Stat. at 845 (codified at 20 U.S.C. § 951(7)) ("[I]t is necessary and appropriate for the Federal Government to help create

and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent[.]").

The government message conveyed by the NEA's grant selections is, "This excellent art is worthy of public and private support." This message has advanced the Act's purpose by means that have been clear to everyone, including:

- Congress,[2]

- an independent commission appointed by Congress (*see also infra* at 8-9),[3]

- a former head of the American Civil Liberties Union,[4]

---

[2]    *See, e.g.*, 143 Cong. Rec. S9328 (Sept. 17, 1997) (Sen. Bennett):

> The [NEA] is something like a "Good Housekeeping Seal of Approval" put on a local effort which allows the people who are running that local effort to then go out and do their fundraising and say, "You see what we have here is really a class operation. It's something worthy of your support, worthy of your private contributions. Look. It's good enough that the [NEA] has put their seal of approval on it."

- 136 Cong. Rec. 29,234 (Oct. 15, 1990) (Rep. Regula) (Bolan Decl., Ex. C (July 16, 2025) (ECF 24-1)) ("NEA becomes a yardstick by which the private sector often measure the value of projects. . . . [G]etting the private sector support is often predicated upon the endorsement of a project by NEA. ");

- 136 Cong. Rec. 28,638 (Oct. 11, 1990) (Rep. Armey) (Bolan Decl., Ex. B (ECF 24-1)) ("Throughout last summer's debate, many outside Congress who opposed content restrictions on NEA grants argued that Federal grants were important because they constitute a stamp of approval that enables an artist to received greater funding in the private sector.");

- 131 Cong. Rec. 24,808 (Sept. 24, 1985) (Rep. Jeffords) ("[S]upport from the Endowments [of Arts and of Humanities] has always represented a 'Good Housekeeping Seal' of approval which has helped grantees generate non-Federal dollars for projects. . . .").

[3]    Independent Commission, A Report to Congress on the National Endowment for the Arts, at 34-37 (Sept. 1990), *available at, e.g.*, https://archive.org/details/reporttocongress00inde (Bolan Decl., Ex. A (ECF 24-1)) (hereafter "Report"); *id.* at 35 ("The [NEA] has played a significant role both as a catalyst for the growth of the arts and for financial contributions to them."); *id.* ("The reliance of the NEA on matching grants has proven highly effective in stimulating private support and public interest in the arts.").

[4]    Nadine Strossen, Defending Pornography: Free Speech, Sex and the Fight for Women's Rights 103 (1995) (quoted in Br. of Amici Curiae of Volunteer Lawyers for the Arts and Various Arts Organizations in Support of Resps. at *18 n.9, *Nat'l Endowment for the Arts v. Finley*, No. 97-371, 1998 WL 47264 (Feb. 6, 1998)) ("Support from the NEA has served as a seal of approval for art, which in the past had been seen as a 'safe' investment or contribution for conservative corporate and individual donors.").

- and even two of the Plaintiffs in this case.[5]

The NEA's seal of approval is more than a metaphor. Since at least 1999, the NEA has required grant recipients to display prominently and across a winning project's promotion and materials the NEA's logo and a statement that the NEA had selected that project for funding:

> Recipients must acknowledge, in a prominent manner, the Endowment's support in all materials and announcements, both audio and visual, regarding this award. (e.g., "This project is supported in part by an award from the National Endowment for the Arts.") Recipients must also display, in a prominent manner, the National Endowment for the Arts' logo in association with the acknowledgment . . . .

NEA, General Terms & Conditions for Grants and Cooperative Agreements to Organizations, at 4-5 (1999) (Beattie Decl., Ex. A (July 15, 2025) (ECF 25-1); Beattie Decl. ¶¶ 3-4; NEA, General Terms & Conditions for Federal Financial Assistance Awards to Organizations, at 6-7 (Nov. 2024) (ECF 11-1, Ex. B).

Under the Act, Congress broadly delegated operation of this patronage program, the power to issue regulations to advance it, and final and exclusive decisionmaking on all grant applications to the NEA's Chair, who has always been selected by and reports to the President. §§ 5(e), 6(b), 7(b)(1), 9(b), 10(a)(1) & (b), 79 Stat. at 847, 849, 851-53 (codified and amended at, *e.g.*, 20 U.S.C. §§ 954(b)(1), (c), (d), 959(a)(1) & (d)); *see also* 20 U.S.C. §§ 959(a)(3) & (4) (authorizing Chair to hire federal employees, consultants, and experts to carry out the agency's work). Because the Act, even as amended in 1990, has never included provisions protecting the Chair from removal, the Chair serves "at the President's pleasure." *See, e.g., Collins v. Yellen*, 594 U.S. 220, 248 (2021).

---

[5]     Byrd Decl. ¶ 19 (Mar. 5, 2025) (ECF 2-5) (Exec. Dir. of Pl. The Theater Offensive) ("[T]he prestige of receiving an NEA grant . . . can provide opportunities for new funding possibilities."); *Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F. Supp. 774, 783 (C.D. Cal. 1991) (" '[M]ost non-federal funding sources regard the NEA award as an imprimatur that signifies the recipient's artistic merit and value. NEA grants lend prestige and legitimacy to projects and are therefore critical to the ability of artists and companies to attract non-federal funding sources.' ") (quoting amicus brief of (Plaintiff here) Theater Communications Group).

**1989-1990: Public controversy, the Independent Commission, and the Act's amendment**

Congress clarified the NEA's purpose and authority following controversy about its funding decisions. *E.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 574 (1998). In 1989, two organizations used NEA funding to exhibit the work of Robert Mapplethorpe and Andres Serrano. *E.g.*, *id.* at 574; Report at 39. In 1990 appropriations for the NEA's budget, Congress deducted the amount spent on those exhibitions, prohibited funding for "obscene" projects, and created an Independent Commission (in the *Finley* Court's words) "to review the NEA's grant-making procedures and assess the possibility of more focused standards for public arts funding." 524 U.S. at 574-75; Department of the Interior and Related Agencies Appropriations Act, 1989, Pub. L. No. 101–121, 104 Stat. 1915 (Nov. 5, 1990).

The Independent Commission made four findings and recommendations relevant to this case. First, the Commission found that arts grant-making "is not an objective activity." Report at 19. Second, it recommended that Congress increase public confidence in the NEA as a patron of the arts by allowing the NEA to consider factors "beyond artistic excellence." *Id.* at 57; *id.* at 19, 40, 57, 61.[6] Third, the Commission recommended revising the Act's purposes to clarify that the government "must be sensitive to the nature of public sponsorship." *Id.* at 60; *id.* at 59, 60.[7]

---

[6]    Report at 19 ("From the grant advisory panels through the National Council to the Chairperson, who has the authority to make final decisions, prudence and a sensitive awareness of the shifting tenor and tastes of society are required."); *id*. at 40:

> To balance freedom and accountability is a complex challenge and no precise code can be devised to achieve a balance but this is no reason to abandon the effort. . . . The Commission . . . commends to Congress, the Endowment and the American people the importance of cooperative efforts to strengthen the Endowment and assure confidence in its activities.

*Id.* at 57 ("But to support art from public funds entails considerations that go beyond artistic excellence. Publicly funded art must take into account the conditions that traditionally govern the use of public money."); *id*. at 61 (describing proposed statutory language that "should act to strengthen, not to weaken, public confidence in its prudence and sensitivity as a steward of public funds" and adding, "If the [NEA] loses the trust and support of the American people, it will have failed.").

[7]    Report at 59 (recommending that Congress "make clear that the arts belong to all the people of the United States"); *id*. ("The preamble should also affirm that the Endowment depends upon the expenditure of public funds and that it must take into account the nature of public sponsorship."); *id*. at 60 (recommending that the statute also include language "that the arts . . . reflect

Fourth, the Commission recommended procedural reforms to increase the NEA's public account-ability, including to emphasize and increase the scope of the Chair's final decisionmaking authority, *id.* at 63-65; and to modify the role of advisory panels, *id.* at 65-68, 71-77.

The Commission also convened a Legal Task Force of constitutional lawyers, who offered views reflecting their understanding of the law in 1990. *Id.* at 83-87, 88-91. Their primary concern was about whether and how the NEA might ban funding of work considered "obscene." *Id.* at 83-84, 88-89. They discouraged adding other content-based restrictions on funding, which they speculated could be unconstitutional. *Id.* at 85-86, 89-90. Nevertheless, one of those lawyers (now Professor Michael McConnell of the Stanford Law School) proposed incorporating "additional criteria for selection . . . perhaps as part of a definition of 'artistic excellence' . . . . It is better to treat all these factors as aspects of the ultimate aesthetic judgment by the NEA rather than to make the additional factors, whatever they may be, absolute prohibitions." *Id.* at 89-90 (quoting McConnell) (cleaned up).

With the benefit of the Report, the U.S. Congress debated proposed amendments to the Act in fall 1990. 136 Cong. Rec. 28,620-28,677 (Oct. 11, 1990) (House) (Bolan Decl., Ex. B (ECF 24-1)); 136 Cong. Rec. 29,233-29,244 (Oct. 15, 1990) (House) (Bolan Decl., Ex. C); 136 Cong. Rec. 33,443-33,478 (Oct. 24, 1990) (Senate) (Bolan Decl., Ex. D). Many Members of Congress noted that artists had every right to create art on their own. Many Members also expressed their view that NEA grant-making should omit content restrictions.

The concern that promoted amendments to the Act, however, was the NEA's selection of controversial art for grants-in-aid and Congress's perception that NEA funding needed to respect taxpayers' concerns lest it lose their support.[8] Congress considered three legislative options—

---

the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups").

[8]    *E.g.*,

- 136 Cong. Rec. 28,622 (Oct. 11, 1990) (Bolan Decl., Ex. B) (Rep. Pashayan) ("No one is censoring anything. Artists have the unfettered right, under the first amendment, freely to express themselves.");

(1) virtually eliminate the NEA; (2) categorically prohibit funding for certain projects based on their content; or, as Professor McConnell proposed, (3) adding considerations of public support to "artistic excellence." *E.g.*, *Finley*, 524 U.S. at 576.

As the *Finley* Court noted, Congress adopted the third option by adding language that now appears in Section 954(d)(1) that allows the Chair to "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 576; Arts, Humanities, and Museums Amendments of 1990, § 103(b), Pub. L. No. 101-512, 104 Stat. 1915, 1963-64 (Nov. 5, 1990) (hereafter, the "Amendments") (codified at 20 U.S.C. § 954(d)(1)); *see also* 524 U.S. at 591 (Scalia, J., concurring in judgment) ("One can regard this as either suggesting that decency and respect are elements of what Congress regards as artistic excellence and merit, or as suggesting that decency and respect are factors to be taken into account in addition to artistic excellence and merit.").

---

- *id.* at 28,627 (Rep. Gaydos) ("[T]he compromise proposal comes to terms with a base principle for the National Endowment—that it must be sensitive to public sponsorship. The National Endowment is, after all, a creation of the American public. It must reflect that public view.");

- *id.* at 28,639 (Rep. Rohrabacher) ("[T]he people are permitted in this country, because we do believe in freedom of speech, a broad freedom to express their views, to express their creative talents, but that when it comes to the Federal tax dollars, that we have a right to set a standard. That makes common sense.");

- *id.* at 28,649 (Rep. Crane) ("Finite resources necessitate selectivity which, in turn, requires standards. These standards are set by a presidentially appointed panel and naturally reflect the tastes of Government.");

- *id.* at 28,652 (Rep. Shumway) ("[S]carce Federal dollars must be prudently prioritized. . . . Considering that the money used is the people's money, the strings attached are appropriate.");

- 136 Cong. Rec. 33,456 (Oct. 24, 1990) (Bolan Decl., Ex. D) (Sen. Grassley) ("[T]he real focus of this amendment is restricting tax dollars, not restricting art. Artists can do with private funding whatever they like. . . . Congress established the NEA . . . to promote the arts and to encourage appreciation of the arts throughout the country. This function of the NEA does not require funding projects which stretch the boundaries of public tolerance.");

- *id.* at 33,474, 33,475 (Sen. McClure) ("[P]eople hurt public support for the arts by refusing to recognize that the taxpayers have some rights to tell us what they believe with respect to the expenditure of their money. . . . When you destroy public acceptance of the result . . . you must inevitably reduce public support . . . if the taxpayers rebel.").

In the Amendments, Congress also re-wrote the Act's declaration of findings and purpose. Echoing the Independent Commission, Report at 59, Congress added the statement, "The arts . . . belong to all the people of the United States." § 101, 104 Stat. at 1961 (codified at 20 U.S.C. § 951(1)). The Amendments then added language to Section 951(5) (*i.e.*, what is quoted below) and a new Section 951(6)—respectively:

> [T]he Government must be sensitive to the nature of public sponsorship. Public funding of the arts and humanities is subject to the conditions that traditionally govern the use of public money. Such funding should contribute to public support and confidence in the use of taxpayer funds. Public funds provided by the Federal Government must ultimately serve public purposes the Congress defines.
> . . . .
> The arts and the humanities reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups.

§ 101, 104 Stat. at 1961 (codified at 20 U.S.C. §§ 951(5), (6)).

**The Supreme Court's 1998 *Finley* decision**

A group of artists sued the NEA in federal court to facially challenge the validity of Section 954(d)(1) under the First and Fifth Amendments. In *Finley*, the Supreme Court rejected their challenges for three reasons relevant to this case.

First, the Court noted that Section 954(d)(1) "imposes no categorical requirement," 524 U.S. at 581, which undermined the artists' contention that the NEA would "inevitably . . . utilize[ ] [the provision] as a tool for invidious viewpoint discrimination." *Id.* at 582.

Second, the Court concluded that Section 954(d)(1)'s "decency and respect" language was no less subjective than the same provision's "artistic excellence" standard, *id.* at 583-84, whose necessary subjectivity the Court found constitutionally sound. *Id.* at 585-86 ("The 'very assumption' of the NEA is that grants will be awarded according to the 'artistic worth of competing applicants,' and absolute neutrality is simply 'inconceivable.' ") (quoting *Advocates for the Arts v. Thomson*, 532 F.2d 792, 795-96 (1st Cir.), *cert. denied*, 429 U.S. 894 (1976)). To support this conclusion, the *Finley* Court relied, in turn, on two of its precedents: *Regan v. Taxation with*

*Representation of Wash.*, 461 U.S. 540 (1983), and *Rust v. Sullivan*, 500 U.S. 173 (1991). As the *Finley* Court observed, those precedents authorize the government—in the context of selective subsidies—to pick and choose funding winners and losers without requiring neutrality.[9]

Validating the necessary subjectivity of the NEA's funding decisions, the *Finley* Court also distinguished *Rosenberger v. Rector and Visitors of University of Virginia*. 515 U.S. 819 (1995). There, as summarized in *Finley*, the Court concluded that the University's student activities fund created a limited public forum from which the University could not exclude publications with religious viewpoints. 524 U.S. at 586 (citing *Rosenberger*, 515 U.S. at 837). The *Finley* Court noted that the "scarcity" of government funding was common to both the NEA and the funding at issue in *Rosenberger*. *Id.* The distinguishing difference in the NEA's case was that its "mandate is to make esthetic judgments" as a patron of the arts, rather than, as in *Rosenberger*, to make "comparably objective decisions on allocating public benefits" to "all student organizations" related to the University's educational mission. *Id.* (quoting and citing *Rosenberger*, 515 U.S. at 834).

Third, the *Finley* Court rejected the artists' Fifth Amendment vagueness claim "[i]n the context of selective subsidies." *Id.* at 589. The Court concluded that, "Section 954(d)(1) merely adds some imprecise considerations to an already subjective selection process." *Id.* at 590.

In dicta, the *Finley* majority and Justice Scalia, concurring in the judgment (and joined by Justice Thomas), expressed two different views on a hypothetical. The *Finley* majority elliptically opined, "If the NEA were to leverage its power to award subsidies on the basis of

---

[9]     524 U.S. at 587-88 (citing *Regan*, 461 U.S. at 549; 20 U.S.C. § 951(5)) ("[T]he Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake. So long as legislation does not infringe on other constitutionally protected rights, Congress has wide latitude to set spending priorities."); *id.* at 588 (quoting *Rust*, 500 U.S. at 193; citation omitted):

> And as we held in *Rust*, Congress may "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." In doing so, "the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other."

subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case." *Id.* at 587. In the same scenario, Justice Scalia perceived no constitutional issue. *Id.* at 595-99. Reading *Regan* and *Rust* more broadly than the Court's majority, *id.* at 597-98, Justice Scalia concluded,

> It is the very business of government to favor and disfavor points of view on (in modern times, at least) innumerable subjects—which is the main reason we have decided to elect those who run the government, rather than save money by making their posts hereditary. And it makes not a bit of difference, insofar as either common sense or the Constitution is concerned, whether these officials further their (and, in a democracy, our) favored point of view by achieving it directly (having government-employed artists paint pictures, for example, or government-employed doctors perform abortions); or by advocating it officially (establishing an Office of Art Appreciation, for example, or an Office of Voluntary Population Control); or by giving money to others who achieve or advocate it (funding private art classes, for example, or Planned Parenthood). None of this has anything to do with abridging anyone's speech.

*Id.* at 598 (footnote omitted).

**The NEA's selective, partial grant-making process**

In February 2025, NEA published on its website the details of its Grants for Arts Projects ("GAP") program for fiscal year ("FY") 2026. ECF 2-2, Ex. 1.[10] GAP is the only NEA grant program at issue in this case. *E.g.*, ECF 15 ¶ 35. This publication describes the NEA's current, selective, grantmaking procedures and GAP program terms.

In a typical GAP round, NEA denies funding for more than half of all proposed projects, and it anticipates a similar outcome for the FY 2026 cycle, pending the availability of appropriations. ECF 2-2, Ex. 1 at 4. And GAP funding for any winning project is limited. GAP funds only arts "projects"—a word used more than 240 times in the NEA's notice—"with specific, definable activities." *Id.* at 9 & *generally*; 20 U.S.C. § 954(c). GAP does not fund an applicant's general operations or full season of programming. ECF 2-2, Ex. 1 at 6. Typically, GAP awards may not exceed 50 percent of a project's costs. 20 U.S.C. § 954(e). And the funding of a winning

---

[10]    The same document is in the Administrative Record of the NEA's predecisional guidance. ECF 19, Ex. 8.

project is typically between $10,000 to $100,000, contingent on Congressionally appropriated funds (none of which have been appropriated for FY 2026). ECF 2-2, Ex. 1 at 4; Beattie Decl. ¶ 5 (ECF 25-1).

Once applicants have submitted their applications, NEA staff first check them for "completeness and eligibility." ECF 2-2, Ex. 1 at 25. Program eligibility requirements include limits on (among other things) artistic disciplines, *id.* at 6-8; specific project activities and costs, *id.* at 10-11; 20 U.S.C. § 954(e); applicant type (*e.g.*, no individuals), *e.g.*, ECF 2-2, Ex. 1 at 13; and number of applications (typically one per calendar year), *id*. at 15.

Different NEA personnel then take three separate, sequential steps. First, advisory panelists, convened by artistic discipline and including "arts experts," evaluate eligible applications. Those advisory panels submit their recommendation on all projects for subsequent review by the National Council on the Arts (the "Council"). 20 U.S.C. § 959(c); ECF 2-2, Ex. 1 at 25-26. Second, the Council's voting members re-evaluate all applications and submit their recommendations to the Chair. The Council includes the Chair; six members of Congress (who lack any vote); and another 18 members—all appointed by the President and confirmed by the Senate—who include both private citizens and arts professionals. 20 U.S.C. § 955(b). Traditionally, concerning the NEA's first of two GAP funding cycles, the Council does not review and make recommendations on project applications until the end of the third week of October. Beattie Decl. ¶ 8 (ECF 25-1). Third, the Chair alone "has final authority to approve each application . . . ." 20 U.S.C. § 955(f)(2). The Chair may not select applications that the Council has recommended denying. *Id.*; ECF 2-2, Ex. 1 at 23, 26. The Chair's review of proposed projects follows shortly after the Council has made its recommendations. Beattie Decl. ¶ 8 (ECF 25-1).

Throughout these steps, the mandatory, affirmative review criteria are "artistic excellence" and "artistic merit," which are weighted equally. ECF 2-2, Ex. 1 at 25. *E.g.*, 20 U.S.C. §§ 954(d)(1), 955(f)(1), 959(c). No project "determined to be obscene" may receive funding. 20 U.S.C. § 954(d)(2). The permissive criteria are "general standards of decency and respect for the diverse beliefs and values of the American public[.]" 20 U.S.C. § 954(d)(1). As the *Finley*

Court recognized, these criteria necessarily implicate "content-based considerations" that inevitably result in "denying money to a large amount of constitutionally protected expression." 524 U.S. at 585 (cleaned up).

The earliest that the NEA will notify applicants for FY 2026 funding (or denial of funding) will be December 2025. ECF 2-2, Ex. 1 at 5, 23. Through an Assurance of Compliance, which applicants must certify, the NEA reserves its rights to ensure that grant recipients comply with the terms of the NEA's awards. ECF 11-1, Ex. A at 10; 20 U.S.C. § 954(h).

**EO 14168**

On January 20, 2025, President Trump issued Executive Order 14168. 90 Fed. Reg. 8615 (Jan. 20, 2025) (again, the "EO") (ECF 19, Ex. 9). The EO instructs federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology," EO § 3(g), subject to the legal authority granted to agency decisionmakers and "consistent with applicable law," EO §§ 8(a)(i) & (b).

On February 6, 2025, the NEA updated its Assurance of Compliance to ask GAP applicants to certify their compliance with the EO. ECF 10 ¶ 6. On March 6, 2025, Plaintiffs sued the NEA in this Court to challenge the certification requirement and the use of the EO in evaluating GAP applications. ECF 1. On March 11, 2025, the NEA rescinded the certification requirement as to the EO. ECF 10 ¶ 8.

In a memorandum dated March 17, 2025, the NEA took two further steps. ECF 11-1, Ex. C. First, it "rescinded all implementation of the EO." *Id.* at 1. Second, it initiated a "new evaluation of the EO." *Id*. The March 17 Memorandum set two deadlines—one for this new administrative process (April 16, 2025), a second to disclose its outcome (April 30, 2025). *Id.* at 2.

**The NEA's April 16, 2025, predecisional guidance**

The NEA met those deadlines. The NEA's April 16, 2025, predecisional guidance does not conclusively decide the merit of any application. It includes six salient features.

First, the NEA construed the EO to require compliance only to the extent permitted by law. *E.g.*, ECF 17-1 at 1 ("The EO requires executive agencies to take all necessary steps, as

permitted by law, to ensure that agency funds are not used to promote gender ideology."); *id.* at 2, 8. Second, the NEA rejected a categorical application of the EO, and opted instead for a case-by-case review that only the Chair will conduct and concerning only proposed projects "and not any other activities [applicants] may conduct." *Id.* at 1-3, 6-8. Third, the NEA excluded the EO from its certification requirements. *Id.* at 1, 6, 8.[11] Fourth, the NEA concluded—based on the Act, *Finley*, and other applicable legal authorities—that the Chair may "make content-based judgments" and thereby implement the EO. *Id.* at 5, 6. Fifth, the NEA re-affirmed its "historical[ ] . . . preference for certain projects, which often reflect administration priorities." *Id.* at 5; ECF 2-2, Ex. 1 at 6-7. Finally, the NEA concluded that its grant-making selections constitute government speech. ECF 17-1 at 6-7.

Over its continuing objections, ECF 17 & 21, the NEA responded to discovery the Court ordered. Text Order (June 4, 2025). The NEA re-affirmed the statements in its predecisional guidance that make clear (a) the NEA's adoption of the EO would not disqualify any applicant from funding consideration, and (b) only the Chair would consider whether a given project might "promote[ ] gender ideology." ECF 21 at 1-2. The NEA also stated, "If the NEA Chair concludes that a proposed project 'promotes gender ideology,' that factor could weigh against the project's final approval." *Id.* at 2.

---

[11]    Plaintiffs contend that the NEA resurrected this certification requirement, despite the express language of the NEA's predecisional guidance, by presenting a general statement on its website that,

> In addition, the applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:
>
> • The applicant will comply with all applicable Executive Orders while the award is being administered. Executive orders are posted at whitehouse.gov/presidential-actions.

ECF 22-2, Ex. 1 at 11. The NEA has edited its Assurance of Compliance webpage to make even clearer that the more specific language of its predecisional guidance controls over the general statement about Executive Orders. Beattie Decl. ¶¶ 6-7 (ECF 25-1); Beattie Decl., Ex. B at 11 (adding to language quoted immediately above, "However, all compliance with EO 14168 is governed exclusively by the NEA's predecisional guidance concerning that EO, and not by the terms of these Assurances.").

**ARGUMENT**

I.   **Because the NEA's selection of arts projects for partial funding is government speech, Plaintiffs' First Amendment claim fails.**

The Supreme Court set forth the elements to identify whether contested speech is the government's—and, therefore, not subject to the First Amendment[12]—in its 2009 decision in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009). And the Court most recently set forth the principles of the government-speech doctrine in its 2022 opinion in *Shurtleff v. City of Boston*:

> When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say. . . . The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks.

596 U.S. 243, 251-52 (2022).

In concluding that the contested speech in *Summum* was the government's—and in assessing the facts of subsequent cases—the Court has typically relied on three principal factors to identify whether the government was speaking and to avoid allowing the government-speech doctrine to act as "a subterfuge for favoring certain private speakers over others based on viewpoint." 555 U.S. at 473; *see also, e.g.*, *Shurtleff*, 596 U.S. at 252; *Matal v. Tam*, 582 U.S. 218, 234-39 (2017) 20 U.S.C. §; *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209-214 (2015). **First**, the Court has considered the history of the expression at issue and whether it has traditionally been a means by which the government has spoken to the public. *E.g.*, *Summum*, 555 U.S. at 470. **Second**, the Court has considered the public's perception of the speaker's identity. *E.g.*, *id.* at 472. **Third**, the Court has assessed the government's control over the message. *E.g.*, *id*. at 471-72.

---

[12]   *See also, e.g.*, *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny."); *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 n.7 (1973) (Stewart, J., concurring) ("Government is not restrained by the First Amendment from controlling its own expression."); *cf. Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view[.]"); *cf. Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("[The government] is entitled to say what it wishes.").

Each of these three government-speech factors, set forth in the following subsections, establishes that the NEA's grantmaking decisions are government speech, precluding Plaintiffs' constitutional claims. The evidence advancing these factors also makes this case distinguishable from First Amendment precedents, all pre-dating *Summum*, on which Plaintiffs rely but that arise in entirely different contexts—*e.g.*, where the relevant government program:

- provides generally available (*i.e.*, not selective) subsidies,[13]

- directly regulates speech,[14] or

- where the government did not claim to be speaking.[15]

---

[13]    *See*:

- *Legal Servs. Corp. v. Velasquez*, 531 U.S. 533 (2001) (cited in ECF 22-1 at 7); *id*. at 542 ("[T]he [Legal Services Corp. ("LSC")] program was designed to facilitate private speech, not to promote a governmental message. Congress funded LSC grantees to provide attorneys to represent the interests of indigent clients."); *see also United States v. Am. Library Ass'n*, 539 U.S. 194, 213 (2003) ("In *Velazquez*, the Court concluded that a Government program of furnishing legal aid to the indigent differed from the program in *Rust* in the vital respect that the role of lawyers who represent clients in welfare disputes is to advocate against the Government, and there was thus an assumption that counsel would be free of state control.") (quoting 531 U.S., at 542-543; cleaned up);

- *Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983) (cited in ECF 22-1 at 9); *id*. at 576 ("This case presents the question of a State's power to impose a special tax on the press and, by enacting exemptions, to limit its effect to only a few newspapers.");

- *Speiser v. Randall*, 357 U.S. 513 (1958) (cited in ECF 22-1 at 9); *id*. at 514-15 (assessing property-tax exemption contingent on taxpayer's oath not to overthrow the government of the United States or California).

[14]    *See*:

- *United States v. Playboy Ent. Grp.*, 529 U.S. 803 (2000) (cited and quoted in ECF 22-1 at 7); *id*. at 806 (evaluating Telecommunication Act of 1996's technological requirements to limit exposure of sexually oriented programming to children);

- *Simon & Schuster, Inc. v. Members of N.Y.*, 502 U.S. 105 (1991) (cited and quoted in ECF 22-1 at 8, 9); *id*. at 108 (assessing state statute forcing into escrow "accused or convicted criminal's income from works describing his crime" to compensate crime victims and creditors);

- *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65 (1st Cir. 2004) (cited in ECF 22-1 at 8); *id*. at 69 (assessing public transit system's restrictions on proposed advertising);

- *McGuire v. Reilly*, 386 F.3d 45 (1st Cir. 2004) (quoted in ECF 22-1 at 8); *id*. at 48 (evaluating challenge to "state law regulating speech and activities within a buffer zone around health care facilities which perform abortions");

[15]    *See:*

- *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (cited and/or quoted in ECF 22-1 at 7, 9); *id*. at 841 ("The [public] University has taken pains to

Plaintiffs' claims also turn on a mistaken understanding of what speech is at issue. Plaintiffs contend the relevant speech is conveyed by each individual project and the people who present them. But this case is not about the right to present projects; it is about something else: the funding and recognition that the NEA's selection conveys. That selection reflects only government speech. Disappointed applicants for NEA funding may still present any work of art, hire anyone, and espouse any mission that they wish. Regardless of the NEA's funding decisions, no private speech is infringed.

### A. The NEA has historically spoken (for 60 years) by selecting arts projects as worthy of public and private support.

Since *Summum*, multiple courts have held, as a general proposition, that government patronage of the arts reflects a historical tradition of government speech.[16] Contrary to Plaintiffs'

---

disassociate itself from the private speech involved in this case."); *id.* 823-24, 834-35 (same); *see also Finley*, 524 U.S. at 586 (distinguishing *Rosenberger*);

- *Ridley*, 390 F.3d at 83 (cited in ECF 22-1 at 8); *id.* at 81-82 ("Nor was the MBTA adopting its own program to inform the public about issues . . . .").

[16]   *See*:

- *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1336 (11th Cir. 2023) (city's removal of one work of art from city art exhibition was government speech) ("Even assuming, as plaintiffs contend, that artistic expression has historically been used for private speech more often than government speech, this does not negate the government's own long historical use of artistic expression to convey messages.");

- *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (city's Commission on the Arts and Humanities rejection of plaintiff's proposed design for public art exhibition was government speech) ("[T]he Commission spoke when it determined which elephant and donkey models to include in the exhibition and which not to include.");

- *Raven v. Sajet*, 334 F. Supp. 3d 22, 31-32 (D.D.C. 2018) (National Portrait Gallery's refusal to exhibit plaintiff's portrait of then-President-elect Donald Trump was government speech) ("[T]he National Portrait Gallery has historically communicated messages from the government, in the sense that it compiles the artwork of third parties for display on government property.");

- *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 248 (D.D.C. 2017) (removal of a constituent's painting displayed among other winners of Congressional art competition was government speech) ("Plaintiffs contend . . . that 'support for art' is not specific enough to constitute a government 'message.' . . . . But certainly the federal government has traditionally acted as an arts patron, which does convey a kind of message about the government's support for art—or at least the art the government chooses to sponsor.") (cleaned up) (citing *Am. Library Ass'n*, 539 U.S. at 204-05 (plurality op.); *Finley*, 524 U.S. at 586 (1998); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998); *Gittens*, 414 F.3d at 30).

contentions, ECF 22-1 at 12 n.2, the NEA is not relying solely on these precedents to defeat Plaintiffs' First Amendment claim.

The plain language of the Act, its 1990 Amendments, and their legislative history as well as the NEA's operation of its GAP program only reinforce the NEA's longstanding message: recipients of NEA funding have produced excellent art meriting public and private support. And it is the NEA's selection of proposed projects for partial federal funding that has historically constituted the government's expression. *See, e.g.*, *Little v. Llano Cnty.*, 138 F.4th 834, 837 (5th Cir. 2025) (*en banc*); *supra* n.16. The following evidence compels this conclusion.

First, since 1965, Congress has neither directly subsidized the arts nor provided non-discretionary grants to the arts through periodic appropriations. Instead, Congress created an intermediary—the NEA, an independent, federal bureaucracy—to administer a selective, grant-in-aid program. Everyone who works for the NEA in evaluating grants—federal employees, contractors, and consultants, including the members of any arts panel that evaluates projects—is paid by the government. *See supra* at 1, 7, 14; *e.g.*, 20 U.S.C. §§ 953(b), 954(d), 959(a)(3) & (4).

Second, not only is the NEA a federal bureaucracy, Congress made it directly and expressly accountable to the two political branches of the federal government. *E.g.*, 20 U.S.C. §§ 954(b)(1), (c), (d), 955(b), (c). The President appoints and the Senate confirms the NEA's final decisionmaker, the Chair, as well as all voting members of the National Council of the Arts. 20 U.S.C. §§ 954(b)(1), 955(b)(1). Had Congress wished to insulate the NEA from any political considerations (as Plaintiffs erroneously contend, *e.g.*, ECF 22-1 at 12), it would not have embedded so many political appointees and elected officials in and at the very top of the NEA's bureaucracy.

Third, Congress expressly empowered this politically accountable federal bureaucracy to make selective and subjective judgments about which projects to fund and which not to fund. *E.g.*, 20 U.S.C. §§ 951(1), (5), (6), 954(d)(1). That selective decisionmaking inevitably reflects only government decisionmaking, not the speech of any private person. *See e.g.*, *Moody v.*

*NetChoice, LLC*, 603 U.S. 707, 728 (2024) ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others.").

And 35 years ago, Congress amended the Act to make it even clearer that the Chair, who has "has final authority to approve each application," 20 U.S.C. § 955(f)(2), may select winning projects relative to her judgment about which will "foster[ ] . . . mutual respect for the diverse beliefs and values of all persons and groups," 20 U.S.C. § 951(6), by "consider[ing] general standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. § 954(d)(1). Congress added this language to make the NEA even *more* responsive to taxpayers, not less so. *See also* 20 U.S.C. §§ 951(1), (5). This statutory language makes explicit the NEA's authority to advance two objectives that may be in tension with one another—to recognize artistic excellence and to promote public accountability.

Finally, the product of all these efforts is—by express statutory design as well as practical operation—to provide the government's seal of approval on certain projects to encourage, in turn, increased private funding for the arts. *See, e.g.*, *supra* at 1, 4-7 & nn.2-5. The NEA provides grants-in-aid to invite equal or greater private support for specified projects. *E.g.*, 20 U.S.C. §§ 951(2), (5), (7), 953(b), 954(c), (e); ECF 22, Ex. 1 at 4, 6, 9. And it is the selection of proposed projects for funding by which the NEA—and the NEA alone—speaks, through an actual seal of approval displayed on selected projects. Beattie Decl., Ex. B at 4-5 (ECF 25-1); ECF 11-1, Ex. B at 6-7.

The government message is simple: recipients of NEA funding have proposed excellent projects, and those projects merit funding from other public and private sources, too. *See, e.g.*, *Little*, 138 F.4th at 837 ("What the library is saying is: 'We think these books are worth reading.' "); *id.* at 854 ("[A public museum's] message is: 'These works are worth viewing.' "); *see also Pulphus*, 249 F. Supp. 3d at 250 ("[I]t is the exercise of editorial discretion in the selection and presentation of the artwork that constitutes the government's expressive conduct; the government 'does not necessarily endorse the specific meaning that any particular donor sees in the

[donated work of art].' ") (quoting *Summum*, 555 U.S. at 474-77; citing also *Am. Library Ass'n*, 539 U.S. at 204-05; *Gittens*, 414 F.3d at 28).

Plaintiffs make three arguments to try to show that NEA's historical mission has been only to facilitate private speech. None is availing.

First, Plaintiffs assert that Congress crafted the Act to avoid promoting a particular political or governmental message. ECF 22-1 at 12-14. This argument, however, ignores the NEA's undeniable character as a federal bureaucracy, run by a Presidentially appointed and Senate-confirmed Chair, advised by similarly politically accountable members of the Council, and staffed entirely by federally compensated public employees, consultants, and contractors. By design, the work of a federal administrative agency reflects the policy preferences of the party in power. *Cf. Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.' ") (quoting U.S. Const., Art. II, § 1, cl. 1; *id*. § 3).

Plaintiffs' argument, moreover, ignores the balancing act that Congress clarified in the 1990 Amendments. 20 U.S.C. §§ 951(1), (5), (6), 954(d)(1); *Finley*, 524 U.S. at 591 (Scalia, J., concurring in the judgment) ("One can regard [Section 954(d)(1)] as either suggesting that decency and respect are elements of what Congress regards as artistic excellence and merit, or as suggesting that decency and respect are factors to be taken into account in addition to artistic excellence and merit.").

The balance that the 1990 Amendment requires, moreover, appears in the Act's delegation of rulemaking to a single official—the NEA's Chair. 20 U.S.C. § 954(d). In striking that balance, the statutory language that the Plaintiffs cite as evidence that Congress wished to promote only private speech and only artistic excellence—ECF 22-1 at 12-14 (citing 20 U.S.C. §§ 951(1), (4), (6), (7), (9), (10), (11), 953(b) & (c))—must be read in conjunction with Section 951(5), which Plaintiffs do not cite and that Congress also amended in 1990, to add the language in bold below:

> It is necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities and the arts by local, State, regional, and private agencies and their organizations. **In doing so, the Government must be sensitive to the nature of public sponsorship. Public funding of the arts and humanities is subject to the conditions that traditionally govern the use of public money. Such funding should contribute to public support and confidence in the use of taxpayer funds. Public funds provided by the Federal Government must ultimately serve public purposes the Congress defines**.

Whether these values conflict with "artistic excellent" or not, the NEA Chair may consider and balance them in making her subjective judgments. 20 U.S.C. §§ 951(1), (5), (6), 954(d)(1). And the statutory values Plaintiffs prefer cannot take precedence over these more specific statutory terms. *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general. . . . The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one.") (cleaned up); Antonin Scalia & Bryan Garner, Reading Law 183 (2012) ("If there is a conflict between a general provision and a specific provision, the specific provision prevails . . . .").

Second, Plaintiffs contend that Congress intended to insulate the NEA from political pressures by precluding "federal supervision or control over the policies, personnel, or operations of grant recipients," 20 U.S.C. § 953(c), and requiring a multilayer review process operated by personnel "interested or expert in the arts, not politics," ECF 22-1 at 14. These provisions do not defeat the Chair's authority or suggest that the government is not speaking. They reflect Congress's choice that the NEA operate only as a public patron of the arts, not as a public regulator of arts organizations. The NEA's predecisional guidance—by focusing solely on the funding of projects and nothing else, ECF 17-1 at 3—is consistent with this limitation.

The "multilayer review" of the NEA evaluation process also reinforces the NEA's grant selections as government speech, rather than undermines it. Had Congress intended "artistic excellence" alone to inform decisionmaking, then it surely would not have allowed for a

Presidential appointee to run the entire operation with such broad regulatory powers or for individuals to be members of the Council who are "interested" but who are neither artists nor arts experts. 20 U.S.C. § 955(b)(1)(C)(i). And that these subordinate personnel merely advise the Chair on final funding decisions further reflects Congress's choice that a public official makes the final decision about how to balance artistic excellence and public accountability.

Third, Plaintiffs contend that there cannot be a "government message" in the NEA's decisionmaking because there is no "particular message" conveyed. *See, e.g.*, ECF 22-1 at 12; *id*. at 13 (quoting ECF 13 at 36); *id*. at 14 (citing 20 U.S.C. § 954(d)(1)). But, the NEA does communicate a particular message through its grantmaking decisions: the projects selected are excellent and worthy of both public and private support. *See supra* at 1, 4-7. Even if that were not true, no authority requires the government to have only one message. The Supreme Court made this point in *Summum* and *Walker*, as the District Court for the District Court of Columbia observed in *Pulphus*:

> [T]he Supreme Court has not required that a medium convey a consistent or unified government message in order to constitute a "traditional" medium for government speech. *See Walker*, 576 U.S. at 211-12 (noting the variety of messages conveyed by state specialty license plates); *Summum*, 555 U.S. at 470-71 (noting the same with respect to public monuments).

249 F. Supp. 3d at 248-49 (cleaned up); *see also Summum*, 555 U.S. at 474 ("Even when a monument features the written word, the monument may be intended to be interpreted, and may in fact be interpreted by different observers, in a variety of ways."). The relevant question is whether the government, through the contested conduct, has a history of broadcasting a message, which it clearly does. *See supra* at 4-7, 19-22; *see also Pulphus*, 249 F. Supp. 3d at 248 ("[C]ertainly the federal government has traditionally acted as an arts patron, which does convey a kind of message about the government's support for art—or at least the art the government chooses to sponsor.").

**B.    The public perceives the NEA's seal of approval as the government speaking.**

The record before the Court supports only one conclusion concerning the public percep-

tion of the NEA's selections of certain projects for funding: it is speech emanating from only the

government.

First, no one could mistake the NEA's funding decisions as private speech. The very ex-

istence of the NEA as a federally funded grant-making body that implements a structured com-

petitive process shows that only the government is speaking. *See, e.g.*, *supra* at 4-7, 13-15; *Pul-*

*phus*, 249 F. Supp. 3d at 249.[17]

Second, the NEA's actual seal of approval granted to winning projects emanates from

only the government. Multiple courts have credited branding of public sponsorship as establish-

ing that the public perceives the relevant speech as the government's.[18] That branding, in turn,

advances Congress's goal in authorizing the NEA: to incentivize private parties to support those

projects, too. *E.g.*, 20 U.S.C. §§ 951(1), (2), (5), (6), 953(b). The public overwhelmingly per-

ceives this speech to come from one source: the government. *See, e.g.*, *supra* at 6-7, 9 & nn.2-5,

8. Admissions by two Plaintiffs also recognize this point. Byrd Decl. ¶ 19 (Mar. 5, 2025)

---

[17]    249 F. Supp. 3d at 249 (cleaned up):

> Here, the art competition clearly takes place under the aegis of
> Congress; it is titled "Congressional Art Competition." It is run by
> members of the House, congressional staffers, and agents of Con-
> gress (i.e., the [Architect of the Capitol]), and the art is chosen by
> members of the House to represent their congressional districts.
> The release form the artist signs states that the artist grants the
> House the right to display the art, and that the determination as to
> the suitability of the entry will be made by "a House panel chaired
> by the Architect of the Capitol."

[18]    *See*:

- *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 212 (2015) ("The State places the name 'TEXAS' in large letters at the top of every plate.").
- *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1336 (11th Cir. 2023) ("Here, the public would reasonably believe that the City endorsed the art produced for ReFrame because it: (1) publicized ReFrame, including the I See You, Too installation in particular, in City press releases and flyers . . . .").
- *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 26 (D.C. Cir. 2005) (describing plaques affixed to each sculpture in exhibit and identifying the public sponsor of the exhibition).

(ECF 2-5) (Exec. Dir. of Pl. The Theater Offensive); *Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F. Supp. 774, 783 (C.D. Cal. 1991) (quoting amicus brief of (Plaintiff here) Theater Communications Group).

When the public has disapproved of the NEA's funding decisions, they have directed their feedback to the source of their consternation: Members of Congress who appropriated the money that the NEA awarded. *See, e.g.*, *supra* at 9 & n.8; *cf. Little*, 138 F.4th at 864 ("[S]uppose a patron walks into the Llano County Public Library looking for Stephen King's Salem's Lot. It's nowhere to be found. In fact, he's told that the library stocks none of King's books because they are morbid trash. Annoyed, the patron wants to lodge a complaint. Question: should he address his complaint to (a) the Library Board; (b) other patrons; or (c) Stephen King? Answer: (a). Any reasonable library patron would grasp this instantly.").

Plaintiffs' contentions about the public perception of NEA-funded projects focus on everything except what the NEA claims is government speech and what Plaintiffs care about most: the NEA's funding and recognition.

Plaintiffs speculate that "it is unlikely that more than a tiny fraction of the public" knows what NEA funding means and that no one who saw one of Plaintiffs' past productions would think "they had just seen the federal government speak." ECF 22-1 at 14. But enough of the public knew what NEA funding meant to motivate Congress in 1990 to amend the Act based on only two photography exhibitions. *See, e.g.*, *supra* at 8-11 & nn.6-8.

Plaintiffs stress that the works that they present are billed as their own, not the NEA's. ECF 22-1 at 14-15. That's not the billing that matters. No one would mistake the NEA's branding—whether in playbill for a theater production, in the credits for a film, or in the introductory label that appears in an art museum's exhibition—as private speech. Plaintiffs attempt to recast the speech at issue by focusing on other elements that they see as advancing public perception of only private speech (*e.g.*, the location of performances, the identities of other funders (ECF 22-1

at 15[19])), which are features that the government does not claim as its own speech. The government's speech is the recognition and funding of the project, not where grantees present their art. And the complementary recognition of private funders only demonstrates the Act's success and the advancement of its express objectives, *e.g.*, 20 U.S.C. § 951(5), for which NEA funding is a catalyst, Report at 35.

Finally, Plaintiffs contend that the relevant speech arises from applicants' proposed projects because, otherwise, the NEA's speech would be "babbling prodigiously and incoherently." ECF 22-1 at 15 n.15 (quoting *Matal v. Tam*, 582 U.S. 218, 236 (2017)). This argument again refuses to acknowledge the government's message: "This is excellent art is worthy of public and private support." *See Pulphus*, 249 F. Supp. 3d at 250 ("[I]t is the exercise of editorial discretion in the selection and presentation of the artwork that constitutes the government's expressive conduct; the government 'does not necessarily endorse the specific meaning that any particular donor sees in the [donated work of art].' ") (quoting *Summum*, 555 U.S. at 474-77; citing also *Am. Library Ass'n*, 539 U.S. at 204-05; *Gittens*, 414 F.3d at 28); *see also Walker*, 576 U.S. at 212-13.

Since the Supreme Court's *Summum* decision, no court considering a government-speech case where the government has been an arts patron has adopted Plaintiffs' analysis. Under the logic of Plaintiffs' proposed construction, artists would have a First Amendment right to demand the display of their works—even if the government bought the art, commissioned it, yet decided not to present it in government-owned buildings or galleries. *See Raven v. Sajet*, 334 F. Supp. 3d 22 (D.D.C. 2018) (rejecting First Amendment challenge brought by artist who demanded that National Gallery display his donated Presidential portrait).

---

[19]    Several courts have noted that the government's ownership interest can help establish perceptions of the speech at issue as the government's, and not a private party's. *See, e.g.*, *McGriff*, 84 F.4th at 1335. Plaintiffs suggest the importance of that fact by noting that the organizations that receive NEA funding retain intellectual property in their NEA-funded projects. ECF 22-1 at 15. But government ownership is not a categorical requirement of the government-speech analysis. *See, e.g.*, *Shurtleff*, 596 U.S. at 252 ("Our review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors.").

### C.    The NEA controls the government speech with its power to approve the arts projects it funds.

The parties agree that no one other than the NEA's Chair makes the final decision to fund a proposed project. ECF 22-1 at 16. The parties also agree that the NEA advises applicants for GAP funding to "frame their projects in the most competitive way possible . . . ." *Id.* at 15. Congress and the NEA, moreover, has issued a host of other guidelines setting forth rules for evaluating applications and restrictions on how its funding may, or may not, be used. 20 U.S.C. §§ 954(c)-(f), (h), (i); *see generally* ECF 2-2, Ex. 1; ECF 11-1, Ex. B; Beattie Decl., Ex. A (ECF 25-1). The dispute, then, is whether this level of "control" is legally sufficient.

When the government is a patron of the arts, the mere power of selection is sufficient to establish government control and to establish that the relevant speech is the government's.[20] And in *Summum* the Court cited no evidence that the city had any role in shaping the privately funded and created monuments, which the city controlled only by deciding which of them to accept (or reject) for display. 555 U.S. at 472 ("[M]any of the monuments were not designed or built by the City and were donated in completed form by private entities, the City decided to accept those donations and to display them in the Park."); *cf. Walker*, 576 U.S. at 213 ("This final approval authority allows Texas to choose how to present itself and its constituency.").

---

[20]    *See*:

- *Gittens*, 414 F.3d at 30 (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)):

    > Much of PETA's argument revolves around what degree of control the Commission retained over the designs sponsors submitted. . . . PETA's contention founders on the legal principle that the Commission, in deciding which designs to accept or reject—that is, in using its "editorial discretion in the selection and presentation of" the various designs—"engage[d] in speech activity."

- *Pulphus*, 249 F. Supp. 3d at 250-51; *id.* at 250 ("[T]he key question is whether the government still 'effectively control[s]' the message being conveyed through the competition, for example by maintaining 'final approval authority' over the selection of the art displayed.") (quoting *Summum*, 555 U.S. at 473; cleaned up).

- *Raven*, 334 F. Supp. 3d at 28 ("Because the Smithsonian is a government entity and the Gallery's art selection decisions constitute government speech, the First Amendment does not limit the Gallery's ability to say what it wants to say.").

Plaintiffs invite the Court to deviate from these conclusions because, in their view, the NEA does not do *more* to control the works it funds. The Court should reject Plaintiffs arguments.

The NEA does not exert more control than it does because it must balance the factors Congress set forth in Sections 951 and 954(d)(1) of the Act. Consistent with those limitations, the NEA does not regulate arts institutions, 20 U.S.C. § 953(c), and the Chair's review of proposed projects under the NEA's predecisional guidance will be limiting to reviewing projects (and not anything else an applicant does). ECF 17-1 at 3.

Plaintiffs' reliance on the Supreme Court's decisions in *Matal v. Tam*, 582 U.S. 218 (2017), and *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), ECF 22-1 at 16, is unavailing. In *Matal*, the question was whether the Patent and Trademark Office's ("PTO") decisions about which commercial marks to register, or not, were government speech. But in the trademark context, when an applicant for a mark otherwise qualifies for registration with the PTO, the PTO *must* register the mark. 582 U.S. at 236. Here, no matter how excellent or meritorious a proposed project might be, the NEA has no obligation to fund it. Instead, the NEA makes subjective, selective decisions about what art to fund, subject to limited Congressional appropriations. *E.g.*, *Finley*, 524 U.S. at 588.[21]

In *Shurtleff*, the Court considered whether the City of Boston's decisions about flags that private groups could apply to fly temporarily at City Hall Plaza were government speech. Boston's claims about government speech faltered most on the control factor. After 12 years of allowing private groups to fly their preferred flags over the Plaza, Boston had denied only the petitioner's request. 596 U.S. at 248-50. Its sole means of control was "over an event's date and time to avoid conflicts" as well as "the plaza's physical premises." *Id.* at 256.

---

[21]    Moreover, in *Matal*, unlike here, there was no government message conveyed. 583 U.S. at 223 (describing distinctive marks as "words, names, symbols, and the like" that "can help distinguish a particular artisan's goods from those of others"); *id*. at 224 (function of trademark to distinguish traders' goods from one another).

Boston's approval of applicants was otherwise indiscriminate, as the city promoted "accommodat[ing] all applicants," did not review proposed flags before approving applications, did not deny applications (again, except for petitioner's), and lacked any written policy about its practice, which (again) "was to approve flag raisings, without exception." *Id.* at 256-57. Thus, the Supreme Court concluded, "[T]he city's lack of meaningful involvement in the selection of flags or the crafting of their messages leads us to classify the flag raisings as private, not government, speech . . . ." *Id.* at 258. The amount of control that the NEA exercises undisputedly exceeds the City of Boston's indiscriminate approval. And, in exercising the control that both parties acknowledge that the NEA has, the NEA (unlike the City of Boston) rejects more applications than it funds. 20 U.S.C. §§ 954(c)-(f), (h), (i); *see generally* ECF 2-2, Ex. 1; ECF 11-1, Ex. B; Beattie Decl., Ex. A.

Plaintiffs next contend that in other government speech cases, the government has either thoroughly controlled every aspect of the government message (*Johanns v. Livestock Mktg. Ass'n*, 554 U.S. 550 (2005)) or owned the article that conveyed that message (*Summum*, *Walker*). ECF 22-1 at 16-17. None of the cases that Plaintiffs cite, however, sets forth a quantum of control that the government must exercise.[22] And the reason is obvious: "In answering these questions, we conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression. Our review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors." *Shurtleff*, 596 U.S. at 252. In the context of this case, the NEA acts as a patron of the arts and controls its own message by selectively evaluating which projects it wishes to endorse. That is government speech, and the First Amendment therefore does not apply.

---

[22]    And government ownership is, in any case, of "no moment." *Gittens*, 414 F.3d at 28 ("In using its 'editorial discretion in the selection and presentation of' the elephants and donkeys, the Commission thus 'engage[d] in speech activity'; 'compilation of the speech of third parties' is a communicative act.' ") (quoting *Forbes*, 523 U.S. at 674).

## II.    The NEA's predecisional guidance does not violate the Fifth Amendment.

Because the First Amendment does not apply to the NEA's predecisional guidance, the Fifth Amendment does not either.[23] Summary judgment, therefore, should issue for the NEA. But even if the Court were to conclude that the speech at issue is the private speech of GAP applicants, Plaintiffs' Fifth Amendment claim fails for three reasons.

First, the *Finley* Court started its analysis by noting that concerns about unconstitutional vagueness are not substantial in the context of public patronage of the arts as contrasted with "a criminal statute or regulatory scheme," in which vague provisions merely "could raise substantial vagueness concerns." 524 U.S. at 588; *id.* at 589 ("[W]hen the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe."). In taking this first analytical step, the *Finley* Court distinguished some of the very authorities Plaintiffs cite. *Compare* 524 U.S. at 588-89, *with* ECF 22-1 at 25-26. Except for *Bella Lewitzky Dance Foundation v. Frohnmayer*, 754 F. Supp. 774 (C.D. Cal. 1991) (cited in ECF 22-1 at 26), none of the other authorities on which Plaintiffs' Fifth Amendment arguments rely presents such a challenge in the context of government arts patronage (or even selective subsidies). Even *Bella Lewitzky* does not help Plaintiffs. The sole issue in that case was a certification requirement (concerning entirely different subject matter than at issue here), which the NEA has expressly disclaimed concerning the EO in its predecisional guidance. ECF 17-1 at 1, 6, 8; Beattie Decl. ¶¶ 6-7 (ECF 25-1); Beattie Decl., Ex. B at 11.

Second, the *Finley* Court held that, "In the context of selective subsidies, it is not always feasible for Congress to legislate with clarity." 524 U.S. at 589; *id.* at 599 (Scalia, J., concurring in judgment) (citation omitted) ("[W]hat is true of the First Amendment is also true of the

---

[23]    *See*:

- *Pulphus*, 249 F. Supp. 3d at 254 ("[B]ecause the speech activity here is likely government speech, plaintiffs have no First Amendment rights at issue. That being so, the Court must also reject plaintiffs' vagueness challenge to the suitability guidelines.")

- *cf. Gittens*, 414 F.3d at 30 ("As a speaker, and as a patron of the arts, the government is free to communicate some viewpoints while disfavoring others, even if it is engaging—to use PETA's words—in 'utter arbitrariness' in choosing which side to defend and which side to renounce.").

constitutional rule against vague legislation: it has no application to funding. Insofar as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government regulation of expressive conduct, not government grant programs."); *see also, e.g.*, *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 64, 95-96 (1st Cir. 2004) (reversing judgment finding regulatory guidelines for government advertising program restricting ads that "demean[ ] or disparage[ ]" unconstitutionally vague; citing *Finley*, 524 U.S. at 581-83). The NEA issued its predecisional guidance expressly relying on these propositions, *e.g.*, ECF 17-1 at 8, obviating any Fifth Amendment concerns.

None of the arguments Plaintiffs make or authorities that they cite undermines the preceding, selective-subsidy propositions that favor the NEA. And it is simply not true that the *Finley* Court concluded that Section 954(d)(1) "did not implicate speech at all," ECF 22-1 at 25—which Plaintiffs argue to contrive some analytical difference between the thwarted Fifth Amendment vagueness claim in *Finley* and the facts here. Every Justice in *Finley* concluded that Section 954(d)(1) implicated speech. *E.g.*, 524 U.S. at 585 (majority op.), 597 (Scalia, J., concurring in judgment; joined by Thomas, J.), 600-01 (Souter, J., dissenting). And, except for Justice Souter, every Justice concluded that artists' Fifth Amendment challenge still failed. *E.g.*, *id.* at 589 (majority op.); *id.* at 599 (Scalia, J., concurring in judgment).

Since the Court's preliminary-injunction order, the NEA has clarified that there is no eligibility bar. ECF 17-1 at 1, 6, 7, 8. It has permanently removed any certification requirement concerning the EO, without regard to the outcome of this case. *Id.* at 1, 6, 8. It also clarified that the NEA will consider only the proposed project relative to the EO, "and not any other activities [an applicant] may conduct that exist beyond the four corners of their application." *Id.* at 3. The NEA's subsequent clarifications and narrowing of any consideration of the EO only reduce any lingering constitutional concerns, particularly where the NEA's Chair retains such broad, express discretion. *Finley*, 524 U.S. at 573; 20 U.S.C. §§ 954(d), 959(a).

III.    **Because the NEA's implementation of the EO will occur only when the Chair makes final decisions about which projects to fund, there is no final agency action and Plaintiffs' non-constitutional APA claims are not ripe.**

The APA provides jurisdiction to federal courts over only final agency action, whose absence here compels summary judgment for the NEA on Plaintiffs' non-constitutional APA claims. 5 U.S.C. § 704. As the Supreme Court held in *Bennett v. Spear*,

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

520 U.S. 154, 177-78 (1997) (cleaned up). Neither condition applies to the NEA's predecisional guidance. Whether that guidance will in fact adversely affect Plaintiffs is, for the same reasons, not ripe, and it is Plaintiffs' burden to establish that they are ripe. *See, e.g.*, *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (affirming dismissal of pre-enforcement judicial review on ripeness grounds). Most importantly, Plaintiffs might still receive NEA funding despite the EO, ECF 21, in which case they would have no administrative action to challenge. For these and the following reasons, the Court should grant summary judgment in the NEA's favor.

First, the consummation of the NEA's GAP decisionmaking—which applications receive awards, and which will not—will not occur until, at the earliest, late October 2025, and will not be announced to GAP applicants until December 2025. Beattie Decl. ¶ 8 (ECF 25-1); ECF 2-2, Ex. 1 at 5, 23. And only the Chair will consider the EO. ECF 17-1 at 1-3, 6-8; *see Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 915, 925 (2025) (noting an agency is "free to develop regulatory standards 'either by general [legislative] rule or by individual order' in an adjudication") (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 202-203 (1947); brackets in original).

For the same reasons, Plaintiffs' non-constitutional APA claims are not ripe for judicial review. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not

occur at all.") (cleaned up); *see also, e.g.*, *Broderick v. di Grazia*, 504 F.2d 643, 645 (1st Cir. 1974) (action for declaratory judgment, that statement Police Commissioner threatened police officers with due process violation in future administrative proceedings, was not ripe because "[a] court could only guess at how [the statement] might be translated into practice"); *cf. Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 79 (1st Cir. 1997) ("[D]isregarding available administrative processes thrusts parties prematurely into overcrowded courts and weakens an agency's effectiveness by encouraging end-runs around it.").

Plaintiffs undisputedly lack any right to NEA funding. They might not qualify for grants on any number of grounds that have nothing to do with the predecisional guidance that their suit challenges. Their proposed projects might be ineligible for any number of reasons set forth in the NEA's general GAP guidance. ECF 2-2, Ex. 1. Their projects might, or might not, be so excellent or meritorious to survive the intermediary steps of advisory review to reach the Chair's final review. Their projects also might not advance the NEA's historical funding preferences (none of which Plaintiffs challenge), and thus might appear less attractive to the NEA for reasons having nothing to do with the EO. ECF 17-1 at 5; ECF 2-2, Ex. 1 at 6-7. Those historical funding priorities may become even more important in a context of extreme budgetary uncertainty. Again, Congress has not appropriated money to the NEA for FY 2026. Beattie Decl. ¶ 5 (ECF 25-1). And whatever Congress might appropriate will need to be rationed, as in past years, among a minority of applicants whose projects the Chair selects to receive awards.

The only way to test whether any of the Plaintiffs will have been affected adversely by the NEA's predecisional guidance—or by some other factor that their claims do not challenge—would be based on a full administrative record that does not yet exist. And waiting for the outcome of that full administrative process cannot constitute any hardship to Plaintiffs such that the Court should not enter summary judgment for the NEA. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998) ("The [plaintiff] thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain."); *City of Fall River v. Fed. Energy Regulatory Comm'n*, 507 F.3d 1, 7 (1st Cir. 2007).

Plaintiffs' contention that the NEA's predecisional guidance nevertheless is final agency action turns on a misrepresentation of the NEA's actual policy. ECF 22-1 at 18. The NEA's discovery responses state only that the Chair's conclusion that a proposed project promotes gender ideology "**could** weigh against the project's final approval." ECF 21 at 2 (emphasis added). Plaintiffs have re-written that contingency as a certainty—that the Chair's conclusion "**will** weigh against the project's final approval." ECF 22-1 at 18 (emphasis added). Plaintiffs' revision tries to bring the NEA's policy within propositions that they derive from *Trafalgar Capital Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) (quoted in ECF 22-1 at 17-18).

But, as noted above, the NEA's predecisional guidance lacks "direct and immediate consequences" for Plaintiffs. 159 F.3d at 35. Plaintiffs ignore the possibility that such projects could still receive NEA funding, as there is neither any eligibility bar nor any certification requirement. And, to try to supply immediate consequences that are lacking, Plaintiffs then cite some prospective applicants' decisions to adjust their applications' subject matter or to not apply at all. ECF 22-1 at 19. But such forbearance reflects applicants' conduct, not the status of the agency's decisionmaking.

Regardless, even if the Court were to conclude there is final agency action, both of Plaintiffs' non-constitutional APA claims fail for reasons that the remaining sections explain, compelling summary judgment for the NEA.

## IV. The broad discretion delegated by Congress to the NEA's Chair encompasses the NEA's predecisional guidance, precluding both of Plaintiffs' non-constitutional APA claims.

### A. The Act, as amended, permits the NEA to consider more than merely "artistic excellence" and "merit" in evaluating grant applications to ensure accountability to the public.

In concurring in the Court's *Finley* judgment, Justice Scalia acknowledged that it was "no secret" that Congress's 1990 Amendments to the Act were motivated by controversy over two photography exhibits that received NEA funding. *Finley*, 524 U.S. at 600. The plain text of those Amendments expressly authorize the NEA to make judgments about which art projects to fund based on factors other than "artistic excellence" and "artistic merit"—namely, the NEA Chair's

judgment of which projects also will foster "respect for the diverse beliefs and values of the American public[.]" 20 U.S.C. § 954(d)(1); *see also* 20 U.S.C. §§ 951(1), (5), (6). This broad delegation encompasses the NEA's predecisional guidance. *See, e.g.*, *supra* at 8-12 & § I.A.

The Court should reject Plaintiffs' contrary interpretation of the Act for four reasons.

First, Plaintiffs read the Act as permitting the NEA to evaluate proposed projects exclusively based on artistic excellence and merit. ECF 22-1 at 20. To buttress that conclusion, Plaintiffs lean heavily on two statutory sources. The first is the definite article "the" in Section 954(d)(1): "artistic excellence and artistic merit are the criteria by which applications are judged . . . ." The second is Section 954(d)(2)'s statement that "obscenity is without artistic merit." But if the Court were to adopt Plaintiffs' interpretation, it would read out of the Act the plain text of Sections 951(1), (5), and (6) as well as the concluding clause of Section 954(d)(1), which expand the factors Congress authorized the NEA's Chair to consider in awarding grants. Plaintiffs' reading, moreover, implies that the NEA must fund every project deemed artistically meritorious. But the Act does not require that, and in practical terms the NEA Chair allocates funding relative to limited Congressional appropriations. *E.g.*, *Finley*, 524 U.S. at 588.

Second, Plaintiffs contend that the NEA's predecisional guidance conflicts with some of the Act's statements of purpose—specifically, those expressed in 20 U.S.C. Section 951(6) and (7). ECF 22-1 at 21. The alleged conflict is easily resolved. Again, the 1990 Amendments authorized the NEA's Chair to balance elite notions of "artistic excellence" (as well as the other values Plaintiffs cite, *e.g.*, "freedom of thought, imagination, and inquiry," 20 U.S.C. § 951(7)) with public accountability (which Sections 951(1), (5), (6) and Section 954(d)(1) expressly promote).

Third, Plaintiffs contend that the Act's language and legislative history establish Congress's intent to preclude any "viewpoint-based" standard. ECF 22-1 at 21. That is a selective reading of those sources, which demonstrate that Congress compromised in Section 954(d)(1), which adopts a clearly subjective standard.

Finally, Plaintiffs contend, hypothetically, that "even if the Act were ambiguous," the constitutional-avoidance doctrine compels the Court to read it to foreclose any viewpoint-based standard. ECF 22-1 at 21 n.5. But because there is no First or Fifth Amendment problem, *see supra* §§ I & II, there is no constitutional issue to avoid that necessitates Plaintiffs' inaccurate interpretation of the Act.

### B.    The NEA's predecisional guidance is not arbitrary and capricious, and instead reflects valid executive branch policy preferences.

For most of the same reasons set forth above, the NEA's predecisional guidance reflects a reasonable choice by the agency. *See Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 23-24 (1st Cir. 1999). Congress authorized the NEA's Chair to make both artistic judgments that also respond to public approval. *E.g.*, 20 U.S.C. §§ 951(1), (5), (6), 954(d)(1). The NEA's funding choices are government speech, which may promote some activities and not others. *See People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 30 (D.C. Cir. 2005) ("As a patron of the arts, the government is free to communicate some viewpoints while disfavoring others, even if it is engaging . . . in utter arbitrariness in choosing which side to defend and which side to renounce.") (cleaned up); *Raven v. Sajet*, 334 F. Supp. 3d 22, 32 (D.D.C. 2018) ("Even political discrimination is allowed when the government chooses to sponsor speech."); *cf. Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

And the NEA's predecisional guidance reflects a policy directive that the President issued, whose own terms limit the application of that policy "consistent with applicable law." EO § 8(b); *see also, e.g.*, *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019) (cleaned up) ("Agency policymaking is not a rarified technocratic process, unaffected by political considerations or the presence of Presidential power.") (cleaned up); *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[An agency] may not simply disregard an Executive Order. To the contrary, as an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."), *cert. denied*, 133 S. Ct. 847 (2013); *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[F]aithful

execution of the laws enacted by the Congress, however, ordinarily allows and frequently re-quires the President to provide guidance and supervision to his subordinates. . . . Those officers are duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law."), *cert. denied*, 537 U.S. 1171 (2003). The NEA's predecisional guidance properly relies on and cites the preceding propositions to explain its policy choices.

The Court should reject Plaintiffs three arguments to the contrary.

First, Plaintiffs contend that the consequences of a democratic election and an agency's adoption of the policy preferences of the President, consistent with applicable law, is legally in-sufficient. ECF 22-1 at 22-23. But the preceding authorities prove otherwise.

Second, Plaintiffs mount a direct attack on the EO itself—including its alleged vague-ness—to try to undermine the validity of the separate administrative process that resulted in the NEA's predecisional guidance. *Id.* at 24. But Plaintiffs do not challenge the EO itself in this case, for good reason: the EO is not subject to the APA, and this Court lacks "jurisdiction . . . to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867); *see also Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part).

Third, Plaintiffs re-package their vagueness argument as an alleged failure by the NEA "to consider . . . important aspect[s] of the problem." ECF 22-1 at 24 (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)). But Plaintiffs' vagueness argument fails for the reasons already stated. Their argument also ignores *State Farm*'s further statement, "We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." 463 U.S. at 43. Finally, the problem that Plain-tiffs identify is the NEA's allegedly insufficient consideration of Plaintiffs' private speech and some of the Act's non-exclusive objectives. ECF 22-1 at 24-25 (quoting 20 U.S.C. 951(7)). But, again, this ignores the balancing act that Congress authorizes the NEA's Chair to make. Plain-tiffs' argument, if adopted by the Court, also would eviscerate the government-speech doctrine and its compelling application in this context by subjecting valid exercises of government speech

to amorphous APA challenges about how much or how little private speech interests might be affected.

## CONCLUSION

For the preceding reasons, the NEA asks the Court to enter final judgment for the NEA on all of Plaintiffs claims and to deny Plaintiffs' motion for summary judgment.

Dated: July 16, 2025                    Respectfully submitted,

                                        NATIONAL ENDOWMENT FOR THE ARTS;
                                        MARY ANNE CARTER, in her official capac-
                                        ity as Acting Chair of the National Endowment
                                        for the Arts,

                                        By their Attorneys

                                        SARA MIRON BLOOM
                                        Acting United States Attorney

                                        */s/ Kevin Bolan*
                                        KEVIN BOLAN
                                        Assistant United States Attorney
                                        One Financial Plaza, 17th Floor
                                        Providence, RI 02903
                                        (401) 709-5000
                                        kevin.bolan@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on July 16, 2025, I filed this document and its attachments through the Court's ECF system, thereby electronically serving all parties of record in this action.

                                        */s/ Kevin Bolan*
                                        KEVIN BOLAN
                                        Assistant United States Attorney