UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RHODE ISLAND LATINO ARTS, *et al.*,

      Plaintiffs,

  *v.*

NATIONAL ENDOWMENT FOR THE ARTS, *et al.*,

      Defendants.

Civil Action
No. 25-cv-79-WES-PAS

**DEFENDANTS' RESPONSES TO PLAINTIFFS'
STATEMENT OF FACTS AND
THEIR SEPARATE STATEMENT OF UNDISPUTED FACTS**

1.     The Grants for Arts Projects ("GAP") is the NEA's "principal grants category." Suppl. Eidelman Decl. Ex. 1.

**Defs.' Resp:** Undisputed.

2.     GAP makes grants "available for arts projects of all sizes in a wide variety of artistic disciplines." *Id.*

**Defs.' Resp:** Undisputed.

3.     GAP applicants may request an amount between $10,000-$100,000. Suppl. Eidelman Decl. Ex. 2.

**Defs.' Resp:** Undisputed.

4.     The GAP application process has two parts. *Id.*

**Defs.' Resp:** Undisputed.

5.     In Part 1, applicants must complete the Application for Federal Domestic Assistance/Short Organization Form, a brief form that collects basic information about the applicant organization, and submit it on Grants.gov. Eidelman Decl. Ex. 1 at 21.

**Defs.' Resp:** Undisputed.

6.      To submit Part 1, applicants must agree to an "Application Certification" that states "I certify (1) to the statements contained in the list of certifications\* and (2) that the statements herein are true, complete and accurate to the best of my knowledge." In addition, they must "provide the required assurances\* and agree to comply with any resulting terms if [they] accept an award." Odsess-Rubin Decl. Ex. A.

**Defs.' Resp:** Undisputed as to the accuracy of the quoted statement(s), but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025);[1] Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

7.      The Certification also states, "I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001)." *Id*.

**Defs.' Resp:** Undisputed as to the accuracy of the quoted statement(s), but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

8.      The asterisk in the Certification provides "The list of certifications and assurances . . . is contained in the announcement or agency specific instructions." *Id.* For the NEA, the relevant list of certifications and assurances is contained in the NEA's "Assurance of Compliance." *See* Eidelman Decl. Ex. 2; Suppl. Eidelman Decl. Ex. 3.

---

[1]      The NEA attaches the Beattie Declaration, and its exhibits, as Ex. 1 to this filing. ECF 25-1.

**Defs.' Resp:** Undisputed as to the accuracy of the quoted statement(s), but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

9.    In Part 2, an applicant must complete the Grant Application Form, which constitutes the majority of the application material, including information about the organization, like history and budget; the project description, timeline, and budget information; and work samples, and submit it on the NEA's applicant portal. Eidelman Decl. Ex. 1 at 21.

**Defs.' Resp:** Undisputed.

10.    The GAP program has two cycles each calendar year. Suppl. Eidelman Decl. Ex 2 at 4.

**Defs.' Resp:** Undisputed.

11.    For the March 2025 Cycle, applicants will be notified of acceptance or rejection in December 2025. *Id.*

**Defs.' Resp:** Undisputed.

12.    For the March 2025 Cycle, the earliest project start date is January 1, 2026. *Id.*

**Defs.' Resp:** Undisputed.

13.    For the July 2025 Cycle, the submission deadline is July 29, 2025, and the notification for acceptance or rejection is April 2026. *Id.*

**Defs.' Resp:** Undisputed.

14.    For the July 2025 Cycle, the earliest project start date is June 1, 2026. *Id.*

**Defs.' Resp:** Undisputed.

15.    For fiscal year 2026, the NEA anticipates 4,500 applications. Eidelman Decl. Ex. 1, at 4.

**Defs.' Resp:** Undisputed.

16.    For fiscal year 2026, the NEA anticipates 2,075 awards totaling $62,245,000. *Id.*

**Defs.' Resp:** Disputed, as Congress has not appropriated any funding to the NEA for FY 2026. Beattied Decl. ¶ 5. Disputed also to the extent this statement conflicts with the NEA's FY26 Congressional Budget request. NEA, Appropriations Request for Fiscal Year 2026 (May 2025), https://www.arts.gov/sites/default/files/NEA-FY26-Congressional-Budget-Request.pdf.

17.    In the past, the NEA has not suggested to applicants that they should make substantive changes to their projects. Second Suppl. Martínez Decl. ¶ 13; Suppl. Odsess-Rubin Decl. ¶ 14; Suppl. Byrd Decl. ¶ 12.

**Defs.' Resp:** Disputed to the extent that these contentions establish any fact relative to any NEA grant applicant other than these three Plaintiffs. Disputed as well concerning he period for which this factual contention might be true, as none of the cited evidence (or any of the Plaintiffs' other declarations) provides any information about the total number of grant applications each Plaintiff has made or their dates before 2016, which is the earliest date that any of the Plaintiffs attest that they received NEA funding. ECF 2-4, ¶ 3 (first NEA award in 2023) (Odsess-Rubin [NQT] Decl. (Mar. 5, 2025)); ECF 22-4, ¶ 4 (same) (Odsess-Rubin [NTQ] Decl. (June 26, 2025)); ECF 2-3, ¶ 5 (first NEA award in 2019) (Martinez [RILA] Decl. (Mar. 5, 2025)); ECF 22-6, ¶ 3 (same) (Martinez [RILA] Decl. (June 27, 2025)); ECF 2-5, ¶ 4 (first NEA award in 2016) (Byrd [TTO] Decl. (Mar. 5, 2025)); ECF 22-5, ¶ 3 (same) (Byrd [TTO] Decl. (June 30, 2025)). Subject to those objections, undisputed as to statements of the declarants' organizations' recent experiences with the NEA grantmaking process.

18.    In the past, the NEA has not otherwise offered feedback on the substance of a project. Second Suppl. Martínez Decl. ¶ 13; Suppl. Odsess-Rubin Decl. ¶ 14; Suppl. Byrd Decl. ¶ 12.

**Defs.' Resp:** Disputed to the extent that these contentions establish any fact relative to any NEA grant applicant other than these three Plaintiffs. Disputed as well concerning he period for which this factual contention might be true, as none of the cited evidence (or any of the Plaintiffs' other declarations) provides any information about the total number of grant applications each Plaintiff has made or their dates before 2016, which is the earliest date that any of the Plaintiffs attest that they received NEA funding. ECF 2-4, ¶ 3 (first NEA award in 2023) (Odsess-Rubin [NQT] Decl. (Mar. 5, 2025)); ECF 22-4, ¶ 4 (same) (Odsess-Rubin [NTQ] Decl. (June 26, 2025)); ECF 2-3, ¶ 5 (first NEA award in 2019) (Martinez [RILA] Decl. (Mar. 5, 2025)); ECF 22-6, ¶ 3 (same) (Martinez [RILA] Decl. (June 27, 2025)); ECF 2-5, ¶ 4 (first NEA award in 2016) (Byrd [TTO] Decl. (Mar. 5, 2025)); ECF 22-5, ¶ 3 (same) (Byrd [TTO] Decl. (June 30, 2025)). Subject to those objections, undisputed as to statements of the declarants' organizations' recent experiences with the NEA grantmaking process.

19.    When the NEA has given feedback on proposals, it has been about how to better frame an applicant's pitch to make it a more competitive application, not about changing the project itself. Second Suppl. Martínez Decl. ¶ 13; Suppl. Byrd Decl. ¶ 12.

**Defs.' Resp:** Disputed to the extent that these contentions establish any fact relative to any NEA grant applicant other than these two Plaintiffs. Disputed as well concerning he period for which this factual contention might be true, as none of the cited evidence (or any of the Plaintiffs' other declarations) provides any information about the total number of grant applications each Plaintiff has made or their dates before 2016, which is the earliest date that any of the Plaintiffs attest that they received NEA funding. ECF 2-3, ¶ 5 (first NEA award in 2019) (Martinez [RILA] Decl. (Mar. 5, 2025)); ECF 22-6, ¶ 3 (same) (Martinez [RILA] Decl. (June 27, 2025)); ECF 2-5, ¶ 4 (first NEA award in 2016) (Byrd [TTO] Decl. (Mar. 5, 2025)); ECF 22-5, ¶ 3 (same) (Byrd [TTO] Decl. (June 30, 2025)). Subject to those objections, undisputed as to statements of the declarants' organizations' recent experiences with the NEA grantmaking process.

20.    The NEA has never suggested removing themes, actors, or other aspects of a proposal because of its substance. Second Suppl. Martínez Decl. ¶ 13; Suppl. Byrd Decl. ¶ 12; *see also* Suppl. Odsess-Rubin Decl. ¶ 14.

**Defs.' Resp:** Disputed to the extent that these contentions establish any fact relative to any NEA grant applicant other than these three Plaintiffs. Disputed as well concerning he period for which this factual contention might be true, as none of the cited evidence (or any of the Plaintiffs' other declarations) provides any information about the total number of grant applications each Plaintiff has made or their dates before 2016, which is the earliest date that any of the Plaintiffs attest that they received NEA funding. ECF 2-4, ¶ 3 (first NEA award in 2023) (Odsess-Rubin [NQT] Decl. (Mar. 5, 2025)); ECF 22-4, ¶ 4 (same) (Odsess-Rubin [NTQ] Decl. (June 26, 2025)); ECF 2-3, ¶ 5 (first NEA award in 2019) (Martinez [RILA] Decl. (Mar. 5, 2025)); ECF 22-6, ¶ 3 (same) (Martinez [RILA] Decl. (June 27, 2025)); ECF 2-5, ¶ 4 (first NEA award in 2016) (Byrd [TTO] Decl. (Mar. 5, 2025)); ECF 22-5, ¶ 3 (same) (Byrd [TTO] Decl. (June 30, 2025)). Subject to those objections, undisputed as to statements of the declarants' organizations' recent experiences with the NEA grantmaking process.

21.    NEA-funded work is billed as the work of the artists and funded organization, not the NEA. Suppl. Odsess-Rubin Decl. ¶ 15; Suppl. Byrd Decl. ¶ 13.

**Defs.' Resp:** Undisputed as to how these two Plaintiffs "bill" their works, to the extent that "billing" a work is separate from crediting sponsorship. To the extent that "billing" a work encompasses crediting sponsorship, denied. All NEA funding recipients must prominently acknowledge the NEA's support, reflecting the NEA's selection of that work as meriting public and private funding. NEA, General Terms & Conditions for Federal Financial Assistance Awards to Organizations, at 6-7 (Nov. 2024) (ECF 11-1, Ex. B); NEA, General Terms & Conditions for Grants and Cooperative Agreements to Organizations, at 4-5 (1999) (Beattie Decl., Ex. A (July 15, 2025)); Beattie Decl. ¶¶ 3-4.

22.     NEA-funded work sits within a body of past work by the funded organization and reflects the mission and audience of that organization. Second Suppl. Martínez Decl. ¶ 15.

**Defs.' Resp:** Undisputed in part; denied to the extent that this contention implies that it is only "the mission and audience of that organization" reflected by NEA funding. All NEA funding recipients must prominently acknowledge the NEA's support, reflecting the NEA's selection of that work as meriting public and private funding. NEA, General Terms & Conditions for Federal Financial Assistance Awards to Organizations, at 6-7 (Nov. 2024) (ECF 11-1, Ex. B); NEA, General Terms & Conditions for Grants and Cooperative Agreements to Organizations, at 4-5 (1999) (Beattie Decl., Ex. A (July 15, 2025)); Beattie Decl. ¶¶ 3-4.

23.     The NEA makes clear that grant recipients have to credit it for the funding it provided, but it typically appears in a list of many other funders. Suppl. Odsess-Rubin Decl. ¶ 16.

**Defs.' Resp:** Undisputed.

24.     Every project supported by the NEA is also supported by other sources of funding. Suppl. Odsess-Rubin Decl. ¶ 16; *see also* Eidelman Decl. Ex. 1 at 20 ("NEA funding cannot exceed 50% of the total cost of the project.").

**Defs.' Resp:** Undisputed.

25.     Work that receives NEA funding is typically performed or exhibited in private venues and galleries, or in public parks and streets not owned by the NEA, but rather other government actors who require separate, distinct approvals. Second Suppl. Martínez Decl. ¶ 14; Suppl. Odsess-Rubin Decl. ¶¶ 15-17.

**Defs.' Resp:** Undisputed.

26.     NEA-funded organizations retain the intellectual property rights in their NEA-funded works. Suppl. Byrd Decl. ¶ 13.

**Defs.' Resp:** Undisputed.

27.     On January 20, 2025, President Donald J. Trump signed Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to

the Federal Government" ("Gender Ideology EO" or "EO"). *See* 90 Fed. Reg. 8615 (Jan. 30, 2025).

**Defs.' Resp:** Undisputed.

28.     On or around February 6, 2025, the NEA amended its Assurance of Compliance to include the language:

> [T]he applicant agrees that, if the applicant is selected and be-
> comes a NEA grant recipient:
> ●     The applicant will comply with all applicable Executive
>     Orders while the award is being administered. Executive
>     orders are posted at whitehouse.gov/presidential-actions.
> . . .
> ●     The applicant understands that federal funds shall not be
>     used to promote gender ideology, pursuant to Executive
>     Order No. 14168, Defending Women From Gender Ideol-
>     ogy Extremism and Restoring Biological Truth to the Fed-
>     eral Government.

Eidelman Decl. Ex. 2 at 11-12.

**Defs.' Resp:** Undisputed.

29.     The Assurance of Compliance stated that the NEA "may conduct a review of your organization to ensure that the applicant is in compliance with these . . . executive orders" and that "[i]f the NEA determines that a recipient has failed to comply . . . , it may suspend or termi-nate the award, and/or recover the funds." Eidelman Decl. Ex. 2 at 10.

**Defs.' Resp:** Undisputed.

30.     Both Part 1 and Part 2 of the application required the applicant to certify agree-ment with the Assurance of Compliance. Odsess-Rubin Decl. ¶ 11.

**Defs.' Resp:** Undisputed as to the accuracy of this statement. Denied concerning EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certi-fication requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

31.    On March 10, 2025, following the filing of this action, the NEA submitted a declaration to this Court stating that the NEA would remove the certification requirement specific to the Gender Ideology EO from the Assurance of Compliance before Part 1 was due, and that the Part 2 deadline would be extended from March 24, 2025, to April 7, 2025. Eilers Decl. ¶¶ 8-9.

**Defs.' Resp:** Undisputed.

32.    On March 11, 2025, the NEA removed the certification requirement specific to the Gender Ideology EO from the Assurance of Compliance. The Assurance then stated that the NEA will "no longer require applicants to certify their compliance with [the Gender Ideology EO] while the outcome of this litigation is pending." Eilers Decl. ¶ 8.

**Defs.' Resp:** Undisputed.

33.    On March 17, 2025, Defendant Carter issued a memorandum ("March 17 Memorandum") to NEA grantmaking staff, stating that "the NEA has rescinded all implementation of the [Gender Ideology] EO, as it applies to the NEA's grantmaking activities" and announcing that the NEA "is initiating a new evaluation of the EO in accordance with the Administrative Procedure Act." Bolan Decl. Ex. C at 1.

**Defs.' Resp:** Undisputed.

34.    The NEA completed its process on April 16, 2025, and announced the resulting policy ("Final EO Implementation") on April 30. *See id.*; Final EO Implementation, ECF 17-1.

**Defs.' Resp:** Undisputed. Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

35.    The Final EO Implementation states that "appropriate action is needed to incorporate the EO in the NEA's grant application review process," that the NEA "intend[s] action to implement [the EO]," as described in the Final EO Implementation, that the NEA is "publish[ing the Final EO Implementation as an] explanation of its intended action to implement [the EO],"

that its purpose is to "outline[ ] . . . how it will implement [the EO] in [the NEA's] review process," and that the Chair will "implement [the EO]" and review grant applications for "whether the proposed project promotes gender ideology." Final EO Implementation at 1-3.

**Defs.' Resp:** Undisputed. Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

36.    The Final EO Implementation explains that the Chair will engage in a "case-by-case review . . . of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology." It further explains that this review "will in general provide a significant public benefit by . . . furthering the current administration's priorities as provided in [the EO]." *Id.* at 2.

**Defs.' Resp:** Undisputed. Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

37.    Defendants "[d]enied" that the Chair's "conclusion that a proposed project 'promotes gender ideology' will make no difference as to whether the project will receive an NEA grant." ECF 21 at 2.

**Defs.' Resp:** Denied. The NEA stated, "The Chair will consider all applicable factors in evaluating a proposed project, and whether a proposed project 'promotes gender ideology' may be a factor as described in the NEA's Final Notice of Implementation of Executive Order 14168, dated April 16, 2025, at 6, § III." ECF 21 at 2 (Resp. to Req. for Admis. No. 3 (June 11, 2025)).

38.    Defendants "[a]dmitted" that the Chair's "conclusion that a proposed project 'promotes gender ideology' will make it less likely that the project will receive an NEA grant." *Id.*

**Defs.' Resp:** Denied. The NEA stated, in part, "If the NEA Chair concludes that a proposed project 'promotes gender ideology,' that factor could weigh against the project's final approval." ECF 21 at 2 (Resp. to Req. for Admis. No. 2 (June 11, 2025)).

39.    "If the NEA Chair concludes that a proposed project 'promotes gender ideology,' that factor could weigh against the project's final approval." *Id.*

**Defs.' Resp:** Undisputed.

40. The Chair's conclusion that a proposed project "promotes gender ideology" cannot weigh in favor of the project's final approval. *Id.*

**Defs.' Resp:** Undisputed.

41. The Assurance of Compliance now includes the language "The applicant will comply with all applicable Executive Orders while the award is being administered. Executive orders are posted at whitehouse.gov/presidential-actions." Suppl. Eidelman Decl. Ex. 3.

**Defs.' Resp:** Undisputed as to the accuracy of this statement. Denied concerning EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

42. The Assurance of Compliance does not exclude the Gender Ideology EO from the requirement that applicants comply with all applicable executive orders. *See id.*

**Defs.' Resp:** Denied. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

43. The Assurance of Compliance also states, "The United States has the right to seek judicial or administrative enforcement of this assurance." *Id.*

**Defs.' Resp:** Undisputed as to the accuracy of this statement. Denied concerning EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

44.    The Assurance of Compliance no longer states that the NEA will "no longer re-quire applicants to certify their compliance with [the Gender Ideology EO] while the outcome of this litigation is pending." *Id.*

**Defs.' Resp:** Undisputed as to the accuracy of this statement. Denied concerning any require-ment by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification re-quirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

45.    Rhode Island Latino Arts ("RILA") is a nonprofit arts organization based in Rhode Island. Martínez Decl. ¶ 2.

**Defs.' Resp:** Undisputed.

46.    Its mission is to promote, encourage, and preserve the art, history, heritage, and cultures of Latinos in Rhode Island. *Id.*

**Defs.' Resp:** Undisputed, but not material.[2]

47.    RILA offers programming of every genre of art, including visual art, dance, and music. It puts on theatrical and musical performances, Latin percussion sessions, dancing events, script readings, and storytelling events. It also has a gallery to showcase artwork and operates lit-eracy programs. *Id.* ¶ 3.

**Defs.' Resp:** Undisputed, but not material.

48.    RILA previously received NEA funding in 2019, 2020, and 2022. *Id.* ¶¶ 5-7.

---

[2]    In each instance in which the NEA contends a factual contention is not material, the NEA bases that contention on the legal irrelevance of that fact (*e.g.*, as the NEA's selection of grants comprises government speech—which turns substantially on the NEA's conduct, not Plaintiffs' conduct or characteristics—as explained in the NEA's cross-motion for summary judgment and opposition to Plaintiffs' summary-judgment motion). *See generally* ECF 24.

**Defs.' Resp:** Undisputed.

49.    When Plaintiffs filed this suit, RILA was in the process of applying for NEA funding in the March 2025 GAP cycle to support programming in 2026. *Id.* ¶ 8.

**Defs.' Resp:** Undisputed, but not material.

50.    RILA submitted Part 1 of its application on February 14, 2025, and agreed to the Assurance of Compliance then in effect, with the intention of proceeding with a more restricted project that would comply with the "gender ideology" prohibition. *Id.* ¶ 19.

**Defs.' Resp:** Undisputed, but not material.

51.    After the certification requirement specific to the Gender Ideology EO had been removed, RILA withdrew and then resubmitted Part 1. Second Suppl. Martínez Decl. ¶ 4.

**Defs.' Resp:** Undisputed, but not material except as to establish venue and RILA's standing.

52.    RILA originally planned to seek support for a production of "Faust," in which the lead character is gay and queer. Martínez Decl. ¶ 12.

**Defs.' Resp:** Undisputed, but not material.

53.    RILA was considering casting a nonbinary actor who uses they/them pronouns for that role. In the past, this actor has chosen to dress as a man during one performance and dress as a woman in the next performance, while performing the same role. *Id.*

**Defs.' Resp:** Undisputed, but not material. Denied to the extent that RILA (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21.

54.    Because, at the time that RILA was preparing its application and choosing which proposal to put forth, the NEA's Assurance of Compliance required certifying that federal funds will "not be used to promote gender ideology," RILA decided not to apply for a grant to support "Faust." *Id.* ¶ 14.

**Defs.' Resp:** Undisputed, that during some period of RILA's application preparation, the preceding statement is accurate, but not material. ECF 13 at 12, 46. Disputed concerning EO 14168.

ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

55.    RILA also considered applying to support its storytelling program. *Id.* ¶ 13.

**Defs.' Resp:** Undisputed, but not material.

56.    In its storytelling program, RILA allows performing artists to tell their stories without restrictions, based on the principle that artistic freedom should allow them to say what they want. The program is open to all performers, including nonbinary and transgender performers, and it allows them to speak about or interpret their art based on their personal lives. *Id.*

**Defs.' Resp:** Undisputed, but not material. Denied to the extent that RILA (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21.

57.    RILA will not tell performers to stay away from topics that could be interpreted as "promoting" what the government deems to be "gender ideology." *Id.*

**Defs.' Resp:** Undisputed, but not material. Denied to the extent that RILA (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21.

58.    RILA decided not to apply for a grant to support the storytelling program because of the gender ideology prohibition in place when the lawsuit was filed. *Id.* ¶ 14.

**Defs.' Resp:** Undisputed, but not material.

59.    Though it is not the project for which RILA wanted to apply, RILA has applied for an NEA grant to support performance tours and an oral history performance highlighting the contributions of Latinos to American history and Rhode Island history. *Id.* ¶ 15.

**Defs.' Resp:** Undisputed, but not material.

60.     Without the "gender ideology" prohibition in place when the suit was filed, the scope would have been different; RILA would have applied for a grant that affirmatively included celebrating transgender, queer, and nonbinary identity and featuring artists and characters with those identities. *Id.*

**Defs.' Resp:** Undisputed, but not material.

61.     Because RILA had to submit Part 2 of its application by April 7, before the NEA issued its Final EO Implementation, and there was no assurance that the NEA would not reimpose the "gender ideology" prohibition, RILA did not expand the scope of the project in Part 2 of its application to reflect its desire to support transgender, queer, and nonbinary artists, characters, and themes within the scope of its NEA-funded programming. Second Suppl. Martínez Decl. ¶ 5.

**Defs.' Resp:** Undisputed, but not material. ECF 13 at 12, 46. Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

62.     RILA made sure to steer clear of anything that could be perceived as "promoting gender ideology" in RILA's application materials, even in how RILA describes itself as an organization. *Id.*

**Defs.' Resp:** Undisputed, but not material. Denied to the extent that RILA (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21.

63.     RILA's application for March 2025 GAP funding remains pending. Second Suppl. Martínez Decl. ¶ 5.

**Defs.' Resp:** Undisputed.

64.     It is not clear to RILA what it means to "promote" what the government deems to be "gender ideology," and that forces RILA to guess as to the parameters, including whether it prohibits allowing a transgender, queer, or nonbinary individual to participate in NEA-funded programming, including any mention of these identities in RILA's work, or including any

fictional characters who are transgender, nonbinary, or queer. Martínez Decl. ¶¶ 16-17; Second

Suppl. Martínez Decl. ¶ 7.

**Defs.' Resp:** Undisputed only as to RILA's subjective perceptions and / or intentions, but not material. Denied to the extent that RILA (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

    65.    RILA's concerns about the lack of clarity regarding what it means to "promote

gender ideology" is heightened by the current language of the Assurance of Compliance. Second

Suppl. Martínez Decl. ¶¶ 8-9.

**Defs.' Resp:** Undisputed only as to RILA's subjective perceptions and / or intentions, but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance). Denied to the extent that RILA (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

    66.    RILA is concerned about the possibility of judicial or administrative penalties if it

receives funding in the March 2025 GAP cycle and does something in its project that the govern-

ment deems to be "promoting gender ideology." *Id.* ¶ 9.

**Defs.' Resp:** Undisputed only as to RILA's subjective perceptions and / or intentions, but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

67.    Given the lack of clarity, RILA fears that even describing itself as an organization that supports transgender, nonbinary, and queer artists might be deemed to "promote gender ideology." Martínez Decl. ¶ 16.

**Defs.' Resp:** Undisputed only as to RILA's subjective perceptions and / or intentions, but not material. Denied to the extent that RILA (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

68.    The lack of clarity also denies RILA the ability to provide artists the creative freedom to which RILA is committed as an organization, and it precludes RILA from expressing viewpoints affirming all identities, including those of transgender, nonbinary, and queer individuals, even though RILA is committed to those views as an artistic organization. *Id.* ¶ 17.

**Defs.' Resp:** Denied. There is no evidence that RILA needs NEA permission to engage in any of the conduct or speech described in this contention. RILA is free to engage in any private speech it wishes to. Nothing in the NEA's predecisional guidance limits any private person's speech. It previews the terms on which the NEA might selectively fund applications for arts projects. ECF 17-1. Denied to the extent that RILA (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

69.    RILA would like to apply for NEA grants in future grant cycles to support works of artistic merit that meet all of the NEA's statutory requirements, and that affirm transgender, nonbinary, and queer identities through that art. Martínez Decl. ¶ 22.

**Defs.' Resp:** Undisputed only as to RILA's subjective perceptions and / or intentions, but not material. Denied to the extent that RILA (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21.

70.    If RILA were to apply for future NEA funding, RILA would have to certify in Part 1 of the application "to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "any false, fictitious, or fraudulent statements or

claims may subject [the applicant] to criminal, civil, or administrative penalties." Second Suppl. Martínez Decl. ¶ 10.

**Defs.' Resp:** Undisputed as to the accuracy of the quoted statement(s), but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

71.    The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded works makes RILA fearful of seeking NEA funds in the future, and adds to its concerns about understanding what "promoting gender ideology" does and does not cover. *Id.* ¶ 10.

**Defs.' Resp:** Undisputed only as to RILA's subjective perceptions and / or intentions, but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

72.    Because of the Final EO Implementation, and the ambiguity of the Assurance of Compliance, RILA will strongly hesitate to apply for NEA funding while they remain in place. *Id.* ¶ 11.

**Defs.' Resp:** Undisputed only as to RILA's subjective perceptions and / or intentions, but not material; inadmissible as speculation, Fed. R. Evid. 602; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

73.    Putting together an application for an NEA grant takes a great deal of effort for RILA, which does not have a dedicated development office. *Id.* ¶ 11.

**Defs.' Resp:** Undisputed, but not material.

74.    It would be very frustrating to RILA, and a drain on its resources, to go through the work of submitting an application only to be denied funding because its proposed project is deemed to express a view disfavored by the NEA. *Id.* ¶ 11.

**Defs.' Resp:** Undisputed only as to RILA's subjective perceptions and / or intentions, but not material.

75.    Absent the Final EO Implementation, and the ambiguity introduced by the Assurance of Compliance, RILA would seek NEA funding in the future without hesitation. *Id.* ¶ 12.

**Defs.' Resp:** Undisputed only as to RILA's subjective perceptions and / or intentions, but not material. Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

76.    National Queer Theater, Inc. ("NQT") is a theater organization. *See* Odsess-Rubin Decl. ¶ 2.

**Defs.' Resp:** Undisputed, but not material.

77.    It is a theater collective dedicated to celebrating the brilliance of generations of LGBTQ+ artists and providing a home for unheard storytellers and activists. *Id.*

**Defs.' Resp:** Undisputed, but not material.

78.    Its work regularly features transgender and nonbinary individuals and themes. *See id.*

**Defs.' Resp:** Undisputed, but not material.

79.    NQT was awarded NEA grants in 2023 and 2024 for its Criminal Queerness Festival ("CQF"). *Id.* ¶ 3.

**Defs.' Resp:** Undisputed.

80.    CQF is devoted to freedom of expression and to fighting censorship and criminal-ization of sexuality and gender identity in other countries. It is meant to be a beacon for the queer community here and abroad, by affirming the equal dignity of people to be who they are, without being compelled to adhere to traditional heterosexual stereotypes. Odsess-Rubin Decl. ¶ 6.

**Defs.' Resp:** Undisputed, but not material.

81.    CQF has featured works from emerging artists from countries that criminalize ho-mosexuality. The plays are chosen by a curatorial committee of prior CQF playwrights. The plays are accompanied by talkback discussions facilitated by the playwrights, human rights ad-vocates, and other subject matter experts. *Id.* ¶¶ 5, 7.

**Defs.' Resp:** Undisputed, but not material.

82.    Supporting transgender, nonbinary, and gender queer writers and themes has al-ways been a part of the festival, including in the years that it has received NEA funding. *Id.* ¶ 7.

**Defs.' Resp:** Undisputed, but not material.

83.    In 2023, the festival featured one play about intersex identity. *Id.*

**Defs.' Resp:** Undisputed, but not material.

84.    In 2024, two plays were written by transgender writers and about trans identity. *Id.*

**Defs.' Resp:** Undisputed, but not material.

85.    For 2025, all three playwrights identify as nonbinary or gender queer, and one play has nonbinary characters. *Id.*

**Defs.' Resp:** Undisputed, but not material.

86.    When NQT submits its application to the NEA, it has not yet determined what plays will appear in the relevant year's CQF. Odsess-Rubin Suppl. Decl. ¶ 14.

**Defs.' Resp:** Undisputed, but not material.

87.    NQT was offered an NEA grant in 2025 for CQF. *Id.* ¶ 4.

**Defs.' Resp:** Undisputed.

88.    NQT's 2025 grant was revoked months before the Festival began, forcing NQT to find funding to fill the hole in its budget. *Id.*

**Defs.' Resp:** Undisputed, but not material.

89.    NQT applied for NEA funding in the March 2025 cycle to support CQF 2026. *Id.* ¶ 5.

**Defs.' Resp:** Undisputed, but not material except as to establish NQT's standing.

90.    Because one could not register to apply for NEA funding without checking the box agreeing to the certification in the application, NQT intended to check that box when this lawsuit was filed, while simultaneously making clear in writing on the application that it was not agreeing to the "gender ideology" prohibition because it believes it is legally invalid. Odsess-Rubin Decl. ¶ 17.

**Defs.' Resp:** Undisputed only as to NQT's subjective perceptions and / or intentions, but not material.

91.    Because the NEA revoked the certification requirement before NQT submitted Part 1 for the March 2025 cycle, NQT did not have to agree to the "gender ideology" certification in this funding cycle. *See* Eilers Decl. ¶ 8.

**Defs.' Resp:** Undisputed.

92.    Given NQT's name, NQT's mission, that it works with transgender actors, and that the vast majority of NQT projects lie at the intersection of queer—including transgender—identities, it is hard to imagine a project that NQT could pitch that would not be at a disadvantage in the review process. Odsess-Rubin Suppl. Decl. ¶ 8.

**Defs.' Resp:** Undisputed only as to NQT's subjective perceptions and / or intentions, but not material; inadmissible as speculation, Fed. R. Evid. 602; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied to the extent that NQT (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects or that the guidance imposes any categorical exclusions. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

93.    At the same time, it is not clear to NQT what does and does not qualify as "promoting" what the government deems to be "gender ideology," and that forces NQT to guess as to what, if anything, it can do to avoid having its projects perceived as "promoting gender ideology." Odess-Rubin Decl. ¶ 14.

**Defs.' Resp:** Undisputed only as to NQT's subjective perceptions and / or intentions, but not material. Denied to the extent that NQT (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

94.    It is not clear to NQT whether "promoting" what the government deems to be "gender ideology" includes merely working with actors, playwrights, and other artists who identify as transgender, nonbinary, or queer, regardless of the content of the art they produce. It is also unclear whether the mere existence of a transgender, nonbinary, or queer character in a piece violates the prohibition. *Id.*

**Defs.' Resp:** Undisputed only as to NQT's subjective perceptions and / or intentions, but not material. Denied to the extent that NQT (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

95.    NQT fears that its very mission as an organization dedicated to celebrating LGBTQ+ artists might also run afoul of the "gender ideology" prohibition. *Id.*

**Defs.' Resp:** Undisputed only as to NQT's subjective perceptions and / or intentions, but not material. Denied to the extent that NQT (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21.

These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

96.    NQT's concerns about the lack of clarity regarding what it means to "promote gender ideology" is heightened by the current language of the Assurance of Compliance. Suppl. Odess-Rubin Decl. ¶¶ 10-11.

**Defs.' Resp:** Undisputed only as to NQT's subjective perceptions and / or intentions, but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance). These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

97.    If NQT were to apply for future NEA funding, NQT would also have to certify in Part 1 of the application "to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "any false, fictitious, or fraudulent statements or claims may subject [the applicant] to criminal, civil, or administrative penalties." *Id.* ¶ 12.

**Defs.' Resp:** Undisputed as to the accuracy of the quoted statement(s), but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

98.    The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded works makes NQT fearful of seeking NEA funds in the future, and only adds to its

concerns about understanding what "promoting gender ideology" does and does not cover. *Id.* ¶ 12.

**Defs.' Resp:** Undisputed only as to NQT's subjective perceptions and / or intentions, but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance). These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

99.    If the Final EO Implementation remains in place, NQT is not likely to continue to apply for NEA grants. *Id.* ¶ 8.

**Defs.' Resp:** Undisputed only as to NQT's subjective perceptions and / or intentions, but not material; inadmissible as speculation, Fed. R. Evid. 602; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

100.    Given that NEA grants are already very competitive, anything that makes NQT less competitive is highly concerning, and could in effect mean that NQT does not stand a chance. *Id.* ¶ 7.

**Defs.' Resp:** Undisputed only as to NQT's subjective perceptions and / or intentions, but not material; inadmissible as speculation, Fed. R. Evid. 602; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied to the extent that NQT (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects or that the guidance imposes any categorical exclusions. ECF 17-1; ECF 21.

101.    Were it not for the Final EO Implementation, and the ambiguity introduced by the Assurance of Compliance, NQT would seek NEA funding, as it has received in the past, for future CQFs. *Id.* ¶ 13.

**Defs.' Resp:** Undisputed only as to NQT's subjective perceptions and / or intentions, but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance). Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

102.    The Theater Offensive, Inc. ("TTO") is a nonprofit theatrical organization whose mission is to present liberating art by, for, and about queer and trans people of color that transcends artistic boundaries, celebrates cultural abundance, and dismantles oppression. Byrd Decl. ¶ 2.

**Defs.' Resp:** Undisputed, but not material.

103.    Although TTO is open to all without regard to race, sex, or other identifying characteristics, it seeks in particular to support the voices of trans, nonbinary, and queer people, including people of color, who are often the most underserved in the theatrical community both on and offstage. Byrd Decl. ¶ 2.

**Defs.' Resp:** Undisputed, but not material.

104.    TTO's work regularly features transgender and nonbinary artists and themes. *Id.*

**Defs.' Resp:** Undisputed, but not material.

105.    TTO has previously received NEA grants in 2016, 2017, 2021, and 2022. Suppl. Byrd Decl. ¶ 3.

**Defs.' Resp:** Undisputed.

106.    In 2024, the NEA offered a grant for TTO's Queer [Re]public Festival in 2025, but the NEA revoked the grant months before the festival began, forcing TTO to find other sources of funding on short notice. *Id.*

**Defs.' Resp:** Undisputed, but not material.

107.    TTO applied for NEA funding in the March 2025 GAP cycle to support the production of a new play titled "Smoke," written by a transgender playwright. Set in 1960's D.C., "Smoke" explores love, found family, motherhood, and healing, and reveals the complexities of transgender life. The production will feature two transgender actors in the leading roles, and rehearsals would begin in May 2026. Byrd Decl. ¶ 10.

**Defs.' Resp:** Undisputed, but not material except as to establish venue and TTO's standing.

108.    The NEA funds would be used to support the artists in the play. *Id.*

**Defs.' Resp:** Undisputed, but not material.

109.    When this lawsuit was filed, TTO intended to check the box agreeing to the certification in the application because doing so was necessary to submit an application, but planned to simultaneously make clear in writing on the application that it is not agreeing to the "gender ideology" prohibition because it believes it is legally invalid. Byrd Decl. ¶ 17.

**Defs.' Resp:** Undisputed only as to TTO's subjective perceptions and / or intentions, but not material.

110.    Because the NEA revoked the certification requirement before TTO submitted Part 1 for the March 2025 cycle, TTO did not have to agree to the "gender ideology" certification in this funding cycle. *See* Eilers Decl. ¶ 8.

**Defs.' Resp:** Undisputed.

111.    TTO's application for the March 2025 cycle remains pending. Suppl. Byrd Decl. ¶ 4.

**Defs.' Resp:** Undisputed.

112.    TTO finds the Final EO Implementation unclear as to what constitutes "promoting" what the government deems to be "gender ideology"; it thereby forces TTO to guess as to what it can and cannot do with an NEA grant. *Id.* ¶ 6.

**Defs.' Resp:** Undisputed only as to TTO's subjective perceptions and / or intentions, but not material. Denied to the extent that TTO (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

113.    For example, it does not make clear whether "promoting" what the government deems to be "gender ideology" includes working with actors, playwrights, and other artists who identify as transgender and/or nonbinary, without more, or whether it prohibits only certain messages, themes, or views. It is unclear whether the existence of a transgender and/or nonbinary character in a piece constitutes "promoting" what the government deems to be "gender ideology." Nor is it clear what views are proscribed, including whether classic American works that feature drag might trigger the "gender ideology" penalty. Byrd Decl. ¶ 18; Suppl. Byrd Decl. ¶ 6.

**Defs.' Resp:** Undisputed only as to TTO's subjective perceptions and / or intentions, but not material. Denied to the extent that TTO (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

114.    TTO fears that its very mission as an organization dedicated to queer and trans people will be deemed to "promote gender ideology." Byrd Decl. ¶ 18.

**Defs.' Resp:** Undisputed only as to TTO's subjective perceptions and / or intentions, but not material. Denied to the extent that TTO (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

115.    TTO's concerns about the lack of clarity regarding what it means to "promote gender ideology" is heightened by the current language of the Assurance of Compliance. Suppl. Byrd Decl. ¶¶ 9-10.

**Defs.' Resp:** Undisputed only as to TTO's subjective perceptions and / or intentions, but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance). These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

116.    If TTO were to apply for future NEA funding, TTO would also have to certify in Part 1 of the application "to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "any false, fictitious, or fraudulent statements or claims may subject [the applicant] to criminal, civil, or administrative penalties." *Id.* ¶ 10.

**Defs.' Resp:** Undisputed as to the accuracy of the quoted statement(s), but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

117.    The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded works makes TTO fearful of seeking NEA funds in the future, and adds to its concerns about understanding what "promoting gender ideology" does and does not cover. *Id.*

**Defs.' Resp:** Undisputed only as to TTO's subjective perceptions and / or intentions, but not material. Denied to the extent that TTO (or any Plaintiff) contends that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance). These

contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

118.    Despite the Final EO Implementation, TTO will continue to apply for NEA grants because TTO believes it is important to showcase narratives that reflect the American people. *Id.* ¶ 11.

**Defs.' Resp:** Undisputed only as to TTO's subjective perceptions and / or intentions, but not material. Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

119.    Communications Group ("TCG") is a national theater organization with over 600 member theaters and affiliates and over 3,500 individual members. Cachapero Decl. ¶ 2.

**Defs.' Resp:** Undisputed, but not material except as to establish TCG's standing.

120.    TCG supports theater professionals through annual convenings, industry reports, workshops, webinars, and the publication of *American Theatre* magazine and TCG Books, while also awarding $43 million in funding and professional development support to more than 900 organizations and 1,300 individuals over its history of grantmaking. *Id.*

**Defs.' Resp:** Undisputed, but not material.

121.    TCG has members around the country, spanning 48 states. Suppl. Cachapero Decl. ¶ 2, ECF 12-2.

**Defs.' Resp:** Undisputed, but not material.

122.    Many of TCG's members apply for and receive funding from the NEA to support their artistic endeavors. Cachapero Decl. ¶ 6.

**Defs.' Resp:** Undisputed, but not material except as to establish TCG's standing.

123.    Many of those members wanted to apply for NEA funding in the March 2025 GAP cycle. *Id.*

**Defs.' Resp:** Undisputed, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2).

124.    Some of those members were deterred from applying for funding in the March 2025 cycle, though they had otherwise planned to and would have liked to, because they feared the penalties that could flow to them if they are deemed have made a false certification. *Id.* ¶ 9.

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

125.    Many of TCG's members also fear that if the promotion of what the government deems to be "gender ideology" affects the likelihood of receiving an NEA grant, they will be effectively barred from even being considered for NEA funding because they work with, or are, transgender, nonbinary, or queer artists, and are committed to treating all artists with equal dignity. *Id.* ¶¶ 9-11.

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied to the extent that TCG or its members (or any Plaintiff) contend that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

126.    For example, one member theater, which has received several NEA grants and whose mission includes presenting "diverse" stories of the American identity, had planned to apply in the March 2025 cycle. However, it decided not to apply because it would not agree to the

Assurance of Compliance in place when it had to make its decision—which stated that funds would not be used to "promote gender ideology"—because the member theater fundamentally disagrees with the "gender ideology" prohibition. Transgender people are part of the theater's workforce, audience, and arts education programs, and the theater recognizes all gender identities. It believes that not acknowledging transgender people or identity is discriminatory. As a result, the theater did not apply for an NEA grant that would otherwise cover 25 percent of their production cost. *Id.* ¶ 10.

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2).Undisputed that an NEA grant will not exceed 50% of a project's cost. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance). Denied to the extent that TCG or its members (or any Plaintiff) contend that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

127.    Many of TCG's members find the "gender ideology" term unclear, and it thereby forces them to guess as to what is and is not permitted with an NEA grant. *Id.* ¶ 12.

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied to the extent that TCG or its members (or any Plaintiff) contend that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

128.    When this lawsuit was filed, TCG had heard from members that they were uncertain about how to proceed, unsure of whether to apply knowing they would be barred from

eligibility because their project may express views that "promote" what the government deems to be "gender ideology," to apply with a different project, or forego applying for NEA funding altogether. *Id.* ¶ 13.

**Defs.' Resp:** Undisputed, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied to the extent that TCG or its members (or any Plaintiff) contend that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

129.    These members felt that they required legal advice to understand how to handle the uncertainty that had been imposed on them, and many were unable to access it in time. In addition, many members, especially smaller theaters, do not have existing relationships with lawyers or the money to support access to legal counsel, particularly on such a quick timeline. *Id.*

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

130.    When this lawsuit was filed, many TCG members expressed dismay at being forced to compromise on their commitment to free artistic expression and their ideals in order to seek NEA funding. These organizations seek to affirm all gender identities, including transgender, nonbinary, and queer identities. *Id.* ¶ 15.

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2).

131.    Some TCG members have also told TCG about the financial impact of losing NEA funding. For example, for one small theater, an NEA grant would cover their entire design team's wages, pension, and health. *Id.*

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2).

132.    Because the NEA's Final EO Implementation is not clear, many of TCG's members, as well as TCG itself, are forced to guess as to whether expressing any particular views will be deemed by the government to "promote gender ideology," thereby making them less likely to receive, or effectively ineligible for, an NEA grant in this or future funding cycles. Second Suppl. Cachapero Decl. ¶¶ 5, 7.

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied to the extent that TCG or its members (or any Plaintiff) contend that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; e.g., Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 589 (1998). Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

133.    TCG's concerns, and the concerns of its members, about the lack of clarity regarding what it means to "promote gender ideology" are only heightened by the current language of the Assurance of Compliance. *Id.* ¶¶ 8-9.

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance). These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g., Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

134.    If TCG or TCG members were to apply for future NEA funding, they would also have to certify in Part 1 of the application "to the statements contained in the list of certifications" contained in the NEA's specific instructions and agree that "any false, fictitious, or fraudulent statements or claims may subject [the applicant] to criminal, civil, or administrative penalties." *Id.* ¶ 10.

**Defs.' Resp:** Undisputed as to the accuracy of the quoted statement(s), but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance).

135.    The possibility of criminal penalties tied to "promoting gender ideology" in future NEA-funded works makes TCG and its members fearful of seeking NEA funds in the future, and only adds to its concerns about understanding what "promoting gender ideology" does and does not cover. *Id.*

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance). Denied to the extent that TCG or its members (or any Plaintiff) contend that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

136.    Many of TCG's members intend to apply for NEA funding in the July 2025 cycle and future cycles, but fewer are now planning to do so even compared to when the NEA had

initially imposed the certification requirement and eligibility bar on February 6, 2025. *Id.* ¶ 11; *see also* Cachapero Decl. ¶ 18.

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2).

137.    Because of the resources necessary to complete an NEA application, TCG members worry that the application for NEA funding is not worth the risk of having grants denied because of the Chair's disapproval of their views. Second Suppl. Cachapero Decl. ¶ 11.

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG members, but not material; inadmissible as hearsay, Fed. R. Evid. 801(c), 802; and thus insufficient to support summary judgment for Plaintiffs or to oppose NEA's cross-motion for summary judgment, Fed. R. Civ. P. 56(c)(2). Denied to the extent that TCG or its members (or any Plaintiff) contend that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21.

138.    TCG has received 42 NEA grants since 1998 to support fieldwide convenings, research, and other programming. Cachapero Decl. ¶ 5.

**Defs.' Resp:** Undisputed.

139.    When the lawsuit was filed, TCG intended to apply in the July 2025 funding cycle for funding for its 2026 national conference, which will include discussions about gender identity and will affirm transgender, nonbinary, and queer members of the theatre community. Second Suppl. Cachapero Decl. ¶ 12.

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG, but not material.

140.    Because of the Final EO Implementation, and the content and messages of TCG's national conference, however, TCG fears it would be unlikely to receive a grant. *Id.*

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG, but not material. Denied to the extent that TCG or its members (or any Plaintiff) contend that the NEA's predecisional guidance involves assessment of anything other than proposed projects. ECF 17-1; ECF 21. Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action.

ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

141.    TCG also fears the ambiguities and legal risks introduced by the Assurance of Compliance even if it were to receive NEA funding. *Id.*

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG, but not material. Denied concerning any requirement by any NEA applicant to certify compliance with EO 14168. ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)); Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance). These contentions also are not material, and the NEA disputes them, as the question of whether the NEA's predecisional guidance is unconstitutionally vague is a question of law and the guidance is not vague. ECF 17-1; ECF 21; *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

142.    TCG no longer intends to apply in the July 2025 cycle. *Id.*

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG, but not material.

143.    But for the Final EO Implementation and the current Assurance of Compliance, TCG would apply for NEA funding in future cycles. *Id.*

**Defs.' Resp:** Undisputed only as to the subjective perceptions and / or intentions of TCG, but not material. Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

144.    The NEA has been a longstanding funder for TCG, including grants in substantial amounts. *Id.* ¶ 13.

**Defs.' Resp:** Undisputed, but not material.

145.    No longer being competitive for NEA funding because of its desire to affirm and celebrate all gender identities would have a great impact on TCG. *Id.*

**Defs.' Resp:** Undisputed that the lack of NEA funding would impact TCG, but not material.

146.    The "gender ideology" prohibition caused TCG to divert a great deal of its time and resources. Cachapero Decl. ¶ 16.

**Defs.' Resp:** Undisputed, but not material.

147.    TCG diverted some of its research into polling members about how the requirement has affected their plans to apply, or not apply, for NEA funding. In addition, TCG's programming team has had to quickly pivot to provide its members and the larger field with informational webinars, federal action updates, and resource materials to help them assess their level of risk and guide their choices with respect to applying for NEA funding. *Id.*

**Defs.' Resp:** Undisputed, but not material.

148.    TCG has also had to expend substantial resources to help members respond to the Final EO Implementation, including efforts to answer their many questions and individual inquiries, more public speaking, having to create additional informational and communications resources, time and money spent monitoring developments from the NEA, and substantive changes to the work of many of TCG's teams. Second Suppl. Cachapero Decl. ¶ 14.

**Defs.' Resp:** Undisputed, but not material. Disputed to the extent that Plaintiffs' characterization of the NEA's predecisional guidance as "Final EO Implementation" suggests that the guidance constitutes final agency action. ECF 17-1 at 1, 2, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation)).

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

1.      Since at least 1999, the NEA has required the recipients of all grants to display prominently and across all of a winning project's promotion and materials the NEA's logo and a statement that the NEA had selected that project for funding. NEA, General Terms & Conditions for Grants and Cooperative Agreements to Organizations, at 4-5 (1999) (Beattie Decl., Ex. A at 4-5 (July 15, 2025); Beattie Decl. ¶¶ 3-4; NEA, General Terms & Conditions for Federal Financial Assistance Awards to Organizations, at 6-7 (Nov. 2024) (ECF 11-1, Ex. B).

2.      Congress has not appropriated money to the NEA for FY 2026. Beattie Decl. ¶ 5 (July 15, 2025)).

3.      The NEA's Assurance of Compliance language concerning executive orders does not apply to EO 14168. Beattie Decl. ¶¶ 6-7 (July 15, 2025); Beattie Decl., Ex. B at 11 (NEA, Assurance of Compliance (July 14, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance); ECF 11-1, Ex. A at 12 (NEA, Assurance of Compliance (Mar. 11, 2025), https://www.arts.gov/grants/legal-requirements-and-assurance-of-compliance (suspending certification requirement for EO 14168 during pendency of this action)); ECF 11-1, Ex. C, at 1 (Mem. from Carter to NEA Grantmaking Staff (Mar. 17, 2025) (rescinding application of EO 14168)); ECF 17-1 at 1, 6, 8 (NEA, Notice (Apr. 16, 2025) (predecisional guidance concerning EO 14168 implementation; noting lack of certification requirement)).

4.      Traditionally, concerning the NEA's first of two GAP funding cycles, the Council does not review and make recommendations on project applications until the end of the third week of October. The Chair's review of proposed projects follows shortly after the Council has made its recommendations. Beattie Decl. ¶ 8.