**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| RHODE ISLAND LATINO ARTS, NATIONAL QUEER THEATER, THE THEATER OFFENSIVE, and THEATRE COMMUNICATIONS GROUP, | Case No. 25-cv-79-WES-PAS |
| *Plaintiffs*, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| *v.* | |
| NATIONAL ENDOWMENT FOR THE ARTS, and MARY ANNE CARTER, in her official capacity as Acting Chair of the National Endowment for the Arts, | |
| *Defendants*. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................2

    I.   THE FINAL EO IMPLEMENTATION AND ASSURANCE OF
        COMPLIANCE VIOLATE THE FIRST AMENDMENT............................................2

        A.  *NEA v. Finley* Forecloses Defendants' Government Speech Argument............3

        B.  Defendants' Argument Fails on Its Own Terms .................................................6

            i.  The relevant expression is NEA-funded art, not NEA funding ........... 6

           ii.  Not all government spending on, or recognition of, private art
              is government speech ........................................................................ 9

    II.  THE FINAL EO IMPLEMENTATION AND ASSURANCE OF
        COMPLIANCE VIOLATE THE APA ..............................................................13

        A.  The Final EO Implementation and Assurance of Compliance Are Final
            Agency Actions and Plaintiffs' APA Claims Are Ripe ..................................13

        B.  The Final EO Implementation and Assurance of Compliance Exceed
            the NEA's Statutory Authority .........................................................................16

        C.  The Final EO Implementation and Assurance of Compliance Are
            Arbitrary and Capricious..................................................................................21

    III. THE FINAL EO IMPLEMENTATION AND ASSURANCE OF
        COMPLIANCE VIOLATE THE FIFTH AMENDMENT .........................................24

    IV. PLAINTIFFS' RECORD EVIDENCE IS ADMISSIBLE ........................................27

CONCLUSION.....................................................................................................29

CERTIFICATE OF SERVICE .................................................................................30

i

## TABLE OF AUTHORITIES

**Cases**

*Advocates for Arts v. Thomson*,
532 F.2d 792 (1st Cir. 1976) ..................................................................................................... 3

*American Federation of Government Employees, AFL-CIO v. Trump*,
No. 25-cv-03698-SI, 2025 WL 1358477 (N.D. Cal. May 9, 2025) ................................... 14, 15

*American Public Health Association v. National Institutes of Health*,
Nos. 25-10787-WGY, 25-10814-WGY, 2025 WL 1822487 (D. Mass. July 2, 2025) ........... 14

*American Public Health Association v. National Institutes of Health*,
Nos. 25-1611, 25-1612, 2025 WL 2017106 (1st Cir. July 18, 2025) ..................................... 21

*Bella Lewitzky Dance Foundation v. Frohnmayer*,
754 F. Supp. 774 (C.D. Cal. 1991) ........................................................................................ 26

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................................... 15

*Building and Construction Trades Department, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ................................................................................................ 23

*Chu v. Legion of Christ, Inc.*,
2 F. Supp. 3d 160 (D.R.I. 2014) ............................................................................................ 28

*Cintrón v. Hospital Comunitario El Buen Samaritano, Inc.*,
597 F. Supp. 3d 515 (D.P.R. 2022) ....................................................................................... 28

*Department of Commerce v. New York*,
558 U.S. 752 (2019) ............................................................................................................... 23

*Echavarria v. Roach*,
565 F. Supp. 3d 51 (D. Mass. 2021) ...................................................................................... 27

*Esperanza Peace & Justice Center v. City of San Antonio*,
316 F. Supp. 2d 433 (W.D. Tex. 2001) .................................................................................. 10

*FBI v. Fikre*,
601 U.S. 234 (2024) ............................................................................................................... 17

*Food & Drug Administration v. Wages and White Lion Investments, LLC*,
145 S. Ct. 898 (2025) ............................................................................................................. 15

*Fratiello v. Mancuso*,
653 F. Supp. 775 (D.R.I. 1987) .............................................................................................. 26

*Freedom From Religion Foundation, Inc. v. Abbott*,
955 F.3d 417 (5th Cir. 2020) ................................................................................. 10

*Freedom From Religion Foundation, Inc. v. Abbott*,
537 F. Supp. 3d 910 (W.D. Tex. 2021) .................................................................. 10

*Freedom From Religion Foundation, Inc. v. Abbott*,
58 F.4th 824 (5th Cir. 2023) .................................................................................. 10

*Freedom From Religion Foundation, Inc. v. Abbott*,
No. A–16–CA–00233–SS, 2016 WL 7388401 (W.D. Tex. Dec. 20, 2016) ........................... 10

*Frese v. Formella*,
53 F. 4th 1 (1st Cir. 2022) ..................................................................................... 25

*Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000) ............................................................................................. 17

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................................................. 26

*Harvey v. Veneman*,
396 F.3d 28 (1st Cir. 2005) ..................................................................................... 7

*Hopper v. City of Pasco*,
241 F.3d 1067 (9th Cir. 2001) ............................................................................... 11

*International Shipping Agency, Inc. v. Union de Trabajadores de Muelles Local 1740*,
No. 12-cv-01996, 2015 WL 5022794 (D.P.R. Aug. 21, 2015) ............................................. 27

*Johanns v. Livestock Marketing Association*,
544 U.S. 550 (2005) ............................................................................................... 7

*Kolender v. Lawson*,
461 U.S. 352 (1983) ............................................................................................. 26

*Legal Services Corp. v. Velazquez*,
531 U.S. 533 (2001) ............................................................................................... 7

*Local 8027 v. Edelblut*,
No. 21-cv-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024) ......................................... 26

*Louisiana v. Biden*,
543 F. Supp. 3d 388 (W.D. La. 2021) ...................................................................... 22

*Louisiana v. Biden*,
45 F.4th 841 (5th Cir. 2022) .................................................................................. 22

iii

*Matal v. Tam,*
    582 U.S. 218 (2017)............................................................................................. 7, 8

*McGriff v. City of Miami Beach,*
    84 F.4th 1330 (11th Cir. 2023) ................................................................................ 12

*McGuire v. Reilly,*
    386 F.3d 45 (1st Cir. 2004)....................................................................................... 7

*McInnis-Misenor v. Maine Medical Center,*
    319 F.3d 63 (1st Cir. 2003)...................................................................................... 16

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,*
    463 U.S. 29 (1983) .................................................................................................. 21

*National Council of Nonprofits v. Office of Management and Budget,*
    No. 25-239, 2025 WL 368852 (D.D.C. Feb. 3, 2025)........................................... 22

*National Education Association v. U.S. Department of Education,*
    __ F. Supp. 3d __, No. 25-CV-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025)........... 25

*National Park Hospitality Association v. Department of Interior,*
    538 U.S. 803 (2003)................................................................................................. 16

*NEA v. Finley,*
    524 U.S. 569 (1998)......................................................................................... passim

*Orr v. Trump,*
    No. 25-cv-10313, 2025 WL 1145271 (D. Mass. Apr. 18, 2025)........................... 22

*PETA v. Gittens,*
    414 F.3d 23 (D.C. Cir. 2005) .................................................................................. 12

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009)................................................................................................. 10

*Pulphus v. Ayers,*
    249 F. Supp. 3d 238 (D.D.C. 2017)........................................................................ 12

*Raven v. Sajet,*
    334 F. Supp. 3d 22 (D.D.C. 2018) .......................................................................... 12

*Regan v. Taxation with Representation of Washington,*
    461 U.S. 540 (1983)................................................................................................... 3

*Reno v. ACLU,*
    521 U.S. 844 (1997)................................................................................................. 24

iv

*Rhode Island Association of Realtors v. Whitehouse*,
   199 F.3d 26 (1st Cir. 1999) .................................................................................... 16

*Rhode Island v. Trump*,
   No. 25-cv-128, 2025 WL 1303868 (D.R.I. May 6, 2025) ....................................... 22

*Ridley v. Massachusetts Bay Transportation Authority*,
   390 F.3d 65 (1st Cir. 2004) ................................................................................. 4, 25

*Rosenberger v. Rector and Visitors of the University of Virginia*,
   515 U.S. 819 (1995) ........................................................................................ 5, 7, 9

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ........................................................................................... 5, 24

*Saia v. New York*,
   334 U.S. 558 (1948) ............................................................................................... 26

*Schiff v. U.S. Office of Personnel Management*,
   No. CV 25-10595-LTS, 2025 WL 1481997 (D. Mass. May 23, 2025) ...................... 9

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ............................................................................................... 15

*Sherley v. Sebelius*,
   689 F.3d 776 (D.C. Cir. 2012) ............................................................................... 23

*Shurtleff v. City of Boston*,
   596 U.S. 243 (2022) ............................................................................................. 7, 8

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*,
   502 U.S. 105 (1991) ................................................................................................. 5

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ............................................................................................... 25

*W.R. Grace & Co. v. U.S. EPA*,
   959 F.2d 360 (1st Cir. 1992) .................................................................................. 16

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ................................................................................................. 7

*Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*,
   No. 25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ................................ 22

**Statutes**

20 U.S.C. § 951 ............................................................................................... 18, 19, 20

20 U.S.C. § 954 ............................................................................................................ 18, 19

**Other Authorities**

Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ........................................... 14, 22

Reply Brief for Petitioner, *Matal v. Tam*, 582 U.S. 218 (2017) (No. 15-1293), 2017 WL 117333 ................................................................................................................................ 9

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................... 27

Fed. R. Evid. 602 ............................................................................................................... 28

Fed. R. Evid. 701 ............................................................................................................... 28

Fed. R. Evid. 803 ............................................................................................................... 28

**INTRODUCTION**

Defendants' Final EO Implementation and Assurance of Compliance unconstitutionally and unlawfully discriminate against a viewpoint the government does not like, and fail to offer the clarity the Constitution requires. The Final EO Implementation requires the Chair to review every project proposal recommended for approval for its viewpoint. If she concludes that the project "promotes gender ideology," she can reduce its chances of receiving funding merely because it expresses that disfavored view. At the same time, Defendants require that applicants certify that they will not use federal funds to "promote gender ideology." These provisions are statutorily unauthorized and unconstitutional, and therefore Plaintiffs are entitled to summary judgment on their First Amendment, APA, and Fifth Amendment claims. Indeed, this Court has already held that Plaintiffs are likely to prevail, and nothing that has occurred since the Court's initial decision changes that conclusion.

Defendants make two principal arguments in attempting to avoid liability. First, they argue that, because NEA funding is government speech, the Final EO Implementation is immune from any First Amendment constraints. But the Supreme Court foreclosed that possibility in *NEA v. Finley*, instead concluding—as this Court itself recognized at the preliminary injunction stage—that NEA grantmaking is subject to First Amendment scrutiny. *See* Mem. and Order 36–37, ECF No. 13. Even if Supreme Court precedent did not make this clear, application of the holistic government speech analysis would lead to the same conclusion: the history, public perception, and lack of government control of NEA-funded art shows that it is private speech. The fact that the NEA is selective in issuing grants does not transform a restriction on what the artist-recipient can say into "government speech." The First Amendment applies to multiple situations where the government distributes benefits to private speech on a selective basis, including trademarks,

1

limited public forums, and nonpublic forums—all of which preclude viewpoint discrimination. Moreover, even if NEA grantmaking were government speech, that could not immunize Defendants from all legal claims regarding its operation.

Second, Defendants contend that there is no need to address the Assurance of Compliance because they have (yet again) altered its language, this time qualifying applicants' attestation to "comply with all applicable Executive Orders" with a statement that "all compliance with [the Gender Ideology EO] is governed exclusively by the NEA's predecisional guidance concerning that EO, and not by the terms of these Assurances." Defs.' Br. 16, ECF No. 24. But their contention is wrong twice over. As a factual matter, the unqualified attestation that applicants comply with all EOs continues to appear on at least some live versions of the Assurance on the NEA's website. Statement of Additional Undisputed Facts ¶ 5. And, as a legal matter, even if the attestation were qualified, Defendants' alteration of the Assurance in response to this litigation cannot negate the need for, and propriety of, this Court's review.

For these reasons, the Court should grant summary judgment to Plaintiffs and deny summary judgment to Defendants on all claims.

## ARGUMENT

### I.   THE FINAL EO IMPLEMENTATION AND ASSURANCE OF COMPLIANCE VIOLATE THE FIRST AMENDMENT.

Beyond arguing that NEA funding is government speech, the government does not contest Plaintiffs' First Amendment arguments on the merits. Thus, if the Court decides that NEA-funded art is private speech, not government speech, Plaintiffs prevail. Under any reasonable application of the government speech doctrine, NEA-funded projects are private speech, and the mere fact that the government is selective about which private speech it supports does not transform the art into some sort of "government art."

2

### A.    *NEA v. Finley* Forecloses Defendants' Government Speech Argument.

The vast majority of Defendants' brief is spent arguing that this case is entirely about government speech because the NEA exercises discretion in selecting projects to fund. But as this Court already recognized, the Supreme Court's decision in *NEA v. Finley* forecloses that argument. *See* Mem. and Order 36–37, ECF No. 13 (rejecting Defendants' government speech argument in part based on *Finley*). Had the Supreme Court concluded that NEA-funded art constitutes "government speech," it would not have needed to subject the challenged provision to First Amendment review at all. Instead, it "engaged in [] lengthy analysis of the plaintiffs' claims [and] suggested that violations of the First Amendment could occur in the grantmaking context." *Id.*

The *Finley* Court expressly states that "the First Amendment certainly has application in the subsidy context," and cautions that, "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas,'" *NEA v. Finley*, 524 U.S. 569, 587 (1998) (alteration in original) (quoting *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 550 (1983)). It notes "[p]ermissible applications" of Section 954(d)(1), but "recognize[s], of course, that reference to these permissible applications would not alone be sufficient to sustain the statute against . . . First Amendment challenge." *Id.* at 584–85. Were NEA grants government speech, *every* application of the law would have been permissible under the First Amendment, yet that is not what the Supreme Court held.[1]

---

[1] In a pre-*Finley* decision, the First Circuit came to a remarkably similar conclusion. It rejected a challenge to a content-based denial of funding by the New Hampshire equivalent of the NEA but cautioned that a "claim of discrimination would be another matter . . . . [I]f the danger of distortion were to be evidenced by a pattern of discrimination impinging on the basic first amendment right to free and full debate on matters of public interest, a constitutional remedy would surely be appropriate." *Advocs. for Arts v. Thomson*, 532 F.2d 792, 798 (1st Cir. 1976) (footnote and citation omitted).

3

As discussed in more detail below, the proper inquiry is whether NEA-funded art, not NEA funding and recognition, is government speech. *See* Mem. and Order 34, ECF No. 13. Notably, however, *Finley* forecloses either argument. Whether the expression at issue is the resulting art or (somehow) the government funds, precisely the same grantmaking program was at issue in *Finley* as is before the Court here, and the Supreme Court held that First Amendment scrutiny applies.

Defendants attempt to avoid this conclusion by highlighting the Supreme Court's observation that, in the context of selective subsidies, the government gets to "pick and choose funding winners and losers," and its conclusion that NEA funding is not a limited public forum. Defs.' Br. 12, ECF No. 24. Plaintiffs do not dispute either point—but neither refutes Plaintiffs' argument.[2] Of course, the First Amendment allows the government to choose winners and losers in grants, even if the grant exists to facilitate private speech and even if all applicants pitch protected speech; it can discriminate on the basis of content, but the one thing the First Amendment does *not* allow "even in the provision of subsidies" is viewpoint-based discrimination. *Finley*, 524 U.S. at 587.

Defendants also characterize *Finley*'s rule against viewpoint-based discrimination as dicta, but that portion of the decision—nearly half of the opinion—explains the case's core holding: Section 954(d)(1), as implemented at the time, did not violate the First Amendment specifically because it did not "compel[] the NEA to deny funding on the basis of viewpoint discriminatory

---

[2] Though *Finley* rejected the idea that NEA grantmaking constitutes a limited public forum, it did not reject Plaintiffs' argument that it is a nonpublic forum. As the First Circuit explained in *Ridley v. Massachusetts Bay Transportation Authority*, "selectivity and discretionary access"—two of the factors of NEA grantmaking that the NEA seeks to immunize itself behind—"are defining characteristics of non-public fora." 390 F.3d 65, 95 (1st Cir. 2004). Indeed, *Ridley* pointed to *Finley* in explaining the standards that govern nonpublic fora. *Id.* The NEA's grantmaking is a nonpublic forum, and the rule against viewpoint-based discrimination independently governs for that reason as well.

criteria" and was "aimed at reforming procedures rather than precluding speech," 524 U.S. at 581–82; but if it had required or resulted in viewpoint-based discrimination, the result would have been different, *id.* at 587. Equally, that Justice Scalia's concurrence would not have found a First Amendment violation does not change the fact that his view failed to command a majority. Indeed, when *Finley* was being litigated, even "the NEA itself concede[d that] a more pressing constitutional question would arise if Government funding resulted in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" *Id.* (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)). That the government takes a different position now does not make *Finley* any less binding.[3]

Defendants also hint that *Finley* is no longer good law because it pre-dates the bulk of "government speech" jurisprudence. *See* Defs.' Br. 18, ECF No. 24 (noting that cases Plaintiffs rely on "all pre-dat[e] *Summum*"). But the "government speech" doctrine existed before *Finley* was decided, and *Finley* engaged with the relevant cases. For example, both *Rust v. Sullivan* and *Rosenberger v. Rector and Visitors of the University of Virginia* recognize that "when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *See Rosenberger*, 515 U.S. 819, 833 (1995); *Rust*, 500 U.S. 173, 194 (1991)

---

[3] Defendants' own brief notes that *Finley* rejected the First Amendment claim because the statute did not impose a viewpoint-based burden. *See* Defs.' Br. 11, ECF No. 26 ("First, the Court noted that Section 954(d)(1) 'imposes no categorical requirement,' which undermined the artists' contention that the NEA would 'inevitably utilize the provision as a tool for invidious viewpoint discrimination.'" (quoting *Finley,* 524 U.S. at 581–82)). It is precisely analysis along those lines, which appears throughout *Finley*, *see* 524 U.S. at 580–87, that would have no place in the opinion if all that were at issue were government speech. Moreover, all of the arguments that Defendants make with respect to the 1990 Amendments, from their contention that the government consider not only freedom of thought but also public accountability to their reflection of the public's ire vis-à-vis NEA grantmaking, would have been relevant in *Finley*—which was a challenge to the Amendments themselves—yet the Court concluded that NEA-funded art is private speech.

(similar); *Finley,* 524 U.S. at 579, 586, 588 (citing *Rosenberger* and *Rust*). Thus, *Finley*'s rule against viewpoint-based discrimination in NEA grantmaking is binding on this Court.

**B.      Defendants' Argument Fails on Its Own Terms.**

Even if *Finley* did not foreclose Defendants' argument, it is clear that NEA-funded art is not government speech, and that the proper focus of the Final EO Implementation is the art that the NEA funds. Defendants do not dispute that the speech of NEA-funded artists is their own, nor do they contend that NEA-funded projects are designed to express some government policy. Instead, they argue that their selection decisions—and the "stamp of approval" that accompanies them—is government speech, and therefore allows it to impose viewpoint-based criteria on private art. They are wrong.

i.      <u>The relevant expression is NEA-funded art, not NEA funding.</u>

This Court previously concluded that "the expression at issue . . . [i]s NEA-funded art." Mem. and Order 34, ECF No. 13. That is correct, and not just because *Finley* itself so requires.

First, the Final EO Implementation does not restrict what the *government* can say when it decides who to fund; instead, it restricts the viewpoint expressed *by the funding recipient*. The government is free, of course, to say in its award notices that "nothing in this approval shall be construed as promoting gender ideology." Nothing in the Final EO Implementation bars such a statement, or even addresses what the *government* says when awarding grants. Instead, the Final EO Implementation makes "promoting gender ideology" *by the would-be recipient* a negative factor in Defendants' decision about which private art to support. And the Assurance of Compliance requires the recipient—not the government—to attest that they will not "promote gender ideology." Thus, Defendants limit private artistic speech, not the government's own message.

6

Second, the Supreme Court and the First Circuit have both been clear about the rubric that applies to cases about government spending. They turn not on whether the government spent money, or even spent it selectively, but on whether it "disburses public funds to private entities to convey a governmental message" or to "facilitate private speech." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541-42 (2001) (citation omitted); *see also Rosenberger*, 515 U.S. at 833–34 ("a program to encourage private speech" differs from one that "use[s] private speakers to transmit specific information" about the government's "own program"); *Harvey v. Veneman*, 396 F.3d 28, 42–43 (1st Cir. 2005); *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004). "Neither the latitude for government speech nor its rationale applies to subsidies for private speech in every instance." *Velazquez*, 531 U.S. at 542.[4]

Third, as discussed in Plaintiffs' opening brief, Pls.' Br. 16, ECF No. 22-1, the Supreme Court has expressly rejected the argument that selectivity in government spending, or the government's "stamp of approval," suffice to create government speech. In *Shurtleff*, the government's expenditures on—and even control over—choosing when a flag would be displayed, maintaining the "physical premises" on which it was raised, and "provid[ing] a hand crank" to "rig and raise . . . flags" did not transform the private flag displayed into government speech. *Shurtleff v. City of Boston*, 596 U.S. 243, 256 (2022). "[I]t [wa]s Boston's control over the flags' content

---

[4] Were it otherwise, the Supreme Court's government speech cases would look no further than whether the government chose what to fund, yet every one instead asks whether the *speech* that is funded belongs to the government or a private speaker. *See, e.g.*, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005) (when "consider[ing] whether a federal program that finances generic advertising . . . violates the First Amendment," "the dispositive question is whether the generic advertising at issue is the Government's own speech"); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) (considering whether "specialty license plates," not the money expended on producing them, "convey government speech"); *Matal v. Tam*, 582 U.S. 218, 235 (2017) ("At issue here is the content of trademarks that are registered by the PTO . . . ."); *Shurtleff v. City of Boston*, 596 U.S. 243, 255 (2022) ("[W]e must examine the details of *this* flag-flying program").

and meaning that . . . [wa]s key," for it is "that type of control [that] would indicate that Boston meant to convey the flags' messages." *Id.*

The Supreme Court rejected a virtually identical argument in *Matal v. Tam*, which involved the selective distribution of trademarks to private speakers. The Court rejected the argument that the Trademark Office's selectivity transformed the trademark into government speech, and held that the trademark itself, not the decision to register it, was the relevant focus in terms of assessing whether private or government speech was involved. *Matal v. Tam*, 582 U.S. 218, 235 (2022). The Court refused to hold that "the registration of a trademark converts the mark into government speech," for that would mean that "other systems of government registration could easily be characterized in the same way." *Id.* at 239. And expressly rejecting the same "stamp of approval" argument the NEA makes here, the Court held that "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id.* at 235.

Defendants argue that *Matal* is distinguishable because once a mark qualifies for a trademark under 15 U.S.C. § 1052(a), the PTO must grant it. But the fact that Congress rather than the Executive imposed selective criteria on trademark decisions has no relevance to the question of whether the trademark speaks for the private entity or expresses a government message. If government selectivity were sufficient to transform private speech into government speech, it would not matter which branch of government imposed the selection. Yet the *Matal* Court explicitly held that "[t]rademarks are private, not government, speech," and applied the First Amendment's ban on viewpoint-based discrimination. 582 U.S. at 239.[5]

---

[5] Indeed, the Court rejected a "government speech" argument in *Matal* even though the government itself publishes the trademarks it registers. The government argued that trademark

8

If Defendants were correct that the act of selecting which private speech to support transforms a program into government speech immune from the First Amendment's prohibition against viewpoint discrimination, *every* government expenditure supporting private speech would be immune. It would mean that the NEA could decide to fund only performances portraying President Trump in a positive light. That is not what the First Amendment allows.

Indeed, Defendants' argument would require a rewriting of forum doctrine. In limited and nonpublic forums, the government by definition exercises selectivity over the content and scope of the speech supported, yet the First Amendment places precisely the same prohibition on viewpoint discrimination there that it places on government spending that facilitates private speech here. *See Rosenberger*, 515 U.S. at 829; *Schiff v. U.S. Off. of Pers. Mgmt.*, No. CV 25-10595-LTS, 2025 WL 1481997, at *7 (D. Mass. May 23, 2025) (holding that removal of articles that "promote gender ideology" from limited public forum was unconstitutional viewpoint-based discrimination).

> ii.     <u>Not all government spending on, or recognition of, private art is government speech.</u>

While the government might sometimes select art to express an official message, as when it commissions a monument to commemorate those who fought and died in American wars, or selects art for a national history museum, that does not mean that every decision to support private art turns it into official government art. Where, as here, the government funds are designed to

---

registration "causes the mark to be placed on the PTO's . . . Register[s] and on certificates of registration, which are communicated to foreign governments," thus "incorporati[ng] marks into official government documents and records." Reply Br. for Pet'r, *Matal v. Tam*, 582 U.S. 218 (2017) (No. 15-1293), 2017 WL 117333, at *14–15. Even where the government spent money, offered government registration, and *itself communicated* the marks to others, the Supreme Court held that the program was not government doncent speech. The NEA does much less communicating here.

facilitate private expression, not turn artists into government mouthpieces, it is bound by the First Amendment. While "the government is not required to fund arts programs . . . if it chooses to do so, it must award the grants in a scrupulously viewpoint-neutral manner." *Esperanza Peace & Just. Ctr. v. City of San Antonio,* 316 F. Supp. 2d 433, 447 (W.D. Tex. 2001).

In *Freedom From Religion Foundation, Inc. v. Abbott*, for example, the district court held that displays of private art in the Texas Capitol did not constitute government speech, even though each application had to "be accompanied by a recommendation from the Governor, the Lieutenant Governor, or a member of the Texas [Congress]," the exhibits had to "have a 'public purpose'" and the government "retain[ed] final approval of the exhibit applications." No. A–16–CA–00233–SS, 2016 WL 7388401, at *1 (W.D. Tex. Dec. 20, 2016), *rev'd and vacated*, 955 F.3d 417 (5th Cir. 2020). The court rejected the idea that the government's "final approval authority" sufficed to make it government speech, noting that accepting such an argument could "turn 'free speech' doctrine into a jurisprudence of labels." *Id.* at *5 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 484 (2009) (Breyer, J., concurring)). On appeal, the Fifth Circuit reversed the specific relief granted by the district court on sovereign immunity grounds, but affirmed the not-government-speech holding. *Freedom From Religion Found. v. Abbott*, 955 F.3d at 424, 429.[6]

Similarly, in *Hopper v. City of Pasco*, the Ninth Circuit held that a city violated artists' First Amendment rights when it first "invited [them] to display their work at city hall, and then

---

[6] After remand, the district court held that the government's viewpoint-based rejection of a display violated the First Amendment notwithstanding that the policy by then stated that all displays were government speech. *Freedom From Religion Found., Inc. v. Abbott*, 537 F. Supp. 3d 910, 918 (W.D. Tex. 2021). On subsequent appeal, the Fifth Circuit held that the case was moot because the government had shut down the entire program while the appeal was pending. *Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 831, 832 (5th Cir. 2023). Nevertheless, it kept the district court's declaratory relief in place because, given "the Defendants' wrongful prior exclusion of the [plaintiff's] exhibit," "this precedent is particularly valuable because it might bear on future . . . policies . . . and . . . disputes." *Id.* at 828, 837 (citation omitted).

summarily disinvited [them] when their submissions provoked controversy." 241 F.3d 1067, 1070 (9th Cir. 2001). Though the program at issue was (1) created to avoid "rais[ing] issues that have caused trouble for the [NEA], i.e., offensive or politically motivated art"; (2) the city provided that "the City Hall Gallery [shall not be used] as a venue for controversy"; and (3) a notice told artists that their works will be subject to "restraints that would be accepted with a public arts project paid for with public money," the court rejected the government's argument that "it did not intend to establish a public forum, but only to display noncontroversial art." *Id.* at 1071, 1078. Instead, the court held that the artists' exclusion violated the First Amendment. Defendants' arguments here that their accountability to the public shields them from First Amendment scrutiny raise similar heckler's veto concerns.

Defendants rely on four cases to suggest that all arts patronage by the government is government speech, but those cases do not create any such rule; instead, they reflect a holistic assessment of the specific programs at issue, all of which are very different from this case.[7] As this Court has already concluded in rejecting this very argument, "lump[ing this case] together with . . . cases involving public art exhibits, Smithsonian-commissioned portraits, or public monuments" would conflate it "with situations in which the government exercises far more creative control over the production than is contemplated by [the NEA's authorizing statute]." *See* Mem. and Order 35–36, ECF No. 13.

The Court has already noted that two of the cases Defendants rely on are distinguishable because they reflect a different history, public perception, and level of government control. Mem.

---

[7] For similar reasons, this case is very different from *Summum*. There, the government was selecting private monuments to display on government property to express a government message, much like war memorials or the FDR, Lincoln, Jefferson, and Washington Monuments. Here, by contrast, the NEA program is not enlisting artists to express a government message; it is simply supporting excellent private art.

11

and Order 35, ECF No. 13 (distinguishing *PETA v. Gittens,* 414 F.3d 23 (D.C. Cir. 2005), and *Raven v. Sajet*, 334 F. Supp. 3d 22 (D.D.C. 2018)). Defendants' two additional citations are distinguishable for much the same reasons. In *McGriff v. City of Miami Beach*, the Eleventh Circuit held that an art installation that was part of a city festival constituted government speech because the government not only funded but also (1) "t[ook] ownership over the art, (2) control[led] how the art was to be disseminated, and (3) subject[ed] the art to the reasonable satisfaction of the City Manager." 84 F.4th 1330, 1332, 1334–35 (11th Cir. 2023). In *Pulphus v. Ayers*, the district court held that a congressional art competition in which art was "hung on the walls of the Capitol, associated with a congressional district, and labeled with the name of a member of Congress"; displayed in a non-public area of the Capitol; and for which the artist agreed that "suitability . . . will be [determined] by a House panel" constituted government speech. 249 F. Supp. 3d 238, 249–50 (D.D.C. 2017).[8] In each case, the government exercised significant control over the art, whether through actual ownership or, at a minimum, approval of, and the right to reject, the completed artwork. Typically, the government was also the main or only funder. The public's perception was, relatedly, that the work reflected the government's views. And, in some cases, the government had used the space or program to communicate its own messages in the past.

As discussed in Plaintiffs' opening brief, not one of those factors is present here: the NEA does not fully fund the art at issue, much less own it; the NEA does not control how or where the art is disseminated; the art need not be completed "to the reasonable satisfaction" of any government employee; and the NEA has historically funded works to encourage a diversity of

---

[8] In *Pulphus*, the court held that the entirety of Defendants' argument here—that selection of an art piece for the government's patronage constitutes government speech—failed to establish just one of the factors in the government speech inquiry. 249 F. Supp. 3d at 249 (holding that the history-of-the-medium "factor is therefore inconclusive").

views. Indeed, Defendants agree to financially support proposals for projects before they are even made; they do not choose among completed works. SUF ¶ 86, ECF No. 23. Thus, they do not control—and cannot even be said to approve of—every aspect of a finished product.[9] For all of these reasons, that the NEA is listed as a funder and chooses what it funds cannot suffice to make this a case about government speech.

## II.  THE FINAL EO IMPLEMENTATION AND ASSURANCE OF COMPLIANCE VIOLATE THE APA.

### A.  The Final EO Implementation and Assurance of Compliance Are Final Agency Actions and Plaintiffs' APA Claims Are Ripe.

Defendants are wrong to claim that the NEA's viewpoint-based discrimination and certification requirement are not final agency actions and that, for the same reason, Plaintiffs' APA claims are not ripe.

The Final EO Implementation and Assurance of Compliance are final agency actions.[10] Defendants repeat the tired argument that the Final EO Implementation is "predecisional guidance," with "consummation of the NEA's GAP decisionmaking" not occurring until later in the year. Defs.' Br. 33, ECF No. 24; *see also* Defs.' Mot. for Protective Order 2, ECF No. 17. But as Plaintiffs have already stated, Pls.' Br. 18, ECF No. 22-1, their challenge is not to any *individual* funding decision; it is to Defendants' *policy* of considering "whether the proposed project

---

[9] Defendants also argue that history supports the NEA because the NEA is a government actor, and because the Chair is accountable to the President. But the fact that the NEA is a government body does not mean the First Amendment is irrelevant; to the contrary, it highlights the role of the First Amendment, which restricts only acts by the government. Equally, political appointees are typically at the helm of agencies, but that does not make everything they do government speech or immune from First Amendment challenge. If anything, the Chair's reporting to the President only underscores the likelihood that she will penalize projects that "promote gender ideology."

[10] With respect to the Assurance against "promoting gender ideology," Defendants argue only that it is no longer in place, not that it was not final agency action. *See* Pls.' Br. in Supp. of Prelim. Inj. 14–16, ECF No. 2-1 (explaining why Assurance is final agency action).

13

promotes gender ideology" in evaluating applications, SUF ¶¶ 35–36, ECF No. 23, and allowing that factor to only "weigh against the project's final approval," *id*. ¶¶ 37–39.[11] *See Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, Nos. 25-10787-WGY, 25-10814-WGY, 2025 WL 1822487, at *14 (D. Mass. July 2, 2025) ("The Challenged Directives . . . constitute final agency actions at the macro-level, and the resultant, downstream individual terminations and other effects are also independent final agency action . . . ."); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-cv-03698-SI, 2025 WL 1358477, at *1, *21 (N.D. Cal. May 9, 2025) (holding OMB/OPM memo implementing executive order "to initiate large-scale reductions in force (RIFs)" was final agency action even though "the ultimate impacts of the RIFs may yet be unknown").

The Final EO Implementation marks the consummation of Defendants' decisionmaking with respect to implementing the EO. *See* Exec. Order No. 14168 § 3(g), 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."). It specifically states that because "appropriate action is needed to incorporate the EO in the NEA's grant application review process," the NEA is "publish[ing the Final EO Implementation as an] explanation of its intended action to implement

---

[11] Defendants argue that Plaintiffs have inaccurately characterized the policy, noting that a project's promotion of "gender ideology" "*could* weigh against the project's final approval," not that it *will*. Defs.' Br 35, ECF No. 24. In response to the Requests for Admission, however, Defendants "admitted," with qualifications, that the "conclusion that a proposed project 'promotes gender ideology' will make it less likely that the project will receive an NEA grant," and "denied," with qualifications, that it "will make no difference[.]" Defs.' Objs. and Resps. to Pls.' Reqs. 2, ECF No. 21. As the Final EO Implementation itself states, "[t]he EO requires executive agencies . . . to ensure that agency funds are not used to promote gender ideology," ECF No. 17-1 at 1, such that the Chair's determination that a project "promotes gender ideology" cannot possibly increase its chances of getting funded—nor do Defendants argue that it could. To the extent that Defendants claim that promotion of "gender ideology" may simply not matter at all, with artistic merit and excellence continuing to govern as before, that defies common sense—and is inconsistent with the Final EO Implementation's statement that new action is necessary to implement the EO.

[the EO]" and that its purpose is to "outline[] . . . how it will implement [the EO] in [the NEA's] review process." SUF ¶ 35, ECF No. 23. The policy articulated in the Implementation is not "merely tentative or interlocutory." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). "[N]owhere do defendants assert that" the Final EO Implementation "itself is subject to change or is in draft form." *AFL-CIO*, 2025 WL 1358477, at *21.[12] Its issuance is "done and final." *Id*.[13]

Defendants deny that the Final EO Implementation has "direct and immediate consequences" for Plaintiffs because their "projects could still receive NEA funding." Defs.' Br. 35, ECF No. 24. Again, Plaintiffs do not challenge any individual funding decision, but the *policy* of disfavoring project applications that "promote gender ideology"[14] and the requirement that applicants certify that they will not "promote gender ideology" with federal funds. As a result of the Final EO Implementation, Rhode Island Latino Arts ("RILA") has self-censored by foregoing any proposal that might be deemed to promote "gender ideology." SUF ¶ 62, ECF No. 23. Other Plaintiffs will seriously hesitate before applying so long as the Final EO Implementation and Assurance of Compliance remain in place. *Id*. ¶¶ 72, 75, 99, 101, 142–43 Plaintiffs did not, as

---

[12] Indeed, though Defendants refer to the Implementation as "predecisional guidance" in briefing, the file name viewable on the NEA's website is "final.notice.implementation.eo14168.pdf." *See* Beattie Decl., Ex. B at 11, ECF No. 25-1.

[13] Defendants' citation to *Food & Drug Administration v. Wages and White Lion Investments, LLC*, 145 S. Ct. 898 (2025), Defs.' Br. 33, ECF No. 24, is wholly inapposite. The cited portion of the opinion addresses whether defendant agencies were required "to use notice-and-comment rulemaking to set out the requirements that must be met in a premarket tobacco product application" or could develop regulatory standards by "'individual order' in an adjudication." *White Lion*, 145 S. Ct. at 915 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947)). Nowhere does the opinion address whether the agencies had engaged in a final agency action.

[14] For the same reason, Defendants' contention that "[t]he only way to test whether any of the Plaintiffs will have been affected adversely . . . would be based on a full administrative record that does not yet exist," Defs.' Br. 34, ECF No. 24, misses the mark. The relevant record is that related to the *policy* contained in the Final EO Implementation and the Assurance of Compliance, not to any individual funding decision.

15

Defendants imply, concoct these consequences out of thin air. *See* Defs.' Br. 35, ECF No. 24 (describing Plaintiffs as "try[ing] to supply immediate consequences that are lacking"). These consequences flow directly and immediately from Defendants' own policy to implement the EO.

For the same reasons, Plaintiffs' APA claims against the Final EO Implementation are ripe: the issues are fit for judicial decision and withholding court consideration would cause Plaintiffs' hardship. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Because "the issue presented is . . . legal, as opposed to factual, and the . . . challenged agency action is final," it is fit for judicial review. *W.R. Grace & Co. v. U.S. EPA*, 959 F.2d 360, 364 (1st Cir. 1992); *see also R.I. Ass'n of Realtors v. Whitehouse*, 199 F.3d 26, 34 (1st Cir. 1999) (whether prohibition "unconstitutionally restrain[s] free expression" is purely legal). And as discussed above, withholding the Court's consideration would cause hardship with "direct and immediate consequences" for Plaintiffs and their members. *See McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (hardship inquiry "typically turns upon whether the challenged action creates a 'direct and immediate' dilemma for the parties" (citation omitted)).

### B.    The Final EO Implementation and Assurance of Compliance Exceed the NEA's Statutory Authority.

As with the constitutional claims against the Assurance of Compliance, Defendants do not argue that Plaintiffs' APA challenge to it fails on the merits, instead resting on their purported

16

rescission. That fails to moot Plaintiffs' claim and, because Defendants do not otherwise contest the merits, Plaintiffs are entitled to judgment on it.[15]

With respect to the Final EO Implementation, Defendants' response is grounded in a radical and unsupported interpretation of the National Foundation on the Arts and the Humanities Act ("the Act"): that because the 1990 Amendments authorize the Chair to take into consideration "respect for the diverse beliefs and values of the American public," the Chair is free to discriminate against projects based on a specific viewpoint—here, that of "promoting gender ideology." Defs.' Br. 35–36, ECF No. 24; *see also id.* at 36 (objecting to Plaintiffs' reading of the Act "to preclude any 'viewpoint-based' standard"). This argument makes a mockery of the words "respect" and

---

[15] The NEA continues to host the unqualified Assurance of Compliance on its website. Statement of Additional Undisputed Facts ¶ 5. Multiple NEA webpages lead to the unqualified Assurance of Compliance language, including the page hosting the qualified language. *Id.* ¶ 6. Other language on the NEA website also states that federal award recipients "assum[e] legal, financial, administrative, and programmatic responsibility" to follow "Executive Orders governing Federal financial assistance awards," regardless of whether they receive specific or additional notice of the EO-related requirements. *Id.* ¶ 7.

Even if the change had been clear and universal, it would not moot the claim. Under the "voluntary cessation" doctrine, Defendants bear the "formidable" burden of "show[ing] that the practice cannot 'reasonably be expected to recur.'" *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189, 190 (2000)). Otherwise, "a defendant might suspend its challenged conduct after being sued . . . and later pick up where it left off." *Id.* Indeed, Defendants have done exactly that. Their initial rescission was expressly tied to "the outcome of this litigation." SUF ¶¶ 31, 32, ECF No. 23. After this Court concluded that Plaintiffs' request to preliminarily enjoin the certification for the March 2025 cycle was moot, Defendants reimposed it. *Id.* ¶¶ 41, 42. And they altered it again in response to Plaintiffs' summary judgment motion, Defs.' Br. 16, n.11, ECF No. 24—two days before the government filed its cross-motion for summary judgment, and two weeks after Plaintiffs filed their motion. Beattie Decl. ¶ 7, ECF No. 25-1; *Id.* Ex. B. If the NEA can simply edit its website to coordinate with the government's filings, then it could just as easily edit after the Court's decision on the summary judgment motions to universally reinstate the certification at issue. *See Fikre*, 601 U.S. at 241.

The situation currently before the Court differs from the posture at the preliminary injunction stage, when the Court found that the rapidly approaching submission deadline meant that the NEA would be highly unlikely to reimpose the certification requirement before March 2025 applications were due. *See* Mem. and Order 19-20, ECF No. 13. At this juncture, the possible reinstatement applies to future application cycles.

17

"diverse," morphing them into vehicles for penalizing *any* viewpoint the government disfavors. By Defendants' logic, the Chair could deem the promotion of conservative ideology one of many "diverse beliefs and values" and, on that basis, penalize applications "promoting liberal ideology." The text, purpose, and history of the Act do not countenance such outcomes.

First, Defendants misrepresent Plaintiffs' plain text argument by asserting that "Plaintiffs' reading . . . implies that the NEA must fund *every* project deemed artistically meritorious." Defs.' Br. 36, ECF No. 24 (emphasis added). Plaintiffs have never made such an assertion. Rather, as the plain text of the Act instructs, Plaintiffs merely show that the NEA must use "artistic excellence and artistic merit" as "*the* criteria by which applications are *judged*," 20 U.S.C. § 954(d)(1) (emphasis added). Indeed, no Plaintiff asserts that they are *entitled* to a grant, including irrespective of "limited Congressional appropriations." Defs.' Br. 36, ECF No. 24.[16] Rather, they simply ask that the NEA, in accordance with the plain text of the Act, evaluate their applications on the basis of artistic excellence and merit, not the expression of any disfavored viewpoint.

Defendants rely on this straw man to obscure the weakness of their plain text argument. They argue that "Sections 951(1), (5), and (6) as well as the concluding clause of Section 954(d)(1) . . . expand the factors Congress authorized the NEA's Chair to consider in awarding grants" beyond those of "artistic excellence and artistic merit." *Id.* But nothing in the cited sections of Section 951—which state that Congress "finds and declares" that "[t]he arts and the humanities belong to all the people of the United States," 20 U.S.C. § 951(1), "[p]ublic funds provided by the Federal Government must ultimately serve public purposes the Congress defines," *id*. § 951(5),

---

[16] That Congress has not appropriated NEA funds for 2026 does not make Plaintiffs' claims speculative, moot, or unripe because the 2025 grant application process remains ongoing, as does the congressional budget process for 2025. *See also* Pls.' Resps. to Defs.' Statement of Undisputed Facts ¶ 1.

and "[t]he arts and the humanities reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups," *id*. § 951(6)—authorizes the Chair to pick and then discriminate against a specific viewpoint, particularly one that recognizes the existence and experiences of a group of Americans. Nor does the "concluding clause of Section 954(d)(1)," Defs.' Br. 36, ECF No. 24, which states that the Chair must "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1).

To the contrary, Section 951's emphasis on respect and belonging for all American people precludes discrimination against government-disfavored views, and instead calls for an openness to and respect for *all* people and experiences. And the Amendments' tether to the "public purposes the Congress defines," *id*. § 951(5), only reinforces the Act's pre-1990 purposes, including "creat[ing] and sustain[ing] . . . a climate encouraging freedom of thought, imagination, and inquiry"; fostering "mutual respect for the diverse beliefs and values of all persons and groups"; and achieving the "continuation of free society"—not inhibiting those freedoms by permitting the government to freely discriminate against viewpoints it disfavors. *Id.* § 951(6)–(7), (11).

*Finley*, which expressly addressed the 1990 Amendments, held that these provisions clearly do *not* authorize viewpoint-based discrimination. While Justice Scalia may have "acknowledged that it was 'no secret' that" the insertion of the decency and respect clause was "motivated by controversy over two photography exhibits that received NEA funding," Defs.' Br. 35, ECF No. 24, the majority in *Finley* found that that clause "was aimed at reforming procedures"—by introducing diverse peer review panels—and that it would not "be utilized as a tool for invidious

19

viewpoint discrimination" or "introduce considerations that, in practice, would effectively preclude or punish the expression of particular views." 524 U.S. at 582–83.

Second, Defendants assert that the Final EO Implementation is consistent with the Act's purpose because the Act "authorized the NEA's Chair to balance elite notions of 'artistic excellence' (as well as the other values Plaintiffs cite, e.g., 'freedom of thought, imagination, and inquiry,' 20 U.S.C. § 951(7)) with public accountability." Defs.' Br. 36, ECF No. 24. Defendants appear to suggest that, in order for the NEA to be accountable to the public, it must be permitted to discriminate against projects that "promote gender ideology." Defendants locate the principle of "public accountability" in Sections 951(1), (5), and (6) and 954(d)(1), *id.*, which, as explained above, nowhere authorize the NEA to disfavor specific viewpoints, *see supra* part II.B. Nor does the ordinary meaning of "public accountability"—that the government account for its actions to the public—have anything to do with discriminating against specific viewpoints, let alone the specific viewpoint of "promoting gender ideology."[17]

Third, Defendants accuse Plaintiffs of engaging in a "selective reading" of the Act's statutory and legislative history to "establish Congress's intent to preclude any 'viewpoint-based' standard." Defs.' Br. 36, ECF No. 24. But that's exactly the conclusion that the *Finley* Court drew. *See* Pls.' Br. 21, ECF No. 22-1 (citing *Finley*, 524 U.S. at 581–82); *see also* Pls.' Prelim. Inj. Mot. 18, ECF No. 2-1 (same). As the *Finley* Court explained, Congress added the "decency and respect" clause to the Act in response to a congressionally appointed commission that "cautioned Congress *against* the adoption of distinct viewpoint-based standards for funding." *Finley*, 524 U.S. at 581 (emphasis added). The Court further stated that "[i]n keeping with that recommendation, the

---

[17] Defendants also do not explain—nor is it at all clear—why "artistic excellence" and "freedom of thought, imagination, and inquiry" would be at cross-purposes with public accountability.

criteria in § 954(d)(1) inform the assessment of artistic merit, but Congress *declined to disallow any particular viewpoints*." *Id*. at 582 (emphasis added). Defendants point to no alternative sources of history to debunk this reading. Rather, they simply refer back to the text of the clause, which Defendants claim "adopts a clearly subjective standard." Defs.' Br. 36, ECF No. 24. But the *Finley* Court already concluded that, though the clause is subjective, it "does *not* introduce considerations that, in practice, would effectively preclude or punish the expression of particular views." *Finley*, 524 U.S. at 583 (emphasis added).[18]

### C.    The Final EO Implementation and Assurance of Compliance Are Arbitrary and Capricious.

Defendants' discrimination against applications that "promote gender ideology"—through both the selection process and the certification requirement—is "arbitrary and capricious" because it marks a radical departure from longstanding agency precedent without a "satisfactory" or "rational" explanation. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Again, Defendants make no substantive argument with respect to the Assurance of Compliance. Meanwhile, they claim that the Final EO Implementation "reflects a reasonable choice by the agency" because it comports with the statute, Defs.' Br. 37, ECF No. 24, which Plaintiffs have already explained is incorrect, *see supra* part II.B; Pls.' Br. 20–21, ECF No. 22-1. Moreover, even if it were right, Defendants' explanation still would not explain *why*, even if the statute allows it, the NEA has suddenly decided to penalize viewpoints "promoting gender ideology," including by pointing to any "relevant data" prompting this change or any "rational connection" between "the facts found and the choice made." *State Farm Mut. Auto Ins. Co.*, 463

---

[18] Plaintiffs also win on the APA claims grounded in constitutional violations for the reasons articulated in Sections I and III. Moreover, to the extent that the Court has any doubt about the proper reading of the statute, constitutional avoidance principles weigh in favor of reading it to preclude viewpoint-based discrimination.

U.S. at 43 (citation omitted); *see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, Nos. 25-1611, 25-1612, 2025 WL 2017106, at *9 (1st Cir. July 18, 2025) (denying stay of district court decision holding agency action likely to be arbitrary and capricious where "there was no indication in the record that anyone at [the agency] performed any analysis to support" it).[19]

Defendants also fall back on the argument that the Final EO Implementation "reflects a policy directive that the President issued," and that, in any event, the EO's "terms limit the application of that policy 'consistent with applicable law.'" Defs.' Br. 37, ECF No. 24 (citing Exec. Order No. 14168 § 8(b)). But as Plaintiffs have previously explained, simply pointing to the underlying EO does not amount to a "satisfactory" or "rational" explanation. *See* Pls.' Br. 23, ECF No. 22-1 (citing *Louisiana v. Biden*, 543 F. Supp. 3d 388, 414 (W.D. La. 2021), *vacated and remanded on other grounds*, 45 F.4th 841 (5th Cir. 2022) ("A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order.")). Nor does it matter that the underlying EO contains a general "consistent with applicable law" limitation; the agency must still draw "a rational connection between the facts, the agency's rationale, and the ultimate decision," including how that decision comports with applicable law. *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-cv-00097, 2025 WL 1116157, at *18 (D.R.I. Apr. 15, 2025) (quoting *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025)). Accordingly, recent district court decisions in this Circuit, including in this district, have uniformly rejected agency reliance on an underlying executive order to satisfy APA review, including where those orders have

---

[19] Defendants also argue that the Final EO Implementation is a "reasonable choice" because "[t]he NEA's funding choices are government speech, which may promote some activities and not others." Defs.' Br. 37, ECF No. 24. Plaintiffs debunk this argument above. *See supra* part I.A. But even if the NEA's funding choices were "government speech," it has not explained *why* it is suddenly choosing to disfavor applications that "promote gender ideology."

included similar "consistent with applicable law" language. *See Orr v. Trump*, No. 25-cv-10313, 2025 WL 1145271, at *19 (D. Mass. Apr. 18, 2025) (involving same underlying executive order); *Rhode Island v. Trump*, No. 25-cv-128, 2025 WL 1303868, at *11 (D.R.I. May 6, 2025) (EO 14238); *Woonasquatucket*, 2025 WL 1116157, at *18 (EO 14154).

Defendants cite to "authorities" that they claim "prove otherwise." Defs.' Br. 38, ECF No. 24. But none of the cited cases involve the government's defense to an arbitrary and capricious claim by recourse to an executive order. In *Department of Commerce v. New York*, there was no relevant executive order and the agency cited to a range of evidence in support of its decision. 558 U.S. 752, 774 (2019). *Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012), did not involve an arbitrary and capricious claim at all. There, the court considered whether an agency's failure to respond to comments violated the APA and held it did not because the comments advocated abolition of stem cell research and an underlying executive order mandated the expansion of such research. 689 F.3d at 785. Finally, *Building and Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), involved a direct challenge to an executive order and did not even implicate the APA.[20]

Finally, Defendants argue that "Plaintiffs' argument, if adopted by the Court, . . . would eviscerate the government-speech doctrine . . . by subjecting valid exercises of government speech to amorphous APA challenges about how much or how little private speech interests might be

---

[20] Defendants erroneously claim that "Plaintiffs mount a direct attack on the EO itself" and cite to page 24 of Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment. Defs. Br. 38, ECF No. 24. On page 24 of that brief, Plaintiffs explain why even if Defendants were permitted to rely on the underlying executive order to justify their departure from longstanding practice, the EO itself "fails to provide a 'satisfactory explanation.'" Pls.' Br. 24, ECF No. 22-1. Plaintiffs do not, there or elsewhere, directly challenge the executive order. *See* Am. Compl. 32–36, ECF No. 15 (reciting claims against "gender ideology" certification, "gender ideology" eligibility bar, and Final EO Implementation).

affected." Defs.' Br. 38–39, ECF No. 24. This argument fundamentally misunderstands the requirements of the APA. Even if Defendants were correct that the NEA's funding decisions constitute government speech, *but see supra* part I.A, that would not immunize the Final EO Implementation from an arbitrary and capricious challenge. As a general matter, "government speech" is not a talisman against other challenges. And more specifically, the APA's arbitrary and capricious requirement requires that Defendants adequately *explain* their new policy. Because Defendants have failed to provide that explanation, the Final EO Implementation and Assurance of Compliance are arbitrary and capricious and violate the APA.

### III.    THE FINAL EO IMPLEMENTATION AND ASSURANCE OF COMPLIANCE VIOLATE THE FIFTH AMENDMENT.

The Final EO Implementation and Assurance of Compliance are unconstitutionally vague, and Defendants' arguments in response are unavailing. Defendants first argue that the Final EO Implementation does not violate the Fifth Amendment because the speech at issue is government speech. As explained above, the speech at issue is the artistic expression of the grant recipients, and attempts to regulate it are thus subject to constitutional scrutiny. *See Rust*, 500 U.S. at 200.

Beyond that, Defendants' response amounts to misconstruing *Finley* to argue that a vagueness challenge can never succeed in the context of government funding. Not only are Defendants incorrect, *see id.*, but there are also two crucial distinctions between this case and *Finley* for vagueness purposes.

First, the Assurance of Compliance—which carries the threat of criminal penalties— requires would-be funding recipients to certify that they will comply with all executive orders, including the Gender Ideology EO and its prohibition on using federal funds to "promote gender ideology." SUF ¶¶ 41–42, ECF No. 23. The possibility of criminal penalties further heightens the

24

scrutiny required for the question of vagueness here. *See Reno v. ACLU*, 521 U.S. 844, 871–72 (1997).[21]

Second, by the time the Court in *Finley* considered the vagueness question, it had already concluded that Section 954(d)(1) did not burden speech. Central to its conclusion that "the consequences of imprecision are not constitutionally severe" was the finding that "[i]t is unlikely, however, that speakers will be compelled to steer too far clear of any 'forbidden area' in the context of grants of this nature." *Finley*, 524 U.S. at 588–89. And contrary to Defendants' assertion, the Court did *not* conclude that Section 954(d)(1) burdened speech. In fact, it concluded the opposite. *See Finley*, 524 U.S. at 585 ("[N]either are we persuaded that, in other applications, the language of § 954(d)(1) itself will give rise to the suppression of protected expression.").[22] Here, by contrast, the Final EO Implementation disfavors certain viewpoints, so a heightened standard is required for the vagueness analysis for that reason as well. *See Frese v. Formella*, 53 F. 4th 1, 6 (1st Cir. 2022); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

Furthermore, a vagueness challenge cannot be thrown out simply because it arises in the context of government funding. Indeed, many courts have reached the merits when addressing vagueness challenges in such a context. *See, e.g.*, *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 95–96 (1st Cir. 2004) (rejecting a vagueness challenge not because no such challenge could lie, but on the merits because "words like 'demean' or 'disparage' have reasonably clear meanings"); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, __ F. Supp. 3d __, No. 25-CV-091-LM, 2025 WL

---

[21] The gender ideology certification continues to appear on the NEA's website. Statement of Additional Undisputed Facts ¶¶ 5–6. Even if it did not, Defendants' alterations to the Assurance in response to this litigation would still necessitate this Court's review. *See supra* n.15.

[22] Defendants assert that every justice concluded that Section 954(d)(1) implicated speech, but (as they also argue), Justices Scalia and Thomas saw no First Amendment implications in the statute at all. *Finley*, 524 U.S. at 597–98 (Scalia, J., concurring).

1188160, at *19–22 (D.N.H. Apr. 24, 2025) (highlighting the loss of federal funding as one of the "substantial" penalties for violating the vague requirements in question). The discretionary nature of the process itself does not bar a finding of unconstitutional vagueness. *See Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F. Supp. 774, 781–82 (C.D. Cal. 1991).[23]

As argued in Plaintiffs' opening brief, the Final EO Implementation and Assurance of Compliance are unconstitutionally vague. The lack of clarity around what constitutes "promoting gender ideology" has already caused applicants, including Plaintiffs, to steer "far clear" of anything that might be deemed to do so. *See* Pls.' Br. 27-29, ECF No. 22-1. Defendants notably make no attempt to characterize "promoting gender ideology" as a clear standard. *See* Defs.' Br. 31-32, ECF No. 24. And the Final EO Implementation significantly broadens the discretion of one person, the NEA Chair, exacerbating the potential for arbitrary or discriminatory enforcement. *See* Pls.' Br. 29, ECF No. 22-1. Courts have long warned that giving "such unbridled discretion" to a single decisionmaker risks arbitrary and discriminatory enforcement that "invites the suppression of ideas." *Fratiello v. Mancuso*, 653 F. Supp. 775, 790 (D.R.I. 1987) (citing *Saia v. New York*, 334 U.S. 558, 562 (1948)); *see also, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 113 n.22 (1972); *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983); *Local 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 WL 2722254, at *15–17 (D.N.H. May 28, 2024).

The NEA's purported clarifications, as listed in Defendants' brief, Defs. Br. 32, ECF No. 24, also do not mitigate the vagueness concerns. The removal of the eligibility bar has been accompanied by bestowing the Chair with the responsibility to disfavor those same projects and

---

[23] Defendants try to discount *Bella Lewitzky* because of the certification requirement in that case. However, there was a certification requirement here at the time Plaintiffs moved for summary judgment, and the vagueness analysis in *Bella Lewitzky* did not factor the certification aspect into its analysis. 754 F. Supp. at 781–82.

26

discretion to determine just how much to penalize any project deemed to be "promoting gender ideology." *See* SUF ¶¶ 38–39, ECF No. 23. And the Final EO Implementation's assertion that there is no certification requirement is contradicted by the NEA's Assurance of Compliance. *See id.* ¶¶ 41–44. These "clarifications" only serve to add to the confusion as to how the NEA will enforce the Final EO Implentation and Assurance of Compliance, giving further reason for applicants to censor themselves and "steer too far clear of any 'forbidden area,'" *Finley*, 524 U.S. at 588; SUF ¶¶ 65–66, 71–72, 96, 98–99, 115, 117, 133, 135-36, 141–43, ECF No. 23.

## IV.    PLAINTIFFS' RECORD EVIDENCE IS ADMISSIBLE.

Defendants contend that several of Plaintiffs' facts are inadmissible. They object that SUF ¶¶ 72, 92, 99, and 100—stating that RILA and National Queer Theater ("NQT") will strongly hesitate to apply for NEA funding while the Final EO Implementation remains in place; that it would be difficult for NQT to pitch any project that does not risk "promoting gender ideology"; and that anything that makes NQT less competitive could mean it will not receive NEA funding—contain speculation. And Defendants object that SUF ¶¶ 123–33, 135–37, which detail the impacts of the Implementation on Theatre Communications Group ("TCG") members and TCG itself, contain hearsay.

Federal Rule of Civil Procedure 56(c) permits a party to object to material cited in support of a fact—but only if the objection "state[s] that the movant's evidence '*cannot* be presented in a form that would be admissible' at trial." *Int'l Shipping Agency, Inc. v. Union de Trabajadores de Muelles Loc. 1740*, No. 12-cv-01996, 2015 WL 5022794, at *3 (D.P.R. Aug. 21, 2015) (quoting Fed. R. Civ. P. 56(c)(2)). Defendants object to Plaintiffs' stated facts, but fail to identify the purportedly objectionable material cited in support of them, nor do they explain how the cited material could not be properly introduced through testimony at trial. "Absent any analysis, the Court cannot make a well-reasoned determination about what portion of Plaintiff's statement of

27

facts should be stricken as inadmissible . . . or whether the evidence could nonetheless be properly introduced at trial." *Echavarria v. Roach*, 565 F. Supp. 3d 51, 63 (D. Mass. 2021).

Even if Defendants had borne their burden to properly object, the objections would not hold water. With respect to speculation, the facts Defendants object to are based on the personal knowledge of the declarants cited. Marta Martínez has personal knowledge of RILA's current plans regarding future NEA applications, SUF ¶ 72, ECF No. 23, and Adam Odsess-Rubin has the same for NQT's plans, *id.* ¶ 99. *See* Fed. R. Evid. 602. NQT's impressions of how it might fare in the NEA grant application process, SUF ¶¶ 92, 100, ECF No. 23, are rationally based on Mr. Odsess-Rubin's perception, given past experiences of applying for NEA funding and past communications with the NEA; helpful for understanding why NQT will likely not apply for NEA funding while the Final EO Implementation and Assurance of Compliance are in effect; and not based on expert knowledge. *See* Fed. R. Evid. 701.

As for Defendants' remaining objections, where Defendants are presumably objecting to statements made by TCG members, such statements could be properly introduced at trial through testimony by TCG members. *See, e.g.*, *Cintrón v. Hosp. Comunitario El Buen Samaritano, Inc.*, 597 F. Supp. 3d 515, 525 n.17 (D.P.R. 2022). Even if that were not the case, all of the statements fall within exceptions to hearsay because they describe TCG members' "then-existing state of mind (such as motive, intent, or plan)" or emotional condition. *See* Fed. R. Evid. 803(3). For example, that TCG members are fearful of seeking NEA funds because of the NEA's Assurance of Compliance language, SUF ¶¶ 133, 135, ECF No. 23, is a statement of the members' emotional condition because it describes mental feelings they shared with TCG leadership. Similarly, whether TCG members intend to apply for NEA funding in future application cycles, *id.* ¶ 136, is a statement of their intent or plan toward NEA funding at the time they talked to TCG leadership.

28

*See also Chu v. Legion of Christ, Inc.*, 2 F. Supp. 3d 160, 178–79 (D.R.I. 2014). Accordingly, the Court may rely on the evidence cited in support of Plaintiffs' statement of facts.

## CONCLUSION

For the reasons detailed above, Plaintiffs are entitled to judgment on all of their claims against the Final EO Implementation and Assurance of Compliance.

Dated: August 1, 2025                    Respectfully submitted,

/s/   Vera Eidelman
Vera Eidelman
Scarlet Kim
Lauren Yu
Brian Hauss
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
veidelman@aclu.org
scarletk@aclu.org
lyu@aclu.org
bhauss@aclu.org

/s/   Lynette Labinger
Lynette Labinger, Esq. (Bar No. 1645)
Cooperating counsel
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF RHODE ISLAND
128 Dorrance Street, Box 710
Providence, RI 02903
401.465.9565
LL@labingerlaw.com

David D. Cole
600 New Jersey Ave. NW
Washington, DC 20001
(202) 622-9078
cole@georgetown.edu

29

## CERTIFICATE OF SERVICE

I hereby certify that I filed the within document via the ECF system on this 1st day of

August 2025 and that it is available for viewing and downloading to all counsel of record.


By:      */s/  Vera Eidelman*
Vera Eidelman