UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
RHODE ISLAND LATINO ARTS, et al.,       )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )        C.A. No. 25-79 WES
                                        )
NATIONAL ENDOWMENT FOR THE ARTS,        )
et al.,                                 )
                                        )
          Defendants.                   )
_____)

**<u>MEMORANDUM AND ORDER</u>**

WILLIAM E. SMITH, Senior District Judge.

     Before the Court are Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion"), Dkt. No. 22, and Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Summary Judgment Motion ("Defendants' Motion"), Dkt. No. 24.  Plaintiffs are three arts groups that applied for grants from the National Endowment for the Arts ("NEA") and a membership organization that represents such groups.  Defendants are the NEA and its Acting Chairperson.  Pursuant to an Executive Order, the NEA intends to disfavor grant applications that "promote gender ideology."  Plaintiffs allege this practice would violate the First Amendment, the Administrative Procedure Act ("APA"), and the Fifth Amendment.  Because the Court agrees with Plaintiffs regarding their First Amendment and APA claims, but not their Fifth Amendment claim,

Plaintiffs' Motion is granted in part and denied in part, and Defendants' Motion is denied in part and granted in part.

Defendants are therefore enjoined from applying a viewpoint-based standard of review to Plaintiffs that disfavors applications deemed "to promote gender ideology," and the Court vacates and sets aside Defendants' current plan to implement the Executive Order.

## I.    BACKGROUND

### A. The NEA's Authorizing Statute

The National Foundation on the Arts and the Humanities Act of 1965 ("NFAHA") declares, as amended, that "[t]he arts . . . belong to all the people of the United States." 20 U.S.C. § 951(1). The NFAHA further provides that "it is necessary . . . for the Federal Government to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." Id. § 951(7). In accordance with these principles, the NFAHA established the NEA, which provides financial assistance to groups and certain individuals "of exceptional talent engaged in or concerned with the arts." Id. § 954(c). Among the priorities identified in the funding program at issue in this case are "projects and productions which have substantial . . . artistic and cultural significance, giving emphasis to American creativity

2

and cultural diversity," and those with similar significance "that reach, or reflect the culture of, a minority, inner city, rural, or tribal community." Id. § 954(c)(1), (4).

Because the drafters and subsequent amenders of the NFAHA were concerned about the NEA being leveraged as an instrument of "political control of culture," they took several steps to ensure that grants are awarded based on talent alone, irrespective of the artists' viewpoints or the messages conveyed in their works. See Am. Compl. ¶ 18, Dkt. No. 15 (quoting H.R. Rep. No. 89-618, at 21 (1965)); see also id. ¶ 22 ("Congress's intent was to have 'Government assistance, but not intervention[;] . . . support but not control[;] . . . stimulation but not participation.'" (omissions in original) (quoting 111 Cong. Rec. 23963 (1965) (statement of Rep. John S. Monagan))).

One safeguard against political interference is a prohibition against federal supervision or control over the policies, personnel, or operations of grant recipients. 20 U.S.C. § 953(c). Another safeguard is the nested, multilayer review process that underlies each individual grant decision. Working outward from the innermost layer, this process begins with an advisory panel's review of a grant application; the panel is required to "recommend applications . . . solely on the basis of artistic excellence and artistic merit." Id. § 959(c). Notably, the NEA must "ensure

3

that all panels are composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view." Id. § 959(c)(1).

From there, the NEA's National Council on the Arts (the "Council") is required to make recommendations concerning whether to approve applications determined by the advisory panels to have artistic excellence and artistic merit. Id. § 955(f)(1). Just as the composition of the advisory panels ensures a diversity of viewpoints and backgrounds, so too does that of the Council. In selecting a voting member of the Council, the President must "give due regard to equitable representation of women, minorities, and individuals with disabilities who are involved in the arts and shall make such appointments so as to represent equitably all geographical areas in the United States." Id. § 955(b)(1), (1)(C). Each of the Council's eighteen voting members "shall hold office for a term of six years, and the terms of office shall be staggered." Id. § 955(c).

At the outermost layer of review is the Chairperson, who may not approve or disapprove any application until it is recommended for approval by the Council, and who may not approve an application for which the Council has made a negative recommendation. Id. § 955(f)(2); see also id. § 955(b)(1) (requiring the President to

4

consider equitable representation in appointment of Chairperson).
In establishing regulations and procedures for the NEA's funding
program, the Chairperson must ensure that "artistic excellence and
artistic merit are the criteria by which applications are judged,
taking into consideration general standards of decency and respect
for the diverse beliefs and values of the American public."  Id.
§ 954(d)(1).  The NFAHA further provides that "[i]n selecting
individuals and groups of exceptional talent as recipients of
financial assistance to be provided under [the program at issue
here], the Chairperson shall give particular regard to artists and
artistic groups that have traditionally been underrepresented."
Id. § 954(c).  The Chairperson and voting members of the Council
are appointed by the President and confirmed by the Senate, id.
§§ 954(b)(1), 955(b)(1)(C); and members of the advisory panels are
appointed by the Chairperson, id. § 959(c)(6).  The Chairperson
serves a four-year term and is eligible for reappointment.  Id.
§ 954(b)(2).

This complex statutory framework demonstrates Congress's
intent to insulate the NEA from political control and to encourage
the freedom of expression.  As a Senate committee report on the
original version of the NFAHA explained:

It is the intent of the committee that in the
administration of this act there be given the fullest
attention to freedom of artistic and humanistic
expression.  One of the artist's and humanist's great

> values to society is the mirror of self-examination
> which they raise so that society can become aware of its
> shortcomings as well as its strengths . . . . Countless
> times in history artists and humanists who were vilified
> by their contemporaries because of their innovations in
> style or mode of expression have become prophets to a
> later age.  Therefore, the committee affirms that the
> intent of this act should be the encouragement of free
> inquiry and expression. . . .  [C]onformity for its own
> sake is not to be encouraged, and . . . no undue
> preference should be given to any particular style or
> school of thought or expression.

Am. Compl. ¶ 22 (omissions in original) (quoting S. Rep. No. 89-300, at 3-4 (1965)); see also id. (quoting 111 Cong. Rec. 23963 (1965) (statement of Rep. Henry Helstoki) ("The Federal Government will supply the money, but the artists and their organizations will suggest the proposals, select the performances which are to be produced and do all the planning.  The Federal Government will be the means, but the end product will be the sole responsibility of the performing artists.")).

**B. The Instant Litigation**

**1. The Executive Order (the "EO")**

On January 20, 2025, President Trump signed Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."  Id. ¶ 48. According to Section 2(f) of the EO:

> "Gender ideology" replaces the biological category of
> sex with an ever-shifting concept of self-assessed
> gender identity, permitting the false claim that males
> can identify as and thus become women and vice versa,
> and requiring all institutions of society to regard this

6

> false claim as true. Gender ideology includes the idea
> that there is a vast spectrum of genders that are
> disconnected from one's sex. Gender ideology is
> internally inconsistent, in that it diminishes sex as an
> identifiable or useful category but nevertheless
> maintains that it is possible for a person to be born in
> the wrong sexed body.

Exec. Order No. 14168, § 2(f), 90 Fed. Reg. 8615, 8615-16 (Jan. 30, 2025). The EO has multiple substantive provisions, but relevant to this case is Section 3(g), which declares that "[f]ederal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Id. § 3(g), 90 Fed. Reg. at 8616.

**2. Initial EO Implementation and Lawsuit**

The President signed the EO about three weeks ahead of the application deadline for the semiannual Grants for Arts Project ("GAP"), the NEA's premier grant program. Am. Compl. ¶¶ 35, 38. The submission deadline for the current funding cycle was initially set for February 13, 2025. Id. ¶ 38. On February 6, however, the NEA updated its application procedure and pushed the final deadline to March 24, with an intermediate deadline set for March 11. Id. ¶¶ 38, 41. The updated procedure required applicants to confirm that, if selected, they (1) would "comply with all applicable Executive Orders while the award [was] being administered" and (2) "underst[ood] that federal funds shall not be used to promote

7

gender ideology, pursuant to Executive Order No. 14168." Statement of Undisputed Facts ("PSUF") ¶ 28, Dkt. No. 23.

Plaintiffs are three individual arts groups — Rhode Island Latino Arts ("RILA"), National Queer Theater ("NQT"), and The Theater Offensive ("TTO") — and one member organization, Theatre Communications Group ("TCG"). Id. ¶¶ 45, 76, 102, 119. On March 6, Plaintiffs filed a Complaint alleging the NEA's implementation of the EO violated the First Amendment, APA, and Fifth Amendment; they also moved for a preliminary injunction. Am. Compl. ¶ 6; see Compl. ¶¶ 96-123, Dkt. No. 1.

### 3. Rescission of EO Implementation and Denial of Preliminary Injunction

After Plaintiffs filed their lawsuit, the NEA rescinded its implementation of the EO, pushed back the application deadline a second time, now to April 7, and announced it would re-implement the EO following a "new evaluation . . . in accordance with the [APA]." PSUF ¶¶ 31-33; Defs.' Resp. Pls.' Mot. Prelim. Inj. Ex. 1, at 70-71, Dkt. No. 11-1. According to the NEA, "[t]his new consideration and evaluation process [would be] complete[d] by April 16, 2025" — nine days after the revised deadline — and the NEA would "implement and make public the final decision resulting from that process by April 30, 2025." Defs.' Resp. Pls.' Mot. Prelim. Inj. Ex. 1, at 71.

Because the NEA had rescinded its implementation of the EO,

Defendants argued that Plaintiffs' claims were nonjusticiable, and they urged the Court to deny Plaintiffs' motion for a preliminary injunction.  In a Memorandum and Order entered April 3, the Court found that Plaintiffs' claims were justiciable under the voluntary cessation exception to the mootness doctrine.  Mem. & Order 20-23, Dkt. No. 13.  Applying this exception, the Court found that if a prohibition on the use of NEA funds to "promote gender ideology" were reinstated, it would likely violate the First Amendment and the APA.  Id. at 24-41.  The Court nevertheless denied Plaintiffs' motion for a preliminary junction.  Id. at 46.  Although Plaintiffs demonstrated a likelihood of success on the merits of their claims and showed irreparable harm, the Court found that the balance of the equities and public interest weighed heavily in Defendants' favor, in large part because an injunction would "short circuit" the NEA's then-pending administrative review process.  Id. at 42-46.

### 4. Re-Implementation of EO and Motions for Summary Judgment

As promised, the NEA published its final decision regarding the implementation of the EO (the "Final Notice") on April 30.[1] See Admin. R. ("AR") 207, 215, Dkt. No. 19.  The Final Notice

---

[1] The Court uses the term "Final Notice" because that is the name given to the corresponding file in the Administrative Record. See the drop-down Table of Contents for Admin. R. ("AR"), Dkt. No. 21.

states that the "existing multi-tiered application review process will remain unchanged," and that the Chairperson will implement the EO "by evaluating projects that promote gender ideology based on the existing statutory criteria at the final stage of application review."[2]  Id. at 207.  In other words, neither when advisory panels determine that certain applications "have artistic excellence and artistic merit," 20 U.S.C. § 955(f)(1), nor when the Council "make[s] recommendations to the Chairperson concerning . . . whether to approve [those] applications," id. § 954(f), (f)(1), will the NEA implement the EO.  Rather, the Chairperson will independently assess those applications "for artistic excellence and merit, including whether the proposed project promotes gender ideology," on a "case-by-case" basis.  AR 208.  If the Chairperson "concludes that a proposed project 'promotes gender ideology,'" it will not be "denied solely" for that reason, but it "could weigh against the project's final approval."  Defs.' Objs. & Resp. Pls.' 1st Set Reqs. Admis. ("Defs.' Admiss.") 2, Dkt. No. 21; see Text Order (June 4, 2025).  In no circumstance, however, could it "weigh in favor of the project's final approval."

---

[2] "The Chair[person's] review of proposed projects follows shortly after the Council has made its recommendations," which traditionally does not happen "until the end of the third week of October."  Defs.' Resps. Pls.' Statement Facts & Separate Statement Undisputed Facts ("DSUF") ¶ 4, Dkt. No. 25.

Defs.' Resps. Pls.' Statement Facts & Separate Statement Undisputed Facts ("DSUF") ¶ 40, Dkt. No. 25 (emphasis added).

In their Amended Complaint, Plaintiffs allege that the Final Notice violates the First Amendment, APA, and Fifth Amendment; and they move for summary judgment on all claims. Am. Compl. ¶¶ 112-141; Pls.' Mem. L. Supp. Mot. Summ. J. (Pls.' Mem.") 1-2, Dkt. No. 22-1. Defendants move for summary judgment on all claims as well. Defs.' Mot. 1-3.

## II. LEGAL STANDARD

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Viscito v. Nat'l Plan. Corp., 34 F.4th 78, 83 (1st Cir. 2022) (quoting Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017)). "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." Scottsdale Ins. v. United Rentals (N. Am.), Inc., 977 F.3d 69, 72 (1st Cir. 2020).

In the administrative law context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. Bos.

Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016).

## III. DISCUSSION

On the First Amendment claim and all three APA claims, the Court grants summary judgment to Plaintiffs; on the Fifth Amendment claim, however, the Court grants summary judgment to Defendants.

### A. First Amendment Claim

The Court finds that the NEA's Final Notice violates the First Amendment because it is a viewpoint-based restriction on private speech. A threshold issue is whether NEA-funded art is government speech or private speech. If NEA-funded art is government speech, then restrictions on that speech do not implicate the Free Speech Clause of the First Amendment. Because the Court determines that NEA-funded art is private speech, it next considers whether the Final Notice amounts to a restriction on that speech and, if so, what type of restriction.

With the Final Notice in effect, projects deemed to promote gender ideology are less likely to be approved for NEA funding. The Final Notice is thus a restriction on artists' speech, and one that is viewpoint based, because it assigns negative weight to the expression of certain ideas on the issue of gender identity. The Final Notice is thus presumptively unconstitutional. Because the restriction cannot withstand judicial scrutiny, the Court

12

concludes that the Final Notice violates the First Amendment.

**1. Government or Private Speech**

The Court must first determine whether the Free Speech Clause of the First Amendment applies to the NEA's funding program. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." <u>Pleasant Grove City v. Summum</u>, 555 U.S. 460, 467 (2009). The line between private speech and government speech "can blur," however, when "the government invites the people to participate in a program." <u>Shurtleff v. City of Boston</u>, 596 U.S. 243, 252 (2022). That is what Congress did when it decided to fund the arts through the NEA. In these situations, a court must assess whether the program is designed to "transmit the government's message" or facilitate private expression. <u>Id.</u>; <u>see id.</u> at 271 (Alito, J., concurring). If the former, then participation in the program is government speech, and the government can restrict the viewpoints expressed in the program without implicating the Free Speech Clause. If the latter, then participation in the program is private speech, and the Free Speech Clause applies.

To determine whether participants in a program are engaged in government speech or private speech, a court considers "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the

extent to which the government has actively shaped or controlled the expression."[3]  Id.  These considerations have led the Supreme Court to hold that "the messages of permanent monuments in a public park constituted government speech, even when the monuments were privately funded and donated."  Id.  (citing Summum, 555 U.S. at 470-73).  Similarly, the Supreme Court held that Texas's specialty license plate designs are government speech, even when the designs are proposed by private parties, because license plates "long have communicated messages from the States," the designs "are often closely identified in the public mind with the State," and "Texas maintains direct control over the messages conveyed" on the plates. Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 210-13 (2015) (brackets omitted).

On the other hand, the Supreme Court held that "trademarking words or symbols generated by private registrants" were private speech because even though the government "had to approve each proposed mark, it did not exercise sufficient control over the

---

[3] As the Supreme Court has emphasized, these considerations do not amount to "rigid factors."  See Shurtleff v. City of Boston, 596 U.S. 243, 252 (2022); see id. at 261-76 (Alito, J., concurring) (criticizing the majority's "factorized approach" and advocating a method of review in which "government speech occurs if — but only if — a government purposefully expresses a message of its own through persons authorized to speak on its behalf, and in doing so, does not rely on a means that abridges speech").

nature and content of those marks to convey a governmental message in so doing." Shurtleff, 596 U.S. at 252-53 (citing Matal v. Tam, 582 U.S. 218 (2017)). And it also held that Boston's flag-raising program, in which the city occasionally let private groups hoist their own flags in place of the Boston flag on one of three flagpoles in front of city hall — the flags of the United States and Massachusetts flew from the other poles — was also private speech. Shurtleff, 596 U.S. at 248. For despite "the historical practice of flag flying at government buildings," the city had no "meaningful involvement in the selection of flags or the crafting of their messages." Id. at 258.

These precedents lead the Court to conclude that NEA-funded art is private speech, not government speech.[4] Indeed, all three considerations discussed above — history, public perception, and

---

[4] Defendants contend the relevant inquiry is not whether NEA-funded art is government speech, but whether the NEA's decision to fund that art is government speech. Defs.' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply") 4-5, Dkt. No. 32. That cannot be right. When the NEA decides to fund certain art, that is an example of "the government invit[ing] the people to participate in a program." Shurtleff, 596 U.S. 243, 252 (2022). The Court must therefore determine whether speakers participating in the program are "exercising a power to speak for [the] government" or speaking for themselves. See id. at 268 (Alito, J., concurring). In this case, the relevant act of participation is the production of art that is funded by the NEA. It is therefore the art — not the NEA's decision to fund the art — that is the proper focus of the Court's government speech inquiry.

control — weigh in favor of Plaintiffs.[5]

### a. History

The Court first considers the "history of the expression at issue." Shurtleff, 596 U.S. at 252. The objective here is to determine whether the relevant speech has traditionally been used to "communicate[] messages from the [government]." Walker, 576 U.S. at 210-11.

There is no question that, historically, art has been used as a medium to communicate the government's messages and that often the government has relied on the work of private artists to achieve that goal. Were the Court "to consider only that general history," it would find that the first factor of the government-speech test favors Defendants. Shurtleff, 596 U.S. at 253. But the Court is wary of painting with too broad a brush. Notwithstanding the general history of government involvement in the arts, the history of the specific arts-funding program at issue here suggests that its participants are engaged in private speech.[6]

---

[5] The Court takes heed of Justice Alito's warning that, because the government-speech doctrine "is susceptible to dangerous misuse," the Supreme Court "must exercise great caution before extending [its] government-speech precedents." Matal v. Tam, 582 U.S. 218, 235 (2017).

[6] Supreme Court precedent suggests that the general history of the expression involved and the specific history of the program at issue are both relevant to government-speech analysis. See

16

At its inception, the NEA was designed not as an instrument of political communication but as a vehicle for private expression. That much is clear from the text of the NFAHA, which declares that "[t]he arts . . . belong to all the people of the United States," 20 U.S.C. § 951(1), and moreover directs "the Federal Government to help create and sustain not only a climate encouraging freedom of thought . . . but also the material conditions facilitating the release of this creative talent," id. § 951(7); see also supra Part I.A (discussing structure and legislative history of NFAHA).

Despite this origin story, Defendants suggest that subsequent controversies surrounding the NEA — and amendments to the NFAHA that were passed in response — complicate the historical analysis. See Defs.' Mot. 8-11, 21.  In 1990, Congress amended the NFAHA following public controversy over two "provocative works," neither of which received funding directly from the NEA but rather from "organization[s] that received NEA support."  Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 574-75 (1998).  The first was a "retrospective of photographer Robert Mapplethorpe's work," which "included homoerotic photographs that several Members of Congress

---

Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 210-12 (2015) (considering both histories); see also id. at 218-29 (citing Cornelius v. NAACP Leg. Def. & Educ. Fund, 473 U.S. 788, 804-06 (1985) (discussing history of specific fundraising program involved in that case).

condemned as pornographic," and the second was "Andres Serrano's work Piss Christ, a photograph of a crucifix immersed in urine." Id. at 574.  With the help of an independent commission, Congress amended the NFAHA with the provisions now codified at § 954(d), which require the Chairperson to ensure (1) that "general standards of decency and respect for the diverse beliefs and values of the American public" are considered in the distribution of NEA funds, and (2) that projects "determined to be obscene are prohibited from receiving" NEA support.  See Pub. L. No. 101-512, § 103, 104 Stat. 1915, 1963 (1990).  Defendants also highlight language that was added to the NFAHA's findings and purpose section:

> [T]he Government must be sensitive to the nature of public sponsorship.  Public funding of the arts . . . is subject to the conditions that traditionally govern the use of public money.  Such funding should contribute to public support and confidence in the use of taxpayer funds.  Public funds provided by the Federal Government must ultimately serve public purposes the Congress defines.
>
> . . . .
>
> The arts . . . reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups.

Defs.' Mot. 11 (quoting Pub. L. No. 101-512, § 101, 104 Stat. at 1961 (codified at 20 U.S.C. § 951(5), (6))) (second omission in original).

In the Court's view, none of these additions transformed the

18

NEA into a means for communicating the government's messages.  If anything, the 1990 amendments demonstrate that Congress intended to preserve the NEA as a vehicle for private speech, despite the potential for public controversy.  See Finley, 524 U.S. at 582 (quoting 136 Cong. Rec. 28674 (1990) ("If [Congress has] done one important thing in this amendment, it is this.  We have maintained the integrity of freedom of expression in the United States.")).  As noted in Finley, the independent commission "cautioned Congress against the adoption of distinct viewpoint-based standards for funding" and, consistent with that recommendation, "Congress declined to disallow any particular viewpoints."  524 U.S. at 581-82.  Instead, Congress emphasized the importance of respecting the "diverse beliefs" of all Americans while accounting for "general standards of decency"[7] and ensuring that obscenity, which is not

---

[7] In the Court's view, the "decency" component of 20 U.S.C. § 954(d)(1) is akin to requirements that school libraries take "educational suitability" into account when selecting the books on their shelves.  See Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 584 (1998) (citing Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 871 (1981)).  Such requirements may be permissible.  Id.  But even if the NEA has some degree of content-based discretion over its funding choices, "that discretion may not be exercised in a narrowly partisan or political manner," because "[o]ur Constitution does not permit the official suppression of ideas."  Pico, 457 U.S. at 870-71; see also Matal, 582 U.S. at 243 (noting "some content- and speaker-based restrictions may be allowed" depending on the nature of the forum, but "'viewpoint discrimination' is forbidden." (quoting

protected by the First Amendment, is ineligible for NEA funding. 20 U.S.C. § 954(d)(1), (2); see also United States v. Williams, 553 U.S. 285, 288 (2008) (noting obscenity is unprotected speech). None of these changes suggest that Congress reformed the NEA into a medium for communicating government messages at the expense of other views.  Rather, this chapter of the NEA's history reinforces the notion that it was designed to support free expression through the use of public funds, despite the resulting challenges.

As a final note on the history front, Defendants contend that "government patronage of the arts reflects a historical tradition of government speech."  Defs.' Mot. 19.  Although the Court agrees as a general matter, the cases Defendants cite in support of their argument demonstrate the risks of employing an overly broad reading of history in this context.  See id. at 19 n.16.  One case involved a public art exhibit organized around specific themes in which the host city not only funded, but also took ownership of, the winning installations and provided the venue for their display.  McGriff v. City of Miami Beach, 84 F.4th 1330, 1332-35 (11th Cir. 2023). Another involved the Smithsonian Institution's decisions over which art it chooses to exhibit in the National Portrait Gallery. Raven v. Sajet, 334 F. Supp. 3d 22, 25-26 (D.D.C. 2018).  And a

---

Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 831 (1995))).

20

third involved a congressional art competition in which the works were selected to represent a particular House district, sponsored by the House member for that district, and displayed on the Capitol grounds. Pulphus v. Ayers, 249 F. Supp. 3d 238, 240-41 (D.D.C. 2017).[8]

None of these examples capture the unique history and purpose of the NEA, let alone the NEA's relationship with the art that it funds. To be sure, these considerations are better addressed under the rubrics of public perception and control. But the NEA stands in contrast to the government-funded arts programs discussed in these cases, which in turn undermines Defendants' argument about history. In conclusion, the "history of the expression at issue," defined narrowly as NEA-funded art, supports a finding that such art is private speech. See Shurtleff, 596 U.S. at 252.

### b. Public Perception

The Court next considers "whether the public would tend to view the speech at issue as the government's." Id. at 255. Another way of framing the inquiry is whether, in transmitting a message through art using NEA funds, an artist "likely intends to convey

---

[8] For a discussion of the fourth case that Defendants cite, People for the Ethical Treatment of Animals, Inc. v. Gittens, 414 F.3d 23 (D.C. Cir. 2005), see Mem. & Order 35, Dkt. No. 13. See Defs.' Cross-Mot. Summ. J. & Opp'n Pls.' Summ. J. Mot. ("Defs.' Mot.") 19 n.16, Dkt. No. 24.

to the public that the [government] has endorsed that message."
Walker, 576 U.S. at 212.  As with the history factor, the public-
perception factor supports Plaintiffs' contention that NEA-funded
art is private speech.

Unlike the programs involved in the cases Defendants cite
above, the NEA does not take ownership of or designate a venue for
the works that it funds.  Instead, NEA-funded art "is billed as
the work of the artists and funded organization[s], not the NEA,"
DSUF ¶ 21, and must be "supported by other sources of funding" in
addition to the NEA, id. ¶ 24; see 20 U.S.C. § 954(e).  Moreover,
NEA-funded art "is typically performed or exhibited in private
venues and galleries, or in public parks and streets not owned by
the NEA, but rather other government actors who require separate,
distinct approvals."  DSUF ¶ 25; contra Raven, 334 F. Supp. 3d at
25-26; Pulphus, 249 F. Supp. 3d at 240-41.  And "NEA-funded
organizations retain the intellectual property rights in their
NEA-funded works."  DSUF ¶ 26; contra McGriff, 84 F.4th at 1332-
35.

Based on these facts about NEA-funded art, the Court finds it
unlikely that members of the public would think that NEA-funded
artists speak for anyone but themselves, and certainly not for the
government.  That is especially true given the diversity of views
reflected in the projects that the NEA — even when accounting for

22

changes in presidential administrations — has decided to fund. See, e.g., Pls.' Mem. 15 n.3 (citing examples in which the NEA has funded projects with conflicting themes and that appear to clash with the relevant administration's policy views). Indeed, if the government is speaking through recipients of NEA funding, then it is "babbling prodigiously and incoherently, saying many unseemly things, and expressing contradictory views." Matal, 582 U.S. at 236 (citation modified).

Notwithstanding the above, Defendants argue that "the public perceives the NEA's seal of approval as the government speaking." Defs.' Mot. 25. True, recipients of NEA funding must acknowledge, "in a prominent manner," that their projects are supported in part by an award from the NEA and display the NEA's logo in materials related to their projects. Id.; see DSUF ¶ 23. But "if private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." Matal, 582 U.S. at 235. Furthermore, many artists likely seek NEA support in part because the prestige of receiving a grant could translate to other funding opportunities. See Defs.' Mot. 7 n.5 (citing, inter alia, Decl. Giselle Byrd ¶ 19, Dkt. No. 2-5). In this respect, the NEA's seal of approval functions as an endorsement, and one that signals to prospective funders the artistic merits of a given project. But

the government can endorse a project as good art without further endorsing all the messages or viewpoints it conveys. In short, the government may speak for itself when it approves an artist's work, but that does not mean the artist speaks for the government when it produces that work.

The Court therefore concludes that when it comes to NEA-funded art, "the public's likely perception" is that a private person, not the government, "is speaking." Shurtleff, 596 U.S. at 252.

### c. Control

The final consideration is the extent to which the government has "actively controlled" the production of NEA-funded art and "shaped the messages" that the art conveys. Id. at 256. In this context, it matters less that the NEA has final approval authority over each project, see id. at 252-53 (citing Matal, 582 U.S. 218), and that it contributes — by providing partial funding — to the means of production, see id. at 256 (discussing Boston's provision of hand crank for raising flags). Rather, what matters most is the NEA's control over the art's "content and meaning" because "that type of control would indicate that [it] meant to convey the [art's] messages." Id.

This factor weighs decisively in favor of a conclusion that NEA-funded art is private speech. As with the trademarks at issue

24

in Matal, the NEA "does not dream up" the art that it funds, "and it does not edit [the projects] submitted for [approval]." Matal, 582 U.S. at 235.  In fact, when Plaintiffs received NEA funding in the past, the NEA neither "suggested to applicants that they should make substantive changes to their projects" nor "otherwise offered feedback on the substance of a project." DSUF ¶¶ 17-18.  Moreover, "[w]hen the NEA has given feedback on proposals, it has been about how to better frame an applicant's pitch to make it a more competitive application, not about changing the project itself." Id. ¶ 19 (emphasis added).  And NQT, which hosts an annual theater festival, has received approval for NEA funding in previous cycles before even deciding which plays to include in the relevant year's festival.  See Suppl. Decl. Adam Odsess-Rubin ¶ 14, Dkt. No. 22-4.  In scenarios like this, the NEA cannot be said to control, or even be aware of, the content or viewpoints of the works that it funds.  See Pls.' Opp'n Defs.' Cross-Mot. & Reply Supp. Pls.' Mot. ("Pls.' Reply") 12-13, Dkt. No. 31.

Defendants discredit Plaintiffs' declarations to the extent that Plaintiffs' experiences do not "establish any fact relative" to the NEA in general.  See, e.g., DSUF ¶ 18.  But Defendants mount no evidence that would allow the Court to look beyond Plaintiffs' experiences and make general findings about the NEA's control over the content and meaning of the art that it funds.  Relatedly, the

Final Notice proclaims that "the NEA has historically expressed a preference for certain projects, which often reflect administration priorities." AR 211. But there is no evidence in the record that, prior to this funding cycle, the NEA has solicited applications through its GAP program for projects that espouse specific themes, much less advance the administration's policy preferences. Id. (discussing current funding cycle's "America250" program); see generally DSUF (providing no examples from previous cycles). Contra McGriff, 84 F.4th at 1332-35. Instead, Defendants' control argument rests on the NEA's final approval authority. See Defs.' Mot. 28-30. But for all the reasons above, that is insufficient.

The Court concludes that the history, public perception, and government's control of the expression at issue — NEA-funded art — all demonstrate that such art is not government speech, but private speech.

### 2. Nature of Speech Restriction

Because NEA-funded art is private speech, the Free Speech Clause of the First Amendment applies to any restrictions that are placed on that speech. The Court must therefore review the Final Notice to determine whether it restricts artist's speech and, if it does, the type of restriction at issue. The latter question is important to the extent this case implicates the Supreme Court's

forum precedents.  See Finley, 524 U.S. at 586 (suggesting NEA is not a limited public forum and, by implication, is thus a nonpublic forum); Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 830 (1995) (describing university's student activities fund as a "metaphysical" limited public forum).  Depending on the nature of the forum involved, "some content- and speaker-based restrictions may be allowed."  Matal, 582 U.S. at 243.  But in all cases, "'viewpoint discrimination' is forbidden."  Id. (quoting Rosenberger, 515 U.S. at 831); see also Shurtleff, 596 U.S. at 275-76 (Alito, J., concurring) (noting that if Boston had created a nonpublic forum, it could have restricted use of its flagpole to certain subject matters, but "it could not have employed viewpoint-discriminatory criteria to bar otherwise-eligible speakers from expressing their views on those subjects").

The Court concludes that the Final Notice restricts artists' speech, and that it does so on the basis of viewpoint.  As defined in the EO, "gender ideology" "permit[s] the false claim that males can identify as and thus become women and vice versa," and "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex."  EO § 2(f), 90 Fed. Reg. at 8615-16.  The EO further provides that "[f]ederal funds shall not be used to promote gender ideology," and that "[e]ach agency shall assess grant conditions and grantee preferences [to] ensure grant

funds do not promote gender ideology." Id. § 3(g), 90 Fed. Reg. at 8616.

The Final Notice states that the Chairperson will assess NEA funding applications "for artistic excellence and merit, including whether the proposed project promotes gender ideology," on a "case-by-case" basis. AR 208. It does not further define what it means to "promote gender ideology." But it notes that "[t]he EO requires executive agencies to take all necessary steps, as permitted by law, to ensure that agency funds are not used to promote gender ideology." Id. at 207 (emphasis added).

Defendants concede that if the Chairperson "concludes that a proposed project 'promotes gender ideology,' that factor could weigh against the project's final approval." Defs.' Admiss. 2. To be sure, the Chairperson "will not disqualify a project from consideration solely on [the Chairperson's] conclusion that a proposed project 'promotes gender ideology.'" Id. But in no circumstance could that conclusion "weigh in favor of the project's final approval." DSUF ¶ 40.

From the Court's perspective, these concessions demonstrate that projects deemed to "promote gender ideology" are less likely to receive NEA funding. In other words, the NEA intends to disfavor applications that promote gender ideology precisely because they promote gender ideology. The Final Notice therefore

promises to penalize artists based on their speech. If the NEA restricted all applications that touched on the subject of "gender ideology," or on the relationship between sex and gender more broadly, that would amount to a content-based restriction on artists' speech. See Rosenberger, 515 U.S. at 828-29. Because the Final Notice targets the promotion of specific ideas about these topics, however, the NEA is engaged in viewpoint discrimination, which is "an egregious form of content discrimination." Id. at 829; see also Finley, 524 U.S. at 587 (upholding 20 U.S.C. § 954(d)(1) but noting it "would confront a different case" "[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints"). Therefore, regardless of whether forum analysis applies to the NEA, the Final Notice is presumptively invalid because it is viewpoint discriminatory. See Cornelius, 473 U.S. at 806; Shurtleff, 596 U.S. at 275-76 (Alito, J., concurring); see also Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004).

### 3. Application of Judicial Scrutiny

Viewpoint discrimination is traditionally subject to strict scrutiny, which requires the government to prove the restriction is "narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015). Defendants make no

effort to argue the Final Notice satisfies any type of judicial scrutiny, let alone strict scrutiny; indeed, Defendants have not even asserted the state interest behind the NEA's new policy, aside from complying with the EO.  See generally Defs.' Mot.  Therefore, the Court finds that the Final Notice fails judicial scrutiny and thus violates the First Amendment.

**B. APA Claims**

The Court also finds that the Final Notice violates the APA. The APA requires courts to "hold unlawful and set aside agency action" that, inter alia, is in excess of statutory authority, arbitrary and capricious; or contrary to a constitutional right. 5 U.S.C. § 706(2)(A)-(C).  Although the APA "embodies a 'basic presumption of judicial review,'" agency action is not reviewable unless it is "final."  Dep't of Com. v. New York, 588 U.S. 752, 771 (2019) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 140 (1967)); see 5 U.S.C. § 704.  To satisfy this requirement, the action must (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citation modified).

**1. Final Agency Action and Ripeness**

The Court finds that the Final Notice is reviewable as final

agency action because it marked the consummation of the NEA's "consideration and evaluation process" about how to implement the EO and determined that the Chairperson has the right, if not the obligation, to assess NEA grant applications based on viewpoint-discriminatory criteria. See Defs.' Resp. Pls.' Mot. Prelim. Inj. Ex. 1, at 71. And it also stated that the Chairperson would exercise this right when reviewing applications submitted during the current funding cycle. Defendants argue there is no final agency action because Plaintiffs' applications might not advance to the final stage of review, when the Chairperson will exercise this purported right. Defs.' Mot. 33. In any event, Defendants contend, "Plaintiffs undisputedly lack any right" to receive NEA grants, which are competitive. Id. at 34.

Defendants' arguments are unavailing. No application will be approved without first being assessed according to the criteria. The assessment is thus a prerequisite to acceptance and, therefore, all applications are subject to it. By way of an analogy, imagine that an elite college announces that it will assess student applications based on applicants' race, but only during the final stage of review when most applicants are no longer in contention. Just because the admissions policy will be enforced against only some applicants does not change the fact that it applies to all applicants. So too here. Nor do Plaintiffs claim a right to

31

receive NEA grants.  Rather, they claim a right to have their applications assessed according to criteria that are not viewpoint discriminatory, and that the Final Notice violates that right. See Pls.' Reply 18.  The Court thus finds that the Final Notice is reviewable under the APA.

Relatedly, the Court finds that Plaintiffs' APA claims are ripe because the issues are fit for judicial review and Plaintiffs will face hardship if the Court withholds consideration.  See Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003). Relevant to this inquiry is whether the issues are "purely legal" and whether "further factual development" is necessary.  Id. at 812.  The issues are fit for judicial review because whether the Chairperson has power to assess applications based on viewpoint-discriminatory criteria is a purely legal question.  Furthermore, Plaintiffs will face hardship if the Court withholds consideration of this question, because if it turns out the Chairperson lacks the power asserted, then Plaintiffs' applications will have been assessed according to unlawful criteria.

In summary, the Final Notice is reviewable, and Plaintiffs' APA claims are ripe.  The Court therefore considers the merits of Plaintiffs' APA claims.

## 2. In Excess of Statutory Authority

The Court finds that the Final Notice violates the APA because

32

the NEA's authorizing statute does not empower the Chairperson to categorically disfavor applications for promoting certain views. See 5 U.S.C. § 706(2)(C). The "command of the APA" is "that 'the reviewing court' — not the agency whose action it reviews — is to 'decide all relevant questions of law' and 'interpret . . . statutory provisions.'" Loper Bright Enters. v. Raimondo, 603 U.S. 369, 398 (2024) (omission in original) (quoting 5 U.S.C. § 706). Therefore, "in deciding whether an agency has acted within its statutory authority," courts "must exercise their independent judgment" and, in doing so, provide no deference to the agency's interpretation. Id. at 392, 412. Here, the relevant question is whether the Final Notice is inconsistent with the NEA's authorizing statute, the NFAHA.

In attempting to reconcile the Final Notice with the NFAHA, the Court can only conclude that "the NEA [has tried] to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints." Finley, 524 U.S. at 587. According to the Final Notice, the Chairperson will conduct a "case-by-case review . . . of grant applications for artistic excellence and merit, including whether the proposed project promotes gender ideology." AR 208. This independent assessment will occur during the final stage of the application process — after the advisory panels have determined whether certain

33

applications "have artistic excellence and artistic merit," and after the Council has "ma[d]e recommendations to the Chairperson concerning . . . whether to approve" those applications. 20 U.S.C. § 955(f), (f)(1); see AR 210-12. During these earlier stages, neither the advisory panels nor the Council will consider whether proposed projects promote gender ideology; only the Chairperson will do that. See Defs.' Mot. 33; AR 207-09, 212-14. If the Chairperson concludes that a proposed project promotes gender ideology, the effect can only be negative. See supra Part III.A.2.

As to what empowers the Chairperson to categorically disfavor projects that promote certain viewpoints, Defendants offer two theories. First, the Final Notice posits that the Chairperson has statutory authority to make an independent assessment of artistic excellence and artistic merit, and that whether a project promotes gender ideology is relevant to that assessment. See AR 210-11. Second, Defendants contend that the NFAHA empowers the Chairperson to consider whether a project aligns with "general standards of decency and respect for the diverse beliefs and values of the American public," with the implication being that a project that promotes gender ideology does not. Defs.' Mot. 35-36 (discussing 20 U.S.C. § 954(d)(1)).

Both theories conflict with the NFAHA. To be sure, the NFAHA affords the Chairperson some discretion over whether to approve

applications that have made it past the first two rounds of review. When exercising that discretion, the Chairperson will be assessing content. See Finley, 524 U.S. at 585-86. Even so, neither the statute's instruction to employ the "subjective criteria" of excellence and merit nor its "vague exhortation" to consider decency and respect for diverse beliefs — i.e., viewpoint diversity — empowers the Chairperson to adopt an explicit policy of viewpoint discrimination. See id. at 583-84, 587.

Although the Chairperson has final approval authority over whether the NEA should fund certain projects, the NFAHA vests most of the substantive power to review those projects in the advisory panels and the Council. And the statute constrains the discretion of those entities as well. The Chairperson must "utilize advisory panels," which are required to recommend applications "solely on the basis of artistic excellence and artistic merit." 20 U.S.C. § 959(c). Those recommendations go to the Council, which in turn "make[s] recommendations to the Chairperson concerning" whether to approve those application and how much funding to provide for each. Id. § 955(f)(1)-(2). The Council cannot recommend applications to the Chairperson that have not been determined by the panels to have artistic excellence and artistic merit. Id. § 955(f)(1). And the Chairperson "may not approve an application with respect to which the Council makes a negative recommendation." Id.

35

§ 955(f)(2). Therefore, the panels' discretion constrains the Council's discretion, which in turn constrains the Chairperson's.[9]

This multistep review process reflects the NFAHA's stated purpose of "encouraging freedom of thought," id. § 951(7), as well as a broader effort to minimize the influence of politics over the NEA's funding decisions. See supra Part I.A (discussing NFAHA's legislative history). Other features of the statute speak to those intentions as well. The Chairperson is directed to "ensure that all advisory panels are composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view." 20 U.S.C. § 959(c)(1). Furthermore, the panels must include "lay individuals who are knowledgeable about the arts but who are not engaged in the arts as a profession and do not belong to arts organizations or artists' organizations. Id. § 959(c)(2). Panel members are appointed by the Chairperson. Id. § 959(c)(6).

As for the Council, its eighteen voting members must be "private citizens" who are widely recognized for their involvement in the arts and include "practicing artists, civic cultural

---

[9] The statute contains one exception not relevant here, which allows the Council to delegate its authority to the Chairperson for certain applications and with significant limitations. See 20 U.S.C. § 955(f).

36

leaders, members of the museum profession, and others who are professionally engaged in the arts." Id. § 955(b)(1)(C). Although appointed by the President, the Council's voting members serve staggered, six-year terms and cannot be reappointed for two years after their terms expire. Id. § 955(c). The NFAHA instructs the President to "give due regard" to different types of diversity in making the appointments. Id. § 955(b)(1)(C).

In contrast, the Chairperson has no statutorily prescribed qualifications and serves a four-year term. Id. § 954(b). This lopsidedness in the statutory scheme confirms that the NFAHA is designed to shield the NEA's review process from politics. For one, unlike the final stage of review, which is entrusted to a single person, the first two stages of review are entrusted to multimember deliberative bodies that represent cross sections of the American public. Furthermore, unlike the decision to give the Chairperson a four-year term, the fact that Congress gave the Council's voting members a staggered, six-year term with a two-year bar on reappointment suggests that it meant for them to be insulated from political influence. See Beck v. Tex. Bd. of Dental Exam'rs, 204 F.3d 629, 636 (5th Cir. 2000). And as noted above, when it comes to experience or expertise in the arts, the NFAHA contemplates a marked asymmetry between the Council and advisory panels on one side and the Chairperson on the other. This in turn

37

suggests that the Chairperson's role in the application review process is designed to be more formal than substantive.

Given these considerations, the Court finds it impossible to square the Final Notice with the NEA's authorizing statute. Although the NFAHA gives the Chairperson the final word over whether to approve applications for NEA grants, the Chairperson cannot use that power to downgrade applications simply because they promote disfavored views. The Court therefore finds that the Final Notice violates the APA because it exceeds the Chairperson's statutory authority under the NFAHA.

### 3. Arbitrary and Capricious

The Final Notice also violates the APA because it is arbitrary and capricious. See 5 U.S.C. § 706(2)(A). In determining whether final agency action is arbitrary and capricious under the APA, a reviewing court must consider "whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" Dep't of Com., 588 U.S. at 773 (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)). The scope of review is narrow, and a court "may not substitute [its] judgment for that of the [agency]." Id. That said, final agency action may be arbitrary and capricious "if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

The NEA's only explanation for its decision to categorically disfavor applications that promote gender ideology is that it will "serve the public by . . . furthering the current administration's priorities as provided in the [EO]," AR 214, which states that "[f]ederal funds shall not be used to promote gender ideology." EO § 3(g), 90 Fed. Reg. at 8616.  The administrative record — which consists of the NFAHA, "a smattering of cases," the EO, the NEA's grant application guidelines, and the Final Notice — is devoid of reasoned policy analysis and is devoted instead to defending the NEA's decision on legal grounds.  Pls.' Mem. 22; see generally AR. There is no examination of relevant data, there are no findings of fact, and there is zero explanation of what it means for a project to "promote gender ideology," let alone how that concept relates to artistic merit, artistic excellence, general standards of decency, or respect for the diverse beliefs and values of the American public.  In short, the NEA has made no effort to justify its policy on any grounds aside from complying with the EO.

Defendants' basic argument is that the NEA is accountable to the public and the President executes the public's will; therefore, the Final Notice cannot be arbitrary and capricious because it "reflects a policy directive that the President issued." Defs.' Mot. 37. To be sure, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." Dep't of Com., 588 U.S. at 781. But a "decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order." Louisiana v. Biden, 543 F. Supp. 3d 388, 414 (W.D. La. 2021), vacated and remanded on other grounds, 45 F.4th 841 (5th Cir. 2022). Because the NEA has failed to explain its action outside of complying with the EO, the Court concludes that the Final Notice is arbitrary and capricious in violation of the APA.

### 4. Contrary to Constitutional Right

Finally, for the reasons discussed in Part III.A, the Final Notice is unlawful under the APA because it violates Plaintiffs' constitutional rights to free speech.

### C. Fifth Amendment Claim

The Court finds that Defendants are entitled to summary judgment on Plaintiffs' Fifth Amendment claim. The Fifth Amendment to the U.S. Constitution prohibits deprivations of "life, liberty,

or property, without due process of law." U.S. Const. amend. V. Under the void-for-vagueness doctrine, a law may violate the Fifth Amendment if it (1) does not "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or (2) "may authorize and even encourage arbitrary and discriminatory enforcement." City of Chicago v. Morales, 527 U.S. 41, 56 (1999).

"The degree of vagueness that the Constitution tolerates — as well as the relative importance of fair notice and fair enforcement — depends in part on the nature of the enactment," including the subject matter involved and the penalties at stake. Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498-99 (1982). "In particular, the [Supreme] Court has 'expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.'" Sessions v. Dimaya, 584 U.S. 148, 156 (2018) (quoting Hoffman Ests., 455 U.S. at 498-99). But "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." Hoffman Ests., 455 U.S. at 499.

Plaintiffs contend that the Final Notice is void for vagueness

on both notice and enforcement grounds.  Regarding notice, they argue that the NEA's failure to explain what it means to "promote gender ideology" has left Plaintiffs uncertain of what exactly the Chairperson intends to disfavor.  Pls.' Mem. 25-27.  As a result, Plaintiffs have submitted applications that "steer 'far clear' of anything that might be deemed to [promote gender ideology]."  Id. at 27 (quoting Finley, 524 U.S. at 588).  Regarding enforcement, Plaintiffs argue that the Final Notice "significantly broadens the discretion of one person, the NEA Chair, exacerbating the potential for arbitrary or discriminatory enforcement."  Pls.' Reply 26; see Pls.' Mem. 29.

Notwithstanding the substantive merits of Plaintiffs' notice argument, the Court finds it unavailing because the NEA adopted the Final Notice after Plaintiffs had already submitted their grant applications.  See supra Part I.B.3-4.  Plaintiffs' enforcement argument also fails because the Final Notice does not broaden the Chairperson's discretion; rather, it specifies how the Chairperson intends to use that discretion.  To be sure, this use of discretion violates the First Amendment and the APA for the reasons discussed above, see supra Part III.A-B, and the Final Notice promises both arbitrary and discriminatory enforcement.  But that does not make the Final Notice unconstitutionally vague.  Defendants are thus entitled to summary judgment on Plaintiffs' Fifth Amendment claim.

**D. Remedy**

The Court declares that the Final Notice is unconstitutional and unlawful; vacates and sets aside the Final Notice, 5 U.S.C. § 706(2); and instructs Plaintiffs to submit an application for fees and other expenses, 28 U.S.C. § 2412(d).

In addition to vacatur of the Final Notice, Plaintiffs seek permanent injunctive relief. Am. Compl. 36-37. The Supreme Court has recently cautioned federal courts to ensure that "injunctions are [no] broader than necessary to provide complete relief to each plaintiff with standing to sue." Trump v. CASA, Inc., 606 U.S. 831, 861 (2025). The Court finds that here, complete relief requires at least that Defendants be permanently enjoined from (1) applying to Plaintiffs — including members of TCG — a viewpoint-based standard of review that disfavors applications deemed "to promote gender ideology," and (2) requiring Plaintiffs — including members of TCG — to comply with the EO when using NEA funds.[10]

_____

[10] The parties dispute whether the NEA has reinstated the "certification requirement" in its "Assurance of Compliance." See Pls.' Opp'n Defs.' Cross-Mot. & Reply Supp. Mot. Summ. J. (Pls.' Reply") 17 n.15; Defs.' Reply 2-3; see also Mem. & Order 17-20. In any event, it follows that if Defendants are enjoined from disfavoring applications for federal funds that "promote gender ideology," they should be enjoined from requiring applicants to comply with an executive order stating that "[f]ederal funds shall not be used to promote gender ideology" should they receive those funds. See Exec. Order No. 14168, § 3(g), 90 Fed. Reg. 8615, 8615-16 (Jan. 30, 2025).

Accordingly, the Court orders (1) and (2).  If Plaintiffs believe the injunction as stated falls short of complete relief, the Court instructs them to provide briefing on this issue within fourteen (14) days of the date of this order; Defendants will have seven (7) days to respond; and Plaintiffs will have seven (7) days to reply.

Plaintiffs are entitled to injunctive relief because they have shown "actual success on the merits" of their First Amendment claim, irreparable harm would occur absent such relief, and "the public interest would not be adversely affected by an injunction." Doe v. R.I. Interscholastic League, 137 F.4th 34, 40 (1st Cir. 2025); see Nken v. Holder, 556 U.S. 418, 435 (2009) (noting the third and fourth injunction factors "merge when the Government is the opposing party"); Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). As for the public interest factor, the Court denied Plaintiffs' earlier request for preliminary injunctive relief largely because an injunction at that time would have impeded the NEA's then-pending administrative review process. See Mem. & Order 42-44. Because that process has since concluded, this consideration no longer applies. And the public interest is not on the government's side when it uses a program designed to promote free expression to

squash it instead.

Finally, the scope of the injunction does not affect the broad scope of vacatur under 5 U.S.C. § 706(2). See CASA, 806 U.S. at 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the [APA] authorizes federal courts to vacate federal agency action.").

## IV. CONCLUSION

For the reasons above, Plaintiffs' Motion for Summary Judgment, Dkt. No. 22, is GRANTED IN PART and DENIED IN PART; and Defendants' Cross-Motion for Summary Judgment, Dkt. No. 24, is DENIED IN PART and GRANTED IN PART.


IT IS SO ORDERED.


_____
William E. Smith
Senior District Judge
Date: September 19, 2025